## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- :
                                                         :
PRCM ADVISERS LLC,                                       :
                                                         :
                              Plaintiff,                 :    Civil Case No.: _____
                                                         :
             - v. -                                      :    JURY TRIAL DEMANDED
                                                         :
TWO HARBORS INVESTMENT CORP.                             :
                                                         :
                              Defendant.                 :
------------------------------------------------------- :
```

## COMPLAINT

Plaintiff PRCM Advisers LLC ("Pine River"), by and through its undersigned

counsel, hereby brings this action against Defendant Two Harbors Investment Corp.

("Two Harbors") seeking injunctive relief and/or monetary damages.[1]

## INTRODUCTION

1.       This case arises out of Two Harbors' breach of the parties' management

agreement (the "Management Agreement") and Two Harbors' intent and threat to continue to

use, without authorization or license, Pine River's intellectual property after the termination of

the Management Agreement.

2.       Two Harbors fabricated a claim that Pine River's compensation through 2019 was

---

[1] On June 17, 2020, Pine River filed a lawsuit in New York state court against Two Harbors asserting claims for *inter alia* breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair competition. After filing its lawsuit, Two Harbors made clear to Pine River that Two Harbors intends to misappropriate Pine River's intellectual property in violation of federal law. Accordingly, on July 21, 2020, Pine River voluntarily dismissed its state court lawsuit and filed this lawsuit for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and other causes of action.

"unfair" as a pretext for terminating the Management Agreement, so that it can force through a "management internalization" transaction without paying Pine River at least the fair value of the Management Agreement – which Pine River would have received in a mutual, negotiated termination of the Management Agreement.  After Pine River filed a lawsuit in New York state court against Two Harbors for breach of contract based on Two Harbors' improper termination of the Management Agreement, Two Harbors retaliated against Pine River and purported to terminate the Management Agreement "for cause" (even though Two Harbors had terminated the Management Agreement months earlier based on a claim that Pine River's compensation is "unfair").  Two Harbors has no valid basis for terminating the Management Agreement "for cause."  Two Harbors purported to terminate the Management Agreement "for cause" to avoid paying Pine River even the termination fee that Two Harbors previously recognized it owed to Pine River for terminating the Management Agreement based on a claim of "unfair compensation."[2]  Moreover, Two Harbors intends to improperly use Pine River's employees and misappropriate Pine River's valuable trade secrets and other intellectual property to accomplish its plan of internalization in clear violation of Two Harbors' contractual, statutory and common law obligations.

3.      The Management Agreement has been in effect since October 28, 2009, with subsequent amendments.  It assigns Pine River responsibility for managing all Two Harbors operations, and it assigns to Pine River all intellectual property created or developed in

---

[2] The Management Agreement provides that in the event that Two Harbors terminates Pine River for "unfair" compensation, which is what Two Harbors has improperly done here, Two Harbors is required to pay Pine River a "termination fee" equal to "three times the sum of the average annual Base Management Fee earned by [Pine River] during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination."  This termination fee is significantly lower than the fair value of the Management Agreement – which is at least the amount Pine River would be entitled to receive in a mutual, negotiated termination of the Management Agreement.  The Management Agreement does not provide for the payment of a termination fee in the event of a termination "for cause."

connection with the Management Agreement.  Two Harbors, which was formed in 2009, is a publicly-traded real estate investment trust ("REIT") focused on investing in residential mortgages and related assets (a "residential mortgage REIT").  Two Harbors has a Board of Directors but has no employees of its own.  Rather, Two Harbors is, and has always been since its inception over ten years ago, entirely dependent on Pine River and Pine River's employees and intellectual property, including trade secrets and know-how, to operate and manage its REIT pursuant to the Management Agreement.  This type of "externally-managed" structure is used by many residential mortgage REITs.[3]

4.      In a letter dated March 20, 2020, Two Harbors abruptly terminated the Management Agreement, claiming that Pine River's compensation is "unfair," without providing any details or supporting materials.  Two Harbors justified this determination in a letter dated April 10, 2020 with assertions based on Pine River's 2019 compensation.

5.      Two Harbors' assertions that Pine River's 2019 compensation was unfair are bogus.  Pine River's 2019 compensation (as well as its compensation in other years) was demonstrably fair:

    a.  First, the terms of Pine River's compensation in 2019 and earlier years compare favorably to those of other external managers to residential mortgage REITs. Pine River receives a base management fee equal to 1.5% per annum of Two Harbors' "stockholders' equity," as defined by the Management Agreement, which is consistent with the base management fee rate charged by most other

---

[3] Pine River was formed to manage Two Harbors.  Pine River is a subsidiary of Pine River Capital Management, L.P. ("Pine River Capital").  Pursuant to a Shared Facilities and Services Agreement executed on October 28, 2009 between Pine River and Pine River Capital, Pine River relies on the personnel and other resources of Pine River Capital and its subsidiaries to manage Two Harbors.  For simplicity, those shared personnel and resources are collectively referred to in this Complaint as Pine River's employees and resources.

external managers to residential mortgage REITs.  But unlike several of those managers, Pine River does not receive any incentive compensation.

b. Second, Pine River's 2019 compensation compares *very* favorably to other external managers to residential mortgage REITs when compared on an apples-to-apples basis; for example, by expressing manager compensation paid as a percentage of unadjusted stockholders' equity calculated in accordance with Generally Accepted Accounting Principles ("GAAP").  On this apples-to-apples basis, Pine River's 2019 compensation of 1.26% was lower than that of the vast majority of other external managers to residential mortgage REITs.

c. Third, Pine River's 2019 compensation compares even more favorably to other external managers to residential mortgage REITs when considered relative to performance.  In the residential mortgage REIT industry, it is customary to evaluate performance based on economic return, which reflects the economic value generated per share of common stock, net of manager compensation and all other expenses.  Two Harbors itself has emphasized to investors that economic return is the most appropriate financial metric to evaluate Two Harbors' financial performance.  Two Harbors' 2019 economic return (which is net of Pine River's compensation) exceeded that of all other externally-managed residential mortgage REITs.  As Two Harbors touts on its website and in its 2020 proxy statement, under Pine River's management Two Harbors has had "[s]ubstantial total stockholder return outperformance . . . relative to peers" and "a total stockholder return of 256%, outperforming the Bloomberg REIT Mortgage Index by 77%."

6.     In truth, Two Harbors' claim that Pine River's compensation is "unfair" is merely

a pretext for Two Harbors to effect an internalization on the cheap.  Two Harbors has been

planning for some time to internalize its management functions using Pine River's employees,

investment strategies, intellectual property, including trade secrets and know-how, and

commercial advantages.





7.      Two Harbors has essentially admitted that its motive for seeking an internalization and terminating the Management Agreement has nothing to do with the fairness of Pine River's compensation.  In its April 13, 2020 press release announcing termination of the Management Agreement (and again in subsequent investor presentations), Two Harbors highlighted that "the non-renewal of the Management Agreement" will result in a transition to "self-management" and that a transition to self-management "will result in material benefits to [Two Harbors'] stockholders."  Two Harbors even listed these benefits, which have nothing to do with the fairness of Pine River's compensation, such as attracting new investors who prefer internal management and to "strengthen the alignment of interests" with Two Harbors' "management team" – all of whom are Pine River's employees.

8.      Of course, there is nothing improper with Two Harbors' desire to internalize management, in and of itself.  It is not uncommon for externally-managed REITs to internalize their management functions via negotiated, mutually-agreed transactions with their external managers.  There exist various examples of such transactions.  Under such transactions, the REIT pays the manager a negotiated, mutually-agreed amount – based on at least the fair value of the management agreement – in exchange for the manager's agreement to terminate the parties' management agreement and transition the manager's employees, investment strategies, intellectual property, including trade secrets and know-how, and commercial advantages to the REIT.

9.      But Two Harbors never approached Pine River to negotiate a termination of the Management Agreement ███████████████████████████████████ ████

10.     Instead, Two Harbors fabricated a claim of "unfair" compensation as a pretext for unilaterally terminating the Management Agreement in order to effect an internalization on the cheap.

11.     Two Harbors fabricated this claim because internalization requires termination of the parties' Management Agreement, and termination of the Management Agreement can only occur in two cases: (i) if the parties mutually agree to terminate the Management Agreement, or (ii) if, pursuant to the Management Agreement, there exists one of a limited number of specifically-defined bases.  One such basis is if Pine River's compensation is "unfair."

12.     Through its fabrication, Two Harbors aims to shortchange Pine River on the amount it would be entitled to receive in a mutual, negotiated termination of the Management Agreement.  The amount by which Two Harbors is shortchanging Pine River will now be determined at trial and could well exceed the termination fee by $100 million.

13.     Two Harbors also intends to improperly use Pine River's employees and intellectual property, including trade secrets and know-how, to effect internalization.

   a.  Two Harbors has been planning to poach Pine River's employees in senior management positions at Two Harbors to leave Pine River and join Two Harbors. Indeed, Two Harbors emphasized this fact in its April 13, 2020 press release, stating that Two Harbors will become "self-managed" using Pine River's "strong and experienced senior management team along with the other personnel currently providing services to Two Harbors, to whom [Two Harbors'] Board of

Directors intends to extend offers of employment."

b.  Pine River has developed and owns significant intellectual property which Two
Harbors uses in its day-to-day operations.  In its April 13, 2020 press release, Two
Harbors stated that it "anticipates a smooth and timely transition of all functions
necessary to operate the Company's business without interruption."  Two Harbors
further admitted in its 2019 10-K that "in the event of a termination of the
management agreement . . . it may be difficult or costly to replace certain
intellectual property, systems, facilities or other services that have been
historically provided by or contracted through Pine River that are necessary or
desirable to execute our business plan."  Unless Pine River consents to Two
Harbors' continued use of Pine River's intellectual property after the Management
Agreement terminates – and Pine River has unequivocally informed Two Harbors
that it does not so consent – Two Harbors would have no alternative but to
misappropriate Pine River's intellectual property, including trade secrets and
know-how, to internalize management "without interruption" to its business.  Two
Harbors has informed Pine River that it plans to do exactly that – misappropriate
Pine River's intellectual property in order to continue managing Two Harbors
after the Management Agreement terminates.

