UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PRCM ADVISERS LLC,

                              Plaintiff,

              -against-                                          20-cv-5649 (LAK)


TWO HARBORS INVESTMENT CORP.,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/23/2021

## MEMORANDUM OPINION

Appearances:

> Ching-Lee Fukuda
> Jon Muenz
> Ketan V. Patel
> Thomas K. Cauley Jr.
> Steven Sexton
> SIDLEY AUSTIN LLP
> *Attorneys for Plaintiff*
>
> Daniel Roeser
> Richard M. Strassberg
> Ezekiel L. Hill
> GOODWIN PROCTER LLP
> *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

            This case involves what might be described as an alleged coup by Two Harbors

Investment Corp. ("Two Harbors") against PRCM Advisers LLC ("PRCM" or "Pine River"), its

external manager. Two Harbors, a real estate investment trust, allegedly fabricated reasons to

terminate PRCM, poached its employees, and misappropriated its intellectual property – all without

paying PRCM a cent. Two Harbors now moves to dismiss these allegations. For the reasons

2

discussed below, that motion is granted in part and denied in part.

## *Background*

I.      *The Management Structure*

PRCM was formed by Pine River Capital Management, L.P. ("Pine River Capital") in 2009 to manage Two Harbors.[1]  From their inception in 2009 until August of 2020, neither company had any employees.[2]  Instead, Two Harbors was managed entirely by PRCM which, in turn, relied on the employees of Pine River Capital and its other subsidiaries (collectively "PRCM & Affiliates") pursuant to a shared facilities and services agreement (the "Shared Services Agreement").[3]

The management agreement between Two Harbors and PRCM (the "Management Agreement") discussed this arrangement.   Section 2(d) provided that PRCM "may enter into agreements with other parties, including its affiliates, for the purpose of engaging" personnel to provided various services "for and on behalf" of Two Harbors.[4]  It stated also that PRCM could not enter into any such agreements, apart from the Shared Services Agreement, without Two Harbors' approval.[5]

---

[1]     Amended Complaint [Dkt. 28] at ¶ 4 n. 3.

[2]     *Id.* at ¶ 26.

[3]     *Id.* at ¶ 4 n. 3.

[4]     Management Agreement [Dkt. 36-3] at § 2(d).

[5]     *Id.*

In addition to the personnel discussed in section 2(d), PRCM agreed also to provide Two Harbors with a "management team, including a Chief Executive Officer, President, Chief Financial Officer, Chief Information Officer, and other support personnel, to provide the management services to be provided by" PRCM to Two Harbors.[6]  While the Management Agreement referred to the Shared Services Agreement only in section 2(d), PRCM alleges broadly that "[p]ursuant to [the Shared Services Agreement], Pine River relied on the personnel and other resources of Pine River Capital and its subsidiaries to manage Two Harbors."[7]

Also relevant to this management structure, the Management Agreement defined "manager" to include both PRCM and its "permitted assignees."[8]  While "permitted assignees" was not a defined term, section 14 allowed PRCM to assign the Management Agreement to any of its affiliates without Two Harbors' consent.[9]  Section 14 provided also that PRCM could subcontract its responsibilities to its affiliates.[10]

PRCM does not allege that it entered into any assignment agreements with its affiliates.  Nonetheless, it alleges that "[t]he Management Agreement defined Pine River to include Pine River's 'permitted assignees,' which would include the personnel and other resources of Pine

---

[6]  *Id.* at § 3(a).

[7]  Am. Compl. at ¶ 4 n. 3.

[8]  Management Agreement at § 1(w).

[9]  *Id.* at § 14(a).

[10]  *Id.* at § 14(b).

4

River Capital and its subsidiaries."[11]   PRCM does not allege any other facts regarding the relationship with its affiliates or the personnel it relied on to manage Two Harbors.

## II.    *The Termination Provisions*

Two Harbors could terminate the Management Agreement in two distinct ways.

First, according to section 13(a), Two Harbors could decide not to renew the agreement if – among other reasons – two thirds of its independent directors agreed that PRCM's compensation was unfair.[12]   Once Two Harbors decided not to renew, PRCM could attempt to renegotiate its compensation.[13]  If such a negotiation were successful, the Management Agreement would "continue in full force and effect . . . except that the compensation payable to the Manager hereunder shall be the revised compensation."[14]  If it were not, Two Harbors would be required to pay a termination fee under section 13(a).[15]

In addition, Two Harbors could terminate for cause under section 15 of the Management Agreement if PRCM or "its agents or its assignees materially breache[d]" the agreement or if PRCM engaged in "gross negligence."[16]  If Two Harbors terminated the agreement

---

[11]
Am. Compl. at ¶ 4 n. 3.

[12]
Management Agreement at § 13(a).

[13]
*Id.*

[14]
*Id.*

[15]
*Id.* at § 13(b).

[16]
*Id.* at § 15(a).

under this section it was not required to pay a termination fee.[17]

### III.   *The Intellectual Property Provisions*

Section 27 of the Management Agreement provided that all intellectual property "created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise . . . shall be the sole and exclusive property of the Manager."[18]   PRCM licensed Two Harbors to use this intellectual property only during the term of the Management Agreement.[19]   Two Harbors agreed also to take various acts as "requested by the Manager . . . to confirm, or enforce the Manager's rights in and to the Intellectual Property."[20]

In addition, the personnel managing Two Harbors were required to enter into confidentiality, nonsolicitation, and inventions agreements ("Confidentiality Agreements") governing their use of PRCM's confidential information.[21]   Generally, the Confidentiality Agreements allowed them to use PRCM's intellectual property and other confidential information only for PRCM's benefit.[22]   They provided also that their employer owned any inventions created

---

[17]
   *Id.* at § 13(b).

[18]
   *Id.* at § 27(a).  Section 27 was added to the Management Agreement in 2014 in the Second Amendment to the Management Agreement [Dkt. 36-13].

[19]
   *Id.*

[20]
   *Id.*

[21]
   Am. Compl. at ¶ 40.

[22]
   Confidentiality Agreement [Dkt. 40-11] at § 1(b).

6

during the course of their employment and required them to protect the confidentiality of PRCM's intellectual property.[23]  Section 15 included an exception from these obligations "in connection with the services Employee provides to Two Harbors."[24]  According to section 15, the restriction on using PRCM's intellectual property would "not restrict Employee from providing continued service and support to Two Harbors, whether during or after the termination of Employee's employment with Employer."[25]

Nonetheless, section 6 of the Confidentiality Agreements – which is not one of the sections discussed in section 15 – provided that "[u]pon the termination of Employee's employment . . . Employee agrees to deliver promptly to Employer all of Pine River's property, including all Work Product, Inventions, any item containing Confidential Information."[26]

IV.    *Two Harbors Internalizes Management*

According to the amended complaint, this management structure made Two Harbors entirely dependant on PRCM.[27]  PRCM therefore expected that Two Harbors would internalize management only through a mutually agreeable transaction in which Two Harbors would

---

[23]

   *Id.* at §§ 1-3.

[24]

   *Id.* at § 15(b).

[25]

   *Id.*

[26]

   *Id.* at §  6.

[27]

   Am. Compl. at ¶ 4.

compensate PRCM for its intellectual property and know-how.[28]  In fact, in December 2018, Two Harbors and PRCM discussed internalizing Two Harbors' management but concluded that it would not be economical for Two Harbors.[29]  Nonetheless, on March 20, 2020, Two Harbors informed PRCM that PRCM's compensation was unfair and that it was not renewing the Management Agreement pursuant to section 13(a).[30]  Two Harbors set the effective termination date for September 19, 2021.[31]  PRCM did not seek to renegotiate its fees.[32]  Instead, it sued Two Harbors in New York Supreme Court for – among other claims – improperly terminating the Management Agreement.[33]

In addition, PRCM sent letters to Two Harbors and its personnel asserting its rights with regard to the personnel and intellectual property used to manage Two Harbors.  In particular, PRCM claimed that it owned any intellectual property developed when managing Two Harbors and emphasized that Two Harbors could not use that intellectual property after the Management Agreement terminated.[34]  PRCM's letters instructed the personnel managing Two Harbors to continue performing their obligations under the Management Agreement until that agreement

---

[28]  *Id.* at ¶¶ 10, 19.

[29]  *Id.* at ¶ 48.

[30]  *Id.* at ¶ 61.

