## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- :
                                         :
PRCM ADVISERS LLC, PINE RIVER CAPITAL:   
MANAGEMENT L.P. and PINE RIVER:   
DOMESTIC MANAGEMENT L.P.,            :      Case No. 1:20-cv-05649-LAK
                                          :
                   Plaintiffs,        :      **JURY TRIAL DEMANDED**
                                          :
           - v. -                          :
                                          :
TWO HARBORS INVESTMENT CORP.        :
                                          :
                   Defendant.          :
---------------------------------------------------------- :

## SECOND AMENDED COMPLAINT

Plaintiffs PRCM Advisers LLC, Pine River Capital Management L.P. ("Pine River Capital"), and Pine River Domestic Management L.P. ("Pine River Domestic") (collectively, "Pine River"), by and through their undersigned counsel, hereby bring this action against Defendant Two Harbors Investment Corp. ("Two Harbors") seeking injunctive relief and/or monetary damages.[1]

## INTRODUCTION

1.      This case arises out of Two Harbors' breach of the parties' management agreement (the "Management Agreement") and Two Harbors' use of, without authorization or

---

[1] On June 17, 2020, Pine River filed a lawsuit in New York state court against Two Harbors asserting claims for *inter alia* breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair competition. After filing its lawsuit, Two Harbors made clear to Pine River that Two Harbors intended to misappropriate Pine River's intellectual property in violation of federal law. Accordingly, on July 21, 2020, Pine River voluntarily dismissed its state court lawsuit and filed this lawsuit for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and other causes of action. After August 14, 2020 – the day Two Harbors unilaterally terminated the Management Agreement – Two Harbors misappropriated Pine River's intellectual property, including trade secrets and continues to this day to improperly use Pine River's intellectual property, including trade secrets.

license, Pine River's intellectual property after its unlawful termination of the Management Agreement.

2.       Two Harbors initially fabricated a claim that Pine River's compensation through 2019 was "unfair" as a pretext for terminating the Management Agreement, so that it could force through a "management internalization" transaction without paying Pine River at least the fair value of the Management Agreement – which Pine River would have received in a mutual, negotiated termination of the Management Agreement.  After Pine River filed a lawsuit in New York state court against Two Harbors for breach of contract based on Two Harbors' improper termination of the Management Agreement, Two Harbors retaliated against Pine River and purported to terminate the Management Agreement "for cause" (even though Two Harbors had terminated the Management Agreement months earlier without "cause" based on a claim that Pine River's compensation is "unfair").  Two Harbors had no valid basis for terminating the Management Agreement "for cause."  Two Harbors purported to terminate the Management Agreement "for cause" to avoid paying Pine River even the termination fee that Two Harbors previously recognized it owed to Pine River for terminating the Management Agreement based on a claim of "unfair compensation."[2]

3.       Moreover, Two Harbors is improperly using—over Pine River's repeated notices and objections—Pine River's valuable trade secrets and other intellectual property to accomplish its plan of internalization in clear violation of Two Harbors' contractual, statutory and

---

[2] The Management Agreement provides that in the event that Two Harbors terminates Pine River for "unfair" compensation, which is what Two Harbors initially purported to do, Two Harbors is required to pay Pine River a "termination fee" equal to "three times the sum of the average annual Base Management Fee earned by [Pine River] during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination."  This termination fee is significantly lower than the fair value of the Management Agreement – which is at least the amount Pine River would be entitled to receive in a mutual, negotiated termination of the Management Agreement.  The Management Agreement does not provide for the payment of a termination fee in the event of a termination "for cause."

common law obligations.  While Pine River previously had unfettered access to its intellectual property, including trade secrets, leading up to the termination of the Management Agreement, Two Harbors refused to allow Pine River access to Pine River's own intellectual property—even as Pine River continued to manage Two Harbors' business—in clear violation of Two Harbors' obligations.  Since the August 14, 2020 termination of the Management Agreement, Two Harbors has improperly hired Pine River's employees—knowing that those employees have confidentiality obligations to Pine River—and has knowing and willfully misappropriated Pine River's trade secrets and other intellectual property in violation of state and federal law.

4.      Until Two Harbors improperly terminated the Management Agreement on August 14, 2020, the Management Agreement had been in effect since October 28, 2009, with subsequent amendments.  It assigned Pine River responsibility for managing all Two Harbors operations, and it assigned exclusively to Pine River all intellectual property created or developed in connection with the Management Agreement.  Two Harbors, which was formed in 2009, is a publicly-traded real estate investment trust ("REIT") focused on investing in residential mortgages and related assets (a "residential mortgage REIT") throughout the United States.  Two Harbors has a Board of Directors but, until it lured away and improperly hired Pine River's employees, had no employees of its own.  Rather, until August 14, 2020, Two Harbors was, and had always been since its inception over ten years ago, entirely dependent on Pine River and Pine River's employees pursuant to the Management Agreement.  Two Harbors is, and has always been, entirely dependent on Pine River's intellectual property, including trade secrets and know-how, to operate and manage its REIT.  This type of "externally-managed" structure is used by many residential mortgage

REITs.[3]

5.      In a letter dated March 20, 2020, Two Harbors abruptly terminated the Management Agreement, claiming that Pine River's compensation is "unfair," without providing any details or supporting materials.  Two Harbors justified this determination in a letter dated April 10, 2020 with assertions based on Pine River's 2019 compensation.

6.      Two Harbors' assertions that Pine River's 2019 compensation was unfair are bogus.  Pine River's 2019 compensation (as well as its compensation in other years) was demonstrably fair:

    a.      First, the terms of Pine River's compensation in 2019 and earlier years compare favorably to those of other external managers to residential mortgage REITs. Pine River received a base management fee equal to 1.5% per annum of Two Harbors' "stockholders' equity," as defined by the Management Agreement, which is consistent with the base management fee rate charged by most other external managers to residential mortgage REITs.  But unlike several of those managers, Pine River did not receive any incentive compensation under the Management Agreement.

    b.      Second, Pine River's 2019 compensation compares *very* favorably to other external managers to residential mortgage REITs when compared on an apples-to-apples basis; for example, by expressing manager compensation paid as a

---

[3] PRCM Advisers LLC  was formed to manage Two Harbors.  PRCM Advisers LLC is a subsidiary of Pine River Capital.  Pursuant to a Shared Facilities and Services Agreement executed on October 28, 2009 between PRCM Advisers LLC and Pine River Capital, PRCM Advisers LLC relied on the personnel and other resources of Pine River Capital and its subsidiaries—one of which is Pine River Domestic—to manage Two Harbors.  The Management Agreement defined PRCM Advisers LLC to include PRCM Advisers LLC's "permitted assignees," which would include the personnel and other resources of Pine River Capital and its subsidiaries.  For simplicity, those shared personnel and resources are collectively referred to in this Complaint as Pine River's employees and resources.

percentage of unadjusted stockholders' equity calculated in accordance with
Generally Accepted Accounting Principles ("GAAP").  On this apples-to-apples
basis, Pine River's 2019 compensation of 1.26% was lower than that of the vast
majority of other external managers to residential mortgage REITs.

    c.    Third, Pine River's 2019 compensation compares even more favorably to other
external managers to residential mortgage REITs when considered relative to
performance.  In the residential mortgage REIT industry, it is customary to
evaluate performance based on economic return, which reflects the economic
value generated per share of common stock, net of manager compensation and all
other expenses.  Two Harbors itself has emphasized to investors that economic
return is the most appropriate financial metric to evaluate Two Harbors' financial
performance.  Two Harbors' 2019 economic return (which is net of Pine River's
compensation) exceeded that of all other externally-managed residential mortgage
REITs.  As Two Harbors touted on its website and in its 2020 proxy statement,
under Pine River's management Two Harbors had "[s]ubstantial total stockholder
return outperformance . . . relative to peers" and "a total stockholder return of
256%, outperforming the Bloomberg REIT Mortgage Index by 77%."

7.    In truth, Two Harbors' claim that Pine River's compensation was "unfair" was
merely a pretext for Two Harbors to effect an internalization on the cheap.  Two Harbors had
been planning for some time to internalize its management functions using Pine River's
employees, investment strategies, intellectual property, including trade secrets and know-how,
and commercial advantages.

    a.    In December 2018, Two Harbors' Board of Directors and Two Harbors' senior

management discussed internalization of management and concluded that it would not be economical for Two Harbors to internalize based on precedent mutually-agreed internalization transactions, which showed that, in order to internalize through a consensual agreement with Pine River, Two Harbors would need to pay Pine River an amount much higher than even the termination fee that Two Harbors publicly acknowledged in April 2020 that it owed to Pine River.

b. In December 2019—without the knowledge of Pine River's CEO—Two Harbors' Board of Directors and Two Harbors' senior management again discussed, and this time recommended, internalization of management.

c. In January 2020—months before Two Harbors first alleged that Pine River's compensation was "unfair," and approximately seven months before Two Harbors purported to terminate the Management Agreement "for cause"— the Chairman of Two Harbors' Board of Directors stated to Pine River's CEO, and others present, that Two Harbors had decided to internalize management and that Two Harbors' Board of Directors had tasked Two Harbors' senior management with developing a plan to effect internalization.

d. Subsequently in January 2020, the Chairman of Two Harbors' Board of Directors reiterated to Pine River's CEO that Two Harbors had decided to internalize management, and even went so far as to assure Pine River's CEO that, as part of this internalization, Pine River could expect a negotiated outcome involving a significant internalization payment to Pine River.  However, following this meeting, Two Harbors never reached out to Pine River regarding any such negotiation.

8.      Two Harbors has essentially admitted that its motive for seeking an internalization and for the initial termination of the Management Agreement had nothing to do with the fairness of Pine River's compensation.  In its April 13, 2020 press release announcing its initial termination of the Management Agreement (and again in subsequent investor presentations), Two Harbors highlighted that "the non-renewal of the Management Agreement" will result in a transition to "self-management" and that a transition to self-management "will result in material benefits to [Two Harbors'] stockholders."  Two Harbors even listed these benefits, which have nothing to do with the fairness of Pine River's compensation, such as attracting new investors who prefer internal management and to "strengthen the alignment of interests" with Two Harbors' "management team"— all of whom were Pine River's employees at the time.

9.      In that same April 13, 2020 press release, Two Harbors further stated: "Under the terms of the Management Agreement, Two Harbors will pay a one-time cash termination fee to the Manager on September 19, 2020, calculated in accordance with the Management Agreement, equal to three times the sum of the average annual management fee earned by the Manager during the twenty-four month period ending June 30, 2020 (the most recent completed fiscal quarter prior to the termination date).  The amount of the cash termination fee is estimated to be approximately $144 million."

10.     There is nothing improper with Two Harbors' desire to internalize management, in and of itself.  It is not uncommon for externally-managed REITs to internalize their management functions via negotiated, mutually-agreed transactions with their external managers. There exist various examples of such transactions.  Under such transactions, the REIT pays the manager a negotiated, mutually-agreed amount—based on at least the fair value of the

management agreement—in exchange for the manager's agreement to terminate the parties' management agreement and transition the manager's employees, investment strategies, intellectual property, including trade secrets and know-how, and commercial advantages to the REIT.

11.     But Two Harbors never approached Pine River to negotiate an internalization (in spite of having explicitly assured Pine River that it would eventually do so).

12.     Instead, Two Harbors fabricated a claim of "unfair compensation" as a pretext for unilaterally terminating the Management Agreement in order to effect an internalization on the cheap.

13.     Two Harbors fabricated this claim because internalization required termination of the parties' Management Agreement, and termination of the Management Agreement could only occur in two cases: (i) if the parties mutually agreed to terminate the Management Agreement, or (ii) if, pursuant to the Management Agreement, there existed one of a limited number of specifically-defined bases.  One such basis was if Pine River's compensation was "unfair."

14.     Through its fabrication, Two Harbors aimed to shortchange Pine River on the amount it would be entitled to receive in a mutual, negotiated termination of the Management Agreement.  The amount by which Two Harbors is shortchanging Pine River will now be determined at trial and could well be hundreds of millions of dollars.

15.     At the time it initially terminated the Management Agreement based on a claim of "unfair compensation," Two Harbors also made clear that it intended to improperly use Pine River's employees and intellectual property, including trade secrets and know-how, to effect internalization.

        a.   As part of its internalization process, Two Harbors planned to poach Pine River's

employees in senior management positions, as well as other Pine River personnel, at Two Harbors to leave Pine River and join Two Harbors.  Indeed, Two Harbors emphasized this fact in its April 13, 2020 press release, stating that Two Harbors will become "self-managed" using Pine River's "strong and experienced senior management team along with the other personnel currently providing services to Two Harbors, to whom [Two Harbors'] Board of Directors intends to extend offers of employment."

b. Pine River has developed and owns significant intellectual property, which Two Harbors has used and continues to improperly use in its day-to-day operations.  In its April 13, 2020 press release, Two Harbors stated that it "anticipates a smooth and timely transition of all functions necessary to operate the Company's business without interruption."  Two Harbors further admitted in its 2019 10-K that "in the event of a termination of the management agreement . . . it may be difficult or costly to replace certain intellectual property, systems, facilities or other services that have been historically provided by or contracted through Pine River that are necessary or desirable to execute our business plan."  Unless Pine River consented to Two Harbors' continued use of Pine River's intellectual property after the Management Agreement terminates—and Pine River unequivocally informed Two Harbors that it did not so consent—Two Harbors would have no alternative but to misappropriate Pine River's intellectual property, including trade secrets and know-how, to internalize management "without interruption" to its business.  Two Harbors informed Pine River that it planned to do exactly that—misappropriate Pine River's intellectual property in order to continue

managing Two Harbors after the Management Agreement terminated—and, in fact, that is precisely what Two Harbors did after its termination of the Management Agreement "for cause" on August 14, 2020.

c.  By letter dated June 23, 2020, Two Harbors claimed—in direct contradiction of the terms of the Management Agreement—that any "intellectual property created or developed by dedicated Two Harbors personnel for Two Harbors' use and at Two Harbors' expense is the intellectual property of Two Harbors (not Pine River) and belongs to Two Harbors (not Pine River)."  But, until August 14, 2020, Two Harbors had no personnel.  As Two Harbors correctly acknowledged in its own SEC filings, all of the individuals who managed Two Harbors prior to August 14, 2020 were employees of Pine River.  And the Management Agreement is crystal clear that all of the intellectual property Pine River has developed to manage Two Harbors belongs solely and exclusively to Pine River.

d.  For security reasons, to limit the number of individuals with access to material non-public information and confidential consumer information, and to safeguard Pine River's proprietary and confidential information, certain of the intellectual property Pine River developed to manage Two Harbors is stored on dedicated computers and servers in Two Harbors' offices or dedicated offsite space.  The now former Pine River employees who are involved in managing Two Harbors have access to those computers and servers.  Pine River requested by letter dated June 24, 2020 that Two Harbors discuss the transition of Pine River's intellectual property to Pine River after September 19, 2020 – the date Two Harbors unilaterally set at that time to terminate the Management Agreement.  However,

Two Harbors refused to transfer Pine River's intellectual property to Pine River after September 19 or even provide Pine River access to its own intellectual property (other than to those employees Two Harbors intended to hire after termination of the Management Agreement).  Instead, by letter dated July 3, 2020, Two Harbors reiterated its position that the intellectual property belongs solely to Two Harbors and demanded that Pine River "retract and disavow its position" that the intellectual property belongs to Pine River, and not to Two Harbors.  Without any legal basis, Two Harbors' Board of Directors also directed Pine River not to communicate with the Pine River employees who are involved in managing Two Harbors "other than communications concerning the day-to-day operations of Two Harbors and to direct any other communications only to the Board."  The Management Agreement requires that Two Harbors "do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be requested by the Manager to carry out the intent of [the Management] Agreement or to otherwise perfect, record, confirm, or enforce the Manager's rights in and to the Intellectual Property."  Thus, Two Harbors' position that Pine River had no right to talk to Pine River's own employees about the return of Pine River's intellectual property was contrary to the Management Agreement.

16.     Two Harbors' actions are in breach of the Management Agreement.  Further, its actions following the termination of the Management Agreement have resulted in the misappropriation and infringement of Pine River's intellectual property, and forced Pine River to

bring suit to protect its rights, property and interests.  On June 17, 2020, Pine River brought suit

in the Supreme Court of the State of New York alleging, among other claims, breach of contract,

breach of the implied covenant of good faith and fair dealing, and unfair competition.  In

retaliation for Pine River's lawsuit, which sought to enforce Pine River's contractual rights under

the Management Agreement, and in order to try to avoid paying Pine River even the $144

million termination fee that Two Harbors previously acknowledged it owes Pine River, Two

Harbors sent Pine River a letter dated July 15, 2020 purporting to terminate the Management

Agreement a second time – this time "for cause."  Based largely on alleged facts that predate the

first termination of the Management Agreement, Two Harbors terminated the Management

Agreement effective August 14, 2020.

