UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRCM ADVISERS LLC, et al.,

        Plaintiffs,

-against-

TWO HARBORS INVESTMENT CORP.,

        Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/30/22

20-CV-5649 (LAK) (BCM)

**MEMORANDUM AND ORDER REGARDING PRIVILEGE DISPUTE**

**BARBARA MOSES, United States Magistrate Judge.**

       By letter-motion dated November 21, 2022 (Def. Ltr.) (Dkt. 203), plaintiffs ask the Court to overrule defendant's privilege claims as to seventeen documents (including three that were produced in unredacted form but later clawed back) concerning the Second Amendment to the parties' Management Agreement, and reopen the deposition of Two Harbors director Stephen Kasnet to permit them to question him about those documents. On November 28, 2022, defendant filed an opposition letter-brief (Def. Opp. Ltr.) (Dkt. 212) and on November 30, 2022, plaintiffs filed a reply letter-brief (Reply Ltr.) (Dkt. 220). The Court heard argument on the motion on December 14, 2022. For the reasons that follow, the motion will be granted.

## Background

       Plaintiffs PRCM Advisors LLC, Pine River Capital Management L.P., and Pine River Domestic Management L.P. (collectively Pine River) served as the external manager of defendant Two Harbors Investment Corp. (Two Harbors), a real estate investment trust (REIT), from October 28, 2009, until August 14, 2020, when Two Harbors terminated the parties' Management Agreement and commenced managing itself. *See* Second Amended Complaint (SAC) (Dkt. 86) ¶ 27; Answer, Affirmative Defenses, and Counterclaims (Ans. & Counterclaims) (Dkt. 93) at 70-71, ¶ 3. During that almost 11-year period, Pine River served as Two Harbor's investment advisor, ran its day-to-day operations, and supplied its management team and other personnel. SAC ¶ 28;

Ans. & Counterclaims at 71, ¶ 4. On November 3, 2014, the Two Harbors board of directors approved a short (2-page) Second Amendment to the Management Agreement stating, in relevant part: "All Intellectual Property created or developed by [Pine River] in connection with [its] performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of [Pine River]." SAC ¶ 101(b); Ans. & Counterclaims at 105-06, ¶ 116; *see also* Pl. Ltr. Ex. 6 (Dkt. 203-6) (Nov. 3, 2014 board minutes); *id*. Ex. 8 (Dkt. 203-8) (Second Amendment).

In this action, Pine River alleges that Two Harbors's termination of the Management Agreement breached that contract because Two Harbors lacked "cause" to terminate it (and in the absence of cause would have been required to pay Pine River a substantial termination fee). SAC ¶ 2. Pine River further alleges that Two Harbors poached its employees and continued to use Pine River's intellectual property (IP), "including trade secrets and know-how," after the termination, without authorization, in violation of the Second Amendment to the Management Agreement. *Id*. ¶¶ 3, 33-35. Plaintiffs assert ten claims against Two Harbors, on a variety of statutory, contract, and tort theories. *Id*. ¶¶ 115-217. As relevant here, Pine River seeks "a declaration that the Second Amendment to the Management Agreement is a valid and binding contract between the parties, and that Two Harbors may not make any use of Pine River's intellectual property after August 14, 2020," *id*. ¶ 177; damages (potentially measured by the imposition of a reasonable royalty) for Two Harbors's alleged misappropriation of its trade secrets; and an order enjoining Two Harbors from using or disclosing any of its "trade secret, proprietary and/or confidential" information. *Id*. at pp. 92-94.

Two Harbors, for its part, alleges that Pine River – motivated by its desire to keep the lucrative Management Agreement in place – breached its contractual and fiduciary duties to Two

