**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PRCM ADVISERS LLC, PINE RIVER
CAPITAL MANAGEMENT L.P., and PINE
RIVER DOMESTIC MANAGEMENT L.P.,

        Plaintiffs,

v.

TWO HARBORS INVESTMENT CORP.,

        Defendant.

---

Case No. 1:20-cv-05649-LAK-BCM

**ORAL ARGUMENT REQUESTED**

 

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TWO HARBORS**
**INVESTMENT CORP.'S MOTION FOR SUMMARY JUDGMENT**

Daniel Roeser
Richard M. Strassberg
Amadou Diaw
Christine Sama
Marco Wong

**GOODWIN PROCTER LLP**

*Attorneys for Defendant Two*
*Harbors Investment Corp.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD.............................................................................................................. 7

ARGUMENT........................................................................................................................... 8

    I.      THIS COURT SHOULD GRANT TWO HARBORS SUMMARY
          JUDGMENT ON ITS FAITHLESS SERVANT COUNTERCLAIM................. 8

    A.     PRCM OWED FIDUCIARY DUTIES TO TWO HARBORS. ............................ 9

    B.     PRCM WAS FAITHLESS IN THE PERFORMANCE OF ITS
          SERVICES.................................................................................................... 10

    1.      THERE IS NO GENUINE DISPUTE THAT PRCM WAS FAITHLESS
          WITH RESPECT TO THE LTIP SHARING ARRANGEMENTS.................... 11

    2.      THERE IS NO GENUINE DISPUTE THAT PRCM WAS FAITHLESS
          WITH RESPECT TO THE SIERING/ROTH COMPENSATION
          STRUCTURE. ................................................................................................ 15

    3.      THERE IS NO GENUINE DISPUTE THAT PRCM WAS FAITHLESS
          WITH RESPECT TO THE PINE RIVER RESTRICTIVE COVENANTS. ...... 17

    4.      THERE IS NO GENUINE DISPUTE THAT PRCM WAS FAITHLESS
          WITH RESPECT TO THE REPUTATIONAL RISK CREATED BY MR.
          TAYLOR REPEATEDLY DRESSING IN BLACKFACE. .............................. 20

    5.      THERE IS NO GENUINE DISPUTE THAT PRCM WAS FAITHLESS
          WITH RESPECT TO THE BUSINESS DISRUPTIONS. .................................. 22

    C.     PRCM MUST DISGORGE ITS COMPENSATION......................................... 23

    II.     THIS COURT SHOULD GRANT TWO HARBORS SUMMARY
          JUDGMENT ON PINE RIVER'S BREACH OF CONTRACT CLAIMS......... 24

    A.     THE TERMINATION FEE PROVISION AND THE HEDGE CLAUSE
          VIOLATE THE IAA AND, THEREFORE, THE MANAGEMENT
          AGREEMENT IS NOT ENFORCEABLE. ....................................................... 24

    B.     TWO HARBORS DID NOT BREACH THE MANAGEMENT
          AGREEMENT BY TERMINATING IT FOR CAUSE BECAUSE PRCM
          WAS GROSSLY NEGLIGENT.................................................................... 29

    III.    THE COURT SHOULD GRANT TWO HARBORS SUMMARY
          JUDGMENT ON PINE RIVER'S CLAIMS CONCERNING THE
          ALLEGED "INTELLECTUAL PROPERTY" AND TRADE SECRETS
          AT ISSUE. .................................................................................................... 30

    A.     THE ALLEGED "INTELLECTUAL PROPERTY" AND TRADE
          SECRETS AT ISSUE ARE NOT SUBJECT TO THE TERMS OF  THE
          MANAGEMENT AGREEMENT. .................................................................... 30

-i-

**TABLE OF CONTENTS**
(continued)

Page

B.    THE COURT SHOULD GRANT TWO HARBORS SUMMARY
JUDGMENT ON PINE RIVER'S CLAIMS CONCERNING THE
ALLEGED "INTELLECTUAL PROPERTY" AND TRADE SECRETS
AT ISSUE. ........................................................................................................... 33

IV.    THE COURT SHOULD GRANT TWO HARBORS SUMMARY
JUDGMENT ON PINE RIVER'S DTSA CLAIM FOR TWO
ADDITIONAL REASONS. ..................................................................................... 36

A.    PINE RIVER HAS FAILED TO IDENTIFY TRADE SECRET
MATERIAL WITH SPECIFICITY ........................................................................ 37

CONCLUSION ............................................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Albert v. Loksen,
    239 F.3d 256 (2d Cir. 2001)........................................................................36

In re Ampal-Am. Israel Corp.,
    No. 12-13689 (SMB), 2020 WL 5075992 (Bankr. S.D.N.Y. Aug. 25, 2020)........................29

Auchincloss & Lawrence Inc.,
    1974 WL 10979 (S.E.C. No-Action Letter Feb. 8, 1974)........................................27

Baraliu v. Vinya Capital, L.P.,
    765 F. Supp. 2d 289 (S.D.N.Y. 2011)...........................................................33

Beacon Hill CBO II, Ltd. v. Beacon Hill Asset Mgmt. LLC,
    249 F. Supp. 2d 268 (S.D.N.Y. 2003), <u>aff'd on other grounds</u>, 89 F. App'x
    749 (2d Cir. 2004)..................................................................................9

Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.,
    1 F. Supp. 3d 224 (S.D.N.Y. 2014)...........................................................37, 39

City of Saint Paul, Alaska v. Evans,
    344 F.3d 1029 (9th Cir. 2003) ...................................................................28

Devlin v. Transportation Comms. Int'l Union,
    2002 WL 413919 (S.D.N.Y. Mar. 14, 2002)................................................35, 36

Endico v. Endico,
    No. 19 CIV 7231 (JCM), 2022 WL 3902730 (S.D.N.Y. Aug. 30, 2022)...................7, 23

Gevorkyan v. Judelson,
    869 F.3d 57 (2d Cir. 2017)........................................................................28

GPIF-I Equity Co. v. HDG Mansur Inv. Servs., Inc.,
    No. 13 CIV. 547 CM, 2014 WL 1612004 (S.D.N.Y. Apr. 21, 2014)...................15, 16

Hahn v. Breed,
    587 F. Supp. 1369 (S.D.N.Y. 1984)..............................................................20

IDX Systems Corp. v. Epic Systems Corp.,
    285 F.3d 581 (7th Cir. 2002) .................................................................37, 38

In the Matter of J. Baker Tuttle Corp. Tuttle & Co. Jason Baker Tuttle, Sr.,
    1990 WL 322592 (S.E.C. Dec. 21, 1990)........................................................25

Katel Ltd. Liab Co. v. AT&T Corp.,
    607 F.3d 60 (2d Cir. 2010)......................................................................................36

Kinsey v. Cendant Corp.,
    521 F. Supp. 2d 292 (S.D.N.Y. 2007)....................................................................34

Kleeberg v. Eber,
    No. 16-cv-9517 (LAK), 2023 WL 2711294 (S.D.N.Y. Mar. 30, 2023)
    (Kaplan, J.)........................................................................................................15, 17

In re McDonald's Corp. S'holder Derivative Litig.,
    291 A.3d 652 (Del. Ch. 2023).................................................................................22

In re Parmalat Sec. Litig.,
    684 F. Supp. 2d 453 (S.D.N.Y. 2010) (Kaplan, J.), aff'd sub nom. Food
    Holdings Ltd. v. Bank of Am. Corp., 423 F. App'x 73 (2d Cir. 2011) ....................8

Phansalkar v. Andersen Weinroth & Co., L.P.,
    344 F.3d 184 (2d Cir. 2003).........................................................................8, 23, 24

Phansalkar v. Andersen Weinroth & Co., L.P.,
    No. 00 CIV 7872 (SAS), 2001 WL 1524479 (S.D.N.Y. Nov. 29, 2001), aff'd
    in part, vacated in part, rev'd in part, 344 F.3d 184 (2d Cir. 2003)..................15, 17

Phyto Tech. Corp. v. Givaudan SA,
    No. 18-CV-6172 (JGK), 2022 WL 2905515 (S.D.N.Y. July 22, 2022)...........39, 40

Qualis Care, L.P. v. Hall,
    No. 95 CIV. 4955 (BSJ), 1999 WL 683564 (S.D.N.Y. Sept. 1, 1999)....................9

Rahbari v. Oros,
    732 F. Supp. 2d 367 (S.D.N.Y. 2010)....................................................................29

Reading Int'l, Inc. v. Oaktree Capital Mgmt LLC,
    317 F.Supp.2d 301 (S.D.N.Y. 2003)......................................................................35

Samba Enterprises, LLC v. iMesh, Inc.,
    No. 06 CIV 7660 (DC), 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009), aff'd
    sub nom. Samba Enterprises, Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir.
    2010) ..................................................................................................................19, 20

Samba Enterprises, Ltd. v. iMesh, Inc.,
    390 F. App'x 55 (2d Cir. 2010) ...............................................................................9

Sit-Up Ltd. v. IAC/InterActive Corp.,
    No. 05 CIV 9292 (DLC), 2008 WL 463884 (S.D.N.Y. Feb. 20 2008) ..................39

SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC,
    491 F.3d 350 (8th Cir. 2007) ................................................................38

Stanley v. Skowron,
    989 F. Supp. 2d 356 (S.D.N.Y. 2013)..............................................23, 24

Therapy Prods. Inc. v. Bissoon,
    623 F.Supp.2d 485 (S.D.N.Y. 2009)....................................................34

In re Tops Holding II Corp.,
    646 B.R. 617 (Bankr. S.D.N.Y. 2022)...................................................29

Transamerica Mortgage Advisors, Inc. v. Lewis,
    444 U.S. 11 (1979)...............................................................................9

Triple H Family Ltd. P'ship v. Neal,
    C.A. No. 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018) ...................................21