c.  By letter dated June 23, 2020, Two Harbors claimed – in direct contradiction of
the terms of the Management Agreement – that any "intellectual property created
or developed by dedicated Two Harbors personnel for Two Harbors' use and at
Two Harbors' expense is the intellectual property of Two Harbors (not Pine
River) and belongs to Two Harbors (not Pine River)."  But Two Harbors has no

personnel.  As Two Harbors has correctly acknowledged in its own SEC filings, all of the individuals who manage Two Harbors are employees of Pine River. And the Management Agreement is crystal clear that all of the intellectual property Pine River has developed to manage Two Harbors belongs solely and exclusively to Pine River.

d.  For security reasons, to limit the number of individuals with access to material non-public information and confidential consumer information, and to safeguard Pine River's proprietary and confidential information, certain of the intellectual property Pine River developed to manage Two Harbors is stored on dedicated computers and servers in Two Harbors' offices or dedicated offsite space.  The Pine River employees who are involved in managing Two Harbors have access to those computers and servers.  Pine River requested by letter dated June 24, 2020 that Two Harbors discuss the transition of Pine River's intellectual property to Pine River after September 19, 2020 – the date Two Harbors unilaterally set at that time to terminate the Management Agreement.  However, Two Harbors has refused to transfer Pine River's intellectual property to Pine River after September 19.  Instead, by letter dated July 3, 2020, Two Harbors reiterated its position that the intellectual property belongs solely to Two Harbors and demanded that Pine River "retract and disavow its position" that the intellectual property belongs to Pine River, and not to Two Harbors.  Without any legal basis, Two Harbors' Board of Directors also directed Pine River not to communicate with the Pine River employees who are involved in managing Two Harbors "other than communications concerning the day-to-day operations of Two Harbors and to

direct any other communications only to the Board." Thus, Two Harbors has taken the incorrect legal position that Pine River has no right to talk to Pine River's own employees about the return of Pine River's intellectual property.

14.     Two Harbors' actions are in breach of the Management Agreement, seek to misappropriate or infringe Pine River's intellectual property, and thus have forced Pine River to bring suit. On June 17, 2020, Pine River brought suit in the Supreme Court of the State of New York alleging, among other claims, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair competition. In retaliation for Pine River's lawsuit, which seeks to enforce Pine River's contractual rights under the Management Agreement, and in order to try to avoid paying Pine River even the termination fee that Two Harbors previously acknowledged it owes Pine River,[4] Two Harbors sent Pine River a letter dated July 15, 2020 purporting to terminate the Management Agreement a second time – this time "for cause." Based largely on alleged facts that predate the first termination of the Management Agreement, Two Harbors now claims that the Management Agreement will terminate effective August 14, 2020.

15.     There is no valid basis to terminate Pine River "for cause." Two Harbors simply manufactured reasons for terminating Pine River for cause as another excuse to internalize management functions, and this second termination is intended to avoid paying Pine River even a termination fee. To justify terminating Pine River for cause, Two Harbors points to events that occurred years ago, which events Two Harbors was aware of before it terminated the Management Agreement the first time based on its fabricated claim that Pine River's

---

[4] In a press released dated April 13, 2020, Two Harbors stated: "Under the terms of the Management Agreement, Two Harbors will pay a one-time cash termination fee to the Manager on September 19, 2020, calculated in accordance with the Management Agreement, equal to three times the sum of the average annual management fee earned by the Manager during the twenty-four month period ending June 30, 2020 (the most recent completed fiscal quarter prior to the termination date). The amount of the cash termination fee is estimated to be approximately $144 million."

compensation was "unfair."  Two Harbors also claims that it is justified in terminating Pine River for cause because Pine River took legal positions in this litigation with which Two Harbors disagrees.  Two Harbors' reasons for purporting to terminate the Management Agreement for cause are baseless and retaliatory.

16.     Two Harbors is attempting to deprive Pine River of the benefits to which Pine River is contractually entitled under the Management Agreement – namely, continued management of Two Harbors in exchange for payment of management fees.  Two Harbors initially fabricated a claim that Pine River's compensation through 2019 was "unfair" as a pretext for terminating the Management Agreement in order to force through a "management internalization" transaction without Pine River's consent.  Two Harbors then purported to terminate the Management Agreement a second time – this time "for cause."  Two Harbors aims to shortchange Pine River on the amount it would be entitled to receive in a mutual, negotiated termination of the Management Agreement.  Moreover, Two Harbors now intends to misappropriate Pine River's employees and intellectual property, including trade secrets and know-how.

17.     Two Harbors' actions thus have forced Pine River to bring this action – concurrent with a voluntary dismissal of the state court lawsuit – in order to enforce the terms of the Management Agreement and to protect its intellectual property and trade secret rights under federal and New York state law.

## THE PARTIES

18.     Plaintiff PRCM Advisers LLC is a Delaware limited liability company with its principal place of business in Minnetonka, Minnesota.

19.     Defendant Two Harbors Investment Corp. is a Maryland corporation with its

corporate headquarters at 575 Lexington Avenue, Suite 2930 in New York, New York.

Shares of Two Harbors are publicly-traded on the New York Stock Exchange under the symbol

"TWO."  Two Harbors invests in residential mortgage-backed securities, mortgage servicing

rights and other financial assets.  At the end of 2019, Two Harbors had a market capitalization of

$4 billion and a $41 billion investment portfolio.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 and 18 U.S.C. § 1836(c).  The Court has supplemental jurisdiction over the New York state

law claims pursuant to 28 U.S.C. § 1367 because those claims are sufficiently related to the

federal claims as to form part of the same case or controversy.

21.     Personal jurisdiction and venue are proper over Defendant Two Harbors in

this District pursuant to 18 U.S.C. § 1965(a) and (b), 28 U.S.C. § 1391(b)(1) and (2), and

Federal Rule of Civil Procedure 4(k) because a substantial part of the events or omissions

giving rise to this action, and upon which the allegations in the Complaint are based,

occurred in this District and because Defendant Two Harbors is headquartered in this

District.

## FACTUAL BACKGROUND

**A.      Pine River Has Managed Two Harbors Pursuant to the Management
         Agreement Since 2009.**

22.     Defendant Two Harbors was formed in 2009 and is a publicly-traded residential

mortgage REIT focused on investing in residential mortgages and related assets.  REITs give

investors the opportunity to invest in income-producing real estate and related assets.  Since Two

Harbors' inception, Pine River has provided investment advisory and other management services

to Two Harbors pursuant to the Management Agreement into which the parties entered on

October 28, 2009.

23.     Pine River is responsible for administering the business activities and day-to-day operations of Two Harbors pursuant to the Management Agreement and a shared facilities and services agreement with Pine River's affiliated entities.  Two Harbors has a Board of Directors but has no employees of its own.  Rather, Two Harbors is, and has always been, entirely dependent on Pine River and Pine River's employees and intellectual property, including trade secrets and know-how, to operate and manage its REIT pursuant to the Management Agreement. This type of "externally-managed" structure is used by many residential mortgage REITs.

24.     As recently as in its 2019 10-K, released on February 26, 2020, Two Harbors has represented to its shareholders that pursuant to the terms of the Management Agreement:

> Pine River "provides [Two Harbors] with our management team, including our executive officers and support personnel.  In addition, [Pine River] provides us with a dedicated team of investment professionals and other support . . . Each of our executive officers is an employee or partner of an affiliate of Pine River; we do not have any employees.  We do not pay any of our executive officers cash compensation; rather, we pay PRCM Advisers a base management fee . . . We also reimburse [Pine River] for the allocable share of the compensation paid by Pine River to its personnel serving as our principal financial officer and general counsel and other reimbursable costs under the management agreement . . . ."

25.     The Management Agreement had an initial term from October 28, 2009 to October 28, 2012 and since then has been subject to automatic renewal annually, in perpetuity, unless it is terminated pursuant to certain limited bases enumerated in the Management Agreement.  The Management Agreement has automatically renewed for the last seven years and was set to automatically renew again for another one-year term at the end of its current term on October 28, 2020 unless terminated by Two Harbors for one of the limited bases specified in the Management Agreement.

**B.     Pursuant to the Management Agreement, Pine River Has Created and Developed Valuable Intellectual Property, Including Trade Secrets, Which It Has Licensed to Two Harbors Solely for the Duration of the Management Agreement.**

26.     Under the Management Agreement, Two Harbors agreed that "[a]ll Intellectual Property created or developed by [Pine River] in connection with [its] performance of [the Management Agreement] or otherwise and the ***Intellectual Property Rights associated therewith shall be the sole and exclusive property of the Manager*** [(*i.e.*, Pine River)]. [Two Harbors] shall assign and do[es] hereby assign to [Pine River] all Intellectual Property Rights in such Intellectual Property." (Emphasis added).  Two Harbors further agreed that it will take all necessary steps to "enforce [Pine River's] rights in and to the Intellectual Property."

27.     Pine River agreed, solely for the term of the Management Agreement, to grant Two Harbors "a non-exclusive, worldwide, fully paid up, royalty-free, non-sub-licensable, non-transferable license and right to use the Intellectual Property created or developed by [Pine River] in connection with [Pine River's] performance of this Agreement for [Two Harbors'] business purposes."

28.     In connection with the management of Two Harbors' operations, Pine River has developed and is the owner of valuable intellectual property, including trade secrets and know-how.  For security reasons, to limit the number of individuals with access to material non-public information and confidential consumer information, and to safeguard Pine River's proprietary and confidential information, certain of that intellectual property is stored on dedicated computers and servers in Two Harbors' offices or dedicated offsite space.

29.     The Management Agreement defines "Intellectual Property" as "all work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries,

improvements, trade secrets, and know-how or similar rights" but excludes trademark rights that include the name or logo of Two Harbors or its subsidiaries.  As examples, Pine River has developed:





30.     Pine River further has created and maintained confidential and proprietary

31.     In the hands of a competitor, Pine River's trade secrets would be of great value and could be unlawfully used to compete against Pine River.  A competitor possessing such confidential information could utilize it to its gain without incurring the significant effort that Pine River has expended.  As a result, this information has significant value resulting from Pine River's significant investment of time and resources.  The trade secrets identified above further have value for Pine River's other businesses.

32.     Pine River's trade secrets constitute compilations of information that derive independent economic value from not being generally known or available to the public or other

persons who could obtain value from their disclosure or use.

33.     This confidential and trade secret information is not readily available to Pine River's competitors or the general public.  Pine River has made, and continues to make, efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets and protect the confidentiality of its proprietary information.