[31]  *Id.*

[32]  *Id.* at ¶ 62.

[33]  *Id.* at ¶¶ 73, 79.

[34]  *Id.* at ¶¶ 79-80.

8

terminated.[35]

Two Harbors disputed PRCM's legal positions and claimed that PRCM's letters had materially breached the Management Agreement.[36]  Two Harbors demanded that PRCM retract or disavow these statements in order to cure this breach.[37]

Following this exchange, Two Harbors informed PRCM on July 15, 2020 that it was terminating the Management Agreement for cause pursuant to section 15.[38]  Two Harbors' notice of termination listed seven allegedly incurable material breaches or events of gross negligence.[39] Five of the asserted causes for termination related to employment agreements and compensation for the personnel managing Two Harbors.[40]  The sixth related to conduct by PRCM's partners, which Two Harbors claimed had created reputational issues.[41]  The seventh was based on PRCM's letters asserting its rights with regard to the management personnel and intellectual property.[42]  In a subsequent letter, Two Harbors stated that termination was warranted also because PRCM had asked

---

[35]

    *Id.*

[36]

    *Id.*

[37]

    *Id.*

[38]

    *Id.* at ¶ 73.

[39]

    Dkt. 40-8.

[40]

    *Id.* at 3-4.

[41]

    *Id.* at 4.

[42]

    *Id.*

9

its personnel to provide it with passwords to access the contested intellectual property.[43]  Two Harbors set the effective termination date for August 14, 2020.[44]

Two Harbors announced the termination of the Management Agreement in a press release on April 13, 2020.[45]  Two Harbors there stated that it intended to employ the personnel who had managed Two Harbors following termination.[46]  In addition, Two Harbors claimed in communications with PRCM that any intellectual property created or developed by these personnel belonged to it, not PRCM.[47]  Accordingly, Two Harbors made clear that it intended to use the former employees of PRCM & Affiliates and the intellectual property they had developed to internally manage Two Harbors after the Management Agreement terminated.  Two Harbors does not dispute that this is what ultimately occurred.

V.    *The Amended Complaint*

Shortly after receiving Two Harbors' notice of termination for cause, PRCM voluntarily dismissed its state court action and filed this action.[48]  PRCM here alleges that Two Harbors wrongfully terminated the Management Agreement in violation of both sections 13(a) and

---

[43]

Am. Compl. at ¶ 82.

[44]

*Id.* at ¶ 73.

[45]

*Id.* at ¶ 87.

[46]

*Id.*

[47]

*Id.* at ¶ 91.

[48]

The Amended Complaint [Dkt. 28] is the subject of this motion to dismiss.

15 and contrary to the duty of good faith and fair dealing.  In addition, it claims that Two Harbors misappropriated its intellectual property in violation of section 27 of the Management Agreement and the Defend Trade Secrets Act ("DTSA").[49]  PRCM asserts claims also for misappropriation and unfair competition and business practices under New York common law, conversion, unjust enrichment, and tortious interference with contract.  Finally, it seeks a declaratory judgment that Two Harbors improperly terminated the Management Agreement and cannot retain PRCM's intellectual property.

## Discussion

### I.  Legal Standard

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."[50]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[51]  The Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[52]  However, a complaint that offers only "labels and conclusions . . .  will not do."[53]

---

[49]    18 U.S.C. § 1836.

[50]    Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

[51]    Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

[52]    ATSI Commc'ns. Inc. v. Shaar Fund Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

[53]    Twombly, 550 U.S. at 555.

In addition, the Court is "not constrained to accept the allegations of the complaint in respect of the construction of [an] Agreement, although – at this stage in the proceedings – [the Court] strive[s] to resolve any contractual ambiguities in [plaintiff's] favor."[54]  If "the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law," and claims turning on that interpretation may be resolved on a motion to dismiss.[55]

In considering a motion to dismiss, the Court may "rely upon documents attached to the complaint as exhibits and documents incorporated by reference in the complaint."[56]  Moreover, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it . . . relies and which is integral to the complaint," the Court nevertheless may consider the document in deciding the defendant's motion to dismiss.[57]

## II.      Improper Termination

PRCM claims that Two Harbors wrongfully terminated the Management Agreement when it decided not to renew pursuant to section 13 and when it later terminated the agreement for cause pursuant to section 15.  For the reasons discussed below, PRCM fails to state a sufficient

---

[54]      *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

[55]      *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996).

[56]      *Halebian v. Berv*, 644 F.3d 122, 130 n. 7 (2d Cir. 2011) (cleaned up).

[57]      *Int'l Audiotext Network*, 62 F.3d at 72 (internal quotation marks and alterations omitted).

Here, the Court concludes that the Management Agreement, the Confidentiality Agreements, and Two Harbors' notice of termination, the authenticity of which are not disputed, either are incorporated by reference in or are integral to the Amended Complaint and properly are considered on this motion to dismiss.

claim based on either event.

A.    *Termination under Section 13(a)*

Two Harbors' notice of non-renewal set the effective termination date for September 19, 2020.[58]  Two Harbors contends that the Management Agreement remained in effect until that date.  During the interim period, it sent a notice of termination for cause that set the effective termination date for August 14, 2020.[59]  Accordingly, it argues that the Management Agreement came to an end on that date.  On Two Harbors' view, therefore, there was no agreement to terminate on September 19, and nothing at all occurred on that date.  Accordingly, Two Harbors argues that PRCM's claim that Two Harbors' non-renewal breached the Management Agreement would not be "traceable" to the  harm complained of and would not be actionable.[60]

PRCM disagrees with this perspective.  It contends that Two Harbors' notice of non-renewal precluded any later attempt to terminate the agreement for cause.  Accordingly, PRCM contends that the Management Agreement was terminated pursuant to section 13 and not section 15.  PRCM points to no case law supporting this argument, and the Court is aware of none.[61]

---

[58]    Am. Compl. at ¶ 61.

[59]    *Id.* at ¶ 73.

[60]    *See Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525-6 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages.").

[61]    In fact, the only case that the Court could find noted similarly that the "[p]laintiff ha[d] failed to identify any legal support for the novel proposition that a party's exercise of one contractual right of termination operates to preclude that party from later exercising a second, independently triggered right of termination."  *M & B Graphics, Inc. v. Toshiba*

13

Accordingly, the Court turns to the language of the Management Agreement, which forecloses PRCM's argument.  Section 22 of the Management Agreement – titled No Waiver; Cumulative Remedies – provided, in relevant part, that:

> "No failure to exercise and no delay in exercising, on the part of any party hereto, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege."[62]

PRCM does not dispute that this section applies here.  Accordingly, Two Harbors' exercise of its right under section 13 not to renew the Management Agreement did not preclude it from later exercising any separate right it may have had to terminate for cause under section 15. Section 22 therefore forecloses PRCM's argument based on either the theory of waiver or election.[63]

PRCM's argument fails also because it would lead to an unreasonable result.  If Two Harbors could not terminate for cause after sending a notice of non-renewal, PRCM would then be free to breach the contract with impunity until the effective termination date.[64]  This construction

---

*Bus. Sols. (USA), Inc.*, No. 11-10389, 2012 WL 1079897, at *6 (E.D. Mich. Mar. 30, 2012).

Unlike the cases cited by PRCM, this case does not involve a post-hoc rationalization for a singular termination.  Instead, Two Harbors exercised two separate rights of termination. The fact that each termination was based on different events does not on its own make the termination invalid.

[62]

Management Agreement at § 22.

[63]

While no-waiver provisions are more common, the case law cited by PRCM recognizes that "parties could conceivably draft language that purports to avoid the consequences of election."  *ESPN, Inc. v. Off. of Com'r of Baseball*, 76 F. Supp. 2d 383, 390 n. 5 (S.D.N.Y. 1999).  That is what the parties did here, and PRCM has not explained why section 22 does not bar its claim.

[64]

This risk would be significant, as the Management Agreement required Two Harbors to provide PRCM with at least 180 days' notice before terminating the agreement under

would be unreasonable, and PRCM has pointed to no case law or language in the Management Agreement to support this interpretation.