17.     Two Harbors had no valid basis to terminate Pine River "for cause."  Two

Harbors simply manufactured reasons for terminating Pine River for cause as another excuse to

internalize management functions, and this second termination was intended to avoid paying

Pine River even the $144 million termination fee that Two Harbors itself acknowledged in April

2020 it owed Pine River.  To justify terminating Pine River for cause, Two Harbors pointed to

events that occurred years ago, which events Two Harbors was aware of before it terminated the

Management Agreement the first time based on its fabricated claim that Pine River's

compensation was "unfair."  Two Harbors also claimed that it is justified in terminating Pine

River for cause because Pine River took legal positions in this litigation with which Two Harbors

disagrees.  Two Harbors' reasons for purporting to terminate the Management Agreement for

cause are baseless and retaliatory.

18.     Two Harbors is attempting to deprive Pine River of the benefits to which Pine

River is contractually entitled under the Management Agreement—namely, continued

management of Two Harbors in exchange for payment of management fees.  Two Harbors initially fabricated a claim that Pine River's compensation through 2019 was "unfair" as a pretext for terminating the Management Agreement in order to force through a "management internalization" transaction without Pine River's consent.  Two Harbors then purported to terminate the Management Agreement a second time—this time "for cause."  Two Harbors aims to shortchange Pine River on the amount it would be entitled to receive in a mutual, negotiated termination of the Management Agreement.

19.     Moreover, termination of the Management Agreement alone is not sufficient to accomplish the internalization that Two Harbors seeks.  And payment of a termination fee under the Management Agreement would not have given Two Harbors the right to take or use Pine River's intellectual property or poach its employees.  In an arms-length negotiation to internalize management functions, Two Harbors would have been required to pay Pine River for Pine River's intellectual property, including trade secrets and know-how.  Instead, Two Harbors has now stolen Pine River's intellectual property, including trade secrets and know-how, and has improperly hired the Pine River employees who were involved in managing Two Harbors so that Two Harbors can gain access to Pine River's trade secrets and other intellectual property, and self-manage without Pine River.

20.     Two Harbors' actions thus have forced Pine River to bring this action in order to enforce the terms of the Management Agreement and to protect its intellectual property and trade secret rights under federal and New York state law.

### THE PARTIES

21.     Plaintiff PRCM Advisers LLC is a Delaware limited liability company with its principal place of business in Minnetonka, Minnesota.

22.     Plaintiff Pine River Capital Management L.P. is a Delaware limited partnership with its principal place of business in Minnetonka, Minnesota.

23.     Plaintiff Pine River Domestic Management L.P. is a Delaware limited partnership with its principal place of business in Minnetonka, Minnesota.

24.     Defendant Two Harbors Investment Corp. is a Maryland corporation with its corporate headquarters at 575 Lexington Avenue, Suite 2930 in New York, New York. Shares of Two Harbors are publicly-traded on the New York Stock Exchange under the symbol "TWO."  Two Harbors invests in residential mortgage-backed securities, mortgage servicing rights and other financial assets and has offices in New York, Minnesota and Florida.  Two Harbors is a licensed mortgage servicer in most states and a named servicer to mortgages throughout the United States.  Two Harbors has investors located throughout the United States and internationally.  Two Harbors owns residential mortgage backed securities with underlying mortgages throughout the United States.  At the end of 2019, Two Harbors had a market capitalization of $4 billion and a $41 billion investment portfolio.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).  The Court has supplemental jurisdiction over the New York state law claims pursuant to 28 U.S.C. § 1367 because those claims are sufficiently related to the federal claims as to form part of the same case or controversy.

26.     Personal jurisdiction and venue are proper over Defendant Two Harbors in this District pursuant to 18 U.S.C. § 1965(a) and (b), 28 U.S.C. § 1391(b)(1) and (2), and Federal Rule of Civil Procedure 4(k) because a substantial part of the events or omissions giving rise to this action, and upon which the allegations in the Complaint are based,

occurred in this District and because Defendant Two Harbors is headquartered in this District.

## FACTUAL BACKGROUND

**A.    Pine River Managed Two Harbors Pursuant to the Management Agreement Since 2009.**

27.    Defendant Two Harbors was formed in 2009 and is a publicly-traded residential mortgage REIT focused on investing in residential mortgages and related assets.  REITs give investors the opportunity to invest in income-producing real estate and related assets.  From Two Harbors' inception in 2009 until August 14, 2020, Pine River provided investment advisory and other management services to Two Harbors pursuant to the Management Agreement into which the parties entered on October 28, 2009.

28.    Pine River was responsible for administering the business activities and day-to-day operations of Two Harbors pursuant to the Management Agreement and a shared facilities and services agreement with Pine River's affiliated entities.  The Management Agreement was a "turn-key" contract: Pine River provided everything needed for the management and operation of Two Harbors.  Until the termination of the Management Agreement, Two Harbors had a Board of Directors but no employees of its own.  Rather, Two Harbors was, and had always been, entirely dependent on Pine River and Pine River's employees and intellectual property, including trade secrets and know-how, to operate and manage its REIT pursuant to the Management Agreement.  This type of "externally-managed" structure is used by many residential mortgage REITs.

29.    As recently as in its 2019 10-K, released on February 26, 2020, Two Harbors represented to its shareholders that pursuant to the terms of the Management Agreement:

Pine River "provides [Two Harbors] with our management team, including our

executive officers and support personnel.  In addition, [Pine River] provides us with a dedicated team of investment professionals and other support . . . Each of our executive officers is an employee or partner of an affiliate of Pine River; we do not have any employees.  We do not pay any of our executive officers cash compensation; rather, we pay PRCM Advisers a base management fee . . . We also reimburse [Pine River] for the allocable share of the compensation paid by Pine River to its personnel serving as our principal financial officer and general counsel and other reimbursable costs under the management agreement . . . ."

30.     The Management Agreement had an initial term from October 28, 2009 to October 28, 2012 and since then was subject to automatic renewal annually, in perpetuity, unless it was terminated pursuant to certain limited bases enumerated in the Management Agreement. The Management Agreement automatically renewed for the last seven years and was set to automatically renew again for another one-year term at the end of its current term on October 28, 2020 unless terminated by Two Harbors for one of the limited bases specified in the Management Agreement.

   **B.     Pursuant to the Management Agreement, Pine River Has Created and Developed Valuable Intellectual Property, Including Trade Secrets, Which It Licensed to Two Harbors Solely for the Duration of the Management Agreement.**

31.     Under the Management Agreement, Two Harbors agreed that "[a]ll Intellectual Property created or developed by [Pine River] in connection with [its] performance of [the Management Agreement] or otherwise and the ***Intellectual Property Rights associated therewith shall be the sole and exclusive property of the Manager*** [(*i.e.*, Pine River)]. [Two Harbors] shall assign and do[es] hereby assign to [Pine River] all Intellectual Property Rights in such Intellectual Property." (Emphasis added).  Two Harbors further agreed that it will take all necessary steps to "enforce [Pine River's] rights in and to the Intellectual Property."

32.     Pine River agreed, solely for the term of the Management Agreement, to grant Two Harbors "a non-exclusive, worldwide, fully paid up, royalty-free, non-sub-licensable, non-

16

transferable license and right to use the Intellectual Property created or developed by [Pine River] in connection with [Pine River's] performance of this Agreement for [Two Harbors'] business purposes."

33.     In connection with the management of Two Harbors' operations, Pine River developed and is the owner of valuable intellectual property, including trade secrets and know-how.  These trade secrets were regularly used to manage Two Harbors' investments throughout the United States and were initially stored on Pine River's private systems.  After several years, for security reasons, and to limit the number of individuals with access to material non-public information and confidential consumer information, and safeguard Pine River's proprietary and confidential information, certain of that intellectual property was migrated onto dedicated computers and servers in Two Harbors' offices or dedicated offsite space.

34.     The Management Agreement defines "Intellectual Property" as "all work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries, improvements, trade secrets, and know-how or similar rights" but excludes trademark rights that include the name or logo of Two Harbors or its subsidiaries.  As examples, Pine River has developed:

> a.   proprietary and confidential trade life cycle processes and customizations, including Neptune (to integrate instruments and trading data), Interest Rate Swap Trade API (to book interest rate swap trades), Repo Monitor Trading Platform (strategic management of repurchase agreements), TBA Processing, and Operations Workflow Engine;
>
> b.   proprietary and confidential mortgage servicing rights systems including

17

COSMOS (strategic management of loan processes and data), Servicing Transfer (to create transfers for bulk acquisitions, flow acquisitions and refinancing recapture), Holdback Reporting (to manage holdback/settlement documents), Document Management Release Portal (to manage subservicer documents) and Forbearance (to receive and forward forbearance data);

c.  proprietary and confidential risk and investment management models and systems including Prepayment Model (to forecast the level of prepayments on mortgage-related assets, which provides a proprietary means of evaluating investments' attractiveness and managing risk), Investment Management Models and Reports (to evaluate investment performance and guide investment acquisition and divestment decisions), Risk Management Models and Reports (to evaluate and manage the myriad risks associated with a mortgage investment portfolio) and integrations with third party investment and risk management software and data providers (for example Polypaths and Intex);

d.  proprietary and confidential accounting data feeds including feeds to/from ePAM (to integrate accounting systems with other systems);

e.  proprietary and confidential systems and content including Legal Portal (for managing strategic uses of legal agreements and documents), Time Allocation (to track and allocate employee time), Personal Time Off tool, Onboarding tool, a firm-wide information and application portal, and processes and content for software development, test and support management (defect and project tracking, deployment knowledge, support and software testing); and

f. proprietary and confidential processes, tools and content to manage SOX compliance.

35. Pine River further created and maintained confidential and proprietary databases and models that contain, for example, operations tools, third party entity and account mappings, external data management, task-specific proprietary code and configurations, operational data for trading systems (Neptune), operational data for mortgage servicing (Jupiter), accounting (Saturn), integrated reporting across businesses (IDS), managing liquidity and risk (Excess Liquidity), IT processes, core earnings forecasts, taxable income forecasts, legal entities forecasts, budget forecasts, counterparty review models, mergers and acquisition models, capital markets models, industry assessment models, investor presentation models and investor prospect lists.

36. In the hands of a competitor, Pine River's trade secrets would be of great value and could be unlawfully used to compete against Pine River. A competitor possessing such confidential information could utilize it to its gain without incurring the significant effort that Pine River has expended. As a result, this information has significant value resulting from Pine River's significant investment of time and resources. The trade secrets identified above further have value for Pine River's other businesses.

37. Pine River's trade secrets constitute compilations of information that derive independent economic value from not being generally known or available to the public or other persons who could obtain value from their disclosure or use.

38. This confidential and trade secret information is not readily available to Pine River's competitors or the general public. Prior to Two Harbors' termination of the Management Agreement, Pine River made efforts that were reasonable under the circumstances to maintain

the secrecy of its trade secrets and protect the confidentiality of its proprietary information.

39.     Pine River also took steps to ensure the confidentiality of its trade secrets.  For example, Pine River protected all of its custom software with strict access control, integrated at the Windows System account level.  Pine River's custom code was stored in a version control system and access was restricted to developers only.  Access required approval by the appropriate Pine River business line manager, and Pine River business line managers reviewed all access permissions annually.

40.     Similarly, prior to Two Harbors' termination of the Management Agreement, Pine River employees controlled access to all of its confidential documents (including its financial models and spreadsheets) in protected file systems, also integrated at the Windows System account level.  Pine River's business line managers approved all access to restricted directories, and reviewed all access permissions annually.

41.     Pine River also secured its networks with a dedicated Information Security team, and followed industry best practices to prevent unauthorized entry into the network, or unauthorized exfiltration of company information.  Specifically, no persons or systems could send source code outside of Pine River's networks without review and approval by Pine River's compliance personnel and a knowledgeable information technology ("IT") manager.  Final packaging and dissemination of any source code was conducted by the Information Security team.  Pine River's IT personnel blocked USB ports on computers utilized by Pine River personnel to prevent unauthorized transfers of confidential information and all File Transfer Protocol ("FTP") sites were restricted to only known third parties.  Further, Pine River personnel's email was monitored for exfiltration.

42.     Pine River also took steps, during its performance of the Management Agreement,

20

to contractually protect the confidentiality of the trade secrets used to manage Two Harbors.  For example, Pine River employees hired to work on operations related to the Management Agreement were required to execute a "Confidentiality, Nonsolicitation, and Inventions Agreement" that required those employees to safeguard and keep confidential Pine River's intellectual property.  For example, certain of the confidentiality agreements provide:

> Employee is being employed in a position of trust and confidence and will have access to and become familiar with the confidential or proprietary methods, research, products, services, trade secrets and procedures used by [Pine River]. Employee understands that as a condition of employment . . . Employee must protect this information and these relationships and use them for Pine River's benefit only, not for Employee's own or another's benefit. Employee understands that this Agreement is intended to protect the business which Pine River has built and that if Employee breaches any part of this Agreement, it may irreparably harm Pine River's business and may cause damage that would be difficult or impossible to measure.

43.     Other versions of the Confidentiality, Nonsolicitation, and Inventions Agreement reflect that "Employee understands that the primary purpose of this Agreement is to protect Pine River's confidential information, trade secrets, and client and investor relationships, and that if Employee breaches any part of this Agreement, it would seriously harm Pine River's business and cause damage that would be difficult or impossible to measure."

44.     The "Confidential Information" protected by these confidentiality agreements is broad and includes:

> [A]ny trade secret or other information not generally known in Pine River's line of business or readily ascertainable by proper means by others, including: (i) information relating to computer programs developed or being developed by Pine River, including source code, object code, development tools, flow charts, design statistics, specifications, techniques, evaluations, test results, and beta-test results; (ii) third party systems, software and any other information received by the third party in confidence by Pine River; (iii) records and other information relating to past, current and prospective investors in Pine River (including lists of such

investors); (iv) records and other information relating to past, current and prospective clients of Pine River (including lists of such clients); (v) records and other information relating to past, current and prospective vendors of Pine River (including lists of such vendors); (vi) information concerning past, current or anticipated investments, trading positions or trading strategies and techniques of Pine River; (vii) marketing strategies; (viii) the financial statements, financial results and business condition of (A) any Pine River entity and (B) any entity whose debt, equity or other interests are held by any Pine River entity; (ix) information concerning employees, directors and officers of any Pine River entity, including their compensation; (x) all formulae, invention records, research records and reports, experimental and engineering data and reports, product and production specifications and designs, drawings, photos, models, production techniques, test data, processes, and methods related to the operation, investment strategies and products of Pine River, whether patentable or not; and (xi) any of the foregoing that belong to any other person or entity but to which Employee has access by reason of Employee's employment with Employer.

45.     Pine River employees further agreed that they "will not, during Employee's employment with Employer or at any time thereafter, divulge, furnish or make accessible to anyone or use in any way, on behalf of himself/herself or others, any Confidential Information, other than for the benefit of Pine River in the ordinary course of the business of Pine River or as required under compulsion of law."

**C.      Pine River's Management of Two Harbors Was Exemplary and Afforded Two Harbors Significant Benefits.**

46.     Pine River's management of Two Harbors afforded Two Harbors significant benefits.

   a.   Two Harbors recognized these benefits on its public website through mid-2020, stating:

> "[Two Harbors] benefit[s] from Pine River's disciplined and highly analytical investment approach and extensive long-term relationships."

\*   \*   \*

22

Pine River provides Two Harbors with a "[s]ophisticated and differentiated approach to risk management and hedging," which is a "differentiating factor" that "distinguishe[s] [Two Harbors] from [its] competitive cohort."

b. Two Harbors also repeatedly recognized these benefits in its public filings, for example stating:

The "investment professionals provided to [Two Harbors] by [Pine River]" (or "Pine River's fixed income team") "[have] broad experience in managing [Two Harbors'] target assets" and "[have] demonstrated the ability to generate attractive risk-adjusted returns under different market conditions and cycles." (Two Harbors' 10-K filings for each of 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, and 2018).

* * *

"Through [Two Harbors'] relationship with [Pine River], [Two Harbors] benefit[s] from Pine River's disciplined and highly analytical investment approach and extensive long-term relationships in the financial community." (Two Harbors' 2018 10-K, filed on February 27, 2019).

* * *

"Pine River maintains extensive long-term relationships with financial intermediaries, including prime brokers, investment banks, broker-dealers and asset custodians. [Two Harbors] believe[s] these relationships enhance [Two Harbors'] ability to source, finance, protect and hedge [Two Harbors'] investments and, thus, enable [Two Harbors] to succeed in various credit and interest rate environments." (Two Harbors' 2018 10-K, filed on February 27, 2019).