Harbors by, *inter alia*, misleading Two Harbors's independent directors about the Second Amendment. *See* Ans. & Counterclaims at 74, ¶ 13. In Two Harbors's telling, Pine River falsely told Two Harbors's independent directors that the amendment was necessary to move forward with a new commercial real estate (CRE) initiative, and that it merely "clarified" the parties' IP ownership rights. *Id*. at 105-06, ¶¶ 115-16. In fact, Two Harbors alleges, the amendment was not necessary for the CRE initiative, and was not a "clarification" but rather an "underhanded attempt to co-opt ownership of certain 'intellectual property' developed and paid for by Two Harbors." *Id*. at 106, ¶ 117.[1] According to Two Harbors, Pine River was "able to conceal [its] attempt to co-opt ownership of the 'intellectual property' from the Independent Directors because the Independent Directors did not have access to any information regarding the attempt other than that provided by [Pine River]." *Id*. at 107, ¶ 121. As a result of Pine River's "misrepresentations and omissions," the independent directors "were not aware that [Pine River was] attempting by means of the Second Amendment to co-opt ownership of 'intellectual property' developed and paid for by Two Harbors." *Id*. at 106, ¶ 119.

Two Harbors asserts twelve counterclaims against its former manager on a variety of statutory, contract and tort theories, including fraud and negligent misrepresentation. In those claims, Two Harbors expressly alleges that it relied on Pine River's misrepresentations and omissions concerning the Second Amendment and that its reliance was reasonable. Ans. & Counterclaims at 119-22, ¶¶ 180, 188. Two Harbors seeks damages, a declaration that the Second Amendment to the Management Agreement is void, and disgorgement of all IP that Pine River "purports to own" as a result of that amendment. *Id.* at 118, ¶ 168; *id*. at 134-35.

---

[1] In its motion papers (although not in its pleadings), Two Harbors specifies that Pine River failed to inform the independent directors "that the scope of the amendment went beyond the intellectual property needed for the CRE initiative," Def. Opp. Ltr. at 2.

3

**Adoption of the Amendment**

The CRE initiative was presented to the Two Harbors board by its management at an October 22, 2014 meeting, during which management (that is, the Pine River personnel serving as Two Harbors's senior officers) advised that it would ask for (i) an amendment to the Two Harbors investment guidelines, to permit investment in commercial (as well as residential) real estate, and (ii) an amendment to the Management Agreement, to "clarify ownership rights with respect to Intellectual Property." Pl. Ltr. Ex. 2 (Dkt. 203-2) (Oct. 22, 2014 board presentation), at ECF p. 11. The amendment itself was presented during the board's November 3, 2014 meeting, and approved, unanimously, after a discussion led by the Two Harbors Chief Executive Officer, Thomas Siering, and its in-house General Counsel, Rebecca Sandberg. *See* Pl. Ltr. Ex. 6, at ECF p. 2. According to the minutes, prepared by Ms. Sandberg, the board voted only after the directors "asked questions of management, all of which were answered to their satisfaction." *Id*.

Eight directors were present at the November 3, 2014 meeting. Two of them were management directors supplied by Pine River: Mr. Siering, the CEO, and Brian Taylor, the Chairman of the Board. *See* Pl. Ltr. Ex. 6, at ECF p. 2. The other six were independent directors: Mr. Kasnet, James J. Bender, W. Reid Sanders, Hope B. Woodhouse, Jacques R. Rolfo, and E. Spencer Abraham. *See id.* All six were seasoned and sophisticated business professionals. Two of them (Mr. Abraham and Mr. Bender) were lawyers, and all of them except Mr. Abraham had extensive experience in the real estate and/or financial sectors.[2] Mr. Abraham's experience, before

---

[2] *See* Two Harbors Investment Corp., "Who We Are," https://www.twoharborsinvestment.com/who-we-are/board-of-directors; Business Wire, "Two Harbors Investment Corp. Appoints New Board Member Jacques R. Rolfo," https://www.businesswire.com/news/home/20131217006483/en/Two-Harbors-Investment-Corp.-Appoints-New-Board-Member-Jacques-R.-Rolfo (all cited webpages last visited Dec. 30, 2022).

4

joining the Two Harbors board, included six years as a United States Senator and four years as U.S. Secretary of Energy. *See* Two Harbors Investment Corp., "Who We Are," *supra*.

As noted above, the Second Amendment provides that "[a]ll Intellectual Property created or developed by [Pine River] in connection with [its] performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of [Pine River]." Pl. Ltr. Ex. 8, § 27(a). Those rights are licensed to Two Harbors, on a non-exclusive, royalty-free basis, "[f]or the term of this Agreement[.]" *Id*. "Intellectual property" is defined broadly, with a carve-out for "trademarks that include the name or logo of Two Harbors," but no temporal of subject-matter limitations. *Id*. § 27(b).