United States v. W. Pac. R.R. Co.,
    352 U.S. 59 (1956)..............................................................................28

Village Taxi Corp. v. Beltre,
    91 A.D.3d 92 (2nd Dep't 2011) ...........................................................29

Visual Arts Found., Inc. v. Egnasko,
    91 A.D.3d 578 (1st Dep't 2012) ............................................................9

Waite v. UMG Recordings, Inc.,
    No. 19-cv-1091 (LAK), 2022 WL 4227300 (S.D.N.Y. Sept. 13, 2022)
    (Kaplan, J.)...........................................................................................7

Wells v. Rockefeller,
    728 F.2d 209 (3d Cir. 1984)................................................................28

Wendt v. Fischer,
    243 N.Y. 439 (N.Y. 1926) ...................................................................20

Yukos Cap. S.A.R.L. v. Feldman,
    No. 15-cv-4964 (LAK), 2017 WL 10221739 (S.D.N.Y. Feb. 8, 2017) (Kaplan,
    J.).........................................................................................................7

Zabit v. Brandometry LLC,
    540 F. Supp. 3d (S.D.N.Y. 2021).........................................................33

Zam & Zam Super Market, LLC v. Ignite Payments, LLC,
    736 F. App'x 274 (2d Cir. 2018) .........................................................25

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................................7

Standard of Conduct Interpretation, 84 Fed. Reg. at 33,672 n.31 ................................................28

Defendant Two Harbors Investment Corp. ("Two Harbors") submits this memorandum of law in support of its motion for summary judgment on (1) the counterclaim of Two Harbors against PRCM Advisers LLC ("PRCM") under the faithless servant doctrine and (2) the claims of PRCM, Pine River Capital Management L.P., and Pine River Domestic Management L.P. (collectively, "Pine River") against Two Harbors for breach of contract, misappropriation of trade secrets under the Defense of Trade Secrets Act ("DTSA"), unfair competition, unjust enrichment, conversion, and tortious interference.

## PRELIMINARY STATEMENT

Two Harbors was the victim of a series of disloyal and fraudulent acts by Pine River during the 10+ years that PRCM was Two Harbors' external manager.  Although PRCM owed Two Harbors the highest fiduciary duties, PRCM used its position of influence to abuse that trust. PRCM **created** conflicts of interest with (among others) Two Harbors' former Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO") – both Pine River partners – whom PRCM provided to manage Two Harbors.  Then, PRCM **concealed** those conflicts of interest from Two Harbors' Independent Directors, in some cases for as long as a decade, as they managed Two Harbors.  Next, PRCM engaged in conduct that **risked** Two Harbors' reputation.  Further, PRCM **misled** Two Harbors' Independent Directors about some of those conflicts of interest when Two Harbors' Compensation Committee asked PRCM about them.  And, once Two Harbors decided not to renew the Management Agreement, PRCM created still more conflicts of interest to **disrupt** Two Harbors' business.  Now, PRCM would **co-opt** the software programs and other materials that were created for Two Harbors by dedicated Two Harbors personnel while providing services to Two Harbors for which Two Harbors already has paid.  Although PRCM and Pine River partners already have been enriched by collecting nearly $600 million from Two Harbors while treating Two Harbors as their "permanent capital" (not their client with assets under management), that is

not enough for them.  PRCM now seeks over $1 billion more.  The audacity is staggering.

On October 28, 2009, PRCM and Two Harbors entered into the Management Agreement for PRCM to manage Two Harbors as its investment adviser.  The Management Agreement was signed by a Pine River partner on behalf of **both** PRCM and Two Harbors.  As Two Harbors' investment adviser, PRCM owed Two Harbors fiduciary duties.  PRCM managed Two Harbors' day-to-day operations and provided Two Harbors' personnel – including the management team – installing Pine River partners as CEO and CIO (among other positions).  Two Harbors relied on PRCM for investment, risk management, accounting, operations, legal, compliance, and information technology services.  And Two Harbors trusted PRCM to put Two Harbors' best interests above its own.  Pine River had other ideas.

Pine River committed a series of disloyal acts by creating conflicts of interest and then concealing them from Two Harbors' Independent Directors.  Those disloyal acts included (but were not limited to) the LTIP Sharing Agreements, the Siering/Roth Compensation Structure, and the Pine River Restrictive Covenants described below:

- **LTIP Sharing Agreements.**  Unbeknownst to Two Harbors' Independent Directors, Pine River entered into handshake deals with Two Harbors' then-CEO and then-CIO that reduced the compensation that Pine River paid to each of them as Pine River partners by one third of the amount of the awards that Two Harbors granted to each of them under a long-term incentive plan ("LTIP") that Two Harbors had instituted to align its executives' interests with its shareholders' interests.  Those handshake deals (the "LTIP Sharing Agreements") were hidden from Two Harbors' Independent Directors for more than six years as Two Harbors' then-Chairman of the Board (who also was Pine River's founder and a Pine River partner) and then-CEO (who also was a Pine River partner) lobbied the Compensation Committee of Two Harbors' Board for

LTIP awards.  They were successful.  Two Harbors' then-CEO and then-CIO received more than $30 million in LTIP awards, which reduced the compensation that Pine River otherwise would have paid them by more than $10 million.

- **Siering/Roth Compensation Structure.**   Unbeknownst to Two Harbors' Independent Directors, Pine River had an agreement to compensate Two Harbors' then-CEO with 50 percent of the management fee paid by Two Harbors less the compensation costs of the other investment professionals providing services to Two Harbors.  Two Harbors' then-CEO, in turn, had a handshake deal with Two Harbors' then-CIO to split that portion of the management fee equally.  Those agreements (the "Siering/Roth Compensation Structure") were hidden from Two Harbors' Independent Directors for nearly a decade even though they incentivized Two Harbors' then-CEO and then-CIO to minimize the compensation for the rest of Two Harbors' investment team even if it was not in Two Harbors' best interests.

- **Pine River Restrictive Covenants.**  Unbeknownst to Two Harbors' Independent Directors, Pine River imposed restrictive covenants on Two Harbors' then-CEO and then-CIO (among other Two Harbors' executives).  Those restrictive covenants (the "Pine River Restrictive Covenants") precluded Two Harbors' then-CEO and then-CIO (among other Two Harbors' executives) from continuing to provide services to Two Harbors for at least one year in the event that Two Harbors did not renew or terminated the Management Agreement.  The restrictive covenants disincentivized Two Harbors' then-CEO and then-CIO (and other executives) from considering, much less advising, Two Harbors and its Independent Directors on issues related to internalization fairly and objectively because they would lose their positions with Two Harbors (and the millions of dollars in annual compensation that they received) if the Management Agreement was not renewed or was terminated by Two Harbors.  The restrictive covenants also

set up obstacles if Two Harbors sought to change managers or internalize because that necessarily would result in Two Harbors losing the services of its then-CEO and then-CIO (and other executives). Nevertheless, the restrictive covenants were hidden from Two Harbors' Independent Directors for more than a decade.

**Reputational Risk.** PRCM and Pine River partners also engaged in conduct that risked Two Harbors' reputation (the "Reputational Risk").  Mr. Taylor and other Pine River partners all agreed that his conduct created reputational risk for Two Harbors. And that reputational risk was not simply theoretical. It was real.

Once Two Harbors' Independent Directors saw the draft complaint that Pine River's former president was preparing to file, they formed an Independent Committee. That Independent Committee began to investigate the allegations in the draft complaint. As part of that investigation, the Compensation Committee asked for a summary of the compensation arrangements between Pine River and Two Harbors' then-CEO and then-CIO. Pine River affirmatively misled the Compensation Committee in its response. Pine River omitted any mention of the LTIP Sharing Agreements, the Siering/Roth Compensation Structure, or the Pine River Restrictive Covenants. Pine River disclosed those arrangements later in 2019 under further questioning from the Compensation Committee.

In February 2020, Two Harbors formed a Special Committee to consider whether to continue the relationship between PRCM and Two Harbors. The Special Committee hired

financial and legal advisors and, on March 20, 2020, Two Harbors' Independent Directors notified PRCM that Two Harbors intended not to renew the Management Agreement because PRCM's compensation was unfair. The Special Committee based its decision on the advice of its financial and legal advisors. The Special Committee continued to investigate whether the Management Agreement should be terminated for cause as a result of PRCM's disloyal acts.

**Business Disruptions.** Less than three months later, on June 17, 2020, PRCM sued Two Harbors in New York state court because Two Harbors had decided not to renew the Management Agreement. The very next day, Pine River sent a letter to all dedicated Two Harbors personnel (the "Business Disruptions") that (among other things) directed them "to act in Pine River's best interests," not Two Harbors' best interests, and not to "communicate with any attorneys for Two Harbors" – █████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████

But Pine River did not stop there. It sought to **co-opt** the software programs and other materials created for Two Harbors by personnel providing services to Two Harbors for which Two Harbors paid. Pine River invoked for the first time Section 27 of the Management Agreement and claimed that it owned all of the alleged "intellectual property" and trade secrets even though, by the very terms of that section, it did not.

After the Special Committee completed its investigation into whether the Management Agreement should be terminated for cause as a result of PRCM's disloyal acts, Two Harbors' Independent Directors notified PRCM on July 15, 2020, that Two Harbors was terminating the Management Agreement for cause. Seven days later, PRCM retaliated by filing suit in this Court

(and dismissing its complaint in New York state court).  Two Harbors subsequently asserted counterclaims.

Following more than 18 months of discovery, the record is clear.  There is no genuine dispute as to the following fundamental facts:

- **PRCM was faithless in the performance of its services to Two Harbors.**  PRCM owed fiduciary duties to Two Harbors as its external manager.  PRCM violated those fiduciary duties by creating conflicts of interest between Two Harbors and Two Harbors' own executives. All the while, PRCM failed to disclose what it was doing and why.  Not only that, PRCM affirmatively misled Two Harbors by providing a "summary of the economic arrangements" for Two Harbors' then-CEO and then-CIO that omitted some of the very conflicts of interest about which Two Harbors' Compensation Committee was asking.  And PRCM exposed Two Harbors to reputational risk.