34.     Pine River has also taken steps to ensure the confidentiality of its trade secrets. For example, Pine River protects all of its custom software with strict access control, integrated at the Windows System account level.  Pine River's custom code is stored in a version control system and access is restricted to developers only.  Access requires approval by the appropriate Pine River business line manager, and Pine River business line managers review all access permissions annually.

35.     Similarly, Pine River employees control access to all of its confidential documents (including its financial models and spreadsheets) in protected file systems, also integrated at the Windows System account level.  Pine River's business line managers approve all access to restricted directories, and review all access permissions annually.

36.     Pine River also secures its networks with a dedicated Information Security team, and follows industry best practices to prevent unauthorized entry into the network, or unauthorized exfiltration of company information.  Specifically, no persons or systems can send source code outside of Pine River's networks without review and approval by Pine River's compliance personnel and a knowledgeable information technology ("IT") manager.  Final packaging and dissemination of any source code is conducted by the Information Security team.  Pine River's IT personnel block USB ports on computers utilized by Pine River personnel to prevent unauthorized transfers of confidential information and all File Transfer Protocol

("FTP") sites are restricted to only known third parties. Further, Pine River personnel's email is monitored for exfiltration.

37.     Pine River has also taken steps to contractually protect the confidentiality of its trade secrets that Pine River's employees use to manage Two Harbors. For example, Pine River employees hired to work on operations related to the Management Agreement execute a "Confidentiality, Nonsolicitation, and Inventions Agreement" that requires those employees to safeguard and keep confidential Pine River's intellectual property. For example, certain of the confidentiality agreements provide:

> Employee is being employed in a position of trust and confidence and will have access to and become familiar with the confidential or proprietary methods, research, products, services, trade secrets and procedures used by [Pine River]. Employee understands that as a condition of employment . . . Employee must protect this information and these relationships and use them for Pine River's benefit only, not for Employee's own or another's benefit. Employee understands that this Agreement is intended to protect the business which Pine River has built and that if Employee breaches any part of this Agreement, it may irreparably harm Pine River's business and may cause damage that would be difficult or impossible to measure.

38.     Other versions of the Confidentiality, Nonsolicitation, and Inventions Agreement reflect that "Employee understands that the primary purpose of this Agreement is to protect Pine River's confidential information, trade secrets, and client and investor relationships, and that if Employee breaches any part of this Agreement, it would seriously harm Pine River's business and cause damage that would be difficult or impossible to measure."

39.     The "Confidential Information" protected by these confidentiality agreements is broad and includes:

> [A]ny trade secret or other information not generally known in Pine River's line of business or readily ascertainable by proper means by others, including: (i) information relating to computer

programs developed or being developed by Pine River, including source code, object code, development tools, flow charts, design statistics, specifications, techniques, evaluations, test results, and beta-test results; (ii) third party systems, software and any other information received by the third party in confidence by Pine River; (iii) records and other information relating to past, current and prospective investors in Pine River (including lists of such investors); (iv) records and other information relating to past, current and prospective clients of Pine River (including lists of such clients); (v) records and other information relating to past, current and prospective vendors of Pine River (including lists of such vendors); (vi) information concerning past, current or anticipated investments, trading positions or trading strategies and techniques of Pine River; (vii) marketing strategies; (viii) the financial statements, financial results and business condition of (A) any Pine River entity and (B) any entity whose debt, equity or other interests are held by any Pine River entity; (ix) information concerning employees, directors and officers of any Pine River entity, including their compensation; (x) all formulae, invention records, research records and reports, experimental and engineering data and reports, product and production specifications and designs, drawings, photos, models, production techniques, test data, processes, and methods related to the operation, investment strategies and products of Pine River, whether patentable or not; and (xi) any of the foregoing that belong to any other person or entity but to which Employee has access by reason of Employee's employment with Employer.

40. Pine River employees further agree that they "will not, during Employee's employment with Employer or at any time thereafter, divulge, furnish or make accessible to anyone or use in any way, on behalf of himself/herself or others, any Confidential Information, other than for the benefit of Pine River in the ordinary course of the business of Pine River or as required under compulsion of law."

**C.   Pine River's Management of Two Harbors Has Been Exemplary and Has Afforded Two Harbors Significant Benefits.**

41. Pine River's management of Two Harbors has afforded Two Harbors significant benefits.

   a.  Two Harbors recognizes these benefits on its public website, stating:

"[Two Harbors] benefit[s] from Pine River's disciplined and highly analytical investment approach and extensive long-term relationships."

\* \* \*

Pine River provides Two Harbors with a "[s]ophisticated and differentiated approach to risk management and hedging," which is a "differentiating factor" that "distinguishe[s] [Two Harbors] from [its] competitive cohort."

b.  Two Harbors has also repeatedly recognized these benefits in its public filings, for

example stating:

The "investment professionals provided to [Two Harbors] by [Pine River]" (or "Pine River's fixed income team") "[have] broad experience in managing [Two Harbors'] target assets" and "[have] demonstrated the ability to generate attractive risk-adjusted returns under different market conditions and cycles." (Two Harbors' 10-K filings for each of 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, and 2018).

\* \* \*

"Through [Two Harbors'] relationship with [Pine River], [Two Harbors] benefit[s] from Pine River's disciplined and highly analytical investment approach and extensive long-term relationships in the financial community." (Two Harbors' 2018 10-K, filed on February 27, 2019).

\* \* \*

"Pine River maintains extensive long-term relationships with financial intermediaries, including prime brokers, investment banks, broker-dealers and asset custodians. [Two Harbors] believe[s] these relationships enhance [Two Harbors'] ability to source, finance, protect and hedge [Two Harbors'] investments and, thus, enable [Two Harbors] to succeed in various credit and interest rate environments." (Two Harbors' 2018 10-K, filed on February 27, 2019).

\* \* \*

"[Two Harbors] also benefit[s] from Pine River's risk management, accounting, operations, legal, compliance and information technology teams." (Two Harbors' 2018 10-K, filed on February 27, 2019).

42.  Under Pine River's management, Two Harbors has outperformed its peers.

    a.  Two Harbors touts this outperformance on its public website, stating:

> Two Harbors has had "[s]ubstantial total stockholder return outperformance since [its] inception relative to peers."

> \*   \*   \*

> "As of December 31, 2019 [Two Harbors] had grown [its] book value by 10.4% since [its] inception in 2009, compared to the peer average of (28.3%)."

    b.  Two Harbors has also repeatedly touted this outperformance in its public filings, for example stating:

> "Since inception, [Two Harbors] ha[s] generated a total stockholder return of 256%, outperforming the Bloomberg REIT Mortgage Index by 77%." (Two Harbors' 2020 proxy statement, filed on April 3, 2020).

    c.  Two Harbors has further touted this outperformance in recent investor presentations, for example stating:

> Two Harbors enjoyed "2019 Total Return Outperformance" as a result of "strong book value appreciation." (Two Harbors' investor presentation released March 13, 2020).

43.  Two Harbors' March 13, 2020 investor presentation is correct: Two Harbors' 2019 economic return (or "total return," as referred to in Two Harbors' investor presentation), which is net of Pine River's compensation and all other expenses, exceeded that of *all* other externally-managed residential mortgage REITs.

44.  Because Two Harbors has no employees of its own – and has always depended on Pine River and Pine River's employees to operate and manage its REIT – Two Harbors' outperformance is attributable directly and solely to Pine River.

**D.      Two Harbors Has Been Planning to Internalize Management for Some Time.**

45.      ███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

46.      In spite of this conclusion, Two Harbors took steps in 2019 to internalize its

management functions using Pine River's employees, investment strategies, intellectual property

(including trade secrets and know-how) and commercial advantages.

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

[REDACTED]

47.     In hindsight, it is now apparent that Two Harbors has been using Pine River's IT professionals to develop separate IT systems for Two Harbors, so that Two Harbors can misappropriate Pine River's intellectual property as part of its decision to internalize management functions.

[REDACTED]

48. 

49.

50.

51.

52.     Two Harbors made changes to the language of its 2019 10-K compared to the

language of its 2018 10-K, and these changes further reflect Two Harbors' internalization plans.

        a.  Two Harbors' 2018 10-K repeatedly referred to Pine River when describing the

investment professionals who managed Two Harbors, stating:

> The dedicated team of investment professionals provided to us by [Pine River] has broad experience in managing our target assets and has demonstrated the ability to generate attractive risk-adjusted returns under different market conditions and cycles.  *Pine River maintains* extensive long-term relationships with financial intermediaries, including prime brokers, investment banks, broker-dealers and asset custodians . . . We also benefit from *Pine River's* risk management, accounting, operations, legal, compliance and information technology teams.

(Emphasis added).

b.  Two Harbors revised its 2019 10-K to strip out reference to Pine River when describing the "team of investment professionals" who manage Two Harbors, and instead changed "Pine River" to "our" team or used the word "we" to reflect Two Harbors' move toward an internalization:

> *Our* dedicated team of investment professionals has broad experience in managing our target assets and has demonstrated the ability to generate attractive risk-adjusted returns under different market conditions and cycles. *We* have extensive long-term relationships with financial intermediaries, including prime brokers, investment banks, broker-dealers and asset custodians . . . We also benefit from *our* dedicated risk management, accounting, operations, legal, compliance and information technology teams.

(Emphasis added)

c.  This change in disclosure shows that Two Harbors already was preparing to internalize by early 2020 when Two Harbors filed its 2019 10-K – well before Two Harbors communicated its purported conclusion that Pine River's compensation is "unfair."

E.     **Two Harbors Terminated the Management Agreement On A Fabricated Basis of "Unfair" Compensation.**

53.     By March 2020, Two Harbors was ready to internalize Two Harbors' management.

54.     It is not uncommon for externally-managed REITs to internalize their management functions via negotiated, mutually-agreed transactions with their external managers. There exist various examples of such transactions.  Under such transactions, the REIT pays the manager a negotiated, mutually-agreed amount – based on at least the fair value of the management agreement – in exchange for the manager's agreement to terminate the parties' management agreement and transition the manager's employees, investment strategies, intellectual property (including trade secrets and know-how) and commercial advantages to the REIT.