While PRCM may be correct that one may not "resurrect [an] agreement after cancellation"[65] in order to terminate it a second time, the Management Agreement had not terminated when Two Harbor sent its notice of termination for cause.  Even after receiving the notice of non-renewal, PRCM's rights and obligations – including the right to accrue fees under the Management Agreement – continued in full force until the effective termination date.[66]  In addition, PRCM had the right to renegotiate its fees following Two Harbors' notice of non-renewal.  If that negotiation had been successful, the agreement would have "continue[d] in full force and effect."[67]  This would have been possible only if the Management Agreement had remained in "full force and effect" until the effective termination date.  Accordingly, Two Harbors did not need to resurrect the Management Agreement  in order to terminate it for cause.

For each of these reasons, the Court agrees with Two Harbors – as long as the Management Agreement was properly terminated for cause on August 14, 2020, that termination occurred before the non-renewal could have taken effect.  Accordingly, PRCM's claim that the notice of non-renewal breached section 13 of the Management Agreement is dismissed.

---

section 13.  Management Agreement at § 13.  It is noteworthy that Two Harbors was required to provide only 30 days' notice before terminating the agreement for cause.  *Id.* at § 15.  This disparity underscores the unfairness that would result if Two Harbors could not terminate for cause after sending a notice of non-renewal.

[65]

Opp. at 25 (*quoting Cap. Partners LLC v. Wansdown Props. Corp.*, No. 150780/2018, 2019 N.Y. Slip. Op. 30844(U) at *9 (Sup. Ct. N.Y. Cnty. 2019) (cleaned up)).

[66]

Management Agreement at § 16.

[67]

*Id.* at § 13(a).

B.      *Termination under Section 15*

        The foregoing analysis depends on the Management Agreement's proper termination for cause on August 14, 2020. PRCM contends, however, that Two Harbors' attempt to terminate under section 15 was improper and breached the Management Agreement.

        To state a claim for breach of contract under New York law, a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."[68] The parties dispute whether PRCM has alleged the third element adequately.[69] PRCM claims that Two Harbors breached the Management Agreement because "Two Harbors had no valid basis to terminate the Management Agreement 'for cause.'"[70] Section 15 permitted Two Harbors to terminate the agreement for cause based on a material breach or act of gross negligence. To state a claim for wrongful termination PRCM was obligated to allege that Two Harbors was not "entitled to avail itself of [that] termination provision."[71] For the reasons discussed below, it has failed to do so.

        i.      *General Challenges to For Cause Termination*

        As an initial matter, PRCM alleges that all of Two Harbors' reasons for terminating

---

[68]

        *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

[69]

        In this case, the second and third elements are intertwined because the validity of Two Harbors' termination of the Management Agreement depends on whether PRCM adequately performed its own obligations.

[70]

        Am. Compl. ¶ 141.

[71]

        *Jill Stuart (Asia) LLC v. Sanei Int'l Co.*, 548 F. App'x 20, 22 (2d Cir. 2013).

the Management Agreement were a pretext to internalize management without compensating PRCM.[72]  These allegations, however, miss the point.  Two Harbors had a contractual right to terminate for cause if PRCM materially breached the agreement or acted with gross negligence.  To state a claim for breach of contract, PRCM must allege that the purported events did not occur or were not material breaches or acts of gross negligence.  While PRCM asserts generally that it "disagrees with Two Harbors' characterization" of the events listed in the notice of termination,[73] it fails to allege that these events did not occur or that they were not material breaches or grossly negligent.  As long as Two Harbors had cause to terminate, it is "legally irrelevant" whether the decision to terminate "was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract."[74]

Likewise, it is irrelevant that Two Harbors knew about the purported causes for termination before sending the notice of non-renewal.  The Management Agreement expressly provided that Two Harbors' delay in asserting its rights would not waive those rights.[75]  In addition, the Management Agreement provided that Two Harbors' assertion of one right – such as the decision not to renew – would not bar it from asserting another right – including the right to

---

[72]

Am. Compl. at ¶ 75.

[73]

*Id.* at ¶ 76.

[74]

*Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F. Supp. 738, 742 (S.D.N.Y. 1993), *aff'd*, 25 F.3d 105 (2d Cir. 1994). *See also Major Oldsmobile, Inc. v. Gen. Motors Corp.*, 101 F.3d 684 (2d Cir. 1996) (same).

[75]

Management Agreement at § 22.

terminate for cause.[76]   As noted previously, these provisions bar any claim based on Two Harbors'
alleged waiver or election.

        In any case, the doctrine of election is inapplicable here.  The "doctrine of election
permits parties to wait a 'reasonable time' after learning of the alleged breaches before terminating
[a] contract."[77]  Here, PRCM alleges only that Two Harbors was aware of the purported causes for
termination as of March 20, 2020, when it sent the notice of non-renewal.[78]  The Court is not
persuaded that a four month delay before terminating for cause was unreasonable as a matter of law.
And while an election may occur when "the non-breaching party has taken an action (or failed to
take an action) that indicated to the breaching party that [it] had made an election," the decision not
to renew the Management Agreement did not indicate that Two Harbors had made an election
because – as discussed earlier – sending a notice of non-renewal and terminating for cause are not
inconsistent remedies.[79]  Finally, election is inapplicable because the non-renewal was not based on
the same conduct that ultimately caused Two Harbors to terminate the agreement for cause.
Accordingly, the decision not to renew did not indicate that Two Harbors had chosen any particular
course of conduct with regard to the events underlying the for cause termination.[80]

---

[76]

    *Id.*

[77]

    *ESPN*, 76 F. Supp. 2d at 393–94.

[78]

    Am. Compl. ¶ 74-75.

[79]

    *ESPN*, 76 F. Supp. 2d at 389 (explaining that "an election is not a waiver of any rights under
the contract but rather a choice between two inconsistent remedies for breach of the
contract").

[80]

    *Id.* ("The election of remedies simply requires that . . . If [a party] chooses to continue the
contract, then it has elected to continue, and it cannot later decide to terminate based on the

18

In addition, PRCM's suggestion that Two Harbors' delay in terminating for cause indicated that the events were not material "conflat[es] two analytically distinct issues – waiver and materiality."[81]  Instead, Two Harbors' delay is "irrelevant to the issue of materiality."[82]  "Were it otherwise, the agreement's non-waiver provision would be rendered superfluous."[83]  Accordingly, PRCM cannot state a claim for improper termination based on Two Harbors' delay in terminating for cause.

<blockquote>ii.     Specific Challenges to Two Harbors' Causes for Termination</blockquote>

In addition to the foregoing arguments, PRCM contends that all of Two Harbors' reasons for terminating the Management Agreement were insufficient under section 15.  Critically, the Management Agreement did not direct Two Harbors to include any specific information in its notice of termination.[84]  Accordingly, PRCM cannot – and does not – attack the validity of the notice

---

[81]     same breach . . . The key is that once a party has elected a remedy for a particular breach, her choice is binding with respect to that breach.").

[82]     *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 187 (1st Dep't. 2007), *aff'd*, 14 N.Y.3d 791 (2010).

[83]     *Id.*

[84]     *Id.*

While Two Harbors must provide notice and an opportunity to cure a material breach, both parties agree that this requirement does not apply here because Two Harbors claimed that the purported causes for termination are all incurable breaches or events of gross negligence. *See* Opp. Br. at 30 n. 21.  Other than this notice requirement, section 15(a) requires only that Two Harbors provide "30 days' prior written notice of termination," and does not dictate what information must be included in that notice of termination. Management Agreement at § 15(a).  PRCM does not challenge the adequacy of Two Harbors notice of termination, and does not contend that there is any "general rule that effective notice of termination of any contract must always contain a recitation of each and

of termination by pointing to any lack of specificity.  Instead, PRCM must allege sufficient facts to support a plausible claim that it did not materially breach the agreement or act with gross negligence.

"Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'"[85]  Accordingly, "[t]here is no material breach if the effect of the alleged breaching action on the contract as whole is negligible."[86]  With regard to gross negligence, the Second Circuit has defined this as "conduct [that] evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing."[87]  Recklessness in the context of gross negligence refers to "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."[88]

---

every specific provision of the contract that allegedly has been violated." *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1618-19 (4th Dep't. 2011).  Instead, the Court "decline[s] to construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977).

[85]  *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (*quoting Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).

[86]  28 N.Y. Prac., Contract Law § 17:11.  *See also* 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.) ("where a breach causes no damages or prejudice to the other party, it may be deemed not to be 'material.'").

[87]  *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (citation omitted).

[88]  *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (citation omitted).