* * *

"[Two Harbors] also benefit[s] from Pine River's risk management, accounting, operations, legal, compliance and information technology teams." (Two Harbors' 2018 10-K, filed on February 27, 2019).

47. Under Pine River's management, Two Harbors outperformed its peers.

a. Two Harbors touted this outperformance on its public website, stating:

Two Harbors has had "[s]ubstantial total stockholder return

23

outperformance since [its] inception relative to peers."

* * *

"As of December 31, 2019 [Two Harbors] had grown [its] book value by 10.4% since [its] inception in 2009, compared to the peer average of (28.3%)."

b. Two Harbors also repeatedly touted this outperformance in its public filings, for

example stating:

"Since inception, [Two Harbors] ha[s] generated a total stockholder return of 256%, outperforming the Bloomberg REIT Mortgage Index by 77%." (Two Harbors' 2020 proxy statement, filed on April 3, 2020).

c. Two Harbors further touted this outperformance in recent investor presentations,

for example stating:

Two Harbors enjoyed "2019 Total Return Outperformance" as a result of "strong book value appreciation." (Two Harbors' investor presentation released March 13, 2020).

48.     Two Harbors' March 13, 2020 investor presentation is correct: Two Harbors'

2019 economic return (or "total return," as referred to in Two Harbors' investor presentation),

which is net of Pine River's compensation and all other expenses, exceeded that of *all* other

externally-managed residential mortgage REITs.

49.     Because Two Harbors had no employees of its own—and always depended on

Pine River and Pine River's employees to operate and manage its REIT—Two Harbors'

outperformance was attributable directly and solely to Pine River.

**D.     Two Harbors Had Been Planning to Internalize Management for Some Time.**

50.     In December 2018, Two Harbors' Board of Directors and Two Harbors' senior

management discussed internalization of management and concluded that it would not be

economical for Two Harbors to internalize based on precedent mutually-agreed internalization

24

transactions, which showed that, in order to internalize through a consensual agreement with Pine River, Two Harbors would need to pay Pine River an amount much higher than even the termination fee that Two Harbors publicly acknowledged in April 2020 that it owed to Pine River.

51.     In spite of this conclusion, Two Harbors took steps in 2019 to internalize its management functions using Pine River's employees, investment strategies, intellectual property (including trade secrets and know-how) and commercial advantages.

a.     In February 2019, Two Harbors requested, for the first time in Two Harbors' nearly ten-year life, that Pine River provide it with (i) Pine River's employment agreements with Two Harbors' Chief Financial Officer and General Counsel, both of whom were employees of Pine River, (ii) a summary of economic arrangements between Pine River and Two Harbors' Chief Executive Officer and Chief Investment Officer, both of whom were partners and employees of Pine River, and (iii) a summary of the compensation paid to the named executive officers and investment professionals providing services to Two Harbors, all of whom were Pine River employees.  In addition, Two Harbors requested ongoing information regarding any plans Pine River had to alter or modify the compensation paid to the named executive officers or investment professionals providing services to Two Harbors.  Pine River complied with Two Harbors' requests in good faith.  In hindsight, it is clear that Two Harbors wanted this information so that it could eventually poach Pine River's employees.

b.     In July 2019, Pine River sought to negotiate non-competition provisions in favor of Pine River with certain Pine River employees prior to their appointment as co-

chief investment officers of Two Harbors.  Two Harbors advised Pine River that
including non-competition provisions in those employment agreements was
unacceptable to Two Harbors.  Two Harbors ultimately pressured Pine River into
accepting employment agreements that allowed the co-chief investment officers
to compete with Pine River if Two Harbors were to internalize management
functions.  Again, in hindsight, it is clear that these actions were in furtherance of
Two Harbors' plan to internalize management functions using Pine River's
employees.

c.   In August 2019, for the first time in Two Harbors' nearly ten-year life, Two
Harbors insisted that Pine River confirm in writing that it would provide to Two
Harbors, for its review and approval, drafts of any future proposed modifications
to any Two Harbors officers' employment agreements.  Pine River complied with
Two Harbors' request in good faith.  Again, in hindsight, it is clear that these
demands were in furtherance of Two Harbors' plan to internalize management
functions using Pine River's employees.

d.   In November 2019, for the first time in Two Harbors' ten-year life, Two Harbors'
Board of Directors requested information regarding the non-competition
restrictive covenant of Two Harbors' CEO – a partner and employee of Pine
River.  Pine River complied with the Board's request in good faith.  Again, in
hindsight, it is clear that Two Harbors wanted this information in connection with
its plan to internalize management functions.

e.   In January 2020, Two Harbors completed its efforts to substantially separate all
human resources functions from Pine River.  As stated by a Two Harbors officer,

Two Harbors took this action at the express direction of Two Harbors' Board of Directors.  Again, in hindsight, it is clear that Two Harbors wanted to separate functions from Pine River in connection with its plans to internalize management functions.

52.     In hindsight, it is now apparent that Two Harbors had been using Pine River's IT professionals to develop separate IT systems for Two Harbors, so that Two Harbors could misappropriate Pine River's intellectual property as part of its decision to internalize management functions.

a.   Two Harbors insisted that many of Pine River's IT professionals devote substantially all of their attention to Two Harbors' IT projects, including implementing a separate externally-hosted trading system.  Two Harbors further insisted that Pine River's IT personnel spend less time assisting Pine River's other businesses.  This caused inefficiencies and additional expenses for Two Harbors because the salaries of those IT professionals, which became borne almost entirely by Two Harbors, had previously been allocated between Two Harbors and Pine River's other businesses.  In hindsight, it is clear that these actions were in furtherance of Two Harbors' plans to internalize management functions.

b.   In September 2019, during a Two Harbors annual budgeting meeting, a Pine River employee questioned why certain budgeted IT expenditures were necessary given that they seemed to be creating redundancies and reducing economies of scale among Two Harbors and Pine River's other businesses, thereby resulting in unnecessary and increased costs for Two Harbors and Pine River's other businesses.  Multiple senior members of Two Harbors' IT management who were

present at the meeting stated that the expenditures would certainly result in increased and avoidable costs, but those individuals explained that they were simply following instructions from Two Harbors' Board of Directors.  In hindsight, it is clear that Two Harbors' primary goal in creating these redundancies was to plan for an eventual internalization of management functions.

    c.   In late 2019, Two Harbors demanded its own dedicated externally-hosted trading system (whereas previously Two Harbors had agreed that Two Harbors and Pine River would share a single system).  In spite of Pine River's arguments that two separate systems were unnecessary, would reduce efficiency, and would increase Two Harbors' costs, Two Harbors insisted on splitting the parties' joint contract into two separate contracts and developing two separate systems.  Again, Two Harbors took these actions to be able to separate from Pine River and internalize management functions.

    d.   In February 2020, Two Harbors informed Pine River that all Pine River IT professionals serving Two Harbors would no longer be performing services for other Pine River businesses, except in an emergency.  Again, Two Harbors' actions further limited the possibility for cost sharing between Two Harbors and Pine River's other businesses, thereby unnecessarily increasing Two Harbors' expenses.  Again, in hindsight, it is clear that Two Harbors took these actions to prepare to separate from Pine River and internalize.

53.    In December 2019—without the knowledge of Pine River's CEO—Two Harbors' Board of Directors and Two Harbors' senior management again discussed, and this time

recommended, internalization of management.

54.     In January 2020— months before Two Harbors first alleged that Pine River's compensation was "unfair," and approximately seven months before Two Harbors purported to terminate the Management Agreement "for cause"— the Chairman of Two Harbors' Board of Directors stated to Pine River's CEO, and others present, that Two Harbors had decided to internalize management and that Two Harbors' Board of Directors had tasked Two Harbors' senior management with developing a plan to effect internalization.

55.     Subsequently in January 2020, the Chairman of Two Harbors' Board of Directors reiterated to Pine River's CEO that Two Harbors had decided to internalize management, and even went so far as to assure Pine River's CEO that, as part of this internalization, Pine River could expect a negotiated outcome involving a significant internalization payment to Pine River. Following this meeting, however, Two Harbors never reached out to Pine River regarding any such negotiation.

56.     Also in January 2020, a Two Harbors officer requested that Pine River's CEO no longer participate in weekly portfolio reviews with Two Harbors' co-chief investment officers. This Two Harbors officer later told Pine River's CEO that this request was made because Two Harbors' Board of Directors would not want Pine River's CEO to potentially dissuade the co-chief investment officers – both of whom are Pine River employees – from supporting Two Harbors' internalization plans.

57.     Two Harbors made changes to the language of its 2019 10-K compared to the language of its 2018 10-K, and these changes further reflect Two Harbors' internalization plans.

        a.     Two Harbors' 2018 10-K repeatedly referred to Pine River when describing the investment professionals who managed Two Harbors, stating:

> The dedicated team of investment professionals provided to us
> **by [Pine River]** has broad experience in managing our target
> assets and has demonstrated the ability to generate attractive
> risk-adjusted returns under different market conditions and
> cycles. *Pine River maintains* extensive long-term
> relationships with financial intermediaries, including prime
> brokers, investment banks, broker-dealers and asset custodians
> . . . We also benefit from *Pine River's* risk management,
> accounting, operations, legal, compliance and information
> technology teams.

(Emphasis added).

b.  Two Harbors revised its 2019 10-K to strip out reference to Pine River when

describing the "team of investment professionals" who manage Two Harbors, and

instead changed "Pine River" to "our" team or used the word "we" to reflect Two

Harbors' move toward an internalization:

> *Our* dedicated team of investment professionals has broad
> experience in managing our target assets and has demonstrated
> the ability to generate attractive risk-adjusted returns under
> different market conditions and cycles. *We* have extensive
> long-term relationships with financial intermediaries,
> including prime brokers, investment banks, broker-dealers and
> asset custodians . . . We also benefit from *our* dedicated risk
> management, accounting, operations, legal, compliance and
> information technology teams.

(Emphasis added)

c.  This change in disclosure shows that Two Harbors already was preparing to

internalize by early 2020 when Two Harbors filed its 2019 10-K – well before

Two Harbors communicated its purported conclusion that Pine River's

compensation was "unfair."

**E.      Two Harbors Initially Terminated the Management Agreement On A
Fabricated Basis of "Unfair" Compensation.**

58.     By March 2020, Two Harbors was ready to internalize Two Harbors'

management.

59.     It is not uncommon for externally-managed REITs to internalize their management functions via negotiated, mutually-agreed transactions with their external managers. There exist various examples of such transactions.  Under such transactions, the REIT pays the manager a negotiated, mutually-agreed amount—based on at least the fair value of the management agreement—in exchange for the manager's agreement to terminate the parties' management agreement and transition the manager's employees, investment strategies, intellectual property (including trade secrets and know-how) and commercial advantages to the REIT.

60.     But Two Harbors never approached Pine River to negotiate an internalization (in spite of having explicitly assured Pine River that it would eventually do so).

61.     Instead, Two Harbors fabricated a claim of "unfair compensation" under the Management Agreement.  Two Harbors fabricated this claim because internalization required termination of the parties' Management Agreement, and termination of the Management Agreement could only occur in two cases: (i) if the parties mutually agreed to terminate the Management Agreement, *or* (ii) if, pursuant to the Management Agreement, there existed one of a limited number of specifically-defined bases.  One such basis was if Pine River's compensation was "unfair."  Under Section 13(a) of the Management Agreement, automatic renewal of the Management Agreement would not occur after the initial term if:

> at least two-thirds of all of the Independent Directors or the holders of a majority of the outstanding shares of common stock . . . agree that . . . the compensation payable to [Pine River] hereunder is unfair.

62.     So, rather than negotiate a termination of the Management Agreement with Pine River, Two Harbors decided, through its fabrication of a claim of "unfair" compensation, to bypass the need for Pine River's consent in an attempt to shortchange Pine River on the amount

it would be entitled to receive under a mutually-agreed internalization and termination of the Management Agreement.[4]

63.       By letter dated March 20, 2020, Two Harbors notified Pine River that at least two-thirds of the Independent Directors of Two Harbors' Board of Directors agreed that Pine River's compensation through 2019 was purportedly "unfair" and that, on that basis, Two Harbors was unilaterally terminating the Management Agreement effective September 19, 2020. Two Harbors provided no explanation in this letter for its claim that Pine River's 2019 compensation was "unfair;" and prior to March 2020, no member of Two Harbors' Board of Directors had ever told Pine River that Pine River's compensation under the Management Agreement was "unfair."

64.       By letter dated March 26, 2020, Pine River notified Two Harbors that Pine River had no intention to renegotiate its compensation arrangement given the fact that its compensation is more than fair – and Pine River's realization that Two Harbors' goal was to internalize management functions, and not to objectively assess or renegotiate Pine River's compensation.

65.       By letter dated Friday, April 10, 2020, delivered late in the evening before the Easter holiday weekend, Two Harbors provided, for the first time, three purported justifications for its claim that Pine River's compensation is "unfair," without any supporting detail, data or calculations.  As discussed below, Two Harbors' justifications are bogus and completely without merit.

66.       Then on the morning of Monday, April 13, 2020, before markets opened—

---

[4] The Management Agreement provides that in the event that Two Harbors terminates Pine River on a basis of "unfair" compensation, which is what Two Harbors has improperly done here, Two Harbors is required to pay Pine River a "termination fee," equal to "three times the sum of the average annual Base Management Fee earned by [Pine River] during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination."  This termination fee is significantly lower than the fair value of the Management Agreement—which is at least the amount Pine River would be entitled to receive in a mutual, negotiated internalization and termination of the Management Agreement.

without affording Pine River even a single business day to respond to Two Harbors' bogus justifications—Two Harbors announced in a public press release that it was unilaterally terminating the Management Agreement, effective September 19, 2020.  Two Harbors issued this press release without any advance notice to Pine River.

> **F.      By Any Objective Measure, Pine River's Compensation is Fair.**

67.      There was no valid basis for Two Harbors' assertion that Pine River's compensation is "unfair."  By any objective measure, Pine River's compensation was fair.

68.      In its April 10 letter to Pine River, Two Harbors provided three bogus reasons why Pine River's compensation was purportedly "unfair."  Each reason is based on 2019 and is plainly incorrect or specious.

69.      Two Harbors' first claim in its April 10 letter was that "[t]he total compensation paid by [Two Harbors] to [Pine River] for the twelve months ended December 31, 2019, as a percentage of book value was significantly above the average paid by other mortgage REITs of similar scale to their external managers."

70.      That assertion is demonstrably false for the following reasons:

a.   Pine River's 2019 compensation compares favorably to that of other external managers to residential mortgage REITs.  Pine River received a base management fee equal to 1.5% per annum of Two Harbors' "stockholders' equity," as defined by the Management Agreement, which is consistent with the base management fee rate charged by most other external managers to residential mortgage REITs. But unlike several of those managers, Pine River did not receive any incentive compensation.

b.   Pine River's 2019 compensation compares *very* favorably when Pine River's compensation is compared on an apples-to-apples basis; for example, by

expressing manager compensation paid as a percentage of unadjusted stockholders' equity calculated solely in accordance with GAAP. This normalization is particularly crucial when comparing manager compensation, because REITs' management agreements' definitions of "stockholders' equity" (the capital base upon which management fees are charged) often differ materially. On this apples-to-apples basis (manager compensation divided by average GAAP stockholders' equity), Pine River's 2019 compensation of 1.26% was lower than that of *eleven out of thirteen* other external managers to residential mortgage REITs.

c.  Only two externally-managed residential mortgage REITs are larger than Two Harbors, and one of those REITs paid its manager approximately *double* the compensation, as a percentage of average GAAP stockholders' equity, as did Two Harbors in 2019, even though that REIT generated a lower economic return than Two Harbors in 2019. Moreover, Two Harbors has significant investments in mortgage servicing rights, which differentiates it from many residential mortgage REITs. Pine River's 2019 compensation as a percent of GAAP stockholders' equity was lower than that of *all* peers with significant investments in mortgage servicing rights.

d.  Pine River's 2019 compensation compares *even more* favorably when Pine River's compensation is considered relative to its performance. In the residential mortgage REIT industry, it is customary to evaluate performance based on economic return, which reflects the economic value generated per share of common stock, net of manager compensation and all other expenses. Two

34

Harbors itself has emphasized to investors that economic return is the most appropriate financial metric to evaluate Two Harbors' financial performance. Two Harbors' 2019 economic return (which is net of Pine River's compensation) exceeded that of *all* other externally-managed residential mortgage REITs.