## **The Privilege Dispute**

Given the broad and uncomplicated language of the Second Amendment, it seems improbable that Two Harbors's highly sophisticated independent directors, two of whom were lawyers, could have been "misled" by any failure on Pine River's part to expressly point out the obvious, even if they did not have "access to any information" other than that provided by Pine River. However, the parties' privilege dispute does not turn upon this Court's reading of the Second Amendment. Rather, the Court must determine whether Two Harbors waived the attorney-client privilege as to communications with its counsel concerning the Second Amendment, either by putting counsel's advice "at issue" in its counterclaims or by selectively disclosing and using favorable attorney-client communications (that is, communications suggesting that the Second Amendment was prepared with new, CRE-related IP in mind) while withholding closely related communications, on the same subject matter, that may well cast a different light on the matter. These questions, in turn, require a brief description of the documents now in contention between

the parties, all of which were written or received by the Two Harbors General Counsel, Ms. Sandberg.

During the evening of October 16 and the early morning hours of October 17, 2014, Sandberg exchanged emails with Two Harbors's outside counsel, David Axtell and Stephen Quinlivan of Stinson Leonard Street LLP, discussing whether Two Harbors should enter into an "IP assignment agreement" with Pine River and, if so, how to structure it. *See* Pl. Ltr. Ex. 1 (Dkt. 203-1), at ECF pp. 3-12. Ms. Sandberg also inquired about a "joint development/joint ownership agreement," under which the parties would "jointly own the code," but Mr. Axtell advised against it, noting that "joint ownership of IP is usually very problematic in the long run," and explaining that a "cleaner solution" is "to have one party own the IP (including the code) but provide for a very permissive license to the other party." *Id*. at ECF p. 3-4, 6-7.[3]

Two Harbors produced these emails in discovery. *See* Pl. Ltr. at 3. However, on October 26, 2022, when Pine River sought to question independent director Kasnet about one of the email strings with outside counsel, Two Harbors took the position that it was produced "inadvertently" and would be clawed back as privileged. Pl. Ltr. Ex. 3 (Kasnet deposition transcript) (Dkt. 203-3), at 53.[4] Although the emails between Ms. Sandberg and outside counsel did not expressly reference the Second Amendment (which Ms. Sandberg had not yet seen), the subject matter of the clawed-back emails – according to the Two Harbors privilege log – was "negotiation of Management Agreement and Amendment." *See* Pl. Ltr. Ex. 1, at ECF pp. 23-38 (Two Harbors privilege log).

---

[3] This is, of course, the solution embodied in the Second Amendment.

[4] Earlier in his deposition, Mr. Kasnet confirmed that he discussed the language of the Second Amendment at the November 3, 2014 board meeting with both the CEO and "our counsel," meaning Ms. Sandberg. Pl. Ltr. Ex. 3, at 47. Before he could provide any details of that conversation, Two Harbors's litigation counsel instructed him "not to disclose privileged communications." *Id*. at 48.

During the morning of October 17, 2014, Ms. Sandberg and a group of Two Harbors officers discussed the preparation of the presentation "deck" for use at the October 22 board meeting, including the amount of detail required concerning "the need to establish appropriate IP agreements" between Two Harbors and Pine River. *See* Pl. Ltr. Ex. 1, at ECF pp. 14-20. The email thread included Ms. Sandberg, Mr. Siering, Chief Financial Officer Brad Farrell, Chief Investment Officer William Roth, incoming "CRE Professional" Jack Taylor, and Managing Director Marcin Urbaszek. *Id*. Later that day, Ms. Sandberg exchanged messages on the same email thread, using the same "re" line ("today – important!") with Mr. Farrell alone. *Id.* Two Harbors produced the earlier messages (involving multiple officers) in discovery, but redacted the later messages, involving only Ms. Sandberg and Mr. Farrell, on privilege grounds. *Id*. According to the Two Harbors privilege log, the subject matter of the redacted messages was "negotiation of Management Agreement and Amendment."