- **Two Harbors did not breach the Management Agreement by terminating it for cause.**  The Management Agreement contains a Termination Fee Provision and a Hedge Clause that violate the Investment Advisers Act ("IAA") and, as a result, the Management Agreement is not enforceable.  Even if the Management Agreement were not void (and it is), Two Harbors did not breach it by terminating it for cause because, just as PRCM was faithless in the performance of its duties under the Management Agreement, PRCM was grossly negligent in the performance of those duties.

- **PRCM does not own the alleged "intellectual property" or trade secrets under the Management Agreement.**  PRCM claims ownership of the alleged "intellectual property" and trade secrets at issue in this case based on the Management Agreement.  PRCM has no employees. PRCM contracted with Pine River Capital Management L.P. ("PR Capital") to provide personnel

to Two Harbors.  But the personnel who provided services to Two Harbors were employed by a different entity, Pine River Domestic Management L.P. ("PR Domestic").  PR Domestic is not a party to the Management Agreement or the agreement between PRCM and PR Capital under which management services were provided to Two Harbors.  As a result, the acts of the personnel who provided services to Two Harbors are not attributable to PRCM under the Management Agreement.

For the foregoing reasons and those that follow, this Court should grant Two Harbors' motion for summary judgment.

## **LEGAL STANDARD**

"Summary judgment must be granted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Waite v. UMG Recordings, Inc., No. 19-cv-1091 (LAK), 2022 WL 4227300, at *2 (S.D.N.Y. Sept. 13, 2022) (Kaplan, J.)[1]; see Fed. R. Civ. P. 56(a); Yukos Cap. S.A.R.L. v. Feldman, No. 15-cv-4964 (LAK), 2017 WL 10221739, at *4 (S.D.N.Y. Feb. 8, 2017) (Kaplan, J.) (same).  "While facts must be viewed in the light most favorable to the nonmoving party, that is true only if there is a genuine dispute as to those facts." Waite, 2022 WL 4227300, at *2.  "Mere conclusory allegations or unsubstantiated speculation are insufficient to raise a dispute of material fact and defeat summary judgment."  Id.  Consequently, the nonmovant must do more than show that there is "some metaphysical doubt as to the material facts" but rather "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  Endico v. Endico, No. 19 CIV. 7231 (JCM), 2022 WL 3902730, at *5 (S.D.N.Y. Aug. 30, 2022).

---

[1] All alterations, citations, and internal quotation marks are omitted and all emphasis is added unless otherwise noted.

## ARGUMENT

**I.     This Court Should Grant Two Harbors Summary Judgment On Its Faithless Servant Counterclaim.**

"Perfect candor, full disclosure, good faith, in fact, the utmost good faith, and the strictest honesty are required of promoters [and other fiduciaries], and their dealings must be open and fair, or without undue advantage taken." In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (Kaplan, J.), aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp., 423 F. App'x 73 (2d Cir. 2011). "[A]n agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003).

As Judge Kaplan held in denying Pine River's motion for judgment on the pleadings as to Two Harbors' faithless servant claim: "New York's faithless servant doctrine holds that one who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." (Dkt. 328 at 24.) "To show a violation of the faithless servant doctrine, an employer must show (1) that the employee's disloyal activity was related to the performance of his duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part." (Id.) "Although most faithless servant claims have arisen in the employer-employee context, the doctrine arises out of an **agency** or employment relationship." (Id. at 25 (emphasis in original).) "Two Harbors has made factual allegations that, accepted as true on this motion, plausibly allege a claim under the faithless service doctrine." (Id.)

As detailed below, discovery has established that Two Harbors' factual allegations are in fact true, and this Court should grant Two Harbors summary judgment on its faithless servant

counterclaim.  E.g., Visual Arts Found., Inc. v. Egnasko, 91 A.D.3d 578, 578 (1st Dep't 2012) (affirming grant of summary judgment on faithless servant claim); Samba Enterprises, Ltd. v. iMesh, Inc., 390 F. App'x 55, 56 (2d Cir. 2010) (similar); Qualis Care, L.P. v. Hall, No. 95 CIV. 4955 (BSJ), 1999 WL 683564, at *4 (S.D.N.Y. Sept. 1, 1999) (granting summary judgment where Chairman of the company "breached his fiduciary duties of loyalty, good faith, and fair dealing to [plaintiff] and its limited partners").

### A.    PRCM Owed Fiduciary Duties To Two Harbors.

There is no genuine dispute that PRCM owed fiduciary duties to Two Harbors as its external manager.  Indeed, Pine River's witnesses have admitted that fact.  (Statement of Undisputed Material Facts ("SUF") at ¶¶ 9-10.)  Nor could PRCM deny it.  Investment advisers "who manage funds belonging to others are a classic example of fiduciaries who owe the highest duty of loyalty to those on whose behalf they act." Beacon Hill CBO II, Ltd. v. Beacon Hill Asset Mgmt. LLC, 249 F. Supp. 2d 268, 273 (S.D.N.Y. 2003), aff'd on other grounds, 89 F. App'x 749 (2d Cir. 2004); see also, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 17 (1979).  At every turn, the factual record confirms that PRCM owed fiduciary duties to Two Harbors:



███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

**PRCM's Statements To Two Harbors Personnel.**  PRCM's statements to Two Harbors personnel – after filing suit against Two Harbors – confirms that that PRCM was Two Harbors' fiduciary.  "Of course, it goes without saying – but I want to reemphasize – that so long as Pine River is managing Two Harbors, Pine River and its employees and partners must continue to provide Two Harbors with the same high level of service that Pine River has provided to Two Harbors for the last ten years. This of course means that you must always act in the best interests of Two Harbors and its shareholders, and not take any action to the detriment of Two Harbors." (SUF ¶ 13.)

In sum, there is no genuine dispute that "Two Harbors' factual allegations with respect to the nature of plaintiffs' roles and responsibilities and the nature of their relationship with Two Harbors" – i.e., that "the relationship between PRCM and Two Harbors gave rise to fiduciary duties owed by PRCM to Two Harbors" – is true.  (Dkt. 328 at 27.)  Therefore, the relationship between PRCM and Two Harbors "imposed on [PRCM] a duty to act with care and loyalty."  (Id.)

B. **PRCM Was Faithless In The Performance Of Its Services.**

There is no genuine dispute that PRCM violated its fiduciary duties by creating conflicts of interest between Two Harbors and Two Harbors' own executives and then failing to disclose those conflicts of interest to Two Harbors' Independent Directors.  For example, discovery has

established that PRCM was, in fact, faithless with respect to (1) the LTIP Sharing Arrangements, (2) the Siering/Roth Compensation Structure, (3) the Pine River Restrictive Covenants, (4) the Reputational Risk ████████████████████████████████████ ████████████ and (5) the Business Disruptions.

### 1. There Is No Genuine Dispute That PRCM Was Faithless With Respect To The LTIP Sharing Arrangements.

Discovery has established the truth of Two Harbors' factual allegations. Pine River placed its own interests above the fiduciary duties owed to Two Harbors by (1) entering into agreements with Two Harbors' then-CEO, Tom Siering, and Two Harbors' then-CIO, Bill Roth, through which Pine River realized a substantial cash benefit from Two Harbors' equity incentive awards to Mr. Siering and Mr. Roth and (2) failing to disclose those agreements to Two Harbors' Independent Directors for more than six years. Specifically:

- Beginning in 2012, the Two Harbors' Compensation Committee designed and implemented the LTIP to provide incentive compensation to reward and retain key personnel and to align their interests with shareholders' interests by awarding time-vesting restricted stock pursuant to Two Harbors' equity incentive plan. (Compare Def.'s Answer and Counterclaims, Dkt. 91 ("Counterclaim") ¶ 52 with SUF ¶ 14.) As part of the LTIP, the Compensation Committee annually recommended awards for eligible personnel, which then were reviewed by Two Harbors' Board of Directors. (Compare Counterclaim ¶ 53 with SUF ¶ 15.) Pine River, represented by Mr. Taylor, Mr. Siering, and Mr. Roth, participated in the Compensation Committee's design, implementation, and management of the LTIP. (Compare Counterclaim ¶ 54 with SUF ¶ 16.)

- From 2013 through 2019, Mr. Siering and Mr. Roth together received LTIP awards with a combined grant date fair value of approximately $30.8 million. (Compare Counterclaim ¶ 55 with SUF ¶ 17.) The LTIP awards that Mr. Siering and Mr. Roth received were not part of the

compensation that Two Harbors was responsible for paying PRCM under the Management Agreement or part of the compensation that Pine River was responsible for paying Mr. Siering and Mr. Roth.  (Compare Counterclaim ¶ 56 with SUF ¶ 18.)

• While Two Harbors made the LTIP awards to Mr. Siering and Mr. Roth to incentivize their performance, unbeknownst to Two Harbors' Independent Directors, the awards were being used by Pine River to reduce its compensation obligations to Mr. Siering and Mr. Roth. (Compare Counterclaim ¶ 57 with SUF ¶¶ 19-20.)  In 2013, Pine River entered into (1) a handshake deal with Mr. Siering that provided that any LTIP award received by him would reduce the compensation that he was paid by Pine River and/or other Pine River affiliates and (2) a handshake deal with Mr. Roth that provided that any LTIP award received by him would reduce the compensation that he was paid by Pine River and/or other Pine River affiliates.  (Compare Counterclaim ¶ 58 with SUF ¶ 19.)