55.     But Two Harbors never approached Pine River to negotiate a termination of the Management Agreement ███████████████████████████████████ ███

56.     Instead, Two Harbors fabricated a claim of "unfair" compensation.  Two Harbors fabricated this claim because internalization requires termination of the parties' Management Agreement, and termination of the Management Agreement can only occur in two cases: (i) if the parties mutually agree to terminate the Management Agreement, *or* (ii) if, pursuant to the Management Agreement, there exists one of a limited number of specifically-defined bases.  One such basis is if Pine River's compensation is "unfair."  Under Section 13(a) of the Management Agreement, automatic renewal of the Management Agreement will not occur after the initial term if:

> at least two-thirds of all of the Independent Directors or the holders

of a majority of the outstanding shares of common stock . . . agree that . . . the compensation payable to [Pine River] hereunder is unfair.

57.     So, rather than negotiate a termination of the Management Agreement with Pine River, Two Harbors decided, through its fabrication of a claim of "unfair" compensation, to bypass the need for Pine River's consent in an attempt to shortchange Pine River on the amount it would be entitled to receive under a mutually-agreed termination of the Management Agreement.[5]

58.     By letter dated March 20, 2020, Two Harbors notified Pine River that at least two-thirds of the Independent Directors of Two Harbors' Board of Directors agreed that Pine River's compensation through 2019 was purportedly "unfair" and that, on that basis, Two Harbors was unilaterally terminating the Management Agreement effective September 19, 2020. Two Harbors provided no explanation in this letter for its claim that Pine River's 2019 compensation was "unfair;" and prior to March 2020, no member of Two Harbors' Board of Directors had ever told Pine River that Pine River's compensation under the Management Agreement was "unfair."

59.     By letter dated March 26, 2020, Pine River notified Two Harbors that Pine River had no intention to renegotiate its compensation arrangement given the fact that its compensation is more than fair – and Pine River's realization that Two Harbors' goal was to internalize management functions, and not to objectively assess or renegotiate Pine River's compensation.

---

[5] The Management Agreement provides that in the event that Two Harbors terminates Pine River on a basis of "unfair" compensation, which is what Two Harbors has improperly done here, Two Harbors is required to pay Pine River a "termination fee," equal to "three times the sum of the average annual Base Management Fee earned by [Pine River] during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination."  This termination fee is significantly lower than the fair value of the Management Agreement—which is at least the amount Pine River would be entitled to receive in a mutual, negotiated termination of the Management Agreement.

60.     By letter dated Friday, April 10, 2020, delivered late in the evening before the Easter holiday weekend, Two Harbors provided, for the first time, three purported justifications for its claim that Pine River's compensation is "unfair," without any supporting detail, data or calculations.  As discussed below, Two Harbors' justifications are bogus and completely without merit.

61.     Then on the morning of Monday, April 13, 2020, before markets opened – without affording Pine River even a single business day to respond to Two Harbors' bogus justifications – Two Harbors announced in a public press release that it was unilaterally terminating the Management Agreement, effective September 19, 2020.  Two Harbors issued this press release without any advance notice to Pine River.

**F.     By Any Objective Measure, Pine River's Compensation is Fair.**

62.     There is no valid basis for Two Harbors' assertion that Pine River's compensation is "unfair."  By any objective measure, Pine River's compensation is fair.

63.     In its April 10 letter to Pine River, Two Harbors provided three bogus reasons why Pine River's compensation is purportedly "unfair."  Each reason is based on 2019 and plainly incorrect or specious.

64.     Two Harbors' first claim in its April 10 letter was that "[t]he total compensation paid by [Two Harbors] to [Pine River] for the twelve months ended December 31, 2019, as a percentage of book value was significantly above the average paid by other mortgage REITs of similar scale to their external managers."

65.     That assertion is demonstrably false for the following reasons:

        a.  Pine River's 2019 compensation compares favorably to that of other external

            managers to residential mortgage REITs.  Pine River receives a base management

fee equal to 1.5% per annum of Two Harbors' "stockholders' equity," as defined by the Management Agreement, which is consistent with the base management fee rate charged by most other external managers to residential mortgage REITs. But unlike several of those managers, Pine River does not receive any incentive compensation.

b. Pine River's 2019 compensation compares *very* favorably when Pine River's compensation is compared on an apples-to-apples basis; for example, by expressing manager compensation paid as a percentage of unadjusted stockholders' equity calculated solely in accordance with GAAP. This normalization is particularly crucial when comparing manager compensation, because REITs' management agreements' definitions of "stockholders' equity" (the capital base upon which management fees are charged) often differ materially. On this apples-to-apples basis (manager compensation divided by average GAAP stockholders' equity), Pine River's 2019 compensation of 1.26% was lower than that of *eleven out of thirteen* other external managers to residential mortgage REITs.

c. Only two externally-managed residential mortgage REITs are larger than Two Harbors, and one of those REITs paid its manager approximately *double* the compensation, as a percentage of average GAAP stockholders' equity, as did Two Harbors in 2019, even though that REIT generated a lower economic return than Two Harbors in 2019. Moreover, Two Harbors has significant investments in mortgage servicing rights, which differentiates it from many residential mortgage REITs. Pine River's 2019 compensation as a percent of GAAP stockholders'

equity was lower than that of *all* peers with significant investments in mortgage servicing rights.

d. Pine River's 2019 compensation compares *even more* favorably when Pine River's compensation is considered relative to its performance.  In the residential mortgage REIT industry, it is customary to evaluate performance based on economic return, which reflects the economic value generated per share of common stock, net of manager compensation and all other expenses.  Two Harbors itself has emphasized to investors that economic return is the most appropriate financial metric to evaluate Two Harbors' financial performance.  Two Harbors' 2019 economic return (which is net of Pine River's compensation) exceeded that of *all* other externally-managed residential mortgage REITs.

66.    Two Harbors' second claim in its April 10, 2020 letter was that Pine River "had the highest amount of expense reimbursements in the residential mortgage REIT sector during [2019] due in part to high fixed costs and limited shared services across the Manager's businesses."

67.    That assertion is specious for the following reasons:

a. Expense reimbursements have nothing to do with the fairness of Pine River's compensation.  Two Harbors will need to pay these reimbursable expenses, substantially in their entirety, even if it internalizes management functions. Indeed, the Management Agreement does not treat expense reimbursements as "compensation" (for example, they are not addressed in the "Compensation" section of the Management Agreement), and accordingly they may not be taken into account in determining whether Pine River's compensation is "unfair" for

purposes of a non-renewal for unfair compensation under Section 13(a) of the

Management Agreement.

b. If non-manager compensation expenses even were relevant (which they are not)

in determining whether Pine River's compensation is "unfair," comparing

expense reimbursements would still be meaningless because, among other

reasons, the magnitude of reimbursements depends on whether the REIT pays for

expenses directly versus through its manager.  This varies across REITs.  A more

meaningful way to compare non-manager compensation expenses, if they even

were relevant (which they are not), would be to consider "total expense ratios,"

which include manager compensation and *all* operating expenses (whether paid

for by the REIT directly or through its manager and then reimbursed).  Such a

comparison of "total expense ratios" debunks Two Harbors' specious claim with

respect to non-compensation expenses: Two Harbors' 2019 total expense ratio

was among its lowest in years and was lower than that of most other externally-

managed residential mortgage REITs.  Moreover, Two Harbors' low expense

ratio is particularly impressive given that non-compensation expenses are largely

a function of investment strategy, and Two Harbors invests in mortgage servicing

rights – an operationally intensive asset class – whereas many REITs do not.

68.    Two Harbors' third claim in its April 10, 2020 letter was that "[t]he total

compensation paid by [Two Harbors] to [Pine River] for the twelve months ended December 31,

2019, implied an estimated profit margin of [Pine River] that is far in excess of the profit

margins of other asset managers."

69.    This alleged justification is nonsense for the following reasons:

a.  Pine River's estimated profit margin is completely irrelevant to whether Pine River's compensation is unfair.  Pine River's profit margin, whatever its magnitude, does not make the compensation it receives from Two Harbors "unfair."  If Pine River spent lots of money on rent, salaries, benefits and promotional activities, reducing its profit margin to zero, Pine River's lack of profit margin would not mean that the compensation it is paid by Two Harbors is "fair."  Regardless, Pine River's *compensation* – the matter actually in question – is entirely fair when compared to the compensation paid to managers of other externally-managed residential mortgage REITs.

b.  Moreover, even if Pine River's profit margin were relevant, which it is not, Two Harbors has compared an "estimated profit margin" of Pine River to the actual profit margins of undefined "other asset managers," which may not even be external managers to residential mortgage REITs.

**G.  After Pine River Brought an Action in New York State Court to Enforce the Management Agreement, Two Harbors Retaliated by Purporting to Terminate the Management Agreement a Second Time, This Time "For Cause."**

70.  To enforce its rights under the Management Agreement and New York law, Pine River filed suit on June 17, 2020 in the Supreme Court of the State of New York alleging, among other claims, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair competition.  In retaliation for Pine River's lawsuit, and to attempt to avoid paying Pine River even the termination fee it would be owed if Two Harbors had a right to terminate on a basis of "unfair" compensation, which it does not, Two Harbors sent Pine River a letter dated July 15, 2020 that purported to terminate the Management Agreement a second time – this time "for cause" based on Pine River's alleged "incurable material breaches" of the Management

Agreement "and/or gross negligence." Two Harbors claimed that this new, second termination of the Management Agreement would be effective August 14, 2020. Two Harbors' purported termination of Pine River "for cause" is yet another attempt to avoid paying Pine River the fair value of the Management Agreement – which Pine River would have received in a mutual, negotiated termination of the Management Agreement.

71.     To support its fabricated claim of termination "for cause," Two Harbors pointed to certain events that occurred as long as seven years ago and of which Two Harbors was fully aware before it purported to terminate the Management Agreement based on a claim that Pine River's compensation was "unfair." Two Harbors also claimed that, in connection with correspondence exchanged between the parties after Pine River filed its New York state court lawsuit, Pine River "misrepresented its rights and obligations" in those letters. Two Harbors' claim that it may terminate Pine River "for cause" for taking legal positions with which Two Harbors disagrees is absurd.

72.     Two Harbors' actions are plainly retaliatory and are a transparent attempt to avoid paying Pine River even the termination fee that Two Harbors previously acknowledged it owes to Pine River.