*1.      The first five grounds for termination*

Two Harbors' first five grounds for termination all relate to employment agreements and compensation for the executives that PRCM provided to manage Two Harbors.  For example, Two Harbors claims that PRCM required certain executives to enter into agreements containing non-compete provisions that created a conflict of interest between those employees and Two Harbors.[89] It contends also that the compensation agreements with these personnel allowed PRCM to benefit monetarily at Two Harbors' expense.[90]  PRCM alleges that those events are not sufficient to terminate for cause because they "relate to compensation matters or terms of employment for employees or partners of Pine River affiliates."[91]  This allegation is insufficient.

The Management Agreement required PRCM to provided Two Harbors with a management team and to compensate those executives.[92]  Accordingly, Two Harbors properly could terminate the agreement if PRCM failed or was grossly negligent in performing these obligations.[93] The fact that the employment and compensation agreements were entered into with PRCM's affiliates did not rid PRCM of responsibility for any consequence that resulted from providing Two

---

[89]     Dkt. 40-8.

[90]     *Id.*

[91]     Am. Compl. at ¶ 76.

[92]     Management Agreement at §§ 3(a), 9.

[93]     Two Harbors argues also that it was permitted to terminate the Management Agreement based on the actions of PRCM's affiliates because section 15 allowed termination for cause based on a material breach by the "Manager, its agents or assignees." *Id.* at § 15(a).  PRCM alleges only that it contracted with its affiliates to provide personnel to manage Two Harbors. Am. Compl. at ¶ 4 n. 3.  It is unclear at this stage whether PRCM's affiliates acted as its agents or assignees in this regard.  On a motion to dismiss, this ambiguity must be construed in PRCM's favor.

Harbors with executives who were subject to the employment terms of which Two Harbors complains.[94]

In addition, while PRCM contends that Two Harbors has not "ever claimed that any of these events caused any disruption or other harm to Two Harbors,"[95] section 15 does not obligate Two Harbors to explain in its notice of termination how it was harmed. Instead, PRCM must allege plausibly that none of these events materially harmed Two Harbors. PRCM has failed to do so.[96]

Accordingly, PRCM has failed to allege sufficiently that Two Harbors could not properly terminate the Management Agreement based on these employment and compensation matters.

### 2.     *The sixth ground for termination*

The sixth ground for termination involves conduct by PRCM's partners, which Two Harbors claims created reputational issues.[97] The notice of termination points to a specific incident involving a PRCM partner as an example of such conduct.[98] PRCM alleges that the incident referred

---

[94]

In addition, Two Harbors' notice of termination claimed that PRCM failed to disclose these employment and compensation matters. Dkt. 40-8. PRCM does not address whether this failure would provide proper cause for termination.

[95]

Am. Compl. at ¶ 75.

[96]

Based on Two Harbors' notice of termination, it appears that some executives may not have ultimately agreed to the employment terms at issue. But PRCM fails to allege that these agreements were not executed. Without alleging such facts, the Court cannot rely on its own imagination to determine whether these events harmed Two Harbors.

[97]

Dkt. 40-8.

[98]

*Id.*

to "was based on unfounded allegations, was resolved amicably long ago and no lawsuit was ever filed."[99]  While these allegations support its assertion that Two Harbors was not harmed by this particular incident, Two Harbors' notice of termination pointed to this incident only as an example of "certain conduct" by PRCM's partners.[100]  PRCM does not allege that its partners were not involved in any other incidents that may have caused reputational harm.  Accordingly, it has not sufficiently alleged that Two Harbors lacked a valid basis to terminate the Management Agreement.

### 3.    *The seventh and eighth grounds for termination*

The seventh and eighth grounds for termination were based on PRCM's communications with Two Harbors and its personnel following Two Harbors' notice of non-renewal.[101]  PRCM alleges that these communications addressed only legal issue and its rights under the Management Agreement.

Neither party has cited any case law addressing whether communicating about legal issues can be a material breach or act of gross negligence.  Nonetheless, PRCM has alleged adequately that it did not take – or direct others to take – any actions at the time it sent those communications.[102]  Accordingly, PRCM alleged plausibly that these communications did not have any impact on its performance under the Management Agreement.  Two Harbors' arguments to the

---

[99]
    Am. Compl. at ¶ 77.

[100]
    Dkt. 40-8.

[101]
    *Id.*; Dkt. 40-9.

[102]
    Am. Compl. at ¶ 79.

23

contrary raise factual issues that cannot be decided at this stage.

In any case, as further discussed below, PRCM has alleged adequately that it had a right to the intellectual property it sought in these letters.[103]  Likewise, PRCM has alleged that the personnel with whom it corresponded were employees of PRCM & Affiliates, not Two Harbors.[104] These allegations are sufficient to support PRCM's claim that the legal positions taken in those letters did not breach the Management Agreement.  Accordingly, PRCM has alleged adequately that Two Harbors could not properly terminate the Management Agreement based on these communications.  Nonetheless, because Two Harbors' notice of termination did not rest on these communications alone, PRCM has not alleged adequately that Two Harbors' termination of the Management Agreement was improper.  Accordingly, PRCM's claim for improper termination is dismissed.

C.    *Duty of Good Faith and Fair Dealing*

PRCM cannot save its improper termination claim by relying on the duty of good faith and fair dealing.  PRCM contends that Two Harbors breached this duty by fabricating reasons to terminate the agreement in order to internalize management on the cheap.[105]  But "[t]he principle

---

[103]

> The parties dispute whether PRCM's request would have required Two Harbors to provide it with personal identifying information in violation of state and federal law.  *Compare* Br. at 2 ("PRCM and/or its affiliates well knew that the demand asked Two Harbors' personnel to violate federal and state laws") *with* Opp. at 13 (PRCM "proposed to Two Harbors that the parties work together to 'remove [any sensitive Two Harbors' consumer information] from [PRCM's] intellectual property' as part of its return").  This is a factual issue that cannot be decided on a motion to dismiss.

[104]

> Am. Compl. at ¶¶ 4 n. 3; 26; 47.

[105]

> *Id.* at ¶¶ 154-55.

of good faith constrains a party's actions, not a party's motives for those actions."[106]   Accordingly,
"a termination for cause cannot breach the implied covenant, even if motivated by reasons unrelated
to cause."[107]     Instead, as long as Two Harbors had "cause" to terminate the Management
Agreement, "any allegations of other improper motives [are] irrelevant to a determination of good
faith performance."[108]   Accordingly, PRCM's claim based on the alleged breach of the duty of good
faith and fair dealing is dismissed.

III.    *The Intellectual Property Causes of Action*

In addition to claiming that Two Harbors improperly terminated the Management
Agreement, PRCM attacks Two Harbors' failure to return its intellectual property.   It alleges that
Two Harbors breached the Management Agreement by refusing to enforce PRCM's rights in its
intellectual property and violated state and federal law by misappropriating its intellectual property
after the Management Agreement terminated.   For the following reasons, the Court concludes that
these claims are alleged sufficiently.[109]

---

[106]

    *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 94 n. 5 (2d Cir. 2013).

[107]

    *Thompson v. Advanced Armament Corp., LLC*, 614 F. App'x 523, 525 (2d Cir. 2015)
(summary order).   *See also HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp.
LLC*, 994 F. Supp. 2d 520, 537 (S.D.N.Y. 2014) (same).

[108]

    *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 164 F.3d 619 (2d Cir. 1998) (summary order).   *See
also HLT Existing Franchise Holding LLC*, 994 F. Supp. 2d at 537 (same); *HLT Existing
Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir.
2015) (summary order) (*citing Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304
(1983) ("No obligation can be implied . . . which would be inconsistent with other terms of
the contractual relationship.")).

[109]

    With the limited exception of some claims that are dismissed as duplicative, as discussed
below.

A.      *Ownership of the Intellectual Property*

As a threshold issue, Two Harbors argues that PRCM does not own any intellectual property.  Accordingly, it claims that none of PRCM's intellectual property claims can stand.

Section 27 of the Management Agreement provided that "[a]ll Intellectual Property created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise . . . shall be the sole and exclusive property of the Manager."[110]  Two Harbors claims that the "manager" could not have "created or developed" any intellectual property because PRCM had no employees.  PRCM alleges that it relied on the personnel and other resources of Pine River Capital and its subsidiaries to manage Two Harbors pursuant to the Shared Services Agreement.[111]  The parties do not dispute that these personnel developed or created the intellectual property at issue here.[112]  Instead they dispute whether the intellectual property created by these personnel may be attributed to the "manager" under section 27.