71.     Two Harbors' second claim in its April 10, 2020 letter was that Pine River "had the highest amount of expense reimbursements in the residential mortgage REIT sector during [2019] due in part to high fixed costs and limited shared services across the Manager's businesses."

72.     That assertion is specious for the following reasons:

a.   Expense reimbursements have nothing to do with the fairness of Pine River's compensation.  Two Harbors will need to pay these reimbursable expenses, substantially in their entirety, even if it internalizes management functions. Indeed, the Management Agreement does not treat expense reimbursements as "compensation" (for example, they are not addressed in the "Compensation" section of the Management Agreement), and accordingly they may not be taken into account in determining whether Pine River's compensation is "unfair" for purposes of a non-renewal for unfair compensation under Section 13(a) of the Management Agreement.

b.   If non-manager compensation expenses even were relevant (which they are not) in determining whether Pine River's compensation is "unfair," comparing expense reimbursements would still be meaningless because, among other reasons, the magnitude of reimbursements depends on whether the REIT pays for expenses directly versus through its manager.  This varies across REITs.  A more

35

meaningful way to compare non-manager compensation expenses, if they even were relevant (which they are not), would be to consider "total expense ratios," which include manager compensation and *all* operating expenses (whether paid for by the REIT directly or through its manager and then reimbursed). Such a comparison of "total expense ratios" debunks Two Harbors' specious claim with respect to non-compensation expenses: Two Harbors' 2019 total expense ratio was among its lowest in years and was lower than that of most other externally-managed residential mortgage REITs. Moreover, Two Harbors' low expense ratio is particularly impressive given that non-compensation expenses are largely a function of investment strategy, and Two Harbors invests in mortgage servicing rights—an operationally intensive asset class—whereas many REITs do not.

73.     Two Harbors' third claim in its April 10, 2020 letter was that "[t]he total compensation paid by [Two Harbors] to [Pine River] for the twelve months ended December 31, 2019, implied an estimated profit margin of [Pine River] that is far in excess of the profit margins of other asset managers."

74.     This alleged justification is nonsense for the following reasons:

    a.   Pine River's estimated profit margin is completely irrelevant to whether Pine River's compensation is unfair. Pine River's profit margin, whatever its magnitude, does not make the compensation it received from Two Harbors "unfair." If Pine River spent lots of money on rent, salaries, benefits and promotional activities, reducing its profit margin to zero, Pine River's lack of profit margin would not mean that the compensation it is paid by Two Harbors is "fair." Regardless, Pine River's *compensation*—the matter actually in question—

36

was entirely fair when compared to the compensation paid to managers of other

externally-managed residential mortgage REITs.

b.   Moreover, even if Pine River's profit margin were relevant, which it is not, Two

Harbors has compared an "estimated profit margin" of Pine River to the actual

profit margins of undefined "other asset managers," which may not even be

external managers to residential mortgage REITs.

**G.   After Pine River Brought an Action in New York State Court to Enforce the Management Agreement, Two Harbors Retaliated by Purporting to Terminate the Management Agreement "For Cause," Despite the Fact that Two Harbors Lacked Any Valid Basis to Invoke a "For Cause" Termination.**

75.   To enforce its rights under the Management Agreement and New York law, Pine

River filed suit on June 17, 2020, in the Supreme Court of the State of New York alleging,

among other claims, breach of contract, breach of the implied covenant of good faith and fair

dealing, and unfair competition.  In retaliation for Pine River's lawsuit, and to attempt to avoid

paying Pine River even the $144 million termination fee that Two Harbors publicly

acknowledged it would owe Pine River if Two Harbors terminated Pine River "without cause,"

Two Harbors sent Pine River a letter dated July 15, 2020 that purported to terminate the

Management Agreement "for cause" despite Two Harbors having no valid basis for invoking

Section 15 of the Management Agreement (the "July 15 Termination Letter").  This purported

"for cause" termination was based on Pine River's alleged "incurable material breaches" of the

Management Agreement "and/or gross negligence." Although those are the standards required

for terminating "for cause" under the Management Agreement, in fact Two Harbors lacked any

valid basis to meet either one, as detailed below.  Two Harbors stated that this purported "for

cause" termination of the Management Agreement would be effective August 14, 2020.  Two

Harbors' purported termination of Pine River "for cause" is nothing more than an attempt to

avoid paying Pine River the fair value of the Management Agreement—which Pine River was entitled to receive in a mutual, negotiated termination of the Management Agreement and consensual internalization.

76.     Two Harbors was not entitled to avail itself of the "for cause" termination provisions in Section 15.  Contrary to Two Harbors' claims in the July 15 Termination Letter, Pine River was always in full compliance with all of its obligations under the Management Agreement. None of the eight grounds purported by Two Harbors in the July 15 Termination Letter had any impact on Pine River's performance of its duties under the Management Agreement.  None of the eight grounds caused any financial loss or other harm to Two Harbors. None of the eight grounds constituted a breach—let alone a material breach—of any provision of the Management Agreement.  Moreover, Two Harbors failed to provide Pine River an opportunity to cure the alleged breaches as required under the Management Agreement, instead incorrectly asserting without any basis that the alleged breaches were "incurable."  Nor do any of the eight grounds constitute an event of "gross negligence," because Pine River's behavior was at all times commercially reasonable and was neither highly unreasonable nor represented an extreme departure from the standards of ordinary care.   Some of the events alleged by Two Harbors did not occur at all.  Two Harbors simply manufactured the termination "for cause" to avoid paying Pine River even the termination fee under the Management Agreement.

77.     With respect to two of the eight grounds, the Court previously found that Pine River plausibly alleged that it had not materially breached the Management Agreement or committed an act of gross negligence.  (See ECF 59 at 22.)  Pine River restates its allegations concerning those two grounds as follows:

78.     In its July 15 letter, Two Harbors also stated that it was terminating Pine River for

cause based on correspondence exchanged between the parties after Pine River filed its New York state court lawsuit.  Two Harbors claimed in that letter that Pine River "misrepresented its rights" and misrepresented "the obligations of" the Pine River employees who were involved in managing Two Harbors.  Two Harbors further claimed that Pine River directed its employees to "take actions that are in direct violation of the Management Agreement[.]"  Two Harbors' assertions are baseless and do not provide a valid basis for Two Harbors to terminate Pine River for cause.  Pine River did not misrepresent its rights under the Management Agreement, did not misrepresent the obligations of its employees and did not direct its employees to take any actions that would violate the Management Agreement.

79.     After Two Harbors informed Pine River it was terminating the Management Agreement, Pine River filed a lawsuit against Two Harbors in New York state court alleging that Two Harbors had no valid basis to terminate the Management Agreement.  In order to ensure that Pine River protected its rights after the Management Agreement terminated, including its valuable intellectual property, Pine River sent Two Harbors and Pine River's employees correspondence that made clear that *after* the Management Agreement terminated, the intellectual property that Pine River developed to manage Two Harbors would belong solely to Pine River and Two Harbors would have no further license to use that intellectual property.  Pine River's correspondence was consistent with the Management Agreement and did not misrepresent Pine River's rights under the Management Agreement.  Pine River further made clear in its correspondence that it would continue to manage Two Harbors until the termination date and that neither Pine River nor its employees would take any steps to disrupt the operations of Two Harbors.  The statements Pine River made in its correspondence did not breach any provision of the Management Agreement or constitute gross negligence.  Nor has Two Harbors

ever claimed – and rightfully so – that the letters Pine River sent to Two Harbors or the letters Pine River sent to its employees caused any disruption or harm to Two Harbors' business. The letters related to Pine River's rights and its employees' obligations *after* the Management Agreement terminated and had no impact on Pine River's management of Two Harbors. Two Harbors is simply manufacturing baseless reasons to terminate Pine River for cause.

80.     Two Harbors' own correspondence makes clear that Two Harbors improperly purported to terminate Pine River for "cause" simply for making legal arguments with which Two Harbors disagreed. After Two Harbors first terminated the Management Agreement, Pine River sent Two Harbors a letter dated June 24, 2020. In that letter, Pine River requested that Two Harbors discuss the transition of Pine River's intellectual property to Pine River after the Management Agreement terminated. Pine River's June 24 letter explained that the intellectual property belonged solely to Pine River and Pine River explained it was "taking steps to ensure that its intellectual property remains protected once the Management Agreement is terminated[.]' In response, Two Harbors sent Pine River a July 3, 2020 letter claiming that Pine River's June 24 letter "repeatedly asserts legally incorrect positions . . . [and] as a result, the June 24 Letter continues the series of material breaches by Pine River of the Management Agreement." Two Harbors claimed in its July 3 letter that the only way to "cure" Pine River's purported "material breaches" was by "retracting" and "disavowing" those legal positions.

81.     Pine River responded to Two Harbors' July 3, 2020 letter on July 6, 2020. As Pine River explained in its July 6 letter to Two Harbors, raising legal arguments with which Two Harbors may disagree – particularly now that the legal issues involving the Management Agreement are the subjection of litigation – plainly does not constitute a breach of the Management Agreement. Pine River explained that any breach of the Management Agreement

40

must involve action or a failure to act in accordance with the terms of the Management

Agreement, and cannot involve simply "assert[ing] legally incorrect legal positions."  Pine River

also informed Two Harbors in that same July 6 letter that it was no longer productive for the

parties to continue to debate legal issues, and that the court will ultimately need to decide those

legal issues.  In short, Two Harbors' claim that it may terminate Pine River for cause for taking

legal positions in written correspondence with which Two Harbors disagrees is absurd.

82.     Two Harbors then manufactured another excuse to terminate for cause in a letter

dated August 14, 2020 – the termination date.  In its August 14 letter, Two Harbors claimed that

termination for cause is also warranted because Pine River had requested on August 7, 2020 that

Pine River's employees provide Pine River with passwords to the networks and servers on which

Pine River's intellectual property resides.  Requesting that Pine River's employees provide Pine

River with access to Pine River's own intellectual property is not grounds to terminate for cause.

Two Harbors is simply inventing more excuses to try to avoid paying Pine River fair value in

connection with internalization and termination of the Management Agreement.

83.     Pine River refutes each of the remaining six grounds as follows:

84.     <u>Two Harbors' Justification No. 1</u>.  In the July 15 Termination Letter, Two

Harbors stated:

> "In 2013 Pine River entered into what it has described as 'residual sharing
> agreement[s]' with certain [Two Harbors] executives whereby Pine River reduced the
> compensation that it paid to those [Two Harbors] executives based on equity
> compensation that those executives received pursuant to [Two Harbors'] equity
> compensation plan.  The 'residual sharing agreement[s]', pursuant to which Pine River
> realized a cash benefit of approximately $10.3 million, were not disclosed to [Two
> Harbors'] Board of Directors until November 2019, despite [Two Harbors']
> Compensation Committee requesting all information relating to compensation
> arrangements between [Two Harbors'] executives and Pine River and Pine River
> informing the Compensation Committee in February 2019 that all such information had
> been provided."

**Two Harbors could not properly terminate the Management agreement based on this purported justification.**

    a.  **This claim is false, and Pine River denies it.**  There were no binding or contractual "residual sharing agreement" of the kind Two Harbors asserts.  The term "residual sharing agreement" referred to by Two Harbors is merely an informal term used at times by Pine River to describe the process by which Pine River considered LTIP grants when setting discretionary cash bonuses for those partners who received LTIP grants, as is common practice among externally managed mortgage REITs and in the financial services industry.

    b.  **Pine River performed all its obligations under the Management Agreement related to this alleged basis for termination.**

        i.  The Management Agreement required Two Harbors to reimburse Pine River for the costs of employing personnel to provide services to Two Harbors, *except* that Pine River was *solely* responsible for compensating certain executives and investment professionals.  *See* Management Agreement § 9.  In accordance with the Management Agreement, Pine River compensated all such executives and investment professionals, and did not seek reimbursement from Two Harbors for their compensation.  All Pine River partners and employees who provided services to Two Harbors fully performed their responsibilities with respect to the Management Agreement.  Nothing in any compensation arrangement with Pine River in any way adversely impacted Two Harbors or Pine River's performance of its obligations under the Management Agreement.

       ii.  Separate from and unrelated to the Management Agreement, in 2013, the Two Harbors Board of Directors created an equity compensation plan (more

precisely, a long-term incentive plan, or LTIP).  Under the LTIP, Two Harbors awarded certain Pine River partners and employees equity grants from time to time.  The LTIP grants served as an incentive for those personnel to continue providing services to Two Harbors under the Management Agreement and making best efforts on behalf of Two Harbors.

iii.   All personnel—including Pine River partners—who received LTIP grants received the full value of those grants, pursuant to and in full compliance with the terms of the LTIP, and Two Harbors received the full benefit that it anticipated with respect to retention of those personnel and alignment of their interests with those of Two Harbors.

iv.   The LTIP grants had the effect of increasing, not reducing, the total compensation received by Pine River personnel who received the LTIP grants, including Pine River partners. Those partners received the full value of their LTIP grants, in addition to annual cash bonuses pursuant to the Pine River limited partnership agreements, or LPAs. Under the LPAs, Pine River's CEO had complete discretion over the amount of such bonuses and the factors he took into consideration when determining them. Pine River's CEO retained and exercised that discretion at all times and reviewed and revisited his approach to determining bonuses each year.

v.   Two Harbors claims that Pine River improperly failed to disclose the so-called "residual sharing agreements" until November 2019.  But Pine River had no affirmative duty or obligation under the Management Agreement to disclose to Two Harbors its compensation arrangements with its own partners.  Nor was

there ever a time when Two Harbors requested information about Pine River's compensation arrangements that Pine River failed or refused to provide the information.  Before 2019, neither the Two Harbors Board of Directors nor any of its committees asked for the details of any Pine River employees' or partners' compensation arrangements.  In February 2019, Two Harbors requested "a summary of the economic arrangements" between Pine River and its personnel serving as Two Harbors executives, as well as other information regarding their compensation. Pine River promptly provided that information, including full disclosure of the compensation such individuals received, as well as executive officer employment agreements and the relevant language from the Pine River LPAs governing partner compensation.  In November, Pine River personnel made further disclosures on the subject, despite there being no obligation under the Management Agreement to do so.

vi.   No conflict of interest arose because of these discretionary compensation arrangements. The executives remained incentivized to use their best efforts on behalf of Two Harbors, as contemplated by the LTIP program.  Pine River continued to perform all of its obligations under the Management Agreement and had no incentive to do otherwise. Nothing in these discretionary compensation arrangements caused Pine River to benefit monetarily at Two Harbors' expense.  At no time did Two Harbors pay Pine River even one dollar more than was required under the Management Agreement as a result of the LTIP grants or these discretionary compensation arrangements.

c.  **Pine River's actions did not result in a material breach (let alone incurable material breach) of the Management Agreement.**  Neither Pine River's compensation arrangements with its partners and employees—including the annual discretionary bonuses of Pine River personnel serving as Two Harbors executives— nor the timing of disclosure of those arrangements created or constituted a breach of any provision in the Management Agreement, let alone a material breach.  The compensation arrangements had no negative impact on Pine River's performance of its obligations under the Management Agreement and did not cause any financial loss or other harm to Two Harbors or its investors.  The compensation arrangements did not result in Two Harbors paying anything more to Pine River than required by the Management Agreement, and Pine River personnel acting as Two Harbors executives continued to fully provide their services to Two Harbors in all respects.

d.  **Nor were Pine River's actions grossly negligent.**  It is commercially reasonable, and common practice among externally managed mortgage REITs and in the financial services industry, to consider LTIP grants and other non-cash compensation when determining cash bonuses.  Pine River's conduct with respect to its compensation arrangements and the LTIP grants was commercially reasonable and was far from meeting the standard required for gross negligence, i.e., that the alleged conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care.

e.  **Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.**  To the extent any compensation arrangements constituted a breach of the Management Agreement—and they did not—such a breach could be cured by changing the compensation arrangements and, if necessary, by Pine River making monetary payments to its

partners, yet Two Harbors, in further breach of the Management Agreement, gave Pine River no opportunity to cure.

85.    Two Harbors' Justification No. 2.  In the July 15 Termination Letter, Two Harbors stated:

> "Since at least 2014, Pine River's partners serving as [Two Harbors] executives have been subject to certain noncompetition and other restrictive covenants in connection with the Pine River Holdings L.P. Agreement of Limited Partnership.  Those noncompetition and other restrictive covenants, which restrict the individuals subject to them from continuing to provide services to [Two Harbors] in the event that the Management Agreement is not renewed or is terminated, were not disclosed to [Two Harbors'] Board of Directors until December 2019."