At 12:03 p.m. on October 17, 2014, Ms. Sandberg received a copy of the proposed amendment, by email, from Mr. Siering, who wrote, "this was the language that was created for SBY" and asked, "Rebecca, thoughts?" Pl. Ltr. Ex. 1, at ECF pp. 21-22; *id*. Ex. 4 (Dkt. 203-4).[5] At 6:01 p.m.,[6] Ms. Sandberg replied, "I think this is the simplest approach to the whole cloth IP scenario and largely mirrors the way it works in practice now." Pl. Ltr. Ex. 4. That reply went to a group of Two Harbors officers including Mr. Siering, Mr. Farrell, Mr. Roth, Mr. Jack Taylor, and Mr. Urbaszek. *Id*. Two Harbors produced these messages in discovery. Separately, Ms. Sandberg

---

[5] "SBY" was Silver Bay Realty Trust Corp., another publicly-traded REIT managed by Pine River. *See* Pl. Reply Ltr. Ex. 18 (Dkt. 220-2) (deposition testimony of Two Harbors's Rule 30(b)(6) witness), at 174. Two of the independent directors of Two Harbors also sat on the board of SBY. *See* Two Harbors Investment Corp., "Who We Are," *supra*.

[6] Time stamps are given as they appear on the documents presented to the Court, without adjustment for potential time zone variations.

exchanged messages on the same email thread, using the same "re" line ("CRE Team – IP and Other Items"), with Mr. Farrell alone. Two Harbors redacted these messages on privilege grounds. Pl. Ltr. Ex. 1, at ECF pp. 21-22. According to its privilege log, the subject matter of the redacted messages was "negotiation of Management Agreement and Amendment." *Id.* at ECF p. 37.

In total, Two Harbors withheld or redacted sixteen documents from this time period – all authored by or sent to Ms. Sandberg – for which the subject-matter was "negotiation of Management Agreement and Amendment." It also withheld one undated document, described as Ms. Sandberg's handwritten notes, for which the subject-matter was "assessments of Pine River's management of Two Harbors." *See* Pl. Ltr. Ex. 1, at ECF p. 27 (TWOHARBORS_PRIV004682). These are the "Disputed Documents," seventeen in all, that Pine River says it is entitled to see. *See id*. at ECF p. 2 (list of Disputed Documents).

## The Parties' Positions

The Court assumes, for purposes of the present dispute, that Ms. Sandberg was acting solely on behalf of Two Harbors when the Disputed Documents were created, and thus that Two Harbors was the sole holder of the attorney-client privilege with respect to those documents.[7] According to Pine River, Two Harbors waived the privilege by filing its counterclaims, which put

---

[7] *See generally* Order dated September 6, 2022 (Dkt. 166) at 1 (ruling that Two Harbors was the sole holder of the attorney-client privilege when it communicated with its counsel in confidence "for the purpose of obtaining or providing legal advice concerning a matter as to which Two Harbors' interests were adverse to those of its external manager Pine River," even if "one or more of the Two Harbors personnel who participated in or were privy to that communication also served as employees or partners of Pine River"). In this instance Two Harbors has asserted – and Pine River does not challenge – that the parties' interests were adverse with respect to the Second Amendment, and that Ms. Sandberg's communications with outside counsel and with the Two Harbors officers and directors regarding the amendment were "on behalf of Two Harbors – not on behalf of Pine River." *See* Pl. Reply Ltr. at 2; *id*. Ex. 18, at 169-71 (deposition testimony of Two Harbors's Rule 30(b)(6) witness, confirming that Ms. Sandberg was "acting solely on behalf of Two Harbors" in seeking advice from outside counsel and in advising Two Harbors regarding the "negotiations over the second amendment").

"in issue" the independent directors' "knowledge and access to legal advice," *See* Pl. Ltr. at 3-4. ("Basic fairness and settled law require that Two Harbors produce the Disputed Documents because they are essential to discrediting its allegations" and "will reveal that Sandberg advocated for the Second Amendment and shared the same understanding of its 'scope' as Pine River.") Additionally, in Pine River's view, even if there was no at-issue waiver, Two Harbors waived the privilege through its "selective disclosure and affirmative use" of emails to and from Sandberg that are closely related to the Disputed Documents and concern the same subject. *See id*. at 4 ("Two Harbors' knowing disclosure and selective reliance on privileged communications are a textbook subject-matter waiver.").