• Under those agreements, the compensation that Mr. Siering or Mr. Roth was owed by Pine River and/or other Pine River affiliates was reduced by one-third of the value of their LTIP awards from Two Harbors.  (Compare Counterclaim ¶ 58 with SUF ¶ 20.)  As Mr. Taylor admitted to a fellow Pine River partner:

> There is a partial (1/3) cash deduction from [Mr. Siering's] bonus for the value of the LTIP grants.  It began whenever LTIP grants began.  It initiated in a period of tight financial conditions.  LTIPs were unexpectedly granted post the PRCM bonus negotiation round, and there was little argument that partners' total comp should [be] adjusted to partially share the windfall.

(SUF ¶ 21.)  From 2013 through 2019, Pine River realized a cash benefit of at least $10,283,306 by reducing the compensation paid to Mr. Siering and Mr. Roth by one-third of the $30,849,920 that Mr. Siering and Mr. Roth together received in LTIP awards from 2013 through 2019. (Compare Counterclaim ¶ 59 with SUF ¶ 22).

- Moreover, prior to November 2019, Pine River never informed Two Harbors' Independent Directors of the existence or substance of the LTIP Sharing Agreements or the resulting cash benefit to Pine River.  (Compare Counterclaim ¶ 61 with SUF ¶ 23.)  The failure to disclose the LTIP Sharing Agreements misled Two Harbors' Independent Directors, who believed that the LTIP awards made to Mr. Siering and Mr. Roth were solely incentive compensation for services to Two Harbors and not a means by which Pine River could reduce its compensation obligations.  (Compare Counterclaim ¶ 62 with SUF ¶ 24.)

- ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████

- On October 17, 2019, Two Harbors' Compensation Committee requested from Pine River that, "[w]ith respect to the compensation of the CEO, CIO, and the company's investment professionals, please advise as to whether and how the annual LTIP award granted to such individuals impacts their overall compensation (i.e., is total cash compensation adjusted in any manner after taking into consideration the LTIP awards)."  (Compare Counterclaim ¶ 64 with SUF ¶ 27.)  On November 8, 2019, Pine River responded to the Compensation Committee and

disclosed: "With respect to the CEO and CIO, their compensation, including the annual LTIP award granted to them, has been subject to a residual sharing agreement with Pine River. Heretofore, the cash compensation paid out of the management fee to the CEO and CIO has been reduced by 1/3 of the value of the LTIP award granted to the CEO and CIO for that performance year in the spirit of the sharing agreement." (Compare Counterclaim ¶ 65 with SUF ¶ 28.)  That was the first time that Pine River disclosed the existence of the LTIP Sharing Agreements to Two Harbors' Independent Directors.  (Compare Counterclaim ¶ 65 with SUF ¶ 23.)

- On November 25, 2019, Two Harbors' Compensation Committee asked Pine River to "indicate how long the LTIP sharing arrangement . . . had been in effect." (Compare Counterclaim ¶ 66 with SUF ¶ 29.)  On December 3, 2019, Pine River (through Mr. Siering) responded to the Compensation Committee's request and disclosed that the LTIP Sharing Agreements began in 2013:  "My LTIP sharing began at the inception of the Two Harbors' LTIP program as a one-third deduction, based on the amount at the time it was granted, from my discretionary bonus allocation.  By way of example, if I received an LTIP award of $100,000, $33,333 was returned to the Pine River pool and reduced from my cash bonus." (Compare Counterclaim ¶ 67 with SUF ¶ 30.)

- Once Pine River disclosed the LTIP Sharing Agreements to Two Harbors' Independent Directors, the Independent Directors required that Pine River stop the practice immediately. (Compare Counterclaim ¶ 68 with SUF ¶ 31.)  Pine River have never compensated Two Harbors for that nearly $10.3 million cash benefit, although in the words of Mr. Taylor, "[Two Harbors will] probably come at us to recoup the LTIP deduct." (Compare Counterclaim ¶ 60 with SUF ¶ 32.)

The LTIP Sharing Agreements created a conflict of interest by placing the interests of Pine

River above the fiduciary duties owed to Two Harbors and by providing Pine River with a substantial, unintended benefit from Two Harbors' LTIP awards to Mr. Siering and Mr. Roth that was not disclosed to Two Harbors' Independent Directors for more than six years.  GPIF-I Equity Co. v. HDG Mansur Inv. Servs., Inc., No. 13 CIV. 547 CM, 2014 WL 1612004, at *6 (S.D.N.Y. Apr. 21, 2014) (a fiduciary who "plac[es] their own financial interests ahead of" their principal breaches his duty to the principal).  By creating that conflict of interest, PRCM was faithless in the performance of its services to Two Harbors.  See Kleeberg v. Eber, No. 16-cv-9517 (LAK), 2023 WL 2711294, at *25 (S.D.N.Y. Mar. 30, 2023) (Kaplan, J.) (defendant who took "$3 million . . . under his personal consulting agreement . . . [which] reduced the compensation that otherwise could have been paid to the sellers for the ultimate benefit of the trust beneficiaries . . . breached [his] undivided duty of loyalty").  By failing to disclose that conflict of interest, PRCM compounded its faithless performance of its services to Two Harbors.  See Phansalkar v. Andersen Weinroth & Co., L.P., No. 00 CIV. 7872 (SAS), 2001 WL 1524479, at *27 (S.D.N.Y. Nov. 29, 2001) ("failure to disclose [options and shares received] constituted a breach of his duty to the firm"), aff'd in part, vacated in part, rev'd in part, 344 F.3d 184 (2d Cir. 2003).

### 2. There Is No Genuine Dispute That PRCM Was Faithless With Respect To The Siering/Roth Compensation Structure.

Again, discovery has established the truth of Two Harbors' factual allegations.  Pine River placed its own interests above the fiduciary duties owed to Two Harbors by (1) structuring the compensation of Mr. Siering and Mr. Roth such that they were incentivized to minimize the compensation of the rest of Two Harbors' investment team even if it was not in Two Harbors' best interests and (2) failing to disclose that structure to Two Harbors' Independent Directors for a decade.  Specifically:

- Pine River compensated Mr. Siering with 50 percent of the management fee paid

by Two Harbors less the compensation costs of the other investment professionals providing services to Two Harbors.  (<u>Compare</u> Counterclaim ¶ 102 <u>with</u> SUF ¶ 33.)

- Mr. Siering, in turn, had a "handshake agreement" with Mr. Roth to split that portion of the management fee equally.  (<u>Compare</u> Counterclaim ¶ 102 <u>with</u> SUF ¶ 34.)

- Pine River used that compensation structure for Mr. Siering and Mr. Roth each year from 2009 to 2018.  (SUF ¶ 35.)[2]

- That compensation structure incentivized Mr. Siering and Mr. Roth to minimize the compensation costs of the other investment professionals providing services to Two Harbors – even where it would have been in the best interest of Two Harbors for Pine River to spend more on compensation of the other investment team.  (<u>Compare</u> Counterclaim ¶ 102 <u>with</u> SUF ¶ 36.)

- Pine River did not disclose the Siering/Roth Compensation Structure to the Independent Directors until 2019.  (<u>Compare</u> Counterclaim ¶ 102 <u>with</u> SUF ¶ 37.)

- The failure to disclose the Siering/Roth Compensation Structure misled the Independent Directors, who were unaware that Mr. Siering and Mr. Roth could increase their own compensation by deciding that Pine River should spend less on other investment professionals serving Two Harbors.  (<u>Compare</u> Counterclaim ¶ 104 <u>with</u> SUF ¶ 38.)

The Siering/Roth Compensation Structure created a conflict of interest by permitting Mr. Siering and Mr. Roth to increase their own compensation if they reduced the compensation of the rest of Two Harbors' investment team.  <u>GPIF-I Equity Co.</u>, 2014 WL 1612004, at *6.  By creating that conflict of interest, PRCM was faithless in the performance of its services to Two

---

[2] For the year 2017, Mr. Roth did not receive an equal share of the management fee due to an incident relating to Mr. Roth's "trading at the end of quarters and months to change the apparent risk level of the portfolio."  (SUF ¶ 35.)

Harbors.  See Kleeberg, 2023 WL 2711294, at *25 (Kaplan, J.) (defendant who took "$3 million . . . under his personal consulting agreement . . . [which] reduced the compensation that otherwise could have been paid to the sellers for the ultimate benefit of the trust beneficiaries . . . breached [his] undivided duty of loyalty").  By failing to disclose that conflict of interest, PRCM compounded its faithless performance of its services to Two Harbors.  See Phansalkar, 2001 WL 1524479, at *27 ("failure to disclose [options and shares received] constituted a breach of his duty to the firm").

### 3.    There Is No Genuine Dispute That PRCM Was Faithless With Respect To The Pine River Restrictive Covenants.

Once again, discovery has established the truth of Two Harbors' factual allegations.  Pine River created conflicts of interest by imposing restrictive covenants on Mr. Siering and Mr. Roth (among other Two Harbors' executives).  Those restrictive covenants disincentivized Mr. Siering and Mr. Roth (and other executives) from considering, much less advising Two Harbors and its Independent Directors on, issues related to internalization fairly and objectively because they would lose their positions with Two Harbors (and the millions of dollars in annual compensation that they received) if the Management Agreement was not renewed or was terminated by Two Harbors.  In addition, those restrictive covenants set up obstacles if Two Harbors sought to change managers or internalize because that necessarily would result in Two Harbors losing the services of its then-CEO and then-CIO (and other executives).  Pine River failed to disclose the Pine River Restrictive Covenants to Two Harbors' Independent Directors for more than a decade. Specifically:

- Pine River partners served as Two Harbors' CEO and President, CIO/Co-CIO, CFO, and General Counsel for some or all of the term of the Management Agreement.  (Compare Counterclaim ¶ 73 with SUF ¶ 39.)

- While serving as Two Harbors executives, those individuals were subject to non-competition and other restrictive covenants contained in the partnership agreement of Pine River or a Pine River affiliate.  (<u>Compare</u> Counterclaim ¶ 74 <u>with</u> SUF ¶ 40.)