**H.     Two Harbors Has Essentially Admitted to Having Ulterior Motives for Terminating the Management Agreement That Have Nothing to Do with the Fairness of Pine River's Compensation, Any Alleged "Material Breaches" or any Alleged "Gross Negligence" By Pine River.**

73.     Two Harbors' true reason for terminating its Management Agreement with Pine River has nothing to do with the fairness of Pine River's compensation, any alleged "material breach" of the Management Agreement by Pine River, or any alleged "gross negligence" by Pine River. Two Harbors has plainly admitted its true motives. In its April 13, 2020 press release announcing termination of the Management Agreement (and again in subsequent investor

presentations), Two Harbors highlighted "material benefits" which it expects to derive from internalizing, which have nothing to do with Pine River's compensation being "unfair:"

    a.   Two Harbors expects to save approximately $42 million annually by internalizing management functions.

    b.   Two Harbors will eliminate future management fees payable to Pine River.

    c.   Two Harbors hopes to attract new investors that prefer internal management structures.

    d.   Two Harbors expects to "strengthen the alignment of interests" with Two Harbors' "management team" – all of whom are *Pine River's* employees.

74.    By forcing through an internalization without Pine River's consent first using a fabricated claim of "unfair" compensation and later claiming termination "for cause," Two Harbors is attempting to reap the benefits of internalization without properly compensating Pine River for the elimination of its contractual entitlements (and Two Harbors' contractual obligations) under the Management Agreement – namely, payment of management fees in exchange for continued management of Two Harbors.

75.    Two Harbors aims to shortchange Pine River on the amount it would be entitled to receive in a mutual, negotiated termination of the Management Agreement.

**I.   Two Harbors Has Also Admitted that It Intends to Improperly Use Pine River's Employees and Intellectual Property to Facilitate Its Plan of Internalization.**

76.    Not only has Two Harbors fabricated a basis to terminate the Management Agreement as a pretext to effect an internalization, Two Harbors now intends to improperly use Pine River's employees and intellectual property, including trade secrets and know-how, to effect that internalization:

    a.   In its April 13, 2020 press release announcing that it had terminated Pine River, Two Harbors readily admitted that it had terminated Pine River so that Two

Harbors can manage itself using *Pine River's* employees.  In that press release, Two Harbors stated that it will become "self-managed" using *Pine River's* "strong and experienced senior management team along with the other personnel currently providing services to Two Harbors, to whom our Board of Directors intends to extend offers of employment."

b.  In fact, shortly before Two Harbors made public its plans to internalize its management functions, Two Harbors admitted in its 2019 10-K, which Two Harbors filed in February 2020, that its ability to operate successfully hinged on having access to Pine River's employees and intellectual property, including trade secrets and know-how, stating:

> The loss of our access to Pine River's investment professionals and principals may adversely affect our ability to achieve our investment objectives and to execute our business plan . . . [and] in the event of a termination of the management agreement . . . it may be difficult or costly to replace certain intellectual property, systems, facilities or other services that have been historically provided by or contracted through Pine River that are necessary or desirable to execute our business plan.

c.  Two Harbors further recognized in that same 10-K that those Pine River employees had employment agreements that may prohibit or restrict their ability to continue managing Two Harbors if Two Harbors terminated the Management Agreement, stating:

> the individual agreements these [Pine River] investment professionals and principals have with Pine River contain non-solicitation, confidentiality and, with respect to our Chief Executive Officer, non-competition provisions that may prohibit or otherwise restrict their ability to support Two Harbors in the event of a termination of our management agreement.

Two Harbors' 10-K was correct.  Pine River employees who currently manage

Two Harbors have employment agreements that contain confidentiality

provisions prohibiting those employees from disclosing Pine River's trade

secrets and other proprietary and confidential information other than for the

benefit of Pine River after the Management Agreement terminates.

d.  Two Harbors further recognized in its 10-Q for the first quarter of 2020 that it has

been entirely dependent on Pine River's employees to manage Two Harbors and

that it intends to seek to retain those employees to manage Two Harbors:

> We currently depend on Pine River to provide us with our
> executives and employees to administer our business
> activities and day-to-day operations.  Following the
> termination of the management agreement, we expect to
> retain and continue to be managed by our senior management
> team along with the other dedicated personnel currently
> providing services to us.  While our Board of Directors
> intends to extend offers of employment to our current
> personnel, there can be no assurance that all such personnel
> will accept employment with us.

77.     Pine River has not consented to Two Harbors' hiring of Pine River's employees.

Those employees possess valuable intellectual property, including trade secrets and know-how,

of Pine River.  If Two Harbors hires Pine River's employees, those employees will inevitably

disclose Pine River's trade secrets and other confidential and proprietary information to Two

Harbors in breach of their employment contracts and the Second Amendment to the Management

Agreement, which provides that Pine River's intellectual property belongs solely to Pine River,

because those Pine River employees will be performing the exact same job functions for Two

Harbors that they performed when employed by Pine River.

78.     Further regarding Pine River's intellectual property, including its trade secrets and

know-how:

a.  Pine River has developed and owns significant intellectual property which Two Harbors uses in its day-to-day operations.

b.  The Second Amendment to the Management Agreement dated November 3, 2014 expressly provides that all intellectual property that Pine River creates or develops for Two Harbors' use is "the sole and exclusive property of [Pine River and that Two Harbors] shall assign and do[es] hereby assign to [Pine River] all Intellectual Property Rights in such Intellectual Property."  Such intellectual property specifically includes:

> all work product, documents, code, works of authorship, programs, manuals, developments, processes, formulas, data, specifications, fixtures, tooling, equipment, supplies . . . and know-how or similar rights . . . [that are] created or developed by [Pine River] in connection with [Pine River's] performance of th[e] [Management] Agreement or otherwise . . . .

c.  In its April 13, 2020 press release, Two Harbors stated that it "anticipates a smooth and timely transition of all functions necessary to operate the Company's business without interruption."  Two Harbors further admitted in its 2019 10-K that "in the event of a termination of the management agreement . . . it may be difficult or costly to replace certain intellectual property, systems, facilities or other services that have been historically provided by or contracted through Pine River that are necessary or desirable to execute our business plan."  Two Harbors would have no alternative but to misappropriate Pine River's intellectual property to internalize "without interruption" to its business.

79.    Pine River has not consented to Two Harbors' use of Pine River's intellectual property after the Management Agreement is terminated.  Any such use without Pine River's

consent would violate Pine River's intellectual property rights, including misappropriation of Pine River's trade secrets.

80.     Pine River has made clear to its employees and Two Harbors that all of the intellectual property developed to manage Two Harbors belongs solely and exclusively to Pine River, and that Pine River does not consent to Two Harbors using that intellectual property after the Management Agreement terminates.

   a.   On June 18, 2020, Pine River sent a letter to its employees and partners who are involved in managing Two Harbors instructing them that Two Harbors is "not entitled to use any of Pine River's intellectual property after Pine River ceases to manage Two Harbors later in the year," that "as a partner or employee of Pine River, any intellectual property you have created or developed in connection with services rendered to Two Harbors is Pine River's intellectual property," and that they have an "obligation to protect Pine River's valuable intellectual property."

   b.   On June 23, 2020, the chairman of Two Harbors' Board of Directors sent Pine River a letter claiming that Two Harbors owned all of the intellectual property developed and used to manage Two Harbors stating:

> "intellectual property created or developed by dedicated Two Harbors personnel for Two Harbors' use and at Two Harbors' expense is the intellectual property of Two Harbors (not Pine River) and belongs to Two Harbors (not Pine River)."

   c.   Pine River responded by letter dated June 24, 2020 and again informed Two Harbors that, pursuant to the Management Agreement, all intellectual property developed by Pine River, including its trade secrets, were the exclusive property of Pine River.  Pine River requested that Two Harbors discuss the transition of

Pine River's intellectual property to Pine River after September 19, 2020 – the date Two Harbors unilaterally originally set to terminate the Management Agreement.  Pine River informed Two Harbors that Pine River "is taking steps to ensure that its intellectual property remains protected once the Management Agreement is terminated on September 19, 2020."  Pine River also reiterated its position that "after Pine River ceases to manage Two Harbors, Two Harbors will no longer be able to use and rely on Pine River's intellectual property . . . ."  Pine River further requested that Two Harbors confirm that it was in fact Two Harbors' position that the intellectual property belonged to Two Harbors, because if that was the case, Pine River intended to take legal action in advance of September 19, 2020 to protect its rights.  Also on June 24, 2020, Pine River specifically instructed its employees that they must continue to work to advance the best interests of Two Harbors and its shareholders until Pine River ceases to manage Two Harbors' operations on September 19, 2020 and should continue to rely on all intellectual property that Pine River developed in order to continue managing the day-to-day operations of Two Harbors up until Two Harbors' unilaterally-imposed termination of the Management Agreement on September 19, 2020.

d.  By letter dated July 3, 2020, Two Harbors reiterated and confirmed its position that the intellectual property belongs solely to Two Harbors and demanded that Pine River "retract and disavow its position that the intellectual property created or developed by Two Harbors personnel for Two Harbors' use and at Two Harbors' expense does not belong to Two Harbors."  Two Harbors' July 3, 2020

letter further makes clear that Two Harbors has no intention of transitioning Pine

River's intellectual property back to Pine River after the Management Agreement

terminates – which is when Two Harbors' license to use that intellectual property

expires.

e.  By letter dated July 6, 2020, Pine River reiterated its position that under the

express terms of the Management Agreement all intellectual property developed

and created by Pine River's employees to manage Two Harbors belonged

exclusively to Pine River.

f.  By letter dated July 15, 2020, Two Harbors then purported to terminate the

Management Agreement "for cause," claiming Pine River "misrepresented its

rights and obligations" under the Management Agreement.

81.    Two Harbors' positions are in direct contradiction of the terms of the

Management Agreement.  Two Harbors has no personnel, as Two Harbors has correctly

acknowledged in its own SEC filings.  And the Management Agreement is also crystal clear that

all of the intellectual property Pine River has developed to manage Two Harbors belongs solely

and exclusively to Pine River.