The Management Agreement defined "manager" to include PRCM's "permitted assignees."[113]   PRCM claims that  "permitted assignees" includes its affiliates because it was

---

[110]

Management Agreement at § 27.

[111]

Am. Compl. ¶ 4 n. 3.

[112]

PRCM alleges – and Two Harbors does not dispute – that Two Harbors had no employees of its own before the Management Agreement was terminated.  Am. Compl. ¶ 4. Accordingly, PRCM sufficiently alleges that any intellectual property created when PRCM managed Two Harbors was created by the personnel provided by PRCM.

[113]

Management Agreement at § 1(w).

permitted to assign them responsibility under the Management Agreement.[114] Two Harbors argues that "permitted assignees" includes only those affiliates to which PRCM actually assigned responsibilities. The Court agrees with Two Harbors.

"Permitted assignees" is not a defined term. The Management Agreement permitted PRCM to assign responsibilities to its affiliates, but this did not mean that its affiliates were "permitted assignees" if no assignment occurred. In fact, the Management Agreement provided that "permitted assignment to an affiliate shall bind the assignee under this Agreement in the same manner as the Manager is bound."[115] This phrase would be redundant if PRCM's affiliates already were included in the term "manager" notwithstanding any assignment. Plainly, PRCM's responsibilities under the Management Agreement did not inure to its affiliates – who were not parties to the Management Agreement – unless it assigned those responsibilities to them. The definition of "manager" cannot change this result.[116]

In addition, the Management Agreement referred to the "[m]anager and its affiliates."[117] If affiliates were "permitted assignees" and encompassed within the definition of

---

[114]

    *Id.* at § 14.

[115]

    *Id.*

[116]

    *C.f., United States v. Waterman S.S. Corp.*, 471 F.2d 186, 189 n. 4 (5th Cir. 1973) ("[a] party cannot unilaterally employ definitions to bind another [party to] ... provisions to which the other [party] has not consented to be bound."); *APL Co. Pte. v. Kemira Water Sols., Inc.*, 890 F. Supp. 2d 360, 366 (S.D.N.Y. 2012) ("As a general matter, a party cannot unilaterally bind another party to a contract by capturing them within a term defined in that contract.").

[117]

    *See e.g.*, Management Agreement at § 3(a), 9.

"manager," it would have been redundant to refer to both the manager and its affiliates.[118] For each of these reasons, the Court concludes that "permitted assignees" were only persons or entities to which PRCM assigned responsibilities in accordance with section 14 of the Management Agreement.

PRCM does not allege that it assigned its responsibilities under the Management Agreement to its affiliates, only that it "relied" on the personnel of its affiliates pursuant to the Shared Services Agreement.[119]   Accordingly, the Court concludes that PRCM has not plausibly alleged that its affiliates were "permitted assignees."[120]

But this does not end the inquiry.   Section 27 provided that intellectual property created or developed by the "manager" belongs to PRCM.  The "manager" obviously cannot itself create or develop any intellectual property.   Instead, "a corporate legal entity . . . necessarily functions through human actors – its officers, agents and employees."[121]

---

[118]   "[I]t is axiomatic that, when interpreting a contract, the court generally must consider the contract as a whole so that it may give significance to each term." *T.G.I. Friday's Inc. v. Nat'l Restaurants Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995).

[119]   Am. Compl. at ¶ 4 n. 3.

[120]   While PRCM alleges that "permitted assignees" includes its affiliates, this is a matter of contractual interpretation that the Court is not obligated to accept as true.   *See Int'l Audiotext Network, Inc.*, 62 F.3d at 72.

[121]   *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 318 (2d Cir. 2016) (Wesley, C.J., dissenting). *See also Plotkin v. Republic-Franklin Ins. Co.*, 177 A.D.3d 790, 792 (3rd Dep't. 2019) ("since corporations, which are legal fictions, can operate only through their designated agents and employees, the acts of the latter are, in a sense, the acts of the corporation as well") (*quoting People v. Byrne*, 77 N.Y.2d 460, 465 (N.Y. 1991)); *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471 (S.D.N.Y. 2010), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73 (2d Cir. 2011) ("Corporations act only through their agents.").

Two Harbors' assumption that PRCM could act only through employees or assignees is incorrect. For example, PRCM could delegate its responsibilities by contract, in which case the delegee's acts may be attributed to PRCM, at least in some circumstances.[122] In fact, the Management Agreement expressly contemplated that PRCM would fulfill its responsibilities as manager through the employees, officers, partners, and personnel of its affiliates pursuant to the Shared Services Agreement.[123]

Accordingly, the bright line that Two Harbors has constructed between PRCM's employees and other personnel acting on PRCM's behalf is an oversimplification. While PRCM does not allege that it hired employees, it does allege that it contractually retained personnel to carry

---

[122]    See e.g. In re Lehman Bros., Inc., 554 B.R. 626, 632 (S.D.N.Y. 2016), aff'd in part sub nom. In re Lehman Bros. Holdings Inc., 703 F. App'x 18 (2d Cir. 2017) (explaining that "a formal assumption . . . was not required to effect a delegation" particularly where this arrangement was expressly agreed to in the parties' contract). See also Contemporary Mission Inc., 557 F.2d at 924 ("Perhaps more frequently than is the case with other terms of art, lawyers seem prone to use the word 'assignment' inartfully, frequently intending to encompass within the term the distinct concept of delegation" and explaining the difference between delegation and assignment) (cleaned up).

[123]    Management Agreement at § 2(d) (providing that the manger may enter into agreements with its affiliates in order to engage personnel to provide various services to Two Harbors, and expressly mentioning the Shared Services Agreement); Id. at § 3(a) (providing that "the Manager and its affiliates" will provide Two Harbors with a management team "to provide the management services to be provided by the Manager" to devote a portion of their time to the management of Two Harbors as necessary); Id. at § 3(c) (providing that managers, partners, officers, employees, personnel, and agents of the manager or its affiliates may serve as directors, officers, employees, or agents for Two Harbors); Id. at § 9 (describing allocation of compensation "of the personnel of the Manager and its affiliates who provide services" to Two Harbors); Id. at § 14(b) ("Notwithstanding any provision of this Agreement, the Manager may subcontract and assign any or all of its responsibilities under Sections 2(b), 2(c) and 2(d) of this Agreement to any of its affiliates in accordance with the terms of this Agreement applicable to any such subcontract or assignment, and the Company hereby consents to any such assignment and subcontracting.") (emphasis added).

29

out its responsibilities under the Management Agreement.[124] Whether the nature of their relationship with PRCM made their acts attributable to the "manager" under section 27 of the Management Agreement is a fact specific question that the Court cannot decide on a motion to dismiss.[125] At this stage, PRCM has alleged sufficiently that these personnel were acting on its behalf when the intellectual property was developed.[126] This is sufficient for PRCM to claim plausibly that it owns the intellectual property at issue here.[127]

This conclusion is not contrary to the "longstanding principle of New York law that

---

[124]

       Am. Compl. at ¶ 4 n. 3.

[125]

       For example, "New York courts have recognized that the question of the existence and scope of an agency relationship is a factual issue that a court cannot properly adjudicate on a motion to dismiss." *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F. Supp. 2d 457, 471 (S.D.N.Y. 1999). *See also Heredia v. United States*, 887 F. Supp. 77, 80 (S.D.N.Y. 1995) ("New York courts have held that where the circumstances alleged in the pleading raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency are issues of fact and are not properly the basis of a motion to dismiss.") (internal quotation marks omitted).

[126]

      In addition to alleging that it relied on these personnel pursuant to the Shared Services Agreement, PRCM has alleged that the intellectual property at issue was developed in the course of managing Two Harbors and that PRCM controlled the use and dissemination of this intellectual property. Am. Compl. ¶ 15 ("all of the individuals who managed Two Harbors prior to August 14, 2020 were employees of Pine River."); *Id.* at ¶ 31 ("In connection with the management of Two Harbors' operations, Pine River developed and is the owner of valuable intellectual property . . . These trade secrets were regularly used to manage Two Harbors' investments."); *Id.* at ¶ 40 ("Pine River employees hired to work on operations related to the Management Agreement were required to execute a 'Confidentiality, Nonsolicitation, and Inventions Agreement' that required those employees to safeguard and keep confidential Pine River's intellectual property."). These facts support a plausible inference that these personnel acted on PRCM's behalf and subject to PRCM's control with regard to the intellectual property they developed.