**Two Harbors could not properly terminate the Management agreement based on this purported justification.**

**a.    Pine River performed all its obligations under the Management Agreement related to this alleged basis for termination.**

i.    All Pine River partners who provided services to Two Harbors, including those who served as Two Harbors executives, fully performed their responsibilities with respect to the Management Agreement.

ii.   The Pine River LPAs, to which all Pine River partners are party, include a provision that prohibits a partner from engaging in certain specified forms of competition with Pine River for a specified period of time.  The existence of these covenants in the LPAs pre-dates the Management Agreement.  The covenants do not mention, and are not specifically targeted at, Two Harbors, and they do not restrict a partner from providing services to Two Harbors in the event that the Management Agreement is not renewed or terminated, so long as the time limitation of the non-competition provision has expired.

iii.  Two Harbors claims that these covenants were not disclosed to the Two Harbors
      Board of Directors until December 2019.  Nothing in the Management
      Agreement required Pine River to disclose these covenants to Two Harbors or
      prevented Pine River from entering into such restrictive covenants.  In any
      event, before 2019, neither the Two Harbors Board of Directors nor any of its
      committees asked for the details of any Pine River LPAs.  As soon as Two
      Harbors' Board of Directors requested this information, Pine River promptly
      provided it.

iv.  These covenants do not create a conflict of interest. Nothing in the Management
      Agreement anticipated or required that Pine River would agree to Two Harbors'
      employment of Pine River's partners after any termination of the Management
      Agreement, or that Pine River had an obligation to facilitate Two Harbors in
      terminating the Management Agreement and internalizing management using
      Pine River's partners and employees without just compensation.

b.  **Pine River's actions did not result in a material breach (let alone an
incurable material breach) of the Management Agreement.**  Neither the existence of the
purported covenants, nor any issues around their disclosure to Two Harbors, had a negative
impact on Pine River's performance of its obligations under the Management Agreement or
caused any financial loss or other harm to Two Harbors or its investors.  These covenants would
only impact Two Harbors if the Management Agreement were to be terminated, and then would
only preclude Two Harbors from employing Pine River's partners for a limited period.  The
existence of these covenants did not affect Pine River's performance under the Management
Agreement while it was in effect.

c.  **Nor were Pine River's actions grossly negligent.** It is commercially reasonable, and common practice in the financial services industry, to have restrictive covenants of this kind with partners and other key executives.  Pine River's conduct with respect to the covenants was commercially reasonable and was far from meeting the standard required for gross negligence, i.e., that the alleged conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care.

d.  **Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.**  To the extent any restrictive covenants constituted a breach of the Management Agreement—and they did not—such a breach could be cured by revising or eliminating the covenants, yet Two Harbors, in further breach of the Management Agreement, gave Pine River no opportunity to cure.

86.  <u>Two Harbors' Justification No. 3.</u>  In the July 15 Termination Letter, Two Harbors stated:

> "In 2017, in connection with the spinoff of Granite Point Mortgage Trust, Inc. ("Granite Point"), Pine River failed to disclose to [Two Harbors] certain noncompetition and other restrictive covenants in the employment agreements into which Pine River was to enter with Granite Point executives.  Those noncompetition and other restrictive covenants were not disclosed to [Two Harbors'] Board of Directors until after the spinoff."

**Two Harbors could not properly terminate the Management agreement based on this purported justification.**

a.  **This claim is false, and Pine River denies it.**  Nothing in the Management Agreement in any way required Pine River to disclose these restrictive covenants to Two Harbors.  Nonetheless, Pine River did in fact disclose to Two Harbors, before the spinoff, the existence of the employment agreements with the executives, and offered to make any disclosures necessary in connection with the spinoff.

48

b.   **Pine River performed all its obligations under the Management Agreement related to this alleged basis for termination.**

i.   All Pine River personnel who provided services to Two Harbors, including those who served as Granite Point executives after the spinoff, fully performed their responsibilities with respect to the Management Agreement. The restrictive covenants did not create a conflict of interest between the executives and Two Harbors.

ii.   In addition, Pine River fully complied with all its obligations to Two Harbors under the Management Agreement with respect to the spinoff of Granite Point.

c.   **Pine River's actions did not result in a material breach (let alone incurable material breach) of the Management Agreement.**   Nothing in any Granite Point executive's employment agreement with Pine River adversely impacted Two Harbors.  Neither the restrictive covenants in employment agreements with executives of Granite Point nor the timing of disclosure of those covenants constituted a breach – let alone a material breach – of the Management Agreement.  The existence of restrictive covenants with Granite Point executives after the spinoff had nothing to do with Pine River's performance under the Management Agreement.  Employment agreements that would go into effect only after a spinoff did not affect Pine River's performance under the Management Agreement with Two Harbors.

d.   **Nor were Pine River's actions grossly negligent.**   It is commercially reasonable, and common practice in the financial services industry, to have restrictive covenants of this kind with key executives.  Pine River's conduct with respect to the covenants was commercially reasonable and was far from meeting the standard required for gross negligence, i.e., that the

alleged conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care.

   **e.** **Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.** To the extent the covenants constituted a breach of the Management Agreement —and they did not—such a breach could be cured by revising or eliminating the covenants, yet Two Harbors, in further breach of the Management Agreement, gave Pine River no opportunity to cure.

   87. <u>Two Harbors' Justification No. 4.</u> In the July 15 Termination Letter, Two Harbors stated:

> "In 2019, Pine River sought to have [Two Harbors'] incoming co-Chief Investment Officers enter into new employment and confidentiality agreements with Pine River that would have restricted those individuals from continuing to provide services to [Two Harbors] in the event the Management Agreement was not renewed or was terminated without informing [Two Harbors'] Board of Directors and notwithstanding that the Management Agreement does not contain restrictions in the cases of non-renewal or termination."

**Two Harbors could not properly terminate the Management agreement based on this purported justification.**

   **a.** **Pine River performed all its obligations under the Management Agreement related to this alleged basis for termination.**

     i. All Pine River personnel who provided services to Two Harbors, including those who served as Two Harbors' co-Chief Investment Officers, fully performed their responsibilities with respect to the Management Agreement.

     ii. The covenants to which Two Harbors refers were never executed and never went into effect. Even if the covenants had gone into effect—and they did

not—this would not have created a conflict of interest between the co-Chief Investment Officers and Two Harbors.

iii.  Far from these negotiations being secret, Pine River disclosed to Two Harbors that it was undertaking such negotiations and agreed to share the proposed final employment agreements with the Two Harbors Board of Directors before they were executed—thus creating a process for Two Harbors to object to any covenants or other terms in the agreements before execution.

iv.  The Management Agreement does not prohibit Pine River from creating restrictions on hiring its employees in the case of non-renewal or termination, let alone seeking (but failing) to negotiate such restrictions.  Further, nothing in the Management Agreement obligated Pine River to agree that Two Harbors may terminate the Management Agreement and internalize management functions using Pine River's own partners or employees without Pine River's consent and negotiation of a termination agreement, or obligated Pine River to facilitate termination of the Management Agreement and internalization of Two Harbors' management, or prohibited Pine River from taking commercially reasonable efforts to protect its contractual rights under the Management Agreement.

b.  **Pine River's actions did not result in a material breach (let alone incurable material breach) of the Management Agreement.**  "S[eeking] to" enter into an agreement does not constitute a breach—let alone an incurable material breach—of the Management Agreement. Moreover, neither the attempt to negotiate restrictive covenants with Two Harbors' incoming co-CIOs nor the timing of disclosure of those covenants had any negative impact on Pine River's

performance of its obligations under the Management Agreement or caused any financial loss or other harm to Two Harbors or its investors.

      c. **Nor were Pine River's actions grossly negligent.**  It is commercially reasonable, and common practice in the financial services industry, to attempt to negotiate restrictive covenants of this kind with key executives.  Pine River's conduct with respect to the covenants was commercially reasonable and was far from meeting the standard required for gross negligence, i.e., that the alleged conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care.

      d. **Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.**  To the extent the negotiations for the restrictive covenants constituted a breach of the Management Agreement—and they did not—such a breach could be cured by revising or terminating the negotiations, yet Two Harbors, in further breach of the Management Agreement, gave Pine River no opportunity to cure.  In any event, by the time Two Harbors asserted that this constituted a breach, Pine River had already given up on seeking the restrictive covenants, thereby effectively curing the alleged breach.

    88.  <u>Two Harbors' Justification No. 5</u>.  In the July 15 Termination Letter, Two Harbors stated:

> "In 2019, Pine River attempted to negotiate a retirement agreement with [Two Harbors'] then-Chief Executive Officer and President that would have incentivized him to prevent [Two Harbors] from not renewing or from terminating the Management Agreement."

**Two Harbors could not properly terminate the Management agreement based on this purported justification.**

      a. **This claim is false, and Pine River denies it.**  The proposed terms of the retirement agreement, which was never executed and never went into effect, would not have

created improper incentives for the executive to prevent the termination of the Management Agreement and would not have created a conflict of interest between the executive and Two Harbors.  In fact, under the proposed terms, the executive would have received a significant lump sum payment if the Management Agreement had been terminated consensually.

      b.  **Pine River performed all its obligations under the Management Agreement related to this alleged basis for termination.**

       i. All Pine River partners who provided services to Two Harbors, including the then-CEO and President, fully performed their responsibilities with respect to the Management Agreement.

      ii. The agreement to which Two Harbors refers was never executed and never went into effect.

      iii. Far from these negotiations being secret, Pine River informed the Chairman of the Two Harbors Board of Directors that it was in discussions with the Pine River partner serving as Two Harbors' CEO regarding a retirement package and committed to disclose the terms of any such package to Two Harbors in advance of execution.  The Chairman of the Two Harbors Board of Directors expressed his support for the negotiations.

      iv. In any event, nothing in the Management Agreement obligated Pine River to agree that Two Harbors may terminate the Management Agreement and internalize management functions using Pine River's own partners or employees without Pine River's consent and negotiation of a termination agreement, or obligated Pine River to facilitate termination of the Management Agreement and internalization of Two Harbors' management, or

prohibited Pine River from taking commercially reasonable efforts to protect

its contractual rights under the Management Agreement.  Even if the

retirement agreement had been executed, which it was not, aligning the

executive's incentives with the continued operation of the Management

Agreement—which has no termination date and runs in perpetuity—would

not have been a breach of the Management Agreement.

      c.  **Pine River's actions did not result in a material breach (let alone incurable material breach) of the Management Agreement.**  "Attempt[ing] to" enter into an agreement does not constitute a breach—let alone an incurable material breach—of the Management Agreement.  Neither Pine River's negotiation of a potential retirement agreement, nor the proposed terms of that agreement, had any negative impact on Pine River's performance of its obligations under the Management Agreement or caused any financial loss or other harm of any kind to Two Harbors or its investors.

      d.  **Nor were Pine River's actions grossly negligent.**  It was commercially reasonable for Pine River to enter into negotiations with its partner who served as CEO of Two Harbors regarding a potential retirement agreement.  In fact, the Chairman of the Two Harbors Board of Directors encouraged Pine River to engage in such negotiations.  Pine River even agreed to disclose the proposed terms of any such agreement to Two Harbors before it was executed (and it never was executed).  Pine River's conduct was commercially reasonable, and was far from meeting the standard required for gross negligence, i.e., that the alleged conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care.

e. **Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.**  To the extent the negotiations regarding the retirement agreements constituted a breach of the Management Agreement—and they did not—such a breach could be cured by revising the proposed agreement or terminating the negotiations, yet Two Harbors, in further breach of the Management Agreement, gave Pine River no opportunity to cure.  In any event, by the time Two Harbors asserted that this constituted a breach, Pine River had already terminated its negotiations regarding the retirement agreements, thereby effectively curing the alleged breach.

89.   <u>Two Harbors' Justification No. 6</u>.  In the July 15 Termination Letter, Two Harbors stated:

> "In recent years, certain conduct by Pine River partners, including those serving as members of [Two Harbors] Board of Directors and dedicated [Two Harbors] personnel . . . has created reputational issues and risks for [Two Harbors]."

**Two Harbors could not properly terminate the Management agreement based on this purported justification.**

a. **This claim is false, and Pine River denies it.**  There has been no conduct by Pine River partners or other personnel that has created any reputational issues or risks for Two Harbors.

b. **Pine River performed all its obligations under the Management Agreement related to this alleged basis for termination.**

i.   All Pine River partners fully performed their responsibilities with respect to the Management Agreement without creating any reputational issues or risk whatsoever.

    ii.  The dispute between Pine River and a former partner that Two Harbors claims created reputational risk to Two Harbors justifying termination "for cause" was based on unfounded allegations and was resolved amicably and confidentially long ago with no lawsuit ever filed.  Moreover, after the dispute arose Pine River informed Two Harbors of the dispute, and the Chairman of Two Harbors' Board of Directors specifically stated to Pine River's CEO that the dispute was not an issue concerning the Management Agreement.

    iii.  Two Harbors has not identified any other potential conduct by Pine River partners or other personnel that created reputational risk, and none occurred.

    c.  **Pine River's actions did not result in a material breach (let alone incurable material breach) of the Management Agreement.**  The alleged reputational risk did not have any negative impact on Pine River's performance of its obligations under the Management Agreement or cause any financial loss or other harm of any kind to Two Harbors or its investors.

    d.  **Nor were Pine River's actions grossly negligent.**  Pine River's conduct was far from meeting the standard required for gross negligence, i.e., that the alleged conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care.  To the contrary, Pine River's conduct was commercially reasonable and did not create any reputational risk to Two Harbors.

    e.  **Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.**  To the extent Pine River created reputational risk in a manner that constituted a breach of the Management Agreement— and it did not—such a breach could be cured by taking remedial action such as terminating the allegedly problematic conduct or disciplining the

responsible partners or personnel, yet Two Harbors, in further breach of the Management Agreement, gave Pine River no opportunity to cure.

90.     Two Harbors has not identified any alleged bases for termination beyond the eight in the July 15 Termination Letter, and none existed.

91.     In the July 15 Termination Letter, Two Harbors claimed that the eight alleged bases for termination breached Sections 2(a), 2(b), 2(b)(vii), 2(b)(x), 2(b)(xx), 2(b)(xxix), 2(b)(xxx), and 9 of the Management Agreement.  Pine River denies that any of the events Two Harbors identified as justifying "for cause" termination violated any of these provisions:

a.  Section 2(a) of the Management Agreement provides "[Pine River] hereby agrees to use its commercially reasonable efforts to perform each of the duties set forth [in the Management Agreement]."  Pine River's alleged actions described in Justification Nos. 1-6 were commercially reasonable.  Pine River fully performed its duties under this provision.

b.  Section 2(b) of the Management Agreement provides "[Pine River], in its capacity as manager of the assets and the day-to-day operations of [Two Harbors], at all times will be subject to the supervision of [Two Harbors'] Board of Directors and will have only such functions and authority as [Two Harbors] may delegate to it including the functions and authority identified herein and delegated to [Pine River] hereby."  Pine River denies that the alleged actions described in Justification Nos. 1-6 caused Pine River to act outside the authority delegated to it by the Management Agreement and/or by Two Harbors' Board of Directors.  Pine River's actions did not impede or

interfere with Two Harbors' supervisory authority.  Pine River fully performed its duties under this provision.

c.  <u>Section 2(b)(vii)</u> of the Management Agreement provides that Pine River will provide "executive and administrative personnel, office space and office services required in rendering services to [Two Harbors]."  Pine River's alleged actions described in Justification Nos. 1-6 did not impede or interfere with its provision of personnel, office space, and office services to Two Harbors.  Pine River fully performed its duties under this provision. At all times, Pine River provided competent and qualified executives and managers to Two Harbors. Nothing in Pine River's employment or compensation terms with these personnel caused any harm to Two Harbors.

d.  <u>Section 2(b)(x)</u> of the Management Agreement requires Pine River to provide "counseling [to] [Two Harbors] in connection with policy decisions to be made by the Board of Directors."  Pine River's alleged actions described in Justification Nos. 1-6 did not impede or interfere with its provision of counseling to Two Harbors' Board of Directors.  Pine River fully performed its duties under this provision.

e.  <u>Section 2(b)(xx)</u> of the Management Agreement requires Pine River to assist Two Harbors "in complying with all regulatory requirements applicable to [it] in respect of [its] business activities, including preparing or causing to be prepared all financial statements required under applicable regulations and contractual undertakings and all reports and documents, if any, required under the Exchange Act, the Securities Act, or by the NYSE."  Pine River's alleged

actions described in Justification Nos. 1-6 did not impede or interfere with its assistance to Two Harbors in complying with regulatory requirements.  Pine River fully performed its duties under this provision.

f.   Section 2(b)(xxix) of the Management Agreement requires Pine River to perform "such other services as may be required from time to time for management and other activities relating to the assets and business of [Two Harbors] as the Board of Directors shall reasonably request or [Pine River] shall deem appropriate under the particular circumstances."  Pine River's alleged actions described in Justification Nos. 1-6 did not impede or interfere with its performance of any services to Two Harbors, including all services reasonably requested by Two Harbors' Board of Directors.  Pine River fully performed its duties under this provision.

g.   Section 2(b)(xxx) of the Management Agreement requires Pine River to use "commercially reasonable efforts to cause Two Harbors to comply with all applicable laws."  Pine River's alleged actions described in Justification Nos. 1-6 did not impede or interfere with its efforts to cause Two Harbors to comply with all applicable laws.  Pine River fully performed its duties under this provision.

h.   Section 9 of the Management Agreement provides "[Two Harbors] shall pay all of its expenses and shall reimburse [Pine River] for documented expenses of [Pine River] incurred on its behalf . . . excepting those expenses that are specifically the responsibility of [Pine River] as set forth herein."  Pine River paid all of the expenses it is responsible for paying under the Management Agreement, including

compensation costs of Pine River personnel serving as Two Harbors CEO, President, and CIO as required by Section 9, and in all respects fully performed its duties under this provision.  Pine River's alleged actions described in Justification Nos. 1-6 did not impede or interfere with its payment of the expenses for which it was responsible under the Management Agreement. Nothing in Pine River's employment or compensation terms with these personnel caused any harm to Two Harbors.