The "selectively disclosed" emails include the October 17 email in which Mr. Siering sent the proposed Second Amendment to Ms. Sandberg, explained that the language was "created for SBY," and asked for her thoughts, as well as her reply email, characterizing the proposed amendment as "the simplest approach to the whole cloth IP scenario" and an approach that "largely mirrors the way it works in practice now." Pl. Ltr. Ex. 4. During Mr. Siering's deposition, under questioning from Two Harbors's litigation counsel, the witness confirmed that he was "soliciting input from our general counsel" about "language for the amendment" and, more generally, about how Two Harbors would "acquire the intellectual property that it needed to be successful" in the CRE field. Pl. Ltr. Ex. 13 (Siering deposition transcript), at 265-66. Siering added that Ms. Sandberg "endorsed this," meaning the Second Amendment. Pl. Ltr. Ex. 13, at 266.

Additionally, Two Harbors disclosed a lengthy email from Ms. Sandberg to Mr. Siering at 12:15 p.m. on October 17, 2014, which Two Harbors used at the deposition of Brian Taylor, its former Chairman of the Board. *See* Pl. Ltr. Ex. 15 (Taylor deposition transcript), at 91-92; *id*. Ex. 16 (Ex. 4 to Taylor deposition). In that email, Ms. Sandberg reported that she had "spent some

9

time analyzing IP matters with outside counsel" and laid out several options for "how to handle any IP rights for the CRE platform," largely echoing the options discussed in the clawed-back emails with Mr. Axtell. Pl. Ltr. Ex. 16, at ECF p. 2. With respect to IP developed by Pine River "for the CRE platform," Ms. Sandberg wrote that "we would want to determine ownership rights upfront, by contract," and would "want to consider having [Pine River] retain all rights and give licenses to [Two Harbors] and other managed vehicles to use the IP." Id.

Two Harbors argues that it never waived privilege for the withheld, clawed back, or redacted emails on the Disputed Documents list. There was no at-issue waiver, in its view, because it is not using privileged documents "both as a shield and as a sword" to support its claim or defenses. Def. Opp. Ltr. at 3. In fact, it says, the communications over which it has asserted privilege "do not go to," "have no bearing on," and do not "even relate[] to" the "fact question" raised in its counterclaims, which it characterizes as "whether Pine River misrepresented to the Two Harbors Board of Directors the purpose (i.e., the scope) of the Second Amendment[.]" Id. Rather, according to Two Harbors, the Disputed Documents "concern[ed] privileged legal advice for a hypothetical intellectual property ownership agreement related to the CRE Initiative." Id.[8]

Nor, in Two Harbors's view, did it selectively disclose and affirmatively use a subset of Ms. Sandberg's communications to its unfair advantage. Here again, Two Harbors appears to be making a distinction between the email used at Brian Taylor's deposition – which it characterizes as "describing the CRE Initiative," Def. Opp. Ltr. at 3-4 – and any documents going to the scope of the Second Amendment.[9] In any event, it argues, its deployment of the disclosed documents at

---

[8] Two Harbors does not explain why it described the subject matter of almost all of the Disputed Documents rather differently: "negotiation of Management Agreement and Amendments."

[9] However, Two Harbors acknowledges that the document it used as an exhibit at Mr. Siering's deposition, and questioned him about, *did* concern the Second Amendment. Def. Opp. Ltr. at 4.

10

the Siering and Taylor depositions should not result in a subject-matter waiver because it has not actually "used" the resulting testimony "to influence a decision maker," that is, in the courtroom or in support of a motion. *Id*. at 4 (quoting *In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*, 2020 WL 3034792, at *5 (S.D.N.Y. June 5, 2020)).

As for the Kasnet deposition, Two Harbors says there is no basis for reopening it because Kasnet was not even a recipient of any of the Disputed Documents, Def. Opp. Ltr. at 4, and in any event has already answered (some) questions about the Second Amendment, including Ms. Sandberg's statements about it. *Id*.