- The Pine River Restrictive Covenants precluded the individuals subject to them from continuing to provide services to Two Harbors for at least one year in the event that Two Harbors did not renew or terminated the Management Agreement.  (<u>Compare</u> Counterclaim ¶ 74 <u>with</u> SUF ¶ 41.)

- Pine River did not disclose the existence and substance of the Pine River Restrictive Covenants to the Independent Directors until December 2019.  (<u>Compare</u> Counterclaim ¶ 75 <u>with</u> SUF ¶ 42.)

- The failure to disclose the Pine River Restrictive Covenants misled the Independent Directors, who were unaware that the Pine River partners serving as Two Harbors executives were subject to conflicts of interest with respect to issues related to internalization.  (<u>Compare</u> Counterclaim ¶ 75 <u>with</u> ¶ 43.)

- 

- On November 25, 2019, Two Harbors' Compensation Committee asked Pine River whether Mr. Siering was "currently subject to any form of non-competition covenant or any other restriction that is adverse to Two Harbors?"  (<u>Compare</u> Counterclaim ¶ 78 <u>with</u> SUF ¶ 46.)  On

December 3, 2019, Pine River responded to the Compensation Committee's request and Mr. Siering disclosed: "As a partner of Pine River, I have a Limited Partnership Agreement in effect. In that partnership agreement, there is a noncompetition covenant and non-solicitation covenant." (Compare Counterclaim ¶ 79 with SUF ¶ 47.) Mr. Siering also provided the "exact language from the noncompetition/non-solicitation provision of the Limited Partnership Agreement," which precluded Pine River partners from continuing to provide services to Two Harbors for at least one year in the event that Two Harbors did not renew or terminated the Management Agreement. (Compare Counterclaim ¶ 79 with SUF ¶ 47.) That was the first time that Pine River disclosed the existence of the Pine River Restrictive Covenants to Two Harbors' Independent Directors. (Compare Counterclaim ¶ 79 with SUF ¶ 42.)

- Once Pine River disclosed the Pine River Restrictive Covenants to the Two Harbors Independent Directors, Two Harbors disclosed them in its next SEC filing. (See SUF ¶ 48.)

By creating multiples conflict of interest – i.e., disincentivizing Mr. Siering and Mr. Roth (and other executives) from considering, or advising Two Harbors and its Independent Directors on, issues related to internalization fairly and objectively and also setting up obstacles if Two Harbors sought to change managers or internalize – PRCM was faithless in the performance of its services to Two Harbors. A fiduciary acts faithlessly when it enters into contractual provisions that could be detrimental to the principal to whom it owes fiduciary duties. Take, for example, Samba Enterprises, LLC v. iMesh, Inc., No. 06 CIV. 7660 (DC), 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009), aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010). There, the plaintiff and the defendant entered into a contract under which the plaintiff agreed to help the defendant "find partners with which [the defendant] could bundle software, in exchange for a commission on any agreements [the defendant] might enter into." Id. at *1. The

plaintiff ultimately found a suitable partner for the defendant; "[u]nbeknownst to [the defendant], however, [the plaintiff] had also entered into an agreement with that partner under which [the plaintiff] received a fee for referring [the defendant] to that partner." Id. The court found that the plaintiff breached its fiduciary duty to the defendant by creating such a conflict of interest. Id. at *9.

By failing to disclose those conflicts of interest, PRCM compounded its faithless performance of its services to Two Harbors. PRCM was required to disclose the Pine River Restrictive Covenants and the conflicts of interest that they created even if there was no damage or reliance as a result of those restrictive covenants or conflicts of interest. See Samba Enterprises, 2009 WL 705537, at *9 (the plaintiff was liable for breaching its fiduciary duty where "it failed to disclose this conflict to [the defendant]"); Hahn v. Breed, 587 F. Supp. 1369, 1375 (S.D.N.Y. 1984) (a consulting agreement that presented "a conflict of interest" was required to be disclosed); see also Wendt v. Fischer, 243 N.Y. 439, 443-44 (N.Y. 1926) ("If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance . . . The law does not stop to inquire whether the contract or transaction was fair or unfair.").

      **4.**      **There Is No Genuine Dispute That PRCM Was Faithless With Respect To The Reputational Risk** ███████████████████████████████████
██████████

Here again, discovery has established the truth of Two Harbors' factual allegations. Specifically:

- ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████



By creating reputational risk to Two Harbors, PRCM was faithless in the performance of its services to Two Harbors – whether or not that risk materialized.  See Triple H Family Ltd. P'ship v. Neal, C.A. No. 12294-VCMR, 2018 WL 3650242, at *19 (Del. Ch. July 31, 2018) (the defendant's failure to secure insurance coverage for a client "exposed Omni to a significant risk

of monetary and reputational harm," which "behavior was not in the best interest of Omni and constitutes a breach of Neal's fiduciary duties," despite that "[t]hankfully no tragedy occurred during the time [the client] was uninsured"); see also In re McDonald's Corp. S'holder Derivative Litig., 291 A.3d 652, 680 (Del. Ch. 2023) (observing that sexual harassment and misconduct in the workplace "can result in serious injury" because they, among other things, "create a risk that customers and clients will defect to competitors, and subject the corporation to potential liability").

### 5.    There Is No Genuine Dispute That PRCM Was Faithless With Respect To The Business Disruptions.

Yet again, discovery has established the truth of Two Harbors' factual allegations. Pine River placed its own interests above the fiduciary duties owed to Two Harbors by (among other things) directing Two Harbors personnel (1) "to act in Pine River's best interests," not Two Harbors' best interests, and (2) not to "communicate with any attorneys for Two Harbors" ██████████████████████████████████████████████. Specifically:

- On March 20, 2020, Two Harbors notified PRCM that the compensation payable to PRCM under the Management Agreement was unfair and that Two Harbors intended not to renew the Management Agreement (the "Notice of Non-Renewal"). (Compare Counterclaim ¶ 139 with SUF ¶ 55.)

- Following the Notice of Non-Renewal, PRCM filed a lawsuit against Two Harbors in June 2020. (Compare Counterclaim ¶ 140 with SUF ¶ 56.)

- The day after PRCM filing its lawsuit, Pine River directed dedicated Two Harbors personnel that (among other things) that they were obligated "to act in Pine River's best interests" – not Two Harbors' best interests. (Compare Counterclaim ¶ 141 with SUF ¶ 57.) That direction was contrary to the fiduciary duties owed to Two Harbors. (See supra at I.A.)

- At the same time, Pine River instructed Two Harbors personnel that they were not

to "communicate with any attorneys for Two Harbors." (Compare Counterclaim ¶ 141 with SUF ¶ 57.) That instruction presented a significant obstacle to Two Harbors in responding to a pending SEC investigation into both Pine River and Two Harbors. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ Pine River did not relent even though its position was wrong, as this Court ultimately held. (SUF ¶ 59.)

By directing Two Harbors personnel "to act in Pine River's best interests," not Two Harbors' best interests, and not to "communicate with any attorneys for Two Harbors" despite a pending SEC investigation into Pine River and Two Harbors, PRCM was faithless in the performance of its services to Two Harbors. See Endico, 2022 WL 3902730, at *6 ("[O]fficers may not assume and engage in the promotion of personal interests which are incompatible with the superior interests of their corporation.").

**C.    PRCM Must Disgorge Its Compensation.**

"An employee [or agent] who is found to be faithless normally forfeits all compensation received during the period of disloyalty, regardless of whether the employer suffered any damages." Stanley v. Skowron, 989 F. Supp. 2d 356, 360 (S.D.N.Y. 2013); see also Phansalkar,

344 F.3d at 200 ("[A] principal is entitled to recover from his unfaithful agent any commission paid by the principal"; it does not "make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent."); CBRE, 2021 WL 1198644, at *12 ("When a principal seeks to recover compensation from an unfaithful servant, the principal need not allege damage other than the compensation it paid the servant to satisfy the damage element of a claim for breach of fiduciary duty under New York law." (quoting Yukos, 977 F.3d at 241-42)).

Since PRCM was faithless in the performance of its services to Two Harbors during the entire term of the Management Agreement, PRCM must forfeit all of the compensation that it obtained over the course of the Management Agreement. See Phansalkar, 344 F.3d at 211 (the defendant must "forfeit all compensation received after his first disloyal act"); Stanley, 989 F. Supp. 2d at 363 (the defendant was required to "forfeit one hundred percent of the compensation he received during the period of disloyalty as a matter of law"). In addition, PRCM must forfeit the cash benefit that it received from the LTIP Sharing Agreements.

## II.    This Court Should Grant Two Harbors Summary Judgment On Pine River's Breach of Contract Claims.

This Court should grant Two Harbors summary judgment on Pine River's claims for breach of the Management Agreement. There is no genuine dispute that the Management Agreement contains a Termination Fee Provision and a Hedge Clause; those provisions violate the IAA and, as a result, the Management Agreement is void. Moreover, even if the Management Agreement were not void (and it is), there is no genuine dispute that Two Harbors did not breach the Management Agreement by terminating it for cause because PRCM was grossly negligent in the performance of its duties.

### A.    The Termination Fee Provision And The Hedge Clause Violate The IAA And, Therefore, The Management Agreement Is Not Enforceable.

Under New York law, a breach of contract claim requires "the existence of an agreement." (Dkt. 59 at 15); see also Zam & Zam Super Market, LLC v. Ignite Payments, LLC, 736 F. App'x 274, 276 (2d Cir. 2018) (summary order) (similar).  As Judge Kaplan held in his Order on Pine River's motion for judgment on the pleadings, Section 215 of the IAA provides:  "Every contract made in violation of any provision of [the IAA] and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of the IAA, or any rule, regulation, or order thereunder, shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract. . . ." (Dkt. 328 at 14-15.)  Section 215 of the IAA "proscribes" two types of contracts: "(1) contracts that were illegally formed, and (2) those that call for illegal performance." Id. at 17.  Both types of contracts are void.  Id.  The Management Agreement contains a Termination Fee Provision and a Hedge Clause that render the Management Agreement void.