82.    Two Harbors' possession of Pine River's confidential and proprietary information

will be of significant value to Two Harbors.  As Two Harbors has already stated, "in the event of

a termination of the management agreement . . . it may be difficult or costly [for Two Harbors] to

replace certain intellectual property, systems, facilities or other services that have been

historically provided by or contracted through Pine River that are necessary or desirable to

execute our business plan."  Since Two Harbors has never operated its business on its own

without Pine River, the intellectual property, including proprietary systems, platforms, models,

spreadsheets, analytics and other confidential information identified above, would improperly allow Two Harbors to continue to manage its REIT after August 14, 2020 – the date Two Harbors unilaterally set to terminate the Management Agreement. Further, Pine River's intellectual property would provide Two Harbors with all of the necessary tools to develop its own systems, platforms, models, spreadsheets, analytics and other operational information.

   **J.    Even if Two Harbors Had a Basis for Terminating the Management Agreement, Which It Does Not, As a Further Show of Bad Faith Two Harbors Is Also Improperly Attempting to Cheat Pine River on Its Termination Fee.**

   83.    Even if Two Harbors had a basis to terminate the Management Agreement based on a claim of unfair compensation—and it does not—Two Harbors must pay Pine River a termination fee. The Management Agreement provides that in the event that Two Harbors terminates Pine River pursuant to Section 13(a) of the Management Agreement, which is what Two Harbors improperly did here before purporting to terminate the Management Agreement a second time "for cause," Two Harbors would still be required to pay Pine River a "termination fee," equal to "three times the sum of the average annual Base Management Fee earned by [Pine River] during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination."

   84.    Therefore, even if Two Harbors had a basis to terminate the Management Agreement based on a claim of unfair compensation—and it does not—the time period to be used to calculate the termination fee for the current one-year term ending October 28, 2020 would be the two-year period beginning October 1, 2018 and ending September 30, 2020.

   85.    By originally claiming that the termination of the Management Agreement will take effect on September 19, 2020 rather than at the expiration of the current term on October 28,

2020, Two Harbors improperly sought to manipulate the 24-month measuring period to begin one quarter earlier than it should in an effort to improperly reduce the termination fee.  (Two Harbors subsequently purported to terminate Pine River "for cause" to avoid paying even a termination fee.)

86.      In the third quarter of 2018, Pine River agreed to a one-time $17.5 million concession to support Two Harbors in its bid to acquire another residential mortgage REIT called CYS Investments, Inc. ("CYS").  By originally attempting to terminate the Management Agreement in September 2020, Two Harbors sought to include the third quarter of 2018 – and the $17.5 million concession – in the 24-month measurement period in order to reduce the termination fee.  And now, Two Harbors has purported to terminate the Management Agreement "for cause" to avoid paying even the termination fee.

87.      But Two Harbors has no basis to terminate the Management Agreement.  And even if Two Harbors did have a proper basis (which it does not) to terminate the Management Agreement due to "unfair" compensation to Pine River, Two Harbors' shortchanging attempt would fail on two counts.

88.      First, under the terms of the Management Agreement, such termination could not occur before the end of the current renewal term, which is October 28, 2020.  Two Harbors recognized as much in its April 10 letter in which it stated that it "intends not to renew the Management Agreement upon the completion of the current Renewal Term," which is October 28, 2020.

89.      Second, even if Two Harbors had a proper basis (which it does not) to terminate the Management Agreement due to "unfair" compensation and also were able (which it is not) to terminate the Management Agreement before the end of its current renewal term, Two Harbors'

basis for trying to shortchange Pine River on the termination fee would still be invalid.

a.  In 2018, to support Two Harbors' bid to acquire CYS, Pine River agreed to provide $17.5 million to Two Harbors.  Two Harbors' bid was successful and it acquired CYS on July 31, 2018. 

b.  Two Harbors has no right to incorporate this concession in the calculation of the purported termination fee: Two Harbors cannot exclude the management fees that Pine River earned and then refunded; neither can Two Harbors pretend that an out-of-pocket cash payment – having nothing to do with management fees – somehow represents negative management fees.

90.   Two Harbors' opportunistic selection of a September 19, 2020 termination date (which it has no right to do) for no other reason than to try to shortchange Pine River millions of dollars by deducting the $17.5 million concession from the calculation of the termination fee (which it has no right to do) is not conjecture:

91.   Two Harbors' conduct plainly illustrates that it is trying to cheat Pine River out of even out of the termination fee it would be owed if Two Harbors had a right to terminate on a

basis of "unfair" compensation, which it does not. Two Harbors' purported termination of Pine

River "for cause" is yet another transparent attempt to avoid paying Pine River the fair value of

the Management Agreement – which Pine River would have received in a mutual, negotiated

termination of the Management Agreement.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

92.    Pine River incorporates by reference the allegations contained in paragraphs 1

through 91 as set forth above, as if fully set forth at length herein in full.

93.    As a result of and in connection with the Management Agreement, Two Harbors

obtained Pine River's intellectual property, including Pine River's proprietary work product,

documents, code, works of authorship, programs, manuals, developments, processes, formulae,

data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries,

improvements, trade secrets, and know-how or similar rights. At minimum, the proprietary

information identified above in paragraphs 29-30 constitute trade secrets of Pine River subject to

protection under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

94.    Pine River's trade secrets, as described above, relate to a product or service used

in, or intended for use in, interstate or foreign commerce.

95.    Pine River's trade secret information is valuable because it is not generally known

or readily accessed, acquired or duplicated, through proper means, to others who can profit from

its use without a license. This information is limited in distribution within Pine River (and its

licensees) and is not readily available to the public or to Pine River competitors.

96.    Pine River has spent significant time, skill, research and development (R&D) to

develop and maintain its trade secrets, which are extremely valuable to Pine River, which give Pine River a competitive advantage and which would be of great value to a competitor.

97.     Pine River has taken more than adequate measures under the circumstances to maintain the secrecy of its trade secret information, including protecting against impermissible dissemination of the information, requiring passwords to be used to access computer systems and records, requiring confidentiality obligations from its employees and expressly informing the Pine River employees involved in managing Two Harbors that they are prohibited from assisting Two Harbors in obtaining or misappropriating Pine River's intellectual property for use after Two Harbors' termination of the Management Agreement.

98.     Pine River also has policies and procedures that protect this information.  As part of the Management Agreement, Two Harbors agreed that "[a]ll Intellectual Property created or developed" by Pine River – including any trade secrets – in connection with its performance of the Management Agreement would be "the sole and exclusive property" of Pine River and that Two Harbors would assist in "perfect[ing], record[ing], confirm[ing], or enforc[ing] [Pine River's] rights in and to the Intellectual Property."  Two Harbors thus has a duty to maintain the secrecy of Pine River's trade secrets.

99.     In reliance on the terms of the Management Agreement, Pine River has provided Two Harbors with access to its trade secrets solely for the duration of the Management Agreement.

100.    Two Harbors has candidly acknowledged in its public filings that its ability to operate successfully hinges on having access to Pine River's intellectual property, including trade secrets.

101.    Two Harbors has also publicly stated that it intends to hire Pine River employees

as employees of Two Harbors in order to manage Two Harbors after the Management

Agreement terminates.  Those Pine River employees will be performing the same or similar job

functions for Two Harbors that they performed when employed by Pine River.  In order to

perform those job functions, such employees will be using, without Pine River's authorization or

license, the intellectual property including trade secrets that Pine River created and developed in

connection with the Management Agreement.

102.    Pine River derives a significant economic benefit from the above-described  trade

secrets and does not consent to Two Harbors' continued use of its trade secrets beyond the term

of the Management Agreement.

103.    Pine River faces an immediate threat of irreparable harm, for which Pine River

lacks an adequate remedy at law, from Two Harbors' misappropriation and misuse of Pine

River's trade secret information including, but not limited to, loss of future business and the

potential that Pine River's trade secrets may be disseminated beyond the Court's ability to

provide monetary redress.

104.    Unless Two Harbors is preliminarily and permanently enjoined from the

foregoing conduct, Pine River will be irreparably harmed by:

    (a)    Disclosure of trade secrets and other confidential information that is
        solely the property of Pine River;

    (b)    Loss of a competitive advantage, loss of goodwill, lost compensation,
        and loss of business reputation; and

    (c)    Potential future economic loss, which is presently incalculable.

105.    As alleged herein, Two Harbors' conduct has been and is malicious, deliberate

and willful.  Pine River is therefore entitled to recover from Two Harbors exemplary

damages in an amount twice the total of the damages recovered for actual loss as permitted

by 18 U.S.C. § 1836(b)(3)(C).

106.    Pine River is entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets in Violation of the New York Common Law)

107.    Pine River incorporates by reference the allegations contained in paragraphs 1 through 106 as set forth above, as if fully set forth at length herein in full.

108.    Two Harbors' actions, as set forth above, constitute misappropriation under New York law.

109.    As a result of and in connection with the Management Agreement, Two Harbors obtained Pine River's intellectual property, including Pine River's proprietary work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries, improvements, trade secrets, and know-how or similar rights.  At minimum, the proprietary information identified above in paragraphs 29-30 constitute trade secrets of Pine River subject to protection under New York law.

110.    Pine River's trade secret information is valuable because it is not generally known or readily accessed, acquired or duplicated, through proper means, to others who can profit from its use without a license.  This information is limited in distribution within Pine River (and its licensees) and is not readily available to the public or to Pine River competitors.

111.    Pine River has spent significant time, skill, research and development (R&D) to develop and maintain its trade secrets, which are extremely valuable to Pine River, which give Pine River a competitive advantage and which would be of great value to a competitor.

112.    Pine River has taken more than adequate measures under the circumstances to

maintain the secrecy of its trade secret information, including protecting against impermissible dissemination of the information, requiring passwords to be used to access computer systems and records, requiring confidentiality obligations from its employees and expressly informing the Pine River employees involved in managing Two Harbors that they are prohibited from assisting Two Harbors in obtaining or misappropriating Pine River's intellectual property for use after Two Harbors' termination of the Management Agreement.

113.    Pine River also has policies and procedures that protect this information.  As part of the Management Agreement, Two Harbors agreed that "[a]ll Intellectual Property created or developed" by Pine River – including any trade secrets – in connection with its performance of the Management Agreement would be "the sole and exclusive property" of Pine River and that Two Harbors would assist in "perfect[ing], record[ing], confirm[ing], or enforc[ing] [Pine River's] rights in and to the Intellectual Property."  Two Harbors thus has a duty to maintain the secrecy of Pine River's trade secrets.