[127]

      Whether or not Two Harbors paid for the development of the intellectual property – a factual issue that the Court does not decide here – would not change this conclusion because the ownership of the intellectual property is governed by the Management Agreement.

a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided."[128]   As an initial matter, "[t]he doctrine . . . becomes operative only when there is ambiguity.  It does not permit the court to override plain language or to make a new agreement."[129] Because Two Harbors has not pointed to any language in the Management Agreement suggesting that "manager" does not include persons acting on the manager's behalf, this canon has no application here.

In any case, this principle would not be violated by the Court's conclusion.  The purpose of this canon is to ensure that contracts are interpreted in line with the parties' reasonable expectations.[130]  Here, the Management Agreement explicitly defined "manager" to include PRCM's "permitted assignees" and provided that PRCM could assign its responsibilities under the Management Agreement to its affiliates without Two Harbors' consent.[131]   Accordingly, PRCM could have assigned responsibility to its affiliates instead of executing the Shared Services Agreement.  Two Harbors does not dispute that if PRCM had done so, any intellectual property created in managing Two Harbors would have belonged to PRCM.  Two Harbors does not contend

---

128

      Br. at 27 (*citing Luver Plumbing & Heating, Inc. v. Mo's Plumbing & Heating*, 144 A.D.3d 587, 588-89 (1st Dep't 2016)).

129

      *Ruth v. S.Z.B. Corp.*, 153 N.Y.S.2d 163, 168 (Sup. Ct., N.Y. Cnty.), *aff'd*, 2 A.D.2d 970 (1st Dep't. 1956).

130

      *See e.g., Schoellkopf v. Coatsworth*, 166 N.Y. 77, 84 (N.Y. 1901) ("It is a well-established canon of interpretation that in seeking for the intent of parties the fact that a construction contended for would make the contract unreasonable and place one of the parties at the mercy of the other may be properly taken into consideration.").

131

      Management Agreement at §§ 1(w), 14.

31

that this result would be unfair.[132]  The fact that PRCM instead chose to manage Two Harbors

through a Shared Services Agreement instead of  assignment cannot realistically provide PRCM

with an unfair advantage that Two Harbors did not expect.[133]

Accordingly, the Court concludes that PRCM alleged adequately that it owns the

intellectual property that was created or developed in connection with PRCM's management of Two

Harbors.

B.    *Breach of Contract*

Section 27 of the Management Agreement licensed Two Harbors to use PRCM's

intellectual property during the term of the Management Agreement.  This section provided also that

Two Harbors would act "upon request of the Manager . . . [to] perfect, record, confirm, or enforce

the Manager's rights in and to the Intellectual Property."[134]  PRCM alleges that Two Harbors

breached this provision "by failing to assist Pine River in confirming and enforcing Pine River's

---

[132]

    Although Two Harbors notes that the Management Agreement was drafted before it had an
independent board of directors, section 27 was added in a much later amendment.  *See* Dkt.
36-13.  Accordingly, any unfairness based on Pine River Capital standing on both sides of
the transaction is inapplicable here.

[133]

    The Court's conclusion that PRCM has alleged sufficiently that it owns the intellectual
property does not mean – as Two Harbors contends – that Two Harbors' right to terminate
the Management Agreement is rendered illusory.  Instead, this means that Two Harbors
would need to negotiate a mutually agreeable transaction with PRCM in order to internalize
management.  This is precisely what PRCM alleges the Management Agreement was
intended to do.  In addition, PRCM alleges that this is the normal practice for externally
managed REITs like Two Harbors. Am. Compl. at ¶ 57.  To the extent that Two Harbors'
argument disputes these allegations, it is not properly considered on a motion to dismiss.

[134]

    Management Agreement at § 27.

rights in and to its intellectual property."[135]  In addition, PRCM alleges that Two Harbors violated section 27 when it refused to provide PRCM with its intellectual property after Two Harbors sent the first notice of termination.[136]

Two Harbors argues that it may continue using PRCM's intellectual property because PRCM & Affiliates' former personnel – who now are employed by Two Harbors – have an independent right to use this intellectual property under the Confidentiality Agreements with their former employer.   In particular, Two Harbors contends that under section 15(b) of the Confidentiality Agreements, these employees may use PRCM's intellectual property as long as they are providing services for Two Harbors, even after their employment and the Management Agreement terminated.[137]  The Court disagrees.

Section 15(b) provides that "the covenants set forth in Sections 1 through 3" of the Confidentiality Agreements "shall not apply to and shall in no way prohibit Employee's exchange and use of any Confidential Information, Inventions or Copyrights . . . in connection with the services Employee provides to Two Harbors."[138]  Critically, this provision limits only the covenants in sections 1 through 3.  The next line includes a separate limitation on sections 4 and 5.[139]  It

---

[135]    Am. Compl. at ¶ 147.

[136]    *Id.* at ¶ 146.

[137]    Confidentiality Agreement at § 15(b).

[138]    *Id.*

[139]    *Id.*

33

therefore does not impact the obligations in the remainder of the Confidentiality Agreements.[140]

Section 6 – which is not subject to the carve out in section 15(b) – requires the employees to **return** PRCM's intellectual property upon the termination of their employment.[141] PRCM acknowledges that this obligation would not apply to trade secrets or know-how that employees inevitably would carry in their heads even in the absence of tangible items.[142] But that principle has no application here, as PRCM alleges that the misappropriated trade secrets were specific software, models, databases, and tools which inherently were, or were recorded in, tangible form or media.[143] These tangible items are returnable. PRCM & Affiliates' employees were obliged to return them when their employment and the Management Agreement terminated.

Contrary to Two Harbors' argument, hiring these employees did not allow it to continue using PRCM's intellectual property. Section 15(b) would have allowed the employees to use PRCM's intellectual property only if Two Harbors had access to the intellectual property pursuant to some independent right or arrangement with PRCM. Accordingly, the Confidentiality Agreements do not allow Two Harbors to continue using PRCM's intellectual property after the

---

[140]

> See e.g., *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 (2d Cir. 2018) (stating that the principle of *expressio unius est exclusio alterius* applies to contract interpretation and concluding that "[b]y expressly foreclosing certain proceedings from arbitration, the parties in these cases strongly implied that every other 'controversy or dispute' remains subject to arbitral resolution.") (*citing VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001)).

[141]

> Confidentiality Agreement at § 6.

[142]

> Opp. at 19 n. 13 ("because [the employees] had knowledge of the trade secrets that they could not 'unlearn,' Section 15(b) simply makes clear that such knowledge would not prohibit them from working for Two Harbors under the 'inevitable disclosure' doctrine or otherwise.").

[143]

> Am. Compl. at ¶ 32-33.

Management Agreement terminated.

### C.    *Defend Trade Secrets Act ("DTSA")*

#### i.    *Duplicative Claims*

The DTSA provides a remedy for the owner of a misappropriated trade secret.[144]  As an initial matter, Two Harbors argues that PRCM's DTSA claim is duplicative of its breach of contract claim.  Generally, "when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual."[145]  But this principle typically applies to "attempts to repackage" contractual claims as claims "sounding in fraud, conversion, and other torts, as well as unjust enrichment, implied and quasi contract, and quantum meruit."[146]  Neither party has addressed whether the same analysis applies to a statutory claim, as is the case here.[147]

In any case, PRCM's DTSA and contractual claims are not duplicative because the DTSA claim "encompasses periods not included within its breach of contract claim . . . and occurring after the [contract's] termination."[148]  PRCM's DTSA claim applies only to Two Harbors'

---

[144]  18 U.S.C. § 1836.

[145]  *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011).

[146]  *Id.*

[147]  Generally, claims asserted under a contract and a statute are analyzed through the lense of preemption.  Here, the DTSA disposes of any such issue by expressly providing that it does not preempt common law claims.  18 U.S.C. § 1838.

[148]  *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10-cv-128 (PAC), 2013 WL 1775437, at *5 (S.D.N.Y. Apr. 25, 2013).  *See also J.S. Nicol, Inc. v. Peking Handicraft Inc.*, No. 03-cv-1548, 2008 WL 1809319, at *5 (S.D.N.Y. Apr. 21, 2008) ("Damages pursuant to the contract claim are not sufficient to remedy the additional damage suffered as a result of

35

acts after the Management Agreement was terminated because the DTSA covers "misappropriated" trade secrets.[149]   "Misappropriation" is defined as either the "acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means," or "disclosure or use of a trade secret of another without express or implied consent."[150] Accordingly, the DTSA claim is inapplicable during the term of the Management Agreement when Two Harbors had a contractual right to use PRCM's intellectual property.