92.     In the July 15 Termination Letter, Two Harbors also asserted, with respect to Pine River's alleged actions described in Justification Nos. 1-6:

> The above conduct constitutes material and incurable breaches of the Management Agreement because (among other things) it has impeded the supervisory rights of the Company's Board of Directors and breached the Manager's obligations to use commercially reasonable efforts to perform its duties under the Management Agreement, perform such services and activities relating to the operation of the Company as may be appropriate, provide executive personnel required in rendering services to the Company, counsel the Company in connection with policy decisions to be made by the Company's Board of Directors, assist the Company in complying with all regulatory requirements applicable to it in respect of its business activities, perform such other services as may be required from time to time for management and other activities relating to the business of the Company as the Company's Board of Directors shall reasonably request, use commercially reasonable efforts to cause the Company to comply with all applicable laws, and/or be responsible for the compensation paid by the Manager to its personnel serving as the Company's Chief Executive Officer, President, and Chief Investment Officer.

To the extent the foregoing is not merely repetitive of Two Harbors' allegations addressed above, Pine River specifically denies each of Two Harbors' assertions, for the reasons set forth above.  Pine River further denies that any of the alleged actions described by Two Harbors constitutes a breach—let alone a material breach—of the Management Agreement or gross negligence in the performance of Pine River's duties under the Management Agreement. Moreover, Two Harbors failed to provide Pine River with an opportunity to cure the alleged breach.

93.     Two Harbors has also admitted that by no later than December 2019 it was aware of Pine River's alleged actions described in Justification Nos. 1-6, which it now claims constitute material breaches of the Management Agreement or events of gross negligence.  Yet shortly after learning of the conduct that Two Harbors now claims constituted a material breach of the Management Agreement and gross negligence, Two Harbors praised Pine River in its public filings.  *See, e.g.*, 2019 Form 10-K, Two Harbors Investment Corp. (Feb. 26, 2020) (noting that Pine River "has broad experience in managing our target assets and has demonstrated the ability to generate attractive risk-adjusted returns" and that Pine River "ha[s] extensive long-term relationships" that "enhance [Two Harbors'] ability to source, finance, protect and hedge our investments and, thus, enable us to succeed").

94.     Nor did Two Harbors immediately terminate the Management Agreement "for cause" after learning of the six events.  To the contrary, Two Harbors terminated the Management Agreement without cause in March 2020.  After Pine River then filed a lawsuit against Two Harbors challenging the without-cause termination, Two Harbors then claimed in retaliation that the six events constituted grounds to terminate the Management Agreement "for cause."  Two Harbors manufactured phony reasons to assert that it could terminate the Management Agreement "for cause" so that Two Harbors could internalize management functions without paying Pine River fair value in connection with internalization and termination of the Management Agreement.

95.     Because Two Harbors had no valid basis upon which to terminate the Management Agreement "for cause" under Section 15, and further because Two Harbors failed to provide Pine River with an opportunity to cure the alleged breaches as required under Section 15, Two Harbors' termination constituted a breach of the Management Agreement.

**H.**    **Two Harbors Has Essentially Admitted to Having Ulterior Motives for Terminating the Management Agreement That Have Nothing to Do with the Fairness of Pine River's Compensation, Any Alleged "Material Breaches" or any Alleged "Gross Negligence" By Pine River.**

96.    Two Harbors' true reason for terminating its Management Agreement with Pine River has nothing to do with the fairness of Pine River's compensation, any alleged "material breach" of the Management Agreement by Pine River, or any alleged "gross negligence" by Pine River.  Two Harbors has plainly admitted its true motives.  In its April 13, 2020 press release announcing termination of the Management Agreement (and again in subsequent investor presentations), Two Harbors highlighted "material benefits" which it expects to derive from internalizing, which have nothing to do with Pine River's compensation being "unfair:"

a.    Two Harbors expects to save approximately $42 million annually by internalizing management functions.

b.    Two Harbors will eliminate future management fees payable to Pine River.

c.    Two Harbors hopes to attract new investors that prefer internal management structures.

d.    Two Harbors expects to "strengthen the alignment of interests" with Two Harbors' "management team" – all of whom were *Pine River's* employees.

97.    By forcing through an internalization without Pine River's consent first using a fabricated claim of "unfair" compensation and later claiming termination "for cause," Two Harbors is attempting to reap the benefits of internalization without properly compensating Pine River for the elimination of its contractual entitlements (and Two Harbors' contractual obligations) under the Management Agreement – namely, payment of management fees in exchange for continued management of Two Harbors.

98.    Two Harbors aims to shortchange Pine River on the amount it would be entitled to receive in a mutual, negotiated internalization and termination of the Management Agreement.

**I.  Two Harbors Is Knowingly Using Pine River's Former Employees and Pine**

**River's Intellectual Property to Facilitate Its Plan of Internalization and Is Knowingly Preventing Pine River from Accessing Its Own Intellectual Property.**

99.    Not only has Two Harbors fabricated a basis to terminate the Management Agreement as a pretext to effect an internalization, Two Harbors planned to use and is now improperly using Pine River's former employees and Pine River's intellectual property, including trade secrets and know-how, to effect that internalization:

   a.   In its April 13, 2020 press release announcing that it had terminated Pine River, Two Harbors readily admitted that it had terminated Pine River so that Two Harbors can manage itself using *Pine River's* employees.  In that press release, Two Harbors stated that it will become "self-managed" using *Pine River's* "strong and experienced senior management team along with the other personnel currently providing services to Two Harbors, to whom our Board of Directors intends to extend offers of employment."

   b.   In fact, shortly before Two Harbors made public its plans to internalize its management functions, Two Harbors admitted in its 2019 10-K, which Two Harbors filed in February 2020, that its ability to operate successfully hinged on having access to Pine River's employees and intellectual property, including trade secrets and know-how, stating:

> The loss of our access to Pine River's investment professionals and principals may adversely affect our ability to achieve our investment objectives and to execute our business plan . . . [and] in the event of a termination of the management agreement . . . it may be difficult or costly to replace certain intellectual property, systems, facilities or other services that have been historically provided by or contracted through Pine River that are necessary or desirable to execute our business plan.

   c.   Two Harbors further recognized in that same 10-K that those Pine River

employees had employment agreements that could prohibit or restrict their ability

to continue managing Two Harbors after Two Harbors' termination of the

Management Agreement, stating:

> the individual agreements these [Pine River] investment
> professionals and principals have with Pine River contain
> non-solicitation, confidentiality and, with respect to our Chief
> Executive Officer, non-competition provisions that may
> prohibit or otherwise restrict their ability to support Two
> Harbors in the event of a termination of our management
> agreement.

Two Harbors' 10-K was correct.  The now former-Pine River employees who

Two Harbors hired to currently manage Two Harbors have employment

agreements containing ongoing confidentiality provisions prohibiting those

employees from disclosing Pine River's trade secrets and other proprietary and

confidential information other than for the benefit of Pine River after the

Management Agreement terminates.

d.  Two Harbors further recognized in its 10-Q for the first quarter of 2020 that it has

been entirely dependent on Pine River's employees to manage Two Harbors and

that it intended to retain those employees to manage Two Harbors:

> We currently depend on Pine River to provide us with our
> executives and employees to administer our business
> activities and day-to-day operations.  Following the
> termination of the management agreement, we expect to
> retain and continue to be managed by our senior management
> team along with the other dedicated personnel currently
> providing services to us.  While our Board of Directors
> intends to extend offers of employment to our current
> personnel, there can be no assurance that all such personnel
> will accept employment with us.

100.    At no point did Pine River consent to Two Harbors' hiring of Pine River's

employees.  Those employees possess valuable intellectual property, including trade secrets and

know-how, of Pine River.  Those employees will inevitably disclose Pine River's trade secrets and other confidential and proprietary information to Two Harbors because those Pine River employees will be performing the exact same job functions for Two Harbors that they performed when employed by Pine River.

101.    Further regarding Pine River's intellectual property, including its trade secrets and know-how:

     a.   Pine River has developed and owns significant intellectual property which Two Harbors uses in its day-to-day operations.

     b.   The Second Amendment to the Management Agreement dated November 3, 2014 expressly provides that all intellectual property that Pine River creates or develops for Two Harbors' use is "the sole and exclusive property of [Pine River and that Two Harbors] shall assign and do[es] hereby assign to [Pine River] all Intellectual Property Rights in such Intellectual Property."  Such intellectual property specifically includes:

> all work product, documents, code, works of authorship, programs, manuals, developments, processes, formulas, data, specifications, fixtures, tooling, equipment, supplies . . . and know-how or similar rights . . . [that are] created or developed by [Pine River] in connection with [Pine River's] performance of th[e] [Management] Agreement or otherwise . . . .

     c.   In its April 13, 2020 press release, Two Harbors stated that it "anticipates a smooth and timely transition of all functions necessary to operate the Company's business without interruption."  Two Harbors further admitted in its 2019 10-K that "in the event of a termination of the management agreement . . . it may be difficult or costly to replace certain intellectual property, systems, facilities or

other services that have been historically provided by or contracted through Pine River that are necessary or desirable to execute our business plan."  Two Harbors would have no alternative but to misappropriate Pine River's intellectual property to internalize "without interruption" to its business.  Two Harbors did exactly that. After terminating the Management Agreement on August 14, 2020, Two Harbors misappropriated Pine River's intellectual property to internalize without interruption to Two Harbors' business.

102.    Pine River has not consented to Two Harbors' use of Pine River's intellectual property after the Management Agreement terminated.  Two Harbors' continued use—without Pine River's consent—violates Pine River's intellectual property rights and misappropriates Pine River's trade secrets.

103.    Prior to the termination of the Management Agreement, Pine River made clear to its employees and Two Harbors that all of the intellectual property developed to manage Two Harbors belongs solely and exclusively to Pine River, and that Pine River did not consent to Two Harbors using that intellectual property after the Management Agreement terminates.

a.    On June 18, 2020, Pine River sent a letter to its employees and partners who are involved in managing Two Harbors instructing them that Two Harbors is "not entitled to use any of Pine River's intellectual property after Pine River ceases to manage Two Harbors later in the year," that "as a partner or employee of Pine River, any intellectual property you have created or developed in connection with services rendered to Two Harbors is Pine River's intellectual property," and that they have an "obligation to protect Pine River's valuable intellectual property."

b.    On June 23, 2020, the chairman of Two Harbors' Board of Directors sent Pine

66

River a letter claiming that Two Harbors owned all of the intellectual property

developed and used to manage Two Harbors stating:

> "intellectual property created or developed by dedicated Two
> Harbors personnel for Two Harbors' use and at Two
> Harbors' expense is the intellectual property of Two Harbors
> (not Pine River) and belongs to Two Harbors (not Pine
> River)."

c. Pine River responded by letter dated June 24, 2020 and again informed Two

Harbors that, pursuant to the Management Agreement, all intellectual property

developed by Pine River, including its trade secrets, is the exclusive property of

Pine River.  Pine River requested that Two Harbors discuss the transition of Pine

River's intellectual property to Pine River after September 19, 2020 – the date

Two Harbors unilaterally originally set to terminate the Management Agreement.

Pine River informed Two Harbors that Pine River "is taking steps to ensure that

its intellectual property remains protected once the Management Agreement is

terminated on September 19, 2020."  Pine River also reiterated its position that

"after Pine River ceases to manage Two Harbors, Two Harbors will no longer be

able to use and rely on Pine River's intellectual property . . . ."  Pine River further

requested that Two Harbors confirm that it was in fact Two Harbors' position that

the intellectual property belonged to Two Harbors, because if that was the case,

Pine River intended to take legal action in advance of September 19, 2020 to

protect its rights.  Also on June 24, 2020, Pine River specifically instructed its

employees that they must continue to work to advance the best interests of Two

Harbors and its shareholders until Pine River ceases to manage Two Harbors'

operations on September 19, 2020 and should continue to rely on all intellectual

property that Pine River developed in order to continue managing the day-to-day
operations of Two Harbors up until Two Harbors' unilaterally-imposed
termination of the Management Agreement on September 19, 2020.

d.  By letter dated July 3, 2020, Two Harbors reiterated and confirmed its position
that the intellectual property belongs solely to Two Harbors and demanded that
Pine River "retract and disavow its position that the intellectual property created
or developed by Two Harbors personnel for Two Harbors' use and at Two
Harbors' expense does not belong to Two Harbors."  Two Harbors' July 3, 2020
letter further makes clear that Two Harbors has no intention of transitioning Pine
River's intellectual property back to Pine River after the Management Agreement
terminates – which is when Two Harbors' license to use that intellectual property
expires.

e.  By letter dated July 6, 2020, Pine River reiterated its position that under the
express terms of the Management Agreement all intellectual property developed
and created by Pine River's employees to manage Two Harbors belonged
exclusively to Pine River.

f.  By letter dated July 15, 2020, Two Harbors then purported to terminate the
Management Agreement "for cause," claiming Pine River "misrepresented its
rights and obligations" under the Management Agreement.

g.  By letter dated July 30, 2020—while Pine River was responsible for managing
Two Harbors pursuant to the Management Agreement—Pine River requested that
Two Harbors provide Pine River "with all necessary credentials, access codes,
passwords, and network and system access such that Pine River may (1) access all

servers, PCs, hard drives, and other relevant storage devices that contain Pine

River intellectual property and (2) control access to such intellectual property."

Although the Management Agreement requires that Two Harbors "do, execute,

acknowledge and deliver or cause to be done, executed, acknowledged and

delivered all such further acts, deeds, assignments, transfers, conveyances, powers

of attorney and assurances as may be requested by the Manager to carry out the

intent of this Agreement or to otherwise perfect, record, confirm, or enforce the

Manager's rights in and to the Intellectual Property," Two Harbors refused,

incorrectly claiming that privacy laws prohibited Two Harbors from providing

this information.

h. On August 6, 2020, Pine River again requested that Two Harbors "(1) return to

Pine River all Pine River intellectual property embodied in licensed software,

systems and information and (2) remove Pine River intellectual property from

Two Harbors' networks and servers."  Two Harbors refused to provide Pine River

with access to its intellectual property or the intellectual property itself.

i. On August 7, 2020, Pine River requested these same passwords and access from

its employees.  Pine River's employees did not provide the requested information,

which on information and belief, may be because Two Harbors instructed these

employees to refuse Pine River's request.

j. On August 14, 2020, Two Harbors—rather than returning Pine River's

intellectual property now that its license had ended—instead informed Pine River

that its requests for "all necessary passwords and access . . . to networks and

servers in which Pine River's intellectual property resides" constituted an

"Incurable Material Breach[] and Gross Negligence" under the Management
Agreement.

k.   Also on August 14, 2020, Pine River sent a letter to each of its employees
(including those that had recently resigned) reminding each employee of their
duty under the Confidentiality, Nonsolicitation, and Inventions Agreement to
"protect and ensure the confidentiality of Pine River's intellectual property,
including trade secrets," which extends beyond the termination of their
employment.

104.   Two Harbors' positions that "Two Harbors personnel" developed the intellectual
property and that the intellectual property belongs solely to Two Harbors are in direct
contradiction of the terms of the Management Agreement.  Prior to the termination of the
Management Agreement, Two Harbors had no personnel, as Two Harbors has correctly
acknowledged in its own SEC filings.  And the Management Agreement is also crystal clear that
all of the intellectual property Pine River has developed to manage Two Harbors belongs solely
and exclusively to Pine River.