In reply, Pine River points to the deposition testimony of Two Harbors's Rule 30(b)(6) witness, Mychal Brenden. When shown Ms. Sandberg's October 17, 2014, email to Mr. Siering, Mr. Brenden agreed that Ms. Sandberg "appear[ed]" to be "endorsing the language of the second amendment." Pl. Reply Ltr. Ex. 18, at 176. However, according to Two Harbors, Ms. Sandberg's "understanding and the understanding of others was that the intellectual property to be covered under the second amendment only related to the new CRE-related matters." In Pine River's view, this is a further demonstration that Two Harbors has "put Ms. Sandberg's legal advice and beliefs at issue," entitling Pine River to "test that assertion" (that is, the assertion that Ms. Sandberg read the second amendment narrowly to apply only to "CRE-related matters") by reviewing all of her relevant communications. Pl. Reply Ltr. at 2. Further, Pine River argues, if the Disputed Documents were improperly withheld, the Kasnet deposition must be reopened, under the express terms of the parties' stipulated Protective Order (Dkt. 105), so that Pine River can ask the witness about the clawed-back emails between Ms. Sandberg and outside counsel. *Id*. at 4.

**Discussion**

A.  **At Issue Waiver**

"[I]n certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co. v. United States,* 350 F.3d 299, 302 (2d Cir. 2003). Thus, in *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991), the defendant proposed to testify that he did not "willfully" violate the securities laws because he believed his actions were consistent with law. The trial court ruled, and the Second Circuit agreed, that if the defendant gave that testimony, it "would have put his knowledge of the law and the basis for his understanding of what the law required in issue," at which point "his conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.*

In the civil context, the "quintessential example" of an at-issue forfeiture "is the defendant who asserts an advice-of-counsel defense and is thereby deemed to have waived his privilege with respect to the advice that he received." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996); *see also Scott v. Chipotle Mexican Grill, Inc.,* 67 F. Supp. 3d 607, 614-15 (S.D.N.Y. 2014) (Chipotle impliedly waived privilege with respect to the classification of its "apprentices" as exempt from overtime wage requirements when it "invoked two affirmative defenses that require showings of good faith," thus placing the advice of its counsel "at issue"); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 2012 WL 2568972, at *7 (S.D.N.Y. July 3, 2012) (MBIA impliedly waived privilege when it sought to bolster its interpretation of a Master Agreement and Indenture with affidavits detailing what MBIA personnel "expected," "believed," and "intended" when signing the contract, thereby placing the opinion of MBIA's counsel "at

issue"). In such a case, the waiver may be found "even if the privilege holder does not attempt to make use of a privileged communication." *Kidder Peabody*, 168 F.R.D. at 470. It is sufficient if the holder "makes factual assertions the truth of which can only be assessed by examination of the privileged communication." *Id.*; *see also Bowne of N.Y. City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 488 (S.D.N.Y. 1993) ("[E]ven if a party does not attempt to make use of a privileged communication he may waive the privilege if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication."); *Leviton Mfg. Co. v. Greenberg Taurig LLP,* 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010) ("Courts have recognized that a party need not explicitly rely upon advice of counsel to implicate privileged communications. Instead, advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim[.]").

In its counterclaims, as fleshed out by its letter-brief, Two Harbors asserts: (1) that Pine River made misrepresentations and omissions to the Two Harbors independent directors about the purpose and scope of the Second Amendment, *see* Ans. & Counterclaims at 105-06, ¶¶ 115-17; (2) that among its omissions was its failure to inform the independent directors "that the scope of the amendment went beyond the intellectual property needed for the CRE initiative," Def. Opp. Ltr. at 2; (3) that the independent directors had no access to "any information" regarding the true purpose and scope of the amendment "other than that provided by [Pine River]," Ans. & Counterclaims at 107, ¶ 121; (4) that as a result of Pine River's misrepresentations and omissions, coupled with the independent directors' lack of access to outside information, they "were not aware that [Pine River was] attempting by means of the Second Amendment to co-opt ownership of 'intellectual property' developed and paid for by Two Harbors," *id.* at 106, ¶ 119; and (5) that had they known the truth, they would have objected to the Second Amendment. *Id.* at 107, ¶ 121.