**First**, there is no genuine dispute that the Management Agreement contains a Termination Fee Provision.  (SUF ¶ 61.)  In decades of consistent guidance, the SEC has explained that termination fees in advisory agreements may violate the IAA:

> As a fiduciary, an adviser is held to the highest standards of conduct and must act in the best interests of its clients.  We have taken the position that certain fees that may have the effect of penalizing a client for ending the advisory relationship, or that may make the client reluctant to terminate an adviser, may be inconsistent with the adviser's fiduciary duty, and may violate Section 206.

Constellation Fin. Mgmt. L.L.C., 2003 WL 76185, at *2 (S.E.C. No-Action Letter Jan. 9, 2003).[3]

---

[3] See also Bisys Fund Servs., 1999 WL 681503, at *3 (S.E.C. No-Action Letter Sept. 2, 1999); Nat'l Regulatory Servs., Inc., 1992 WL 372154, at *3 (S.E.C. No-Action Letter July 22, 1992); In the Matter of J. Baker Tuttle Corp. Tuttle & Co. Jason Baker Tuttle, Sr., 1990 WL 322592, at *8 (S.E.C. Dec. 21, 1990); Nat'l Deferred Comp., Inc., 1987 WL 108390, at *1 (S.E.C. No-Action Letter Aug. 31, 1987); Robert D. Brown Inv. Counsel, Inc., 1984 WL 48400, at *2 (S.E.C. No-

Even in matters involving sophisticated investors, the SEC has permitted termination fees only in limited circumstances. For example, in <u>Bisys</u>, banks participating in a mutual fund asset-allocation program could pay either an upfront fee or a "contingent fee" assessed if the client terminated the contract before three years. 1999 WL 681503, at *6. The SEC approved the contingent fee only because it (1) was "not a 'penalty' imposed on the client for terminating the program," declined over time, and served as a "beneficial economic alternative" to the upfront fee; (2) did not represent "'compensation' for services that will not be performed"; and (3) would be fully disclosed. <u>Id.</u> at *8; <u>see also</u> <u>Constellation</u>, 2003 WL 76185, at *3 (approving program "substantially similar in all aspects to the program described in the Bisys Letter"). In contrast, the SEC has declined to permit fees that do not meet those conditions. (<u>See</u> <u>supra</u> at 25 n.3.)

The Termination Fee Provision is contrary to this SEC guidance. Unlike the fees in <u>Constellation</u> and <u>Bisys</u>, the Termination Fee Provision is neither a "beneficial economic alternative" to an upfront fee nor compensation for services rendered. There is no genuine dispute that:

- The Termination Fee Provision was enacted to recognize the up-front effort required by PRCM to structure and acquire the assets of Two Harbors. (SUF ¶ 62.)

- Regardless of how much PRCM profited from the Management Agreement or how long the Management Agreement was in effect, the Termination Fee Provision required Two Harbors to pay the equivalent of three years of management fees to PRCM – <u>i.e.</u>, three times the "Base Management Fee" as calculated over the previous 24 months. (SUF ¶ 63.)

- The termination fee did not decline over time but rather increased over the years as

Action Letter July 19, 1984); <u>Churchill Mgmt. Corp.</u>, 1974 WL 10972, at *2 (S.E.C. No-Action Letter May 30, 1974).

Two Harbors' stockholder equity increased because the termination fee is a multiple of the "Base Management Fee," which in turn is 1.5 percent of stockholder equity.  (SUF ¶ 64.)

- Two Harbors paid PRCM nearly $600 million over the 10+ years that the Management Agreement was in effect.  (SUF ¶ 65.)

Under these circumstances, a termination fee of three years of management fees is nothing more than an improper "penalty imposed on the client for terminating the program." Bisys, 1991 WL 681503, at *6.

**Second**, there is no genuine dispute that the Management Agreement contains a Hedge Clause.  (SUF ¶ 66.)  Again, in decades of consistent guidance, the SEC has explained that "any hedge clause which purports to relieve an adviser from liability for any conduct as to which a client has a cause of action which is non-waivable under federal or state law would violate the antifraud provisions of Section 206 of the [IAA], since the effect of such a clause would be to lead clients to refrain from exercising their rights." First Nat'l Bank of Akron, 1976 WL 12229, at *1 (S.E.C. No-Action Letter Feb. 27, 1976).[4]  The Hedge Clause is contrary to this SEC guidance.  There is no genuine dispute of material fact that the Hedge Clause purports to limit PRCM's liability to "acts constituting reckless disregard of [PRCM's] duties under [the MA] which have a material adverse effect on [Two Harbors], willful misconduct or gross negligence."  (SUF ¶ 66.)  As such, the Hedge Clause constitutes a "practice which operates as a fraud or deceit." Tagliaferri, 820 F.3d at 575.

Pine River presumably will argue – as it did in briefing its motion for judgment on the pleadings – that the Termination Fee Provision and Hedge Clause do not violate the IAA because

---

[4] See also Omni Mgmt. Corp., 1974 WL 422072, at *2 (S.E.C. No-Action Letter Dec. 13, 1974); Auchincloss & Lawrence Inc., 1974 WL 10979, at *1 (S.E.C. No-Action Letter Feb. 8, 1974).

(1) Two Harbors is a sophisticated investor with an independent board and represented by independent counsel and (2) Two Harbors gave its informed consent to the Management Agreement, including the Termination Fee Provision and the Hedge Clause. (SUF ¶ 67.) That would ignore the "surrounding facts and circumstances" in light of which such provisions must be evaluated under the SEC's longstanding guidance. See Standard of Conduct Interpretation, 84 Fed. Reg. at 33,672 n.31. There is no genuine dispute that (1) Capitol Acquisition Corp. (not Two Harbors) negotiated the Management Agreement with PRCM before Two Harbors even had an independent board or was represented by independent counsel, much less was a sophisticated investor (SUF ¶ 68); (2) a single Pine River partner executed the Management Agreement on behalf of both PRCM and Two Harbors (SUF ¶ 69); or (3) Capitol Acquisition Corp. and its stockholders (not Two Harbors or its stockholders) consented to the Management Agreement. (SUF ¶ 69.) Given those "surrounding facts and circumstances," PRCM's arguments are fatally defective.[5]

Since the Termination Fee Provision and the Hedge Clause violate the IAA, the Management Agreement is unenforceable and there can be no breach. See Gevorkyan v. Judelson, 869 F.3d 57, 58 (2d Cir. 2017) ("contractual provisions that contravene applicable laws in ways

_____

[5] Although the Court held that Two Harbors' counterclaims based on the Termination Fee Provision and the Hedge Clause are time-barred, the Court did not conclude – and Pine River did not even argue – that Two Harbors' affirmative defense based on the Termination Fee Provision and the Hedge Clause was time-barred. (Dkt. 328 at 21.) That is not surprising. Statutes of limitations and repose do not apply to affirmative defenses. See United States v. W. Pac. R.R. Co., 352 U.S. 59, 72 (1956) ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); City of Saint Paul, Alaska v. Evans, 344 F.3d 1029, 1033 (9th Cir. 2003) ("[C]ourts generally allow defendants to raise defenses that, if raised as claims, would be time-barred."); Wells v. Rockefeller, 728 F.2d 209, 215 (3d Cir. 1984) ("Although expiration of the limitations period may not be used to deny the assertion of an affirmative defense, a claim for affirmative relief that relies on the same factual basis nevertheless comes within the limitations ban.").

that harm the public policies underlying those laws are unenforceable"); see also Village Taxi Corp. v. Beltre, 91 A.D.3d 92, 101 (2nd Dep't 2011) (affirming trial court's dismissal of claim alleging breach of an illegal contract because "illegal contracts are, as a general rule, unenforceable").  Therefore, this Court should grant Two Harbors summary judgment on Pine River's breach of contract claims.

**B.    Two Harbors Did Not Breach The Management Agreement By Terminating It For Cause Because PRCM Was Grossly Negligent.**

Even if the Management Agreement were enforceable (and it is not), there is no genuine dispute that PRCM was grossly negligent in the performance of its duties in violation of Section 15(iii) of the Management Agreement, which provides: "[Two Harbors] may terminate this Agreement effective upon 30 days' prior written notice of termination from [Two Harbors] to [PRCM], without payment of any Termination Fee, if . . . (iii) there is an event of any gross negligence on the part of [PRCM] in the performance of its duties under this Agreement."  (SUF ¶ 71.)

"With regard to gross negligence, the Second Circuit has defined this as conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing. Recklessness in the context of gross negligence refers to conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  (Dkt. 59 at 19.) Courts have repeatedly held that "a failure to act in good faith requires conduct that is . . . more culpable than gross negligence."  Rahbari v. Oros, 732 F. Supp. 2d 367, 389 (S.D.N.Y. 2010); see also In re Tops Holding II Corp., 646 B.R. 617 (Bankr. S.D.N.Y. 2022) (a breach of "[t]he duty to act in good faith" – which is "a subsidiary element of the duty of loyalty" – [is] more culpable than, the conduct giving rise to . . . gross negligence"); In re Ampal-Am. Israel Corp., No. 12-13689 (SMB), 2020 WL 5075992, at *7 (Bankr. S.D.N.Y. Aug. 25, 2020) (a breach of the duty of

loyalty "is qualitatively more culpable than gross negligence").

Just as PRCM was faithless in the performance of its duties under the Management Agreement (see supra Section I), PRCM was grossly negligent in the performance of those duties. Therefore, Two Harbors did not breach the Management Agreement when it terminated the Management Agreement for cause. For the same reasons that this Court should grant Two Harbors summary judgment on its faithless servant counterclaim, a fortiori this Court should grant Two Harbors summary judgment on Pine River's claim that Two Harbors breached the Management Agreement by terminating it for cause.