114.    In reliance on the terms of the Management Agreement, Pine River has provided Two Harbors with access to its trade secrets solely for the duration of the Management Agreement.

115.    Two Harbors has candidly acknowledged in its public filings that its ability to operate successfully hinges on having access to Pine River's intellectual property, including trade secrets.

116.    Two Harbors has also publicly stated that it intends to hire Pine River employees as employees of Two Harbors in order to manage Two Harbors after the Management Agreement terminates.  Those Pine River employees will be performing the same or similar job functions for Two Harbors that they performed when employed by Pine River.  In order to

perform those job functions, such employees will be using, without Pine River's authorization or license, the intellectual property including trade secrets that Pine River created and developed in connection with the Management Agreement.

117.    Pine River derives a significant economic benefit from the above-described  trade secrets and does not consent to Two Harbors' continued use of its trade secrets beyond the term of the Management Agreement.

118.    Pine River faces an immediate threat of irreparable harm, for which Pine River lacks an adequate remedy at law, from Two Harbors' misappropriation and misuse of Pine River's trade secret information including, but not limited to, loss of future business and the potential that Pine River's trade secrets may be disseminated beyond the Court's ability to provide monetary redress.

119.    Unless Two Harbors is preliminarily and permanently enjoined from the foregoing conduct, Pine River will be irreparably harmed by:

(a)      Disclosure of trade secrets and other confidential information that is solely the property of Pine River;

(b)      Loss of a competitive advantage, loss of goodwill, lost compensation, and loss of business reputation; and

(c)      Potential future economic loss, which is presently incalculable.

120.    As alleged herein, Two Harbors' conduct has been willful and deliberate, thereby constituting exceptional circumstances.  Accordingly, Pine River is entitled to recover exemplary damages in an amount to be determined at trial.

121.    As a direct and proximate result of Two Harbors' misappropriation, Pine River has suffered, continues to suffer and will suffer in the future, extensive additional damages which continue to accrue in the form of attorneys' fees and costs related to this litigation, and loss of

business in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract – Improper Termination)

122.    Pine River incorporates by reference the allegations contained in paragraphs 1 through 121 as set forth above, as if fully set forth at length herein in full.

123.    The Management Agreement is a valid and binding contract between Pine River and Two Harbors.

124.    Pine River has timely and fully performed all of the conditions, covenants, and promises required of it under the Management Agreement, and stands ready to fully perform in the future all conditions, covenants and promises required of it under the Management Agreement.

125.    Two Harbors breached the Management Agreement by unilaterally terminating the Management Agreement without any valid justification.

126.    By unilaterally terminating the Management Agreement without valid justification, Two Harbors has deprived Pine River from realizing the benefits to which it is entitled under the Management Agreement, namely, continued management of Two Harbors in exchange for payment of management fees.

127.    Two Harbors has further breached the Management Agreement by initially purporting to terminate the Management Agreement effective September 19, 2020.  Even if Two Harbors had a basis to unilaterally terminate the Management Agreement under Section 13(a)(ii)—and it does not—under the terms of the Management Agreement, the termination could not occur before the end of the current renewal term, which is October 28, 2020.

128.    While Section 13 of the Management Agreement affords Pine River the right to seek to renegotiate its compensation with Two Harbors, Pine River has no intention of exercising

that right and will not renegotiate its compensation with Two Harbors.  That is because Pine

River believes that its compensation is more than fair – and realizes that Two Harbors' goal is to

internalize management functions and not to objectively assess or renegotiate Pine River's

compensation.  Two Harbors has also taken the position by letter dated April 10, 2020 that Pine

River has waived any right to seek to renegotiate its compensation.

129.     Two Harbors has further breached the Management Agreement by improperly

purporting to terminate the Management Agreement for a second time – "for cause" effective

August 14, 2020.  Two Harbors has no valid basis to terminate the Management Agreement "for

cause."

130.     As a direct and proximate result of Two Harbors' conduct, Pine River has

suffered damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Intellectual Property)

131.     Pine River incorporates by reference the allegations contained in paragraphs 1

through 130 as set forth above, as if fully set forth at length herein in full.

132.     The Management Agreement is a valid and binding contract between Pine River

and Two Harbors.

133.     Pine River has timely and fully performed all of the conditions, covenants, and

promises required of it under the Management Agreement, and stands ready to fully perform in

the future all conditions, covenants and promises required of it under the Management

Agreement.

134.     Two Harbors breached the Management Agreement by claiming possession of all

intellectual property created and/or developed by Pine River in connection with Pine River's

performance of the Management Agreement.

135.    By failing to assist Pine River in perfecting, confirming and enforcing Pine River's rights in and to its intellectual property, Two Harbors has deprived Pine River from realizing the benefits to which it is entitled under the Management Agreement, namely, continued ownership and enforcement of its intellectual property rights.

136.    Two Harbors has further breached the Management Agreement by refusing to terminate the use of Pine River's intellectual property after the termination of the Management Agreement.

137.    As a direct and proximate result of Two Harbors' conduct, Pine River has suffered damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing
### (In the Alternative))

138.    Pine River incorporates by reference the allegations contained in paragraphs 1 through 137 as set forth above, as if fully set forth at length herein in full.

139.    The Management Agreement is a valid and binding contract between Pine River and Two Harbors.

140.    Pine River has timely and fully performed all of the conditions, covenants, and promises required of it under the Management Agreement, and stands ready to fully perform in the future all conditions, covenants and promises required of it under the Management Agreement.

141.    There is implied in every contract a covenant of good faith and fair dealing such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

142.    Two Harbors breached this implied covenant by acting arbitrarily in determining

that Pine River's compensation was "unfair," and unilaterally terminating the Management

Agreement on that basis.  Two Harbors' contention that Pine River's compensation is "unfair" is

a complete fabrication and is simply an excuse to terminate the parties' Management Agreement

and bring the management of Two Harbors in-house.

143.    Two Harbors' breach will prevent Pine River from realizing the benefits it is

entitled to receive under the Management Agreement, namely, continued management of Two

Harbors in exchange for payment of management fees.

144.    While Section 13 of the Management Agreement affords Pine River the right to

seek to renegotiate its compensation with Two Harbors, Pine River has no intention of exercising

that right and will not renegotiate its compensation with Two Harbors.  That is because Pine

River believes that its compensation is more than fair – and realizes that Two Harbors' goal is to

internalize management functions and not to objectively assess or renegotiate Pine River's

compensation.  Two Harbors has also taken the position by letter dated April 10, 2020 that Pine

River has waived any right to seek to renegotiate its compensation.

145.    Two Harbors has therefore breached the implied covenant of good faith and fair

dealing.  As a direct and proximate result of Two Harbors' conduct, Pine River has suffered

damages in amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Anticipatory Breach of Contract)

146.    Pine River incorporates by reference the allegations contained in paragraphs 1

through 145 as set forth above, as if fully set forth at length herein in full.

147.    The Management Agreement, as amended by the Second Amendment to the

Management Agreement dated November 3, 2014, is a valid and binding contract between Pine

River and Two Harbors.

148.    Pine River has timely and fully performed all of the conditions, covenants, and promises required of it under the Management Agreement, and the Second Amendment to the Management Agreement, and stands ready to fully perform in the future all conditions, covenants and promises required of it.

149.    The Second Amendment to the Management Agreement provides that all intellectual property developed or created in connection with the management of Two Harbors "shall be the sole and exclusive property of" Pine River.  The intellectual property covered by this provision includes "all work product, documents, code, works of authorship, programs, manuals, developments, processes, formulas, data, specifications, fixtures, tooling, equipment, supplies . . . and know-how or similar right . . . [that are] created or developed by [Pine River] in connection with [Pine River's] performance of th[e] [Management] Agreement or otherwise."

150.    Pine River also has valid and binding employment contracts with employees who perform management services for Two Harbors.  Those employment contracts prohibit Pine River's employees from disclosing to Two Harbors Pine River's valuable trade secrets, know-how and other proprietary and confidential information other than for the benefit of Pine River after August 14, 2020 – which is the effective date of Two Harbors' second unilateral termination of the Management Agreement.

151.    Two Harbors has candidly acknowledged in its public filings that its ability to operate successfully hinges on having access to Pine River's intellectual property, including trade secrets and know-how.

152.    Two Harbors has also publicly stated that it intends to hire Pine River employees as employees of Two Harbors in order to manage Two Harbors after it terminates the Management Agreement.  Those Pine River employees will be performing the same or similar

job functions for Two Harbors that they performed when employed by Pine River. In order to perform those job functions, such employees will be using the intellectual property, including trade secrets and know-how, that Pine River developed or created to manage Two Harbors in those roles.

153. Pine River does not consent to Two Harbors taking or using its intellectual property after the Management Agreement is terminated.

154. If Two Harbors hires Pine River's employees whose employment contracts prohibit them from disclosing to Two Harbors Pine River's valuable trade secrets, know-how and other proprietary and confidential information other than for the benefit of Pine River, Pine River's employees will inevitably disclose Pine River's trade secrets and other confidential and proprietary information to Two Harbors in breach of their employment contracts and the Second Amendment to the Management Agreement, because those Pine River employees will be performing the exact same job functions for Two Harbors that they performed when employed by Pine River.

155. Two Harbors has anticipatorily breached the Second Amendment to the Management Agreement by publicly declaring its intention to hire the Pine River employees who managed Two Harbors as employees of Two Harbors after the Management Agreement terminates, thereby improperly acquiring Pine River's intellectual property in breach of the Management Agreement, as amended by the Second Amendment.

156. Unless Two Harbors' conduct is enjoined, an award of damages alone will be insufficient to remedy the irreparable harm that Pine River will suffer as a result of Two Harbors' breach.

## SEVENTH CLAIM FOR RELIEF
### (Declaratory Judgment)

157.    Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 156 as set forth above, as if fully set forth at length herein in full.

158.    Two Harbors breached the Management Agreement by unilaterally terminating that agreement without any valid justification.

159.    Two Harbors claimed it was terminating the Management Agreement because Pine River's compensation is "unfair" and subsequently claimed it was terminating the Management Agreement "for cause."

160.    There is no basis for Two Harbors' assertion that Pine River's compensation is "unfair" and there is no basis to terminate the Management Agreement "for cause."