Unlike the DTSA claim, PRCM's contractual claim relates to Two Harbor's failure to assist PRCM in "confirming and enforcing" its rights in its intellectual property during the term of the Management Agreement.[151]   In fact, the Management Agreement does not provide that this obligation survives termination of the  Management Agreement.[152]   Accordingly, the DTSA and contractual claims are not duplicative.  PRCM properly may seek a remedy for each distinct alleged wrong, although, of course it may recover for any particular injury only once.

---

defendant's unauthorized use of plaintiff's designs after the expiration of the licensing agreement.").

[149]   18 U.S.C. § 1836.

[150]   18 U.S.C. § 1839(5).

[151]   Am. Compl. at ¶ 147. *See also* Opp. Br. at 15.

[152]   Management Agreement at § 27.

Other sections in the Management Agreement expressly provide that they survive termination. *See e.g., Id.* at §§ 6, 9, 10, 13(a), 13(d).  Accordingly, the absence of such language in section 27 suggests that the obligations therein do not survive termination.

ii.      *Specificity of the Allegations*

There is "no heightened pleading requirement on actions brought under the DTSA."[153] Nonetheless, "district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated."[154] This merely requires that the complaint "specify the general contours of a trade secret without merely restating the elements of one."[155] "Courts have accepted relatively general descriptions of alleged secrets at the motion to dismiss stage."[156]

Paragraphs 32 and 33 of the Amended Complaint lists "examples" of trade secrets that PRCM claims Two Harbors misappropriated.[157] As an initial matter, the "examples" listed in these paragraphs are insufficient to notify Two Harbors of any non-listed trade secrets that PRCM contends were misappropriated.  Accordingly, any trade secrets not included in paragraphs 32 or 33 are not pled with sufficient specificity.

PRCM contends that the Amended Complaint identifies all of its trade secrets by

---

153

    *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-cv-5966 (JSR), 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017).

154

    *ExpertConnect, L.L.C. v. Fowler*, No. 18-cv-4828 (LGS), 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019).

155

    *Kraus USA, Inc. v. Magarik*, No. 17-cv-6541 (ER), 2020 WL 2415670, at *4 (S.D.N.Y. May 12, 2020) (internal quotation marks omitted).

156

    *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19-cv-7367 (JPO), 2020 WL 4570047, at *2 (S.D.N.Y. Aug. 7, 2020) (internal quotation marks omitted).

157

    Am. Compl. at ¶¶ 105, 32-33.

name.[158]   This seems true for a number of items identified by non-descriptive terms, such as

"Neptune" or "COSMOS."[159]  Those are sufficiently alleged.  It is less apparent whether other items

– such as "Operations Workflow Engine," "Time Allocation," or "Personal Time Off tool" – are

listed by name.[160]  In any case, even if these terms were descriptive, PRCM's allegations still would

be sufficient.  Descriptions of trade secrets that "inform the defendants of what they are alleged to

have misappropriated" are adequate.[161]  There is no bright-line rule with regard to which descriptions

are acceptable.[162]  Most of the  descriptions in paragraphs 32 and 33 refer to specific categories of

information (e.g., "propriety databases and models that contain . . . core earnings forecasts") or

describe the specific purpose of the tool (e.g., "proprietary and confidential process, tools, and

content to manage SOX compliance.").[163]  The Court concludes that these descriptions are sufficient

to notify Two Harbors which programs or information PRCM claims were misappropriated.

On the other hand, the description of "confidential and proprietary databases and

---

158

Opp. at 19.

159

Am. Compl. at ¶¶ 32-33.

160

*Id.*

161

*ExpertConnect*, 2019 WL 3004161, at *4.

162

*Compare*, *Tesla Wall Sys.*, 2017 WL 6507110, at *9 ("Tesla's complaint is highly specific regarding defendants' course of conduct [and] pleads numerous specific categories of information, such as 'technical data, internal pricing information, work product, research, engineering designs,' etc."), *with PaySys Int'l, Inc. v. Atos Se*, No. 14-cv-10105 (KBF), 2016 WL 7116132, at *10 (S.D.N.Y. Dec. 5, 2016) (holding the complaint was insufficiently specific when the trade secrets were identified as "the Products, all Enhancements to the Products and all proprietary information, data, documentation and derivative works related to the Products").

163

Am. Compl. at ¶¶ 32-33.

models that contain" generic items such as "operations tools," "external data management," "task-specific proprietary code and configuration," and "IT processes" are not alleged sufficiently.[164] These broad terms can refer a myriad of things, and it is not clear that Two Harbors can identify which database or models are alleged to contain these trade secrets. Accordingly, these descriptions are too vague to support PRCM's DTSA claim.

### iii.   Secrecy of the Trade Secrets

Two Harbors argues also that PRCM failed to maintain the secrecy of its purported trade secrets as required by the DTSA.[165]   The crux of Two Harbors' argument is that the Confidentiality Agreements between PRCM's affiliates and its employees allowed these employees to use PRCM's trade secrets after their employment terminated.[166]   As discussed above, the Court disagrees with Two Harbors' interpretation of the Confidentiality Agreements.   Employees were required to return PRCM's intellectual property following the end of their employment.   The Confidentiality Agreements only allowed them to use the confidential information when working for Two Harbors if Two Harbors had an independent right to the information.   Accordingly, the Confidentiality Agreements do not undermine PRCM's DTSA claim.

In addition, Two Harbors has not explained why PRCM must allege that the Management Agreement separately obligated it to preserve the confidentiality of PRCM's trade

---

[164]

*Id.* at ¶ 33.

[165]

*See* 18 U.S.C. § 1839(3)(A) ("the owner [must have] taken reasonable measures to keep such information secret.").

[166]

Br. at 13-14.

39

secrets.  PRCM alleges that Two Harbors had no employees and was managed by personnel who were all bound by the Confidentiality Agreements.[167]  This is sufficient to allege that PRCM protected the confidentiality of its trade secrets when managing Two Harbors.  In any case, the Management Agreement did require Two Harbors to take various acts "as may be requested by the Manager . . . to otherwise perfect, record, confirm, or enforce the Manager's rights in and to the Intellectual Property."[168]  Accordingly, PRCM sufficiently alleges that the Management Agreement protected its intellectual property.

### iv.    Ownership of the Trade Secrets

Two Harbors argues also that PRCM cannot state a claim under the DTSA because it does not own the alleged trade secrets.  The Court already concluded that this argument fails and that conclusion applies here as well.

Accordingly, the Court concludes that PRCM has sufficiently alleged a claim of trade secret misappropriation under the DTSA.

### D.    Unfair Competition Claim

PRCM's unfair competition claim is not duplicative of its breach of contract claim. "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential

---

[167]    Am. Compl. at ¶¶ at 41-43, 47.

[168]    Management Agreement at § 27.

relationship."[169]  Here, PRCM's unfair competition claim goes beyond Two Harbors' contractual obligations to claim that Two Harbors used its access to PRCM's intellectual property and personnel to terminate the Management Agreement improperly and to internalize management without compensating PRCM.[170]

This would be sufficient to plead an unfair competition claim even if PRCM and Two Harbors were not technically competitors.  "New York's law of unfair competition is a broad and flexible doctrine," which "encompass[es] any form of commercial immorality, or simply as endeavoring to reap when one has not sown."[171]  Accordingly, "a court may sustain an unfair competition claim even if the parties are not 'actual competitors.'"[172]  Instead, the crucial element is "the misappropriation of another's commercial advantage."[173]

PRCM has alleged adequately that ownership of its trade secrets provided a commercial advantage vis-a-vis the management of Two Harbors.[174]  Accordingly, PRCM plausibly

---

[169]

*Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018) (*quoting Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001)).  *See also Trahan v. Lazar*, 457 F. Supp. 3d 323, 355 (S.D.N.Y. 2020) (same).

[170]

Am. Compl. at ¶¶ 169-72.