105.   Two Harbors' possession of Pine River's confidential and proprietary information
will be of significant value to Two Harbors.  As Two Harbors has already stated, "in the event of
a termination of the management agreement . . . it may be difficult or costly [for Two Harbors] to
replace certain intellectual property, systems, facilities or other services that have been
historically provided by or contracted through Pine River that are necessary or desirable to
execute our business plan."  Since Two Harbors has never operated its business on its own
without Pine River, the intellectual property, including proprietary systems, platforms, models,
spreadsheets, analytics and other confidential information identified above, improperly enables

Two Harbors to continue to manage its REIT after August 14, 2020.  Further, Pine River's intellectual property provides Two Harbors with all of the necessary tools to develop its own systems, platforms, models, spreadsheets, analytics and other operational information.

      **J.**      **Even if Two Harbors Had a Basis for Terminating the Management Agreement, Which It Does Not, As a Further Show of Bad Faith, Two Harbors Is Also Improperly Attempting to Cheat Pine River on Its Termination Fee.**

106.     Even if Two Harbors had a basis to terminate the Management Agreement based on a claim of unfair compensation—and it does not—Two Harbors must still pay Pine River a termination fee.  The Management Agreement provides that in the event that Two Harbors terminates Pine River pursuant to Section 13(a) of the Management Agreement, which is what Two Harbors improperly did before purporting to terminate the Management Agreement a second time "for cause," Two Harbors would still be required to pay Pine River a "termination fee," equal to "three times the sum of the average annual Base Management Fee earned by [Pine River] during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination."

107.     Therefore, even if Two Harbors had a basis to terminate the Management Agreement based on a claim of unfair compensation—and it does not—the time period to be used to calculate the termination fee for the current one-year term ending October 28, 2020 would be the two-year period beginning October 1, 2018 and ending September 30, 2020.

108.     By originally claiming that the termination of the Management Agreement will take effect on September 19, 2020 rather than at the expiration of the current term on October 28, 2020, Two Harbors improperly sought to manipulate the 24-month measuring period to begin one quarter earlier than it should in an effort to improperly reduce the termination fee.  (Two

71

Harbors subsequently purported to terminate Pine River "for cause" to avoid paying even a termination fee.)

109.    In the third quarter of 2018, Pine River agreed to a one-time $17.5 million concession to support Two Harbors in its bid to acquire another residential mortgage REIT called CYS Investments, Inc. ("CYS").  By originally attempting to terminate the Management Agreement in September 2020, Two Harbors sought to include the third quarter of 2018—and the $17.5 million concession—in the 24-month measurement period in order to reduce the termination fee.  And now, Two Harbors has purported to terminate the Management Agreement "for cause" to avoid paying even the termination fee.

110.    But Two Harbors had no basis to terminate the Management Agreement.  And even if Two Harbors did have a proper basis (which it did not) to terminate the Management Agreement due to "unfair" compensation to Pine River, Two Harbors' shortchanging attempt would fail on two counts.

111.    First, under the terms of the Management Agreement, such termination could not occur before the end of the current renewal term, which is October 28, 2020.  Two Harbors recognized as much in its April 10 letter in which it stated that it "intends not to renew the Management Agreement upon the completion of the current Renewal Term," which is October 28, 2020.

112.    Second, even if Two Harbors had a proper basis (which it did not) to terminate the Management Agreement due to "unfair" compensation and also were able (which it was not) to terminate the Management Agreement before the end of its current renewal term, Two Harbors' basis for trying to shortchange Pine River on the termination fee would still be invalid.

    a.   In 2018, to support Two Harbors' bid to acquire CYS, Pine River agreed to

provide $17.5 million to Two Harbors. Two Harbors' bid was successful and it acquired CYS on July 31, 2018. When it came time to make the $17.5 million payment, Pine River agreed, at Two Harbors' request, to pay the $17.5 million through a one-time concession in the third quarter of 2018. Approximately $12.44 million of this one-time concession was in the form of a refund of management fees, and approximately $5.04 million was in the form of an additional cash payment from Pine River to Two Harbors.

b.   Two Harbors has no right to incorporate this concession in the calculation of the purported termination fee: Two Harbors cannot exclude the management fees that Pine River earned and then refunded; neither can Two Harbors pretend that an out-of-pocket cash payment – having nothing to do with management fees – somehow represents negative management fees.

113.   Two Harbors' opportunistic selection of a September 19, 2020 termination date (which it had no right to do) for no other reason than to try to shortchange Pine River millions of dollars by deducting the $17.5 million concession from the calculation of the termination fee (which it had no right to do) is not conjecture: Two Harbors' Board of Directors has openly acknowledged that minimizing the termination fee is the reason Two Harbors improperly sought to terminate the Management Agreement in September rather than at the end of the renewal term in October.

114.   Two Harbors' conduct plainly illustrates that it is trying to cheat Pine River out of even the $144 million termination fee it would be owed even if Two Harbors had a right to terminate on a basis of "unfair" compensation, which it does not. Two Harbors' purported termination of Pine River "for cause" is yet another transparent attempt to avoid paying Pine

River the fair value of the Management Agreement – which Pine River would have received in a mutual, negotiated internalization and termination of the Management Agreement.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)**

115.   Pine River incorporates by reference the allegations contained in paragraphs 1 through 114 as set forth above, as if fully set forth at length herein in full.

116.   Pine River owns trade secrets either directly or through assignment from its employees and assignees.

117.   As a result of and in connection with the Management Agreement, Two Harbors obtained Pine River's intellectual property, including Pine River's proprietary work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries, improvements, trade secrets, and know-how or similar rights.  At minimum, the proprietary information identified above in paragraphs 34-35 constitute trade secrets of Pine River subject to protection under the Defend Trade Secrets  Act, 18 U.S.C. § 1836.

118.   Pine River's trade secrets, as described above, relate to a product or service used in, or intended for use in, interstate or foreign commerce. Specifically, these trade secrets are intended for use in managing investments located throughout the United States.  In the past, Pine River used—and Two Harbors is currently using—these trade secrets to service investments throughout the United States, on behalf of clients and shareholders throughout the United States. These investments have underlying mortgages throughout the country.

119.   Pine River's trade secret information is valuable because it is not generally known

or readily accessed, acquired or duplicated, through proper means, to others who can profit from its use without a license.  This information is limited in distribution within Pine River (and its licensees) and is not readily available to the public or to Pine River competitors.

120.    Pine River has spent significant time, skill, research and development (R&D) to develop and maintain its trade secrets, which are extremely valuable to Pine River, which give Pine River a competitive advantage and which would be of great value to a competitor.

121.    Pine River has taken more than adequate measures under the circumstances to maintain the secrecy of its trade secret information, including protecting against impermissible dissemination of the information, requiring passwords to be used to access computer systems and records, requiring confidentiality obligations from its employees and expressly informing the Pine River employees that were involved in managing Two Harbors that they were prohibited from assisting Two Harbors in obtaining or misappropriating Pine River's intellectual property for use after Two Harbors' termination of the Management Agreement.

122.    Pine River also had policies and procedures that protected this information.  As part of the Management Agreement, Two Harbors agreed that "[a]ll Intellectual Property created or developed" by Pine River – including any trade secrets – in connection with its performance of the Management Agreement would be "the sole and exclusive property" of Pine River and that Two Harbors would assist in "perfect[ing], record[ing], confirm[ing], or enforc[ing] [Pine River's] rights in and to the Intellectual Property."  Two Harbors thus had a duty to maintain the secrecy of Pine River's trade secrets.

123.    In reliance on the terms of the Management Agreement, Pine River provided Two Harbors with access to its trade secrets solely for the duration of the Management Agreement.

124.    Two Harbors has candidly acknowledged in its public filings that its ability to

operate successfully hinges on having access to Pine River's intellectual property, including trade secrets.

125.    Two Harbors also publicly stated that it intended to hire Pine River employees as employees of Two Harbors in order to manage Two Harbors after the Management Agreement terminated.  After the August 14, 2020 termination of the Management Agreement, Two Harbors then hired Pine River's employees.  On information and belief, Two Harbors has induced those Pine River employees to perform the same or similar job functions for Two Harbors that they performed when employed by Pine River.  On information and belief, in order to perform those job functions, such employees are using and will be using, without Pine River's authorization or license, the intellectual property including trade secrets that Pine River created and developed in connection with the Management Agreement.

126.    Pine River derives a significant economic benefit from the above-described  trade secrets and does not consent to Two Harbors' continued use of its trade secrets.

127.    Pine River faces an immediate threat of irreparable harm, for which Pine River lacks an adequate remedy at law, from Two Harbors' misappropriation and misuse of Pine River's trade secret information including, but not limited to, loss of future business and the potential that Pine River's trade secrets may be disseminated beyond the Court's ability to provide monetary redress.

128.    Unless Two Harbors is enjoined from the foregoing conduct, Pine River will be irreparably harmed by:

>    (a)    Disclosure of trade secrets and other confidential information that is
>            solely the property of Pine River;

>    (b)    Loss of a competitive advantage, loss of goodwill, lost compensation,
>            and loss of business reputation; and

(c)      Potential future economic loss, which is presently incalculable.

129.    As alleged herein, Two Harbors' conduct has been and is malicious, deliberate and willful.  Two Harbors has also repeatedly and knowingly refused to discontinue its misappropriation of Pine River's trade secrets, and refused to provide Pine River with even copies of Pine River's intellectual property.  Two Harbors must know that these acts cause Pine River harm.  Pine River is therefore entitled to recover from Two Harbors exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C).

130.    Pine River is entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CLAIM FOR RELIEF[5]
### (Misappropriation of Trade Secrets in Violation of the New York Common Law)

131.    Pine River incorporates by reference the allegations contained in paragraphs 1 through 130 as set forth above, as if fully set forth at length herein in full.

132.    Two Harbors' actions, as set forth above, constitute misappropriation under New York law.

133.    As a result of and in connection with the Management Agreement, Two Harbors obtained Pine River's intellectual property, including Pine River's proprietary work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries, improvements, trade secrets, and know-how or similar rights.  At minimum, the proprietary

---

[5] Solely for the purpose of preserving its right to appeal, Pine River re-asserts Counts Two and Five, which were dismissed by the Court's June 23, 2021 order, as well as the portion of Count Six that was dismissed and the portions of Count Three that pertain to Pine River's allegations that Two Harbors breached Section 13 of the Management Agreement.  Pine River does not seek to relitigate Counts Two or Five, or the identified portions of Counts Three or Six.

information identified above in paragraphs 34-35 constitute trade secrets of Pine River subject to protection under New York law.

134.    Pine River's trade secret information is valuable because it is not generally known or readily accessed, acquired or duplicated, through proper means, to others who can profit from its use without a license.  This information is limited in distribution within Pine River (and its licensees) and is not readily available to the public or to Pine River competitors.

135.    Pine River has spent significant time, skill, research and development (R&D) to develop and maintain its trade secrets, which are extremely valuable to Pine River, which give Pine River a competitive advantage and which would be of great value to a competitor.

136.    Pine River has taken more than adequate measures under the circumstances to maintain the secrecy of its trade secret information, including protecting against impermissible dissemination of the information, requiring passwords to be used to access computer systems and records, requiring confidentiality obligations from its employees and expressly informing the Pine River employees that were involved in managing Two Harbors that they were prohibited from assisting Two Harbors in obtaining or misappropriating Pine River's intellectual property for use after Two Harbors' termination of the Management Agreement.

137.    Pine River also had policies and procedures that protected this information.  As part of the Management Agreement, Two Harbors agreed that "[a]ll Intellectual Property created or developed" by Pine River – including any trade secrets – in connection with its performance of the Management Agreement would be "the sole and exclusive property" of Pine River and that Two Harbors would assist in "perfect[ing], record[ing], confirm[ing], or enforc[ing] [Pine River's] rights in and to the Intellectual Property."  Two Harbors thus had a duty to maintain the secrecy of Pine River's trade secrets.

138.    In reliance on the terms of the Management Agreement, Pine River provided Two Harbors with access to its trade secrets solely for the duration of the Management Agreement.

139.    Two Harbors has candidly acknowledged in its public filings that its ability to operate successfully hinges on having access to Pine River's intellectual property, including trade secrets.

140.    Two Harbors also publicly stated that it intended to hire Pine River employees as employees of Two Harbors in order to manage Two Harbors after the Management Agreement terminated.  After the August 14, 2020 termination of the Management Agreement, Two Harbors hired Pine River's employees.  On information and belief, Two Harbors induced those Pine River employees to perform the same or similar job functions for Two Harbors that they performed when employed by Pine River.  On information and belief, in order to perform those job functions, such employees are using and will be using, without Pine River's authorization or license, the intellectual property including trade secrets that Pine River created and developed in connection with the Management Agreement.

141.    Pine River derives a significant economic benefit from the above-described  trade secrets and does not consent to Two Harbors' continued use of its trade secrets.

142.    Pine River faces an immediate threat of irreparable harm, for which Pine River lacks an adequate remedy at law, from Two Harbors' misappropriation and misuse of Pine River's trade secret information including, but not limited to, loss of future business and the potential that Pine River's trade secrets may be disseminated beyond the Court's ability to provide monetary redress.

143.    Unless Two Harbors is enjoined from the foregoing conduct, Pine River will be irreparably harmed by:

(a)     Disclosure of trade secrets and other confidential information that is solely the property of Pine River;

(b)     Loss of a competitive advantage, loss of goodwill, lost compensation, and loss of business reputation; and

(c)     Potential future economic loss, which is presently incalculable.

144.    As alleged herein, Two Harbors' conduct has been malicious, willful and deliberate, thereby constituting exceptional circumstances.  Accordingly, Pine River is entitled to recover exemplary damages in an amount to be determined at trial.

145.    As a direct and proximate result of Two Harbors' misappropriation, Pine River has suffered, continues to suffer and will suffer in the future, extensive additional damages which continue to accrue in the form of attorneys' fees and costs related to this litigation, and loss of business in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract – Improper Termination)

146.    Pine River incorporates by reference the allegations contained in paragraphs 1 through 145 as set forth above, as if fully set forth at length herein in full.

147.    The Management Agreement is a valid and binding contract between Pine River and Two Harbors.

148.    Pine River timely and fully performed all of the conditions, covenants, and promises required of it under the Management Agreement, and stood ready to fully perform in the future all conditions, covenants and promises required of it under the Management Agreement.

149.    Two Harbors breached the Management Agreement by unilaterally terminating the Management Agreement without any valid justification.  In particular, Two Harbors did not have a valid justification to terminate the Management Agreement pursuant to Section 13,

Section 15 or otherwise.

150.    By unilaterally terminating the Management Agreement without valid justification, Two Harbors has deprived Pine River from realizing the benefits to which it is entitled under the Management Agreement, namely, continued management of Two Harbors in exchange for payment of management fees.

151.    Two Harbors has further breached the Management Agreement by initially purporting to terminate the Management Agreement based on a claim of "unfair compensation" effective September 19, 2020.  Even if Two Harbors had a basis to unilaterally terminate the Management Agreement under Section 13(a)(ii)—and it does not—under the terms of the Management Agreement, the termination could not occur before the end of the current renewal term, which is October 28, 2020.

152.    While Section 13 of the Management Agreement affords Pine River the right to seek to renegotiate its compensation with Two Harbors, Pine River did not renegotiate its compensation with Two Harbors.  That is because Pine River believed that its compensation was more than fair – and realized that Two Harbors' goal was to internalize management functions and not to objectively assess or renegotiate Pine River's compensation.  Two Harbors also took the position by letter dated April 10, 2020 that Pine River waived any right to seek to renegotiate its compensation.

153.    Two Harbors has further breached the Management Agreement by improperly purporting to terminate the Management Agreement "for cause" effective August 14, 2020.  Two Harbors had no valid basis to terminate the Management Agreement "for cause."

154.    As a direct and proximate result of Two Harbors' conduct, Pine River has suffered damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Intellectual Property)

155.     Pine River incorporates by reference the allegations contained in paragraphs 1 through 154 as set forth above, as if fully set forth at length herein in full.

156.     The Management Agreement is a valid and binding contract between Pine River and Two Harbors.

157.     Pine River timely and fully performed all of the conditions, covenants, and promises required of it under the Management Agreement, and stood ready to fully perform in the future all conditions, covenants and promises required of it under the Management Agreement.

158.     Two Harbors breached the Management Agreement by taking possession of all intellectual property created and/or developed by Pine River in connection with Pine River's performance of the Management Agreement, and refusing to provide Pine River access to Pine River's own intellectual property (other than those employees Two Harbors intended to hire after August 14, 2020) during the term of the Management Agreement.