Three of these five assertions implicate the independent directors' "state of mind," *Leviton*, 2010 WL 4983183, at *3, and "can only be assessed by examination of the privileged communication[s]" that Two Harbors has withheld. *Kidder Peabody*, 168 F.R.D. at 470. Two Harbors is correct that its communications with its counsel "do not go to" whether Pine River made misrepresentations or omissions about the purpose and import of the Second Amendment (including by failing to mention that "all" ordinarily means "all"). Def. Opp. Ltr. at 3. But Ms. Sandberg's communications are essential to a fair assessment of Two Harbors's remaining factual assertions, which turn on what the independent directors learned about the Second Amendment, from whom, and what they believed about it when they voted to approve it. It is already clear, from the evidence adduced thus far, not only that the independent directors had "access" to legal analysis and advice from Ms. Sandberg (and, indirectly, from Two Harbors's outside counsel), but also that she provided analysis and advice at the November 3, 2014 board meeting. It is unfair, under these circumstances for Two Harbors to make factual assertions about what the independent directors knew (or didn't know) while relying on a claim of privilege to "deprive [Pine River] of access to material that might disprove or undermine [Two Harbors's] contentions." *Sec. & Exch. Comm'n v. Honig*, 2021 WL 5630804, at *14 (S.D.N.Y. Nov. 30, 2021).[10]

---

[10] The testimony of Two Harbors's witnesses illustrates the problem. Mr. Mychal, testifying as a corporate representative, swore under oath that Ms. Sandberg's "understanding," as well as "the understanding of others," was that "the intellectual property to be covered under the second amendment only related to the new CRE-related matters." Pl. Reply Ltr. Ex. 18, at 176; *see also id*. at 177 (Mr. Mychal, reiterating that "the way in which the issue was presented to the board, it was always a package deal, that it only related to CRE-related to – CRE-related IP"). Similarly, Mr. Kasnet, one of the independent directors, testified that he was "led to believe" by "our corporate counsel" that the Second Amendment was "necessary for the creation of the commercial real estate and to support the commercial real estate initiative." Pl. Ltr. Ex. 3, at 49-50. But Kasnet was instructed not to testify about the actual questions he asked Ms. Sandberg, *see id*. at 48, and Pine River was not permitted to show him Ms. Sandberg's emails with outside counsel. *Id*. at 53.

In addition, to prevail on its claims for fraud and negligent misrepresentation, Two Harbors must prove that the independent directors reasonably relied on Pine River's alleged falsehoods and omissions. Here too, it would be unfair if Two Harbors were permitted to make that assertion while simultaneously blocking Pine River from testing it by exploring what those directors were actually told – not only by Mr. Siering but by Ms. Sandberg. Consequently, Two Harbors must produce all of the Disputed Documents on the subject of "negotiation of Management Agreement and Amendment."[11] It is of course irrelevant to the waiver issue whether, in the end, those documents "will reveal that Sandberg advocated for the Second Amendment and shared the same understanding of its 'scope' as Pine River," Pl. Ltr. at 4, as Pine River hopes. *See Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 109 (S.D.N.Y. 2009) ("Forfeiture of privilege is not conditioned on whether the privileged documents ultimately will prove [defendant's] defense.").

### B. Selective Disclosure

Although a party need not "make use of a privileged communication" in order to forfeit the attorney-client privilege by "assert[ing] a factual claim the truth of which can only be assessed by examination of a privileged communication," *Bowne of N.Y. City,* 150 F.R.D. at 488, in this case Two Harbors has engaged in precisely the kind of selective disclosure that would result in a

---

[11] The Court is unpersuaded by Two Harbors's contention that the Disputed Documents "concern[ed] privileged legal advice for a hypothetical intellectual property ownership agreement related to the CRE Initiative" rather than the Second Amendment. Def. Opp. Ltr. at 3. First, the parties – and the Court – are entitled to rely on Two Harbors's privilege log to accurately describe the subject matter of its privileged documents. Second, it is clear from the documents themselves that the "hypothetical intellectual property ownership agreement" and the Second Amendment are not entirely separate and dissimilar issues. On the contrary: as noted above, when Ms. Sandberg first saw the proposed Second Amendment, she characterized it as "the simplest approach to the whole cloth IP scenario," Pl. Ltr. Ex. 4, which she had just been discussing (in the clawed-back emails) with outside counsel.