### III. The Court Should Grant Two Harbors Summary Judgment On Pine River's Claims Concerning The Alleged "Intellectual Property" And Trade Secrets At Issue.

Pine River claims ownership of the alleged "intellectual property" and trade secrets at issue in this case based on the Management Agreement. (SUF ¶¶ 82-83.) There is no genuine dispute, however, that the Management Agreement does not establish that Pine River owns the alleged "intellectual property" or trade secrets at issue in this case.

#### A. Pine River Does Not Own The Alleged "Intellectual Property" Or Trade Secrets At Issue In This Case Under the Management Agreement.

Section 27 of the Management Agreement states: "All Intellectual Property created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of the Manager." (SUF ¶ 73; see also Dkt. No. 59 at 25.) The Management Agreement defines "Manager" to include PRCM and its "permitted assignees" (SUF ¶ 74.)

In his Order on Two Harbors' motion to dismiss, Judge Kaplan determined the scope of this provision. With respect to the term "permitted assignees," Judge Kaplan explained that "permitted assignees" is not a defined term. (SUF ¶ 74) Judge Kaplan "conclude[d] that 'permitted assignees' were only persons or entities to which PRCM assigned responsibilities in

accordance with section 14 of the Management Agreement." (SUF ¶ 75.) Since "PRCM [did] not allege that it assigned its responsibilities under the Management Agreement to its affiliates, only that it 'relied' on the personnel of its affiliates pursuant to the Shared Services Agreement," Judge Kaplan rejected PRCM's argument that its affiliates were "permitted assignees." (SUF ¶ 75.)

With respect to PRCM, Judge Kaplan concluded that "PRCM could delegate its responsibilities by contract, in which case the delegee's acts may be attributed to PRCM, at least in some circumstances. In fact, the Management Agreement expressly contemplated that PRCM would fulfill its responsibilities as manager through the employees, officers, partners, and personnel of its affiliates pursuant to the Shared Services Agreement." (SUF ¶ 76.) Since PRCM alleged that "it contractually retained personnel to carry out its responsibilities under the Management Agreement," the issue of "[w]hether the nature of their relationship with PRCM made their acts attributable to the 'manager' under section 27 of the Management Agreement [was] a fact specific question that the Court [could not] decide on a motion to dismiss." (SUF ¶ 77.)

Discovery has now confirmed that PRCM did not delegate its responsibilities under the Management Agreement to the personnel who provided services to Two Harbors. In short: PRCM has no employees. (SUF ¶¶ 5, 7.) Under the Shared Services Agreement, PRCM contracted with PR Capital to provide personnel to Two Harbors. (SUF ¶ 77.) But the personnel who provided services to Two Harbors were employed by a different entity, PR Domestic. (SUF ¶ 78.) As a result, PRCM did not in fact delegate its responsibilities under the Management Agreement to the personnel who carried out those responsibilities, and the acts of those personnel are not attributable to PRCM under Section 27 of the Management Agreement. Specifically:

- PRCM contracted with PR Capital to provide personnel to Two Harbors pursuant to the Shared Services Agreement. (SUF ¶ 7.) PR Capital agreed to "provide the Manager [i.e.,

PRCM] with personnel and other resources necessary or appropriate for the Manager to carry out its duties and perform its obligations under the Management Agreement." (SUF ¶ 8.) PRCM relied on the personnel and other resources of PR Capital to manage Two Harbors. (SUF ¶ 8.)

- The personnel who provided services to Two Harbors, however, were not personnel of PR Capital but rather personnel of PR Domestic, which was not a party to the Shared Services Agreement. (SUF ¶ 7.) Each received an offer of employment from PR Domestic (not PR Capital). (SUF ¶ 78.) Each entered into a Confidentiality, Nonsolicitation, and Inventions Agreement with PR Domestic (not PR Capital). (SUF ¶ 79.)



(SUF ¶ 81.)[6]

Since PRCM contracted with PR Capital to provide personnel to Two Harbors pursuant to the Shared Services Agreement but the personnel who provided services to Two Harbors were personnel of PR Domestic – not PR Capital – PRCM did not, in fact, delegate its responsibilities under the Management Agreement to the personnel who provided services to Two Harbors.

---

[6] Nor is PR Domestic a "permitted assignee" under the Management Agreement. Putting aside that Judge Kaplan previously rejected PRCM's allegations and arguments on the issue, discovery has in fact confirmed that PRCM did not assign its responsibilities to PR Domestic (or its personnel) in accordance with Section 14 of the Management Agreement, which provides that a "permitted assignment to an affiliate shall bind the assignee under this [Management] Agreement in the same manner as the Manager [i.e., PRCM] is bound." (SUF ¶¶ 5, 7-8 78-79.)

Consequently, the acts of the personnel who provided services to Two Harbors are not attributable to PRCM, and Pine River does not own the alleged "intellectual property" or trade secrets at issue in this case under the Management Agreement.

**B.     For This Reason, The Court Should Grant Two Harbors Summary Judgment On Pine River's Claims Concerning The Alleged "Intellectual Property" And <u>Trade Secrets At Issue.</u>**

Pine River's claims concerning the alleged "intellectual property" and trade secrets at issue in this case all turn on the theory that PRCM owns the alleged "intellectual property" and trade secrets under the terms of the Management Agreement.  (SUF ¶¶82-83.)  Since there is no genuine dispute that PRCM does not own the alleged "intellectual property" or trade secrets for the reasons set forth above, this Court should grant Two Harbors summary judgment on Pine River's claims concerning the alleged "intellectual property" and trade secrets.  Specifically:

•     **DTSA Claim.**  "The DTSA provides a remedy for the owner of a misappropriated trade secret."  (Dkt. No. 59 at 34.)  Pine River bases its claim of ownership of the alleged "intellectual property" and trade secrets at issue in this case on Section 27 of the Management Agreement, but there is no genuine dispute that PRCM does not own the alleged "intellectual property" or trade secrets under Section 27.  (<u>See</u> <u>supra</u> Section III.A.)  Therefore, this Court should grant Two Harbors summary judgment on Pine River's DTSA claim.  <u>See</u> <u>Zabit v. Brandometry LLC</u>, 540 F. Supp. 3d, 412, 419 (S.D.N.Y. 2021) ("The DTSA provides a private right of action for '[a]n *owner* of a trade secret that is misappropriated….'") (citing 18 U.S.C. § 1836(b)(1)) (emphasis added).)

•     **Breach of Contract – Intellectual Property Claim.**  A breach of contract claim requires (among other things) a breach by the defendant.  <u>See</u> <u>Baraliu v. Vinya Capital, L.P.</u>, 765 F. Supp. 2d 289, 297 (S.D.N.Y. 2011).  Pine River asserts that "Two Harbors breached the

Management Agreement by taking possession of all intellectual property created and/or developed by Pine River in connection with Pine River's performance of the Management Agreement." (SUF ¶ 86.)  Pine River again bases its claim of ownership of the alleged "intellectual property" and trade secrets at issue in this case on Section 27 of the Management Agreement, but any such alleged "intellectual property" and trade secrets of which Two Harbors took possession were not created and/or developed by PRCM but rather by Two Harbors.  (See supra Section III.A.)  Therefore, this Court should grant Two Harbors summary judgment on Pine River's breach of contract – intellectual property claim.  See Kinsey v. Cendant Corp., 521 F. Supp. 2d 292,  303 (S.D.N.Y. 2007) ("Where, as here, an application of the undisputed facts to the plain terms of a contract establishes that there has been no breach, summary judgment is both appropriate and warranted.").

- **Unfair Competition Claim.**  "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship."  (Dkt. No. 59 at 39-40.)  PRCM alleged that "ownership of its trade secrets provided a commercial advantage vis-a-vis the management of Two Harbors" and, therefore, that "Two Harbors was able to terminate PRCM and internalize management only by misappropriating PRCM's intellectual property, employees, and know-how." (SUF ¶ 87.)  Again, Pine River bases its claim of ownership of the alleged "intellectual property" and trade secrets at issue in this case on Section 27 of the Management Agreement, but there is no genuine dispute that PRCM does not own the alleged "intellectual property" or trade secrets under Section 27.  (See supra Section III.A.)  Therefore, this Court should grant Two Harbors summary judgment on Pine River's unfair competition claim.  See Therapy Prods. Inc. v. Bissoon, 623 F.Supp.2d 485, 495

(S.D.N.Y. 2009) (granting summary judgment for defendant on plaintiff's' claim on common law unfair competition because plaintiff failed to show "proof of ownership" of intellectual property).

• **Unjust Enrichment.** "To state a claim for unjust enrichment . . . under New York law a plaintiff must show that (1) defendant was enriched, (2) the enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution." (Dkt. No. 59 at 43.) PRCM alleged that it "developed intellectual property that Two Harbors is using without paying PRCM" – i.e., that "Two Harbors did not pay PRCM to use the intellectual property that PRCM alleges it owns under the Management Agreement." (SUF ¶ 88.) Again, there is no genuine dispute that PRCM does not own the alleged "intellectual property" or trade secrets under Section 27 of the Management Agreement (or otherwise). (See supra Section III.A.) Therefore, this Court should grant Two Harbors summary judgment on Pine River's unjust enrichment claim. See Reading Int'l, Inc. v. Oaktree Capital Mgmt LLC, 317 F.Supp.2d 301, 334 n. 24 (S.D.N.Y. 2003) (granting summary judgment to dismiss unjust enrichment claim and holding that "[p]laintiffs have . . . failed to demonstrate that defendants . . . received a benefit of money or property belonging to the plaintiff.")