161.    By any objective measure, Pine River's compensation is fair.  Pine River's compensation is fully consistent with the compensation of its peers – and in many cases, is *lower* than the compensation of its peers.

162.    Accordingly, Pine River seeks a judgment declaring that its compensation is not "unfair," that there is no basis to terminate the Management Agreement "for cause," and that Two Harbors has breached the Management Agreement and is in breach of the Management Agreement's implied covenant of good faith and fair dealing.

163.    The Second Amendment to the Management Agreement provides that all intellectual property, trade secrets and know-how that Pine River developed or created to manage Two Harbors is the sole and exclusive property of Pine River.

164.    Pine River seeks a declaration that the Second Amendment to the Management Agreement is a valid and binding contract between the parties, and that Two Harbors may not make any use of Pine River's intellectual property after August 14, 2020.

165.     Pine River also has valid and binding employment contracts with employees who perform management services for Two Harbors that prohibit those employees from disclosing to Two Harbors Pine River's valuable trade secrets, know-how and other proprietary and confidential information other than for the benefit of Pine River.  Two Harbors has publicly stated that it intends to hire those Pine River employees as employees of Two Harbors.  If Two Harbors hires those Pine River employees after the Management Agreement terminates, Pine River's employees will inevitably disclose Pine River's trade secrets and other confidential and proprietary information to Two Harbors in breach of their employment contracts and the Second Amendment to the Management Agreement, because those Pine River employees will be performing the exact same job functions for Two Harbors that they performed when employed by Pine River.

166.     Unless Two Harbors is enjoined from hiring Pine River's employees, an award of damages alone will be insufficient to remedy the irreparable harm that Pine River will suffer as a result of the improper disclosure of its trade secrets and other confidential and proprietary information to Two Harbors.  Accordingly, Pine River seeks a judgment declaring that Two Harbors is not permitted to hire Pine River's employees whose employment contracts prohibit them from disclosing to Two Harbors Pine River's valuable trade secrets, know-how and other proprietary and confidential information other than for the benefit of Pine River, and enjoining Two Harbors from hiring those employees.

## EIGHTH CLAIM FOR RELIEF
### (Unfair Competition & Business Practices)

167.     Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 166 as if set forth herein in full.

168.     Since as early as 2019, Two Harbors has engaged in a deliberate scheme to

misuse and misappropriate Pine River's employees, investment strategies, intellectual property (including trade secrets and know-how) and commercial advantages to lay the groundwork for Two Harbors to internalize its management functions and terminate its external manager, Pine River.

169.   As a part of Two Harbors' scheme, Two Harbors has abused the parties' confidential relationship and improperly used the skills and labor of Pine River's employees managing Two Harbors to assist Two Harbors in separating its IT systems and infrastructure from those of Pine River, so that Two Harbors could later more easily internalize these functions.

170.   Two Harbors has freely admitted that it could not successfully operate its current business strategy without Pine River's employees' skills and intellectual property.

171.   After unilaterally terminating the Management Agreement, Two Harbors admitted that it plans to internalize the management functions that Pine River currently performs for Two Harbors by hiring Pine River's employees who perform those management functions.

172.   By internalizing management functions, Two Harbors will directly compete and is directly competing against Pine River, because Pine River's business is to provide management services.

173.   Two Harbors' misuse of its confidential relationship with Pine River as well as Pine River's employees to misappropriate Pine River's trade secrets and other commercial advantages constitutes unfair competition and business practices.

174.   As a direct and proximate result of Two Harbors' unfair competition, Pine River has suffered, and will continue to suffer, damages to its business, in an amount to be determined at trial.

175.   In addition, because Two Harbors' conduct is willful, wanton and undertaken

with a conscious disregard for Pine River's rights, Pine River should be awarded punitive or

exemplary damages, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
#### (Unjust Enrichment)

176.    Pine River re-alleges and incorporates by reference the allegations contained in

paragraphs 1 through 175 as if set forth herein in full.

177.    To the extent that the express terms of the Management Agreement do not cover

the subject matter of the instant claim, Two Harbors has been unjustly enriched at Pine River's

expense by Two Harbors' misappropriation of Pine River's valuable confidential information

and intellectual property, including trade secrets and know-how.

178.    Since as early as 2019, Two Harbors has been engaged in a deliberate scheme to

misuse and misappropriate Pine River's employees, investment strategies, intellectual property

(including trade secrets and know-how), and commercial advantages to lay the groundwork for

Two Harbors to internalize its management functions and terminate the Management Agreement

with its external manager, Pine River.

179.    As a part of Two Harbors' scheme, Two Harbors has improperly used the skills

and labor of Pine River's employees managing Two Harbors to assist Two Harbors in separating

its IT systems and infrastructure from those of Pine River, so that Two Harbors could later more

easily internalize these functions.

180.    Two Harbors has freely admitted that it could not successfully operate its current

business strategy without Pine River's employees' skills and intellectual property.

181.    After unilaterally terminating the Management Agreement, Two Harbors admitted

that it plans to internalize the management functions that Pine River currently performs for Two

Harbors by hiring Pine River's employees who perform those management functions and by

misappropriating Pine River's valuable intellectual property, trade secrets and know-how.

182.    By internalizing management functions, Two Harbors will directly compete and is directly competing against Pine River, because Pine River's business is to provide management services.  As a result of Two Harbors' conduct, it has been unjustly enriched at Pine River's expense.

183.    Under these circumstances, it would be unjust, unfair, and against equity and good conscience to permit Two Harbors to retain the benefits it has gained or will gain from using Pine River's valuable intellectual property, including trade secrets, know-how, and other confidential information, without providing Pine River just compensation.

184.    Two Harbors has not provided Pine River reasonable compensation nor has it offered restitution to Pine River despite an obligation to do so.

185.    Restitution should therefore be made by Two Harbors to Pine River in an amount to be proven at trial.

186.    Pine River is also being irreparably harmed by Two Harbors' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief.

**TENTH CLAIM FOR RELIEF**
**(Conversion)**

187.    Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 186 as if set forth herein in full.

188.    As set forth above, Pine River has expended significant time, skill, research and development (R&D) to develop and maintain its intellectual property, including its proprietary and confidential databases, models and other confidential information, which are extremely valuable to Pine River, which give Pine River a competitive advantage and which would be of great value to a competitor.

189.    Under the terms of the Management Agreement, Pine River provided Two Harbors access to its intellectual property, including trade secrets, know-how, and Pine River's confidential databases and models.

190.    For security reasons, to limit the number of individuals with access to material non-public information and confidential consumer information, and to safeguard Pine River's proprietary and confidential information, certain of the intellectual property Pine River developed to manage Two Harbors is stored on dedicated computers and servers in Two Harbors' offices or dedicated offsite space.

191.    Two Harbors is improperly depriving Pine River access to – and is improperly preventing Pine River's employees from providing Pine River access to – Pine River's intellectual property, including its proprietary databases and models.

192.    Pine River has not authorized Two Harbors to continue using any Pine River confidential information, intellectual property or trade secrets following the termination of the Management Agreement.  In fact, Pine River requested by letter dated June 24, 2020 that Two Harbors discuss the transition of Pine River's intellectual property to Pine River after the Management Agreement terminates.

193.    Nevertheless, Two Harbors has admitted that it plans to retain control of Pine River's intellectual property, including Pine River's proprietary databases and models, as part of its plan to internalize the management functions that Pine River currently performs for Two Harbors, and is currently improperly interfering with Pine River's right to access its intellectual property and other confidential information.  Two Harbors is knowingly and unlawfully depriving Pine River of its intellectual property and other confidential information.

194.    Accordingly, Pine River has been damaged by Two Harbors' conversion in an

amount to be determined at trial.

195.    Pine River is also being irreparably harmed by Two Harbors' wrongful acts and is entitled to preliminary and injunctive relief as set forth above.

## PRAYER FOR RELIEF

**WHEREFORE,** for the wrongful acts of Defendant complained of in the foregoing **FIRST** through **TENTH CAUSES OF ACTION**, Plaintiff, PRCM Advisors, LLC, respectfully requests that this Court award the following relief:

A.    The entry of a judgment that Two Harbors has misappropriated Pine River's trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836;

B.    The entry of a judgment that Two Harbors has misappropriated Pine River's trade secrets under New York common law;

C.    The entry of a judgment that Two Harbors breached the Management Agreement;

D.    The entry of a judgment that Two Harbors breached an implied covenant of good faith and fair dealing;

E.    The entry of a judgment that Two Harbors anticipatorily breached the Management Agreement, as amended by the Second Amendment to the Management Agreement;

F.    The entry of a judgment that Two Harbors was unjustly enriched;

G.    The entry of a judgment that Two Harbors unlawfully converted Pine River's property to its own use and benefit;

H.    An order enjoining Two Harbors from hiring Pine River's employees whose employment contracts prohibit them from disclosing Pine River's trade secrets

and other confidential and proprietary information other than for the benefit of Pine River;

I.    An order enjoining, preliminarily and permanently, Two Harbors from using or disclosing any of Pine River's trade secret, proprietary and/or confidential information;

J.    Compensatory, exemplary, and punitive damages in an amount to be determined at a hearing and/or trial (but in no event less than $150,000 exclusive of interest and costs) including, but not limited to, double damages for willful or malicious misappropriation under 18 U.S.C. §1836(b)(3)(C); or in lieu of damages measured by other methods, the damages caused by Defendant's misappropriation measured by imposition of liability for a reasonable royalty for Defendant's unauthorized disclosure or use of Pine River's trade secrets, in an amount to be determined at trial (but in no event less than $150,000 exclusive of interest and costs);

K.    Disgorgement of Defendant's wrongfully obtained profits;

L.    Pine River's costs associated with this action, including without limitation its attorneys' fees;

M.    Prejudgment interest and post-judgment interest on damages;

N.    Such other legal and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pine River hereby demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

Dated: July 21, 2020

By: _/s/ Ching-Lee Fukuda__
Ching-Lee Fukuda
Jon Muenz
Ketan V. Patel
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Phone: (212) 839-5300
Fax: (212) 839-5599

Thomas K. Cauley Jr. (*pro hac* application
to be submitted)
Steven Sexton (*pro hac* application to be
submitted)
SIDLEY AUSTIN LLP
1 S. Dearborn St
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

*Attorneys for Plaintiff PRCM
Advisors, LLC*