[171]

*Telecom Intern. Am., Ltd.*, 280 F.3d at 197-98.  *See also Bos. Tea Co., LLC v. Bay Valley, LLC*, No. 1:17-cv-04742 (ALC), 2018 WL 4211313, at *6 (S.D.N.Y. Sept. 4, 2018) ("New York courts have explained that the law of 'unfair competition' stresses the element of unfairness rather than the element of competition and the term is generally applied to any form of unlawful business injury") (*quoting Louis Capital Markets, L.P. v. REFCO Grp. Ltd., LLC*, 9 Misc. 3d 283, 288 (Sup. Ct. N.Y. Cnty. 2005)).

[172]

*Redf Organic Recovery, LLC v. Rainbow Disposal Co.*, 116 A.D.3d 621, 622 (1st Dep't. 2014).

[173]

*Louis Cap. Markets*, 9 Misc. 3d at 288.

[174]

Am. Compl. at ¶¶ 169-72. .

has claimed that Two Harbors was able to terminate PRCM and internalize management only by misappropriating PRCM's intellectual property, employees, and know-how. These allegations are sufficient to plead a claim for unfair competition under New York law.[175]

      E.    *Common Law Misappropriation Claim*

      For reasons similar to its unfair competition claim, PRCM's misappropriation claim is not duplicative of its breach of contract claim. "To state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage."[176] Accordingly, "[a] claim of misappropriation must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."[177] Two Harbors' access to PRCM's intellectual property arose from their contractual relationship but PRCM has sufficiently alleged that Two Harbors' misappropriation went beyond a mere breach of the Management Agreement.[178]

      On the other hand, Two Harbor points out – and PRCM does not dispute – that PRCM's unfair competition and misappropriation claims are based on the same theory and

---

175

      For the reasons discussed with regard to the breach of contract and DTSA claim, Two Harbors' remaining challenges to PRCM's unfair competition claim fail.

176

      *Trahan*, 457 F. Supp. 3d at 356 (*quoting Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 745 F. Supp. 2d 343, 352-3 (S.D.N.Y. 2010)).

177

      *Id.* (internal quotation marks omitted).

178

      Am. Compl. at ¶ 128.

allegations.[179]   "A claim for unfair competition based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action."[180]   Here, PRCM's misappropriation claim is encompassed within its unfair competition claim.  Accordingly, PRCM's misappropriation claim is dismissed as duplicative.

F.    *Unjust Enrichment*

Two Harbors argues also that PRCM's unjust enrichment claim is duplicative of its breach of contract claim.  PRCM does not dispute that both claims rely on the same factual allegations but instead asserts that it may plead these claims in the alternative.

Unjust enrichment may be pled in the alternative to a contractual claim "if there is 'a bona fide dispute concerning [the] existence of a contract or whether the contract covers the dispute in issue.'"[181]   Here, the parties dispute whether the intellectual property developed by personnel retained by PRCM – who are not its employees – is covered by section 27 of the Management Agreement.  While PRCM's allegations are sufficient to survive a motion to dismiss, this dispute presents a factual issue that cannot be resolved at this stage.  Accordingly, PRCM's claim of unjust enrichment with regard to that intellectual property may be pled in the alternative and will not be dismissed at this stage.

---

[179]

Br. at 29.

[180]

*Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 19-cv-6793EKRML, 2021 WL 535217, at *6 (E.D.N.Y. Feb. 12, 2021) (*quoting Uni-Sys., LLC v. United States Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 179 (E.D.N.Y. 2018) (collecting cases)).  *See also Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 629 (S.D.N.Y. 2014).

[181]

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014) (*quoting Fantozzi v. Axsys Techs.*, Inc., No. 07-cv-02667, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008)).

"[T]o state a claim for unjust enrichment . . . under New York law [a] plaintiff must show that (1) defendant was enriched, (2) the enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution."[182] PRCM has sufficiently pled each of these elements.  According to the Amended Complaint, PRCM developed intellectual property that Two Harbors is using without paying PRCM.  Even if Two Harbors paid for the development of the intellectual property, PRCM's claim of unjust enrichment would still stand because Two Harbors did not pay PRCM to use the intellectual property that PRCM alleges it owns under the Management Agreement.  Accordingly, PRCM has sufficiently alleged that Two Harbors has "benefitted momentarily at [its] expense."[183]

G.    *Conversion*

Conversion may not be pleaded in the alternative to a breach of contract claim, and conversion claims "are routinely dismissed on Rule 12(b)(6) motions where duplicative of breach of contract claims."[184]  "In determining whether a conversion claim is duplicative of a breach of contract claim, courts look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought."[185]  Here, PRCM's conversion claim is based on Two

---

[182]    *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 166 (S.D.N.Y. 1998).

[183]    *See Rostropovich v. Koch Int'l Corp.*, No. 94-cv-2674 (JFK), 1995 WL 104123, at *8 (S.D.N.Y. Mar. 7, 1995) ("Even though defendants paid for the right to use the recordings, the defendants did not pay [plaintiff] and a jury might find that the defendants benefitted monetarily at plaintiff's expense.).

[184]    *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 456 (S.D.N.Y. 2014).

[185]    *AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04-cv-8832 (KMK), 2007 WL 2962591, at *5 (S.D.N.Y. Oct. 10, 2007).

Harbors' allegedly unauthorized use of its trade secrets following the termination of the Management Agreement.[186] Because PRCM has disavowed any breach of contract claim for actions following the termination of the Management Agreement, the conversion claim and breach of contract claim are based on distinct acts and are not duplicative.

Two Harbors' other challenges to PRCM's conversion claim fail for the same reasons discussed with regard to the breach of contract claim and DTSA claim.

## IV.   Declaratory Judgment

PRCM seeks a declaratory judgment that Two Harbors improperly terminated the Management Agreement.  For all the reasons discussed with regard to PRCM's breach of contract claims, this claim fails.

In addition, PRCM seeks a declaratory judgment that Two Harbors may not continue using its intellectual property following the termination of the Management Agreement.  As the Court explained, this claim is based on Two Harbors' actions following termination of the Management Agreement and is not duplicative of PRCM's contractual claim.  Accordingly, PRCM's claim for a declaratory judgment based on section 27 of the Management Agreement will not be dismissed at this stage.

## V.   Tortious Interference

PRCM alleges that Two Harbors interfered with the Confidentiality Agreements

---

[186]    Am. Compl. at ¶¶ 192-3.

between PRCM and its employees.[187]   These agreements were entered into between Pine River

Domestic Management LP and its employees, not PRCM.[188]   PRCM claims that it nevertheless may

enforce the Confidentiality Agreements because the Management Agreement defined "manager"

to "includ[e] those Pine River affiliates to which Pine River assigned or subcontracted certain

responsibilities under the Management Agreement."[189]   Regardless of the accuracy of this statement,

the definition of "manager" in the Management Agreement did not make PRCM a party to the

Confidentiality Agreements.   The only party to the Confidentiality Agreements is Pine River

Domestic Management LP and the Amended Complaint was not brought by this entity.   This is fatal

to PRCM's claim.

    PRCM argues in the alternative that it should be allowed to amend its complaint to

add Pine River Domestic Management LP as a party to this action.[190]   "In the absence of any

apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the

leave sought should, as the rules require, be 'freely given.'"[191]   Two Harbors has not pointed to any

such reason why the Court should not allow PRCM to add Pine River Domestic Management LP

---

[187]
  *Id.* at ¶¶ 202-4.

[188]
  Dkt. 40-11.

[189]
  Opp. at 34.

[190]
  *Id.* at 34 n. 23.

[191]
  *Foman v. Davis*, 371 U.S. 178, 182 (1962) (*citing* Fed. R. Civ. P. 15(a)(2)).

46

as a party to this case.[192]  Accordingly, the Court grants PRCM leave to do so.

> Finally, for the reasons explained above with regard to PRCM's other causes of action, the Court disagrees with Two Harbors' remaining challenges to this claim.

*Conclusion*

> For the forgoing reasons, defendants' motion to dismiss [Dkt. 34] is granted to the extent that plaintiff's claims for tortious interference, common law misappropriation, breach of sections 13(a) and 15 of the Management Agreement, and breach of the duty of good faith and fair dealing are all dismissed.  The motion is  denied in all other respects.  Leave is granted for the plaintiff to amend the complaint only to add Pine River Domestic Management LP as a party to this case, provided it does so within thirty days.

> SO ORDERED.

Dated:          June 23, 2021

Lewis A. Kaplan
United States District Judge

---

192

Reply at 10 n. 17 (arguing only that PRCM cannot amend through its opposition).