159.     Two Harbors further breached the Management Agreement by failing to assist Pine River in confirming and enforcing Pine River's rights in and to its intellectual property.  By its breach, Two Harbors has deprived Pine River from realizing the full benefits to which it is entitled under the Management Agreement, namely, continued ownership and enforcement of its intellectual property rights.

160.     As a direct and proximate result of Two Harbors' conduct, Pine River has suffered damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing
### (In the Alternative))

161.     Pine River incorporates by reference the allegations contained in paragraphs 1 through 160 as set forth above, as if fully set forth at length herein in full.

162.     The Management Agreement is a valid and binding contract between Pine River and Two Harbors.

163.     Pine River timely and fully performed all of the conditions, covenants, and promises required of it under the Management Agreement, and stood ready to fully perform in the future all conditions, covenants and promises required of it under the Management Agreement.

164.     There is implied in every contract a covenant of good faith and fair dealing such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

165.     Two Harbors breached this implied covenant by acting arbitrarily (and not in good faith) in determining that Pine River's compensation was "unfair," and unilaterally terminating the Management Agreement on that basis.  Two Harbors' contention that Pine River's compensation is "unfair" is a complete fabrication and is simply an excuse to terminate the parties' Management Agreement and bring the management of Two Harbors in-house.

166.     Two Harbors further breached this implied covenant by acting arbitrarily (and not in good faith) in unilaterally terminating the Management Agreement "for cause."  Two Harbors' contention that it had a basis to terminate the Management Agreement "for cause" is a complete fabrication and is simply an excuse to terminate the parties' Management Agreement and bring the management of Two Harbors in-house.

167.     Two Harbors' breach will prevent Pine River from realizing the benefits it is entitled to receive under the Management Agreement, namely, continued management of Two Harbors in exchange for payment of management fees.

168.     While Section 13 of the Management Agreement affords Pine River the right to seek to renegotiate its compensation with Two Harbors, Pine River did not exercise that right and did not renegotiate its compensation with Two Harbors.  That is because Pine River believes that its compensation is more than fair – and realizes that Two Harbors' goal is to internalize management functions and not to objectively assess or renegotiate Pine River's compensation. Two Harbors has also taken the position by letter dated April 10, 2020 that Pine River has waived any right to seek to renegotiate its compensation.

169.     Two Harbors has therefore breached the implied covenant of good faith and fair dealing.  As a direct and proximate result of Two Harbors' conduct, Pine River has suffered damages in amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment)

170.     Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 169 as set forth above, as if fully set forth at length herein in full.

171.     Two Harbors breached the Management Agreement by unilaterally terminating that agreement without any valid justification.

172.     Two Harbors claimed it was terminating the Management Agreement because Pine River's compensation is "unfair" and subsequently claimed it was terminating the Management Agreement "for cause."

173.     There is no basis for Two Harbors' assertion that Pine River's compensation is "unfair" and there is no basis to terminate the Management Agreement "for cause."

84

174.    By any objective measure, Pine River's compensation is fair.  Pine River's compensation is fully consistent with the compensation of its peers – and in many cases, is *lower* than the compensation of its peers.

175.    Accordingly, Pine River seeks a judgment declaring that its compensation is not "unfair," that there is no basis to terminate the Management Agreement "for cause," and that Two Harbors has breached the Management Agreement and is in breach of the Management Agreement's implied covenant of good faith and fair dealing.

176.    The Second Amendment to the Management Agreement provides that all intellectual property, trade secrets and know-how that Pine River developed or created to manage Two Harbors is the sole and exclusive property of Pine River.

177.    Pine River seeks a declaration that the Second Amendment to the Management Agreement is a valid and binding contract between the parties, and that Two Harbors may not make any use of Pine River's intellectual property after August 14, 2020.

178.    Pine River also has valid and binding employment contracts with those now former employees who perform management services for Two Harbors that prohibit those former employees from disclosing to Two Harbors Pine River's valuable trade secrets, know-how and other proprietary and confidential information other than for the benefit of Pine River.  Two Harbors hired those Pine River employees as employees of Two Harbors.  The former Pine River employees will inevitably disclose Pine River's trade secrets and other confidential and proprietary information to Two Harbors in breach of their employment contracts and the Second Amendment to the Management Agreement, because, on information and belief, those former Pine River employees are performing the exact same job functions for Two Harbors that they performed when employed by Pine River.

### SEVENTH CLAIM FOR RELIEF
### (Unfair Competition & Business Practices)

179.    Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 178 as if set forth herein in full.

180.    Since as early as 2019, Two Harbors has engaged in a deliberate scheme to misuse and misappropriate Pine River's employees, investment strategies, intellectual property (including trade secrets and know-how) and commercial advantages to lay the groundwork for Two Harbors to internalize its management functions and terminate its external manager, Pine River.

181.    As a part of Two Harbors' scheme, Two Harbors has abused the parties' confidential relationship and improperly used the skills and labor of Pine River's employees managing Two Harbors to assist Two Harbors in separating its IT systems and infrastructure from those of Pine River, so that Two Harbors could later more easily internalize these functions.

182.    Two Harbors has freely admitted that it could not successfully operate its current business strategy without Pine River's employees' skills and intellectual property.

183.    After unilaterally terminating the Management Agreement, Two Harbors admitted that it planned to internalize the management functions that Pine River was performing for Two Harbors by hiring Pine River's employees who were performing those management functions.

184.    By internalizing management functions, Two Harbors now directly competes against Pine River, because Pine River's business is to provide management services.

185.    Two Harbors' misuse of its confidential relationship with Pine River as well as Pine River's employees in order to misappropriate Pine River's trade secrets and other commercial advantages constitutes unfair competition and business practices.

186.    As a direct and proximate result of Two Harbors' unfair competition, Pine River

86

has suffered, and will continue to suffer, damages to its business, in an amount to be determined at trial.

187.    In addition, because Two Harbors' conduct is willful, wanton and undertaken with a conscious disregard for Pine River's rights, Pine River should be awarded punitive or exemplary damages, in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Unjust Enrichment)

188.    Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 187 as if set forth herein in full.

189.    To the extent that the express terms of the Management Agreement do not cover the subject matter of the instant claim, Two Harbors has been unjustly enriched at Pine River's expense by Two Harbors' misappropriation of Pine River's valuable confidential information and intellectual property, including trade secrets and know-how.

190.    Since as early as 2019, Two Harbors has been engaged in a deliberate scheme to misuse and misappropriate Pine River's employees, investment strategies, intellectual property (including trade secrets and know-how), and commercial advantages to lay the groundwork for Two Harbors to internalize its management functions and terminate the Management Agreement with its external manager, Pine River.

191.    As a part of Two Harbors' scheme, Two Harbors has improperly used the skills and labor of Pine River's employees managing Two Harbors to assist Two Harbors in separating its IT systems and infrastructure from those of Pine River, so that Two Harbors could later more easily internalize these functions.

192.    Two Harbors has freely admitted that it could not successfully operate its current business strategy without Pine River's employees' skills and intellectual property.

193.    After unilaterally terminating the Management Agreement, Two Harbors admitted that it planned to internalize the management functions that Pine River was performing for Two Harbors by hiring Pine River's employees who were performing those management functions and by misappropriating Pine River's valuable intellectual property, trade secrets and know-how.

194.    By internalizing management functions, Two Harbors now directly competes against Pine River, because Pine River's business is to provide management services.  As a result of Two Harbors' conduct, it has been unjustly enriched at Pine River's expense.

195.    Under these circumstances, it would be unjust, unfair, and against equity and good conscience to permit Two Harbors to retain the benefits it has gained or will gain from using Pine River's valuable intellectual property, including trade secrets, know-how, and other confidential information, without providing Pine River just compensation.

196.    Two Harbors has not provided Pine River reasonable compensation nor has it offered restitution to Pine River despite an obligation to do so.

197.    Restitution should therefore be made by Two Harbors to Pine River in an amount to be proven at trial.

198.    Pine River is also being irreparably harmed by Two Harbors' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief.

## NINTH CLAIM FOR RELIEF
### (Conversion)

199.    Pine River re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 198 as if set forth herein in full.

200.    As set forth above, Pine River has expended significant time, skill, research and development (R&D) to develop and maintain its intellectual property, including its proprietary and confidential databases, models and other confidential information, which are extremely

valuable to Pine River, which give Pine River a competitive advantage and which would be of great value to a competitor.

201.    Under the terms of the Management Agreement, Pine River provided Two Harbors access to its intellectual property, including trade secrets, know-how, and Pine River's confidential databases and models.

202.    For security reasons, to limit the number of individuals with access to material non-public information and confidential consumer information, and to safeguard Pine River's proprietary and confidential information, certain of the intellectual property Pine River developed to manage Two Harbors is stored on dedicated computers and servers in Two Harbors' offices or dedicated offsite space.

203.    Two Harbors is improperly depriving Pine River access to—and improperly prevented Pine River's employees from providing Pine River access to—Pine River's intellectual property, including its proprietary databases and models.

204.    Pine River has not authorized Two Harbors to continue using any Pine River confidential information, intellectual property or trade secrets following the termination of the Management Agreement.  In fact, Pine River requested by letter dated June 24, 2020 that Two Harbors discuss the transition of Pine River's intellectual property to Pine River after the Management Agreement terminates.

205.    Nevertheless, Two Harbors has retained control of Pine River's intellectual property, including Pine River's proprietary databases and models, as part of its plan to internalize the management functions that Pine River was performing for Two Harbors, and then improperly interfered with Pine River's right to access its intellectual property and other confidential information.  Two Harbors is knowingly and unlawfully depriving Pine River of its

intellectual property and other confidential information.

206.     Accordingly, Pine River has been damaged by Two Harbors' conversion in an

amount to be determined at trial.

207.     Pine River is also being irreparably harmed by Two Harbors' wrongful acts and is

entitled to injunctive relief.

**TENTH CLAIM FOR RELIEF**
**(Tortious Interference With Contract)**

208.     Pine River re-alleges and incorporates by reference the allegations contained in

paragraphs 1 through 207 as if set forth herein in full.

209.     Pine River Capital and Pine River Domestic entered into valid confidentiality

agreements with their employees. Certain of the confidentiality agreements provide:

> Employee is being employed in a position of trust and confidence
> and will have access to and become familiar with the confidential
> or proprietary methods, research, products, services, trade secrets
> and procedures used by [Pine River]. Employee understands that as
> a condition of employment . . . Employee must protect this
> information and these relationships and use them for Pine River's
> benefit only, not for Employee's own or another's benefit.
> Employee understands that this Agreement is intended to protect
> the business which Pine River has built and that if Employee
> breaches any part of this Agreement, it may irreparably harm Pine
> River's business and may cause damage that would be difficult or
> impossible to measure.

210.     Other versions of the confidentiality agreements reflect that "Employee

understands that the primary purpose of this Agreement is to protect Pine River's confidential

information, trade secrets, and client and investor relationships, and that if Employee breaches

any part of this Agreement, it would seriously harm Pine River's business and cause damage that

would be difficult or impossible to measure."

211.     The "Confidential Information" protected by these confidentiality agreements is

broad and includes:

[A]ny trade secret or other information not generally known in Pine River's line of business or readily ascertainable by proper means by others, including: (i) information relating to computer programs developed or being developed by Pine River, including source code, object code, development tools, flow charts, design statistics, specifications, techniques, evaluations, test results, and beta-test results; (ii) third party systems, software and any other information received by the third party in confidence by Pine River; (iii) records and other information relating to past, current and prospective investors in Pine River (including lists of such investors); (iv) records and other information relating to past, current and prospective clients of Pine River (including lists of such clients); (v) records and other information relating to past, current and prospective vendors of Pine River (including lists of such vendors); (vi) information concerning past, current or anticipated investments, trading positions or trading strategies and techniques of Pine River; (vii) marketing strategies; (viii) the financial statements, financial results and business condition of (A) any Pine River entity and (B) any entity whose debt, equity or other interests are held by any Pine River entity; (ix) information concerning employees, directors and officers of any Pine River entity, including their compensation; (x) all formulae, invention records, research records and reports, experimental and engineering data and reports, product and production specifications and designs, drawings, photos, models, production techniques, test data, processes, and methods related to the operation, investment strategies and products of Pine River, whether patentable or not; and (xi) any of the foregoing that belong to any other person or entity but to which Employee has access by reason of Employee's employment with Employer.

212.    Employees of Pine River Capital and Pine River Domestic further agreed that they "will not, during Employee's employment with Employer or at any time thereafter, divulge, furnish or make accessible to anyone or use in any way, on behalf of himself/herself or others, any Confidential Information, other than for the benefit of Pine River in the ordinary course of the business of Pine River or as required under compulsion of law."

213.    Pine River Capital and Pine River Domestic have performed all of their obligations under these agreements.

214.    The employees of Pine River Capital and Pine River Domestic who were

employed by Two Harbors on and after August 14, 2020 have breached their obligations under these agreements by, among other things, taking information belonging to Pine River without Pine River's consent or authorization, and permitting Two Harbors to use this information without Pine River's consent or authorization.

215.    Two Harbors knew when it hired Pine River's staff wholesale, that those employees were employed by Pine River and that they were subject to confidentiality agreements with Pine River that obligated those employees to not disclose any of Pine River's confidential and proprietary information.  Indeed, on multiple occasions, Pine River so informed Two Harbors and its counsel.

216.    With full knowledge that the Pine River employees who were involved in managing Two Harbors would inevitably disclose Pine River's intellectual property, including trade, secrets to Two Harbors in breach of the employees' employment contracts, Two Harbors nevertheless intentionally and improperly hired those employees and induced them to disclose and misuse Pine River's intellectual property to perform the same job functions for Two Harbors that they performed for Pine River.  As a result, Two Harbors has tortiously interfered with the employment agreements between Pine River Capital and Pine River Domestic and their former employees.

217.    As a result of these breaches substantially caused by Two Harbors, Pine River has suffered damages and will suffer further damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** for the wrongful acts of Defendant complained of in the foregoing **FIRST** through **TENTH CAUSES OF ACTION**, Plaintiffs PRCM Advisers LLC, Pine River Capital Management L.P., and Pine River Domestic Management L.P. respectfully request that this Court award the following relief:

A.    The entry of a judgment that Two Harbors has misappropriated Pine River's trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836;

B.    The entry of a judgment that Two Harbors has misappropriated Pine River's trade secrets under New York common law;

C.    The entry of a judgment that Two Harbors breached the Management Agreement;

D.    The entry of a judgment that Two Harbors breached an implied covenant of good faith and fair dealing;

E.    The entry of a judgment that Two Harbors was unjustly enriched;

F.    The entry of a judgment that Two Harbors unlawfully converted Pine River's property to its own use and benefit;

G.    An order enjoining Two Harbors from using or disclosing any of Pine River's trade secret, proprietary and/or confidential information;

H.    The award of damages sufficient to compensate Pine River for Two Harbors' tortious interference of Pine River's contracts with its employees;

I.    Compensatory, exemplary, and punitive damages in an amount to be determined at a hearing and/or trial (but in no event less than $150,000 exclusive of interest and costs) including, but not limited to, double damages for willful or malicious misappropriation under 18 U.S.C. §1836(b)(3)(C); or in lieu of damages measured by other methods, the damages caused by Defendant's misappropriation measured by imposition of liability for a reasonable royalty for Defendant's

unauthorized disclosure or use of Pine River's trade secrets, in an amount

to be determined at trial (but in no event less than $150,000 exclusive of

interest and costs);

J.      Disgorgement of Defendant's wrongfully obtained profits;

K.      Pine River's costs associated with this action, including without limitation

its attorneys' fees;

L.      Prejudgment interest and post-judgment interest on damages;

M.      Such other legal and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pine River hereby demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

Dated: October 25, 2021                By:   *s/Barry M. Landy*
                                              Jan M. Conlin *(pro hac vice)*
                                              Barry M. Landy *(pro hac vice)*
                                              Jacob F. Siegel
                                              CIRESI CONLIN LLP
                                              225 S. 6th St., Ste. 4600
                                              Minneapolis, MN 55402
                                              Phone: (612) 361-8200
                                              Fax: (612) 361-8217

                                              Ching-Lee Fukuda
                                              SIDLEY AUSTIN LLP
                                              787 Seventh Avenue
                                              New York, NY 10019
                                              Phone: (212) 839-5300
                                              Fax: (212) 839-5599

                                              Thomas K. Cauley Jr. (*pro hac vice*)
                                              Steven Sexton (*pro hac vice*)
                                              SIDLEY AUSTIN LLP
                                              1 S. Dearborn St
                                              Chicago, IL 60603

Phone: (312) 853-7000
Fax: (312) 853-7036

*Attorneys for Plaintiffs PRCM Advisers
LLC, Pine River Capital Management
L.P. and Pine River Domestic
Management L.P.*