subject-matter waiver even if its pleadings did not put Ms. Sandberg's communications "at issue." *See* Fed. R. Evid. 502(a); *Pearlstein v. BlackBerry Ltd.*, 2019 WL 1259382, at *7 (S.D.N.Y. Mar. 19, 2019) ("[w]hen there has been a selective disclosure of attorney-client communications in the litigation, courts typically find the party has waived privilege as to all documents pertaining to the subject disclosed"); *Stolarik v. New York Times Co.*, 2019 WL 4565070, at *3 (S.D.N.Y. Sept. 20, 2019) (collecting cases). A "'subject matter waiver,' which allows the attacking party to reach all privileged conversations regarding a particular subject once one privileged conversation on that topic has been disclosed, is simply another form of the waiver by implication rule . . . . Like the 'implied waiver,' the subject matter waiver also rests on the fairness considerations at work in the context of litigation." *In re von Bulow*, 828 F.2d 94, 102–03 (2d Cir. 1987).

It is true that Two Harbors has not yet submitted any selectively-disclosed emails, or any selectively-elicited deposition testimony, to the Court at trial or in support of or opposition to a merits motion. Pine River is correct, however, that when the *holder* of the privilege makes a deliberate choice to question witnesses about privileged communications, that is an "affirmative use" of the privileged material which can constitute an intentional waiver, extending to "undisclosed communications or information concern[ing] the same subject matter." *Speedfit LLC v. Woodway USA Inc.*, 2019 WL 1441148, at *5 (E.D.N.Y. Mar. 28, 2019) (quoting Fed. R. Evid. 502(a)). For this reason as well, Two Harbors must produce all of the communications it has withheld, clawed back, or redacted on the subject of "negotiation of Management Agreement and Amendment."

Two Harbors need not, however, produce the document described on its log as Ms. Sandberg's handwritten notes regarding "assessments of Pine River's management of Two Harbors." Pl. Ltr. Ex. 1, at ECF p. 27 (TWOHARBORS_PRIV004682). The record now before

16

the Court is insufficient to determine whether that document does or does not concern the same subject matter as the remainder of the Disputed Documents.

### C. Kasnet Deposition

The Protective Order states, in pertinent part, that if a document is clawed back mid-deposition, as happened here, and if the Court later determines that the document was not "subject to a valid claim of privilege or protection," the deposition "shall be reopened, limited to questioning related to the Inadvertently Disclosed Information, and the Court shall determine whether any additional remedy is appropriate." Prot. Order (Dkt. 105) § 15(h). In this case, the Court has determined that it would also be appropriate, upon reopening the Kasnet deposition, to permit questioning concerning any of the other Disputed Documents that are the subject of this Order, as well as any related oral communications with Ms. Sandberg concerning the Second Amendment. The fact that Ms. Kasnet is not listed as a recipient of the email that Pine River attempted to use during the first session of his deposition (or any of the other Disputed Documents) may mean that the reopened deposition is a short one, but is not a reason to ignore the parties' Protective Order or leave Pine River unable to question any of the independent directors about Ms. Sandberg's communications.

### Conclusion

Plaintiffs' letter-motion (Dkt. 203) is GRANTED to the extent that defendant shall promptly produce the Disputed Documents except for TWOHARBORS_PRIV004682, as to which the parties shall meet and confer in an effort to determine whether that document does or does not come within the scope of Two Harbors's privilege waiver. If they cannot agree, they shall contact the Court, no later than **January 6, 2023**, to arrange for an *in camera* review. Further, Two Harbors shall produce Stephen Kasnet for no more than one-half day (3-1/2 hours) of additional

deposition testimony, limited to the communications that were previously the subject of Two Harbors's privilege claim.

Dated: New York, New York
December 30, 2022

SO ORDERED.

_____
**BARBARA MOSES**
**United States Magistrate Judge**