• **Conversion Claim.** "To maintain a claim for conversion, Plaintiffs must demonstrate that they had legal ownership or a superior right of possession to specific identifiable property, and that [Defendant] exercised unauthorized dominion over the property to the exclusion of Plaintiffs' rights." See Devlin v. Transportation Comms. Int'l Union, 2002 WL 413919, at * 12 (S.D.N.Y. Mar. 14, 2002). "PRCM's conversion claim is based on Two Harbors' allegedly unauthorized use of its trade secrets following the termination of the Management Agreement." (Dkt. No. 59 at 43-44.) Again, there is no genuine dispute that the alleged "intellectual property" and trade secrets were not PRCM's under Section 27 of the Management Agreement (or

otherwise).  (See supra Section III.A.)  Therefore, this Court should grant Two Harbors summary judgment on Pine River's conversion claim.  See Devlin, 2002 WL 413919, at * 13 (granting summary judgment in favor of defendant on plaintiffs' "conversion claim because [plaintiffs] cannot show the necessary ownership or possessory right in the [property] at issue.")

**Tortious Interference Claim.**  Under New York law, to maintain a claim for tortious interference a Plaintiff must show:  "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of contract, and (d) that the breach resulted in the damage to the plaintiff."  Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001).  "PRCM alleges that Two Harbors interfered with the Confidentiality Agreements between PRCM and its employees."  (SUF ¶ 90.)  PRCM's allegation is based on its ownership of the alleged "intellectual property" and trade secrets.  Again, there is no genuine dispute that PRCM does not own the alleged "intellectual property" or trade secrets under Section 27 of the Management Agreement (or otherwise).  (See supra Section III.A.)  Therefore, this Court should grant Two Harbors summary judgment on Pine River's tortious interference claim.  See Katel Ltd. Liab Co. v. AT&T Corp., 607 F.3d 60, 66 (2d Cir. 2010) (granting summary judgment for defendant on tortious interference claim and holding that "[i]n order to prevail on a cause of action for tortious interference with contractual relations, a plaintiff must establish . . . the actual breach of the contract.")

For all of these reasons, this Court should grant Two Harbors summary judgment on Pine River's claims concerning the alleged "intellectual property" and trade secrets at issue.

## IV.    The Court Should Grant Two Harbors Summary Judgment On Pine River's DTSA Claim For Two Additional Reasons.

Not only should this Court grant summary judgment to Two Harbors as to Pine River's DTSA claim for the reasons set forth above (see supra Section III), this Court also should grant

summary judgment for two additional reasons.  **First**, Pine River has failed to identify trade secret material with the requisite specificity.  Pine River has identified only entire software programs – which consist of public and non-public source code and ideas – without specifying which aspects of the programs confer trade secret protection.  **Second**, Pine River has no viable theory of damages.  Pine River seeks unjust enrichment of at least $686 million or, in the alternative, a "reasonable" royalty of $283.4 million, but both numbers are based on the unsupported speculation of Pine River's experts that, without three software programs alleged to be trade secrets, Two Harbors would have wound down its operations.  Not a single Pine River (or Two Harbors) expert could identify a single instance in which a REIT wound down operations as a result of software programs.  Indeed, Two Harbors has filed a <u>Daubert</u> motion to exclude the speculation of Pine River's experts,[7] and Pine River has presented no other theory of damages.

A.    <u>**Pine River Has Failed To Identify Trade Secret Material With Specificity.**</u>

A plaintiff must identify trade secret material with particularity throughout all stages of the litigation or else its DTSA claim cannot go to the jury.  <u>See</u> <u>Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.</u>, 1 F. Supp. 3d 224, 258-59 (S.D.N.Y. 2014).  Pine River has failed to do so, and therefore this Court should grant Two Harbors summary judgment on Pine River's DTSA claim.

<u>IDX Systems Corp. v. Epic Systems Corp.</u>, 285 F.3d 581 (7th Cir. 2002), is instructive.  There, Plaintiff IDX claimed as trade secrets software used in managing the financial side of a medical practice.  <u>Id.</u> at 582.  The district court granted summary judgment to the defendants after concluding that IDX had failed to identify with sufficient specificity the trade secrets that it

---

[7] See Memorandum of Law in Support of Defendant Two Harbors Investment Corp.'s Motion to Exclude Certain of Plaintiff's Experts' Opinions and Testimony ("Memo ISO Motion to Exclude") (filed Nov. 8, 2023), at §§ II - III.

accused the defendants of misappropriating.  Id. at 583.  The Seventh Circuit affirmed.  It rejected IDX's argument that a lengthy, "43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package [was] specific enough."  Id.  The Seventh Circuit held that, although the 43 pages "describe[d] the software," "it [did] not separate the trade secrets from the other information that goes into any software package," such as:  "Which aspects are known to the trade, and which are not?"  Id. at 583-84.  The Seventh Circuit found:  "IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets."  Id. at 584.  The Seventh Circuit concluded:  "[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."  Id.

This case is very similar to IDX.  Pine River argues – through its experts – that all aspects of the software applications at issue are trade secrets, including every single line of source code.  (See SUF ¶¶ 91-92.)  That is demonstrably false.  Pine River's experts themselves have admitted that the applications at issue use open source code and other publicly available materials.  (SUF ¶¶ 94-96.)  Yet Pine River makes no attempt to separate the alleged trade secret material from the indisputably unprotected material for purposes of the trade secret analysis.  (SUF ¶¶ 97-104.)  Pine River claims that the open source code is uniquely combined and therefore a trade secret but has failed to identify what that unique combination is.  (SUF ¶ 93.)  That will not do.  "Simply to assert [that] a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status."  SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC, 491 F.3d 350, 354 (8th Cir. 2007).

Courts in this Circuit have repeatedly held that trade secret material must be identified with particularity at all stages of the litigation and granted summary judgment where the plaintiff has

failed to do so.  See, e.g., Sit-Up Ltd. v. IAC/InterActive Corp., No. 05 CIV. 9292 (DLC), 2008

WL 463884, *11 (S.D.N.Y. Feb. 20 2008) (a defendant must be able to "divine the line between

secret and non-secret information" so that the "jury can render a verdict based on a discriminating

analysis of the evidence of disclosure and misappropriation"); Big Vision Private Ltd., 1 F. Supp.

3d at 259 ("Several district courts within this Circuit have adopted this particularity requirement

[for trade secret claims], and this Court now joins them.").  That is not surprising.  Handing twelve

jurors a bucket of source code, some public and some not, and asking them to determine whether

any of it is a trade secret is a fruitless exercise.

### B.  <u>Pine River Has No Viable Theory Of Damages.</u>

The Court also should grant Two Harbors summary judgment on Pine River's DTSA claim

because Pine River has no viable theory of damages.  Pine River offers two theories of damages:

(1) unjust enrichment and (2) a reasonable royalty.  (SUF ¶ 105.)  Both are based on the speculation

of Pine River's experts that, without three software programs alleged to be trade secrets, Two

Harbors would have wound down operations.  (See SUF ¶¶ 106-111, 115-116.)   No Pine River

(or Two Harbors) expert, however, could identify a single instance in which a REIT wound down

operations as a result of software programs.  (SUF ¶¶ 107-110.)

The DTSA allows for damages for any unjust enrichment caused by trade secret

misappropriation; but those damages must be based in fact, not speculation.  Phyto Tech. Corp. v.

Givaudan SA, No. 18-CV-6172 (JGK), 2022 WL 2905515, at *10-11 (S.D.N.Y. July 22, 2022).

For the reasons set forth in Two Harbors' Daubert motion, Pine River's measure of unjust

enrichment of at least $686 million is entirely speculative.  (See Memo ISO Motion to Exclude at

§ II.A.)  Pine River's experts simply assume that, without the three software programs alleged to

be trade secrets, Two Harbors would have wound down, launched a new REIT, and independently

developed the functionality provided by the asserted trade secrets.  (See, e.g., SUF ¶ 106; Memo

ISO Motion to Exclude at 12-14.) Pine River's experts fail to ground those opinions in reliable methodologies or facts and identify literally no real-world examples on which their opinions are based. (Memo ISO Motion to Exclude at § III.) Their speculation should be excluded and, without it, Pine River has absolutely no support for its claim of unjust enrichment.

The DTSA also allows for damages for a reasonable royalty in connection with trade secret misappropriation; but that reasonable royalty also must be based in fact, not speculation. Phyto Tech, 2022 WL 2905515, at *12. Like Pine River's measure of unjust enrichment, Pine River's estimate of a reasonable royalty is entirely speculative. (Memo ISO Motion to Exclude at § II.A.) Pine River's experts again assume that, without the three software programs alleged to be trade secrets, Two Harbors would have wound down, launched a new REIT, and independently developed the functionality provided by the asserted trade secrets. (SUF ¶ 115 ███████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████ (Memo ISO Motion to Exclude at 12-14.) Pine River's experts again fail to ground their opinions in reliable methodologies or facts and identify not a single real-world example on which their opinions are based. (Memo ISO Motion to Exclude at § III.) Again, their speculation should be excluded and, without it, Pine River has absolutely no support for its claim of a reasonable royalty.

Since Pine River has no viable theory of damages for its DTSA claim, this Court should grant Two Harbors summary judgment.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Two Harbors' motion for summary judgment.

Dated: November 8, 2023

Respectfully submitted,

*/s/ Daniel Roeser*
Daniel Roeser
Christine Sama
Richard M. Strassberg
Marco Wong
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.:  (212) 813-8800
Fax:   (212) 355-3333
droeser@goodwinlaw.com
csama@goodwinlaw.com
rstrassberg@goodwinlaw.com
MarcoWong@goodwinlaw.com

Amadou Diaw
Kelly Grosshuesch
**GOODWIN PROCTER LLP**
1900 N Street, N.W.
Washington, DC 20036
Tel.:  (202) 346-4000
Fax:   (202) 346-4444
adiaw@goodwinlaw.com
kgrosshuesch@goodwinlaw.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2023, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

*/s/ Daniel Roeser*