USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/17/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRCM ADVISERS LLC, PINE RIVER
CAPITAL MANAGEMENT L.P., and PINE
RIVER DOMESTIC MANAGEMENT L.P.,

        Plaintiffs,

     -against-

TWO HARBORS INVESTMENT CORP.,

        Defendant.

20-CV-5649 (LAK) (BCM)

**REPORT AND
RECOMMENDATION TO THE
HON. LEWIS A. KAPLAN**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff PRCM Advisers LLC (PRCM) managed defendant Two Harbors Investment Corp. (Two Harbors), a publicly-traded real estate investment trust (REIT), from October 28, 2009, until August 14, 2020, when Two Harbors terminated the parties' Management Agreement (MA) and commenced managing itself. In this action, PRCM – together with its parent Pine River Capital Management L.P. (PR Capital) and its affiliate Pine River Domestic Management L.P. (PR Domestic) (collectively Pine River) – alleges principally that Two Harbors terminated the Management Agreement without "cause," as defined in § 15(a) thereof, and without paying any termination fee, after which it continued to use PRCM's valuable intellectual property (IP) in violation of MA § 27(a), which provides that "[a]ll Intellectual Property created or developed by [PRCM] in connection with [its] performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of [PRCM]." PRCM also asserts claims for misappropriation of the IP under the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and related torts under New York law.

Two Harbors, for its part, contends that it was entitled to terminate the Management Agreement on eleven separate grounds, each of which also entitles it to damages or other relief on a variety of contract and tort theories, including the faithless servant doctrine. As to the IP that it

admittedly retained and continues to use after the termination, Two Harbors contends that it was fraudulently induced to adopt § 27(a) as part of the Second Amendment to the Management Agreement in 2014; that § 27(a) is substantively unfair; and that in any event it has not violated § 27(a) because it – not PRCM – created and developed the IP at issue.

Now before me for report and recommendation (*see* Dkt. 336) are the parties' cross-motions for summary judgment as to most of their claims and counterclaims. (Dkts. 338, 347.) For the reasons that follow, I conclude that none of the Pine River conduct alleged by Two Harbors gave it cause to terminate the Management Agreement or constituted an independent breach or tort, and therefore that PRCM is entitled to summary judgment on its claim for breach of § 15(a) of the Management Agreement (as to liability), and on defendant's termination-related counterclaims. However, disputed issues of fact preclude a finding that PRCM created and developed the IP at issue, such that neither side is entitled to summary judgment on their IP-related claims and counterclaims. Consequently, Pine River's motion for summary judgment should be granted in part and denied in part, and Two Harbors' motion should be denied.

## I.    BACKGROUND

### A.    Procedural History

PRCM filed its initial Complaint in this action on July 21, 2020, followed by an Amended Complaint on September 4, 2020, portions of which were dismissed by the district judge pursuant to Fed. R. Civ. P. 12(b)(6).[1] After obtaining leave to amend,[2] PRCM, together with PR Capital and PR Domestic, filed the Second Amended Complaint (SAC) (Dkt. 86) on October 26, 2021.

---

[1] *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2021 WL 2582132 (S.D.N.Y. June 23, 2021) (*PRCM I*).

[2] *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2021 WL 4847224 (S.D.N.Y. Oct. 18, 2021) (*PRCM II*).

Invoking this Court's federal question jurisdiction, *see* SAC ¶ 25, Pine River asserts ten claims, eight of which survived defendant's motion to dismiss (in whole or in part):

| | | |
|---|---|---|
| First Claim | Misappropriation of Trade Secrets (in violation of the DTSA) |
| Third Claim | Breach of Contract (improper termination in violation of MA §15(a)) |
| Fourth Claim | Breach of Contract (retention of IP in violation of MA § 27(a)) |
| Sixth Claim | Declaratory Judgment (that there was no basis to terminate the Management Agreement for cause, that the Second Amendment was "valid and binding," and that Two Harbors was not entitled to use Pine River's intellectual property after terminating the Management Agreement) |
| Seventh Claim | Unfair Competition & Business Practices |
| Eighth Claim | Unjust Enrichment (pled in the alternative to the Fourth Claim, for breach of MA § 27(a)) |
| Ninth Claim | Conversion (of Pine River's IP) |
| Tenth Claim | Tortious Interference with Contract (arising out of Two Harbors' post-termination employment of Pine River personnel, allegedly in violation of their confidentiality agreements) |

SAC ¶¶ 115-217.[3]

On November 18, 2021, Two Harbors filed its Answer, Affirmative Defenses, and Counterclaims (Dkts. 89, 93),[4] in which it asserted 42 affirmative defenses and pled twelve

---

[3] PRCM repleaded its Second and Fifth Claims (for misappropriation of trade secrets under New York law and for breach of the implied covenant of good faith and fair dealing), which were dismissed in *PRCM I*, as well as portions of its Third and Sixth Claims, which were similarly dismissed, but "[s]olely for the purpose of preserving its right to appeal." SAC at 77 n.5.

[4] In this Report and Recommendation, double docket citations are used where, as here, a redacted version of the document is filed in public view and the unredacted version is filed under seal. Additionally, since the paragraph numbering in defendant's pleading is not consecutive throughout the document, references to the answer will appear as "Ans. ¶ __," while references to the counterclaims, beginning on page 70 of the pleading, will appear as "Countercl. ¶ __.")

counterclaims, three of which were dismissed by the district judge pursuant to Fed. R. Civ. P. 12(c), along with one of defendant's affirmative defenses.[5] The surviving counterclaims are:

| | |
|---|---|
| Counterclaim I | Breach of Fiduciary Duty (against PRCM) |
| Counterclaim II | Faithless Servant (against PRCM) |
| Counterclaim III | Gross Negligence (against PRCM and PR Capital) |
| Counterclaim IV | Fraud (against PRCM and PR Capital) |
| Counterclaim V | Negligent Misrepresentation (against PRCM and PR Capital) |
| Counterclaim IX | Unjust Enrichment (against PRCM and PR Capital) |
| Counterclaim X | Aiding and Abetting Breach of Fiduciary Duty (against PR Capital) |
| Counterclaim XI | Breach of Contract (against PRCM) |
| Counterclaim XII | Breach of the Implied Covenant of Good Faith and Fair Dealing (against PRCM) |

Countercl. ¶¶ 156-244.

On November 8, 2023, after discovery, the parties filed competing motions for summary judgment. Pine River's motion (Dkt. 347) is supported by a memorandum of law (Pl. Moving Mem.) (Dkts 348, 364); a 443-paragraph Local Civil Rule 56.1 Statement (Pl. 56.1 St.) (Dkts. 349, 365); and the declaration of Jan M. Conlin (Conlin Decl.) (Dkts. 359, 366), attaching the 127 exhibits referenced in Pine River's Local Civil Rule 56.1 Statement.[6]

---

[5] *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2023 WL 5152288 (S.D.N.Y. Aug. 10, 2023) (*PRCM III*). The district judge dismissed Counterclaims VI, VII, and VIII, which sought rescission, setoff, and a declaratory judgment, respectively, on the ground that the Management Agreement violated the Investment Advisers Act of 1940 (IAA), as well as portions of Counterclaim IX, to the extent it "relies on Two Harbors' argument that the management agreement is invalid" under the IAA. *PRCM III*, 2023 WL 5152288, at *12. Additionally, the district judge dismissed defendant's second affirmative defense, which asserted that because the Management Agreement violated the IAA it was invalid, unenforceable, and void or voidable. *Id.*

[6] *See also* Dkt. 369 (corrected copy of Conlin Decl. Ex. 68); Dkts. 371, 372 (redacted and sealed copies of Conlin Decl. Ex. 114).

Two Harbors' motion (Dkt. 338) is supported by a memorandum of law (Def. Moving Mem.) (Dkts. 367, 368); a 116-paragraph Local Civil Rule 56.1 Statement (Def. 56.1 St.) (Dkts. 351, 352); and the declaration of Christine V. Sama (Sama Decl.) (Dkts. 345, 350), attaching the 63 exhibits referenced in its Local Civil Rule 56.1 Statement.

On December 20, 2023, Two Harbors submitted an opposition memorandum (Def. Opp.) (Dkts. 401, 402); another declaration signed by Christine V. Sama (Sama Opp. Decl.) (Dkts. 392, 394), attaching 62 additional exhibits[7]; the declaration of Alecia Hanson (Hanson Decl.) (Dkt. 396); and a 706-page Local Civil Rule 56.1 Counter-Statement (Def. 56.1 Counter-St.) (Dkts. 398, 400), in which it complains about the length of Pine River's 89-page statement and disputes all but 19 of the 443 paragraphs therein.[8]

Pine River's opposition papers, filed on the same date, include a memorandum of law (Pl. Opp.) (Dkts. 379, 383); the declaration of Kyle W. Wislocky (Wislocky Decl.) (Dkts. 380, 384), attaching 57 additional exhibits; and a 60-page Local Civil Rule 56.1 Counter-Statement (Pl. 56.1

---

[7] *See also* Dkt. 404 (redacted copy of Sama Opp. Decl. Ex. 97).

[8] Many of defendant's quibbles with plaintiffs' Rule 56.1 statement are just that – quibbles – interposed for hyper-technical reasons having nothing to do with whether the facts proffered by plaintiffs are genuinely disputed. For example, defendant disputes 71 of plaintiffs' first 100 statements as "immaterial" – because Pine River did not cite those specific paragraphs, by number, in its opening brief. *See* Def. 56.1 Counter-St. ¶¶ 2-15, 17-20, 22-32, 34-35, 37, 42-46, 48-52, 56-57, 61, 66-71, 73-77, 81, 83-85, 87, 89, 92-100. Additionally, defendant repeatedly disputes statements consisting primarily of direct quotations from the parties' contracts and defendant's own SEC filings, *see, e.g.*, Def. 56.1 Counter-St. ¶¶ 19, 22, 23, 25, 27-29, 31, 33-34, 44-46, 68, 70-71, 78, 88, 91; statements concerning the dates on which various events unquestionably occurred, *see, e.g.*, Def. 56.1 Counter-St. ¶¶ 17, 32, 78; and statements based on admissions in Two Harbors' pleadings rather than "admissible evidence." *See, e.g.*, Def. 56.1 Counter-St. ¶¶ 15, 20-21, 35, 83-85, 88. Two Harbors also disputes statements quoted directly from previous decisions of this Court as to matters that are fundamentally uncontroversial – such as, for example, the fact that a majority of the Two Harbors directors were independent of Pine River and had substantial backgrounds in business, finance, and/or law. *See, e.g.*, Def. 56.1 Resp. ¶¶ 35, 58, 73. The purpose of Rule 56.1 is to identify the facts as to which "there is no genuine issue to be tried." Local Civ. R. 56.1(a). Objections of this nature, which obfuscate rather than illuminate, serve only to increase the workload of opposing counsel and this Court, and are therefore improper.

Counter-St.) (Dkts. 378, 382), in which Pine River concedes (using the phrase "Pine River does not dispute") 72 of defendant's 116 proffered statements, either in whole or in part.

On January 25, 2024, Pine River filed its reply memorandum (Pl. Reply) (Dkts. 414, 417), supported by another declaration of Jan M. Conlin (Conlin Reply Decl.) (Dkt. 415), attaching four exhibits, and defendant filed its own reply memorandum (Def. Reply) (Dkts. 427, 428).

### B.      Facts

The following facts, which are undisputed unless otherwise noted, are taken from (i) the admissions made in the parties' pleadings[9]; (ii) their Rule 56.1 statements, to the extent the facts stated therein are either admitted or not genuinely controverted; (iii) the underlying evidentiary materials referenced in the parties' Rule 56.1 statements; and (iv) other materials in the record or subject to judicial notice, as permitted by Rule 56(c)(1)(A).

### 1.      The Management Agreement

Two Harbors is a publicly-traded REIT (NYSE: TWO). Pl. 56.1 St. ¶¶ 1, 13; Def. 56.1 St. ¶ 1. From October 28, 2009 through August 14, 2020, it was externally managed by PRCM, which was formed for that purpose by its parent PR Capital. Pl. 56.1 St. ¶¶ 1, 13, 15; Def. 56.1 St. ¶ 6.[10] On October 28, 2009, Two Harbors, its affiliate Two Harbors Operating Company LLC,

---

[9] It is entirely appropriate for a party to rely on factual admissions made by the opposing party in its pleading when seeking or resisting summary judgment. Fed. R. Civ. P. 56(c)(1)(A); *see also Gibbs ex rel. Est. of Gibbs v. CIGNA Corp*., 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation."); *Sec. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016) (granting summary judgment to SEC based on, *inter alia*, facts "admitted by Penn in his amended answer").

[10] These basic facts are not subject to any genuine dispute. Indeed, they appear repeatedly in Two Harbors' regulatory filings. *See*, *e.g*., TWO Form 10-K for FY 2010 (Conlin Decl. Ex. 23) at 1. Yet, in its summary judgment papers, Two Harbors "disputes" them – and many similar factual statements – on entirely specious grounds. For example:

- Pine River asserts that "Pine River Capital Management, L.P. ('Pine River Capital') is a global asset manager. Pine River Capital's wholly owned subsidiary, PRCM Advisers LLC ('PRCM') previously served as the external manager of Defendant Two Harbors Investment

and PRCM entered into the Management Agreement (Conlin Decl. Ex 1), under which PRCM (the Manager) managed the assets of Two Harbors (the Company) and conducted its "day-to-day operations," under the supervision of the Two Harbors Board of Directors. MA §§ 2(a)-(b).[11] Certain decisions, as discussed below, were reserved for the Independent Directors of Two Harbors, that is, directors who were "not officers or employees of the Manager or any Person directly or indirectly controlling or controlled by the Manager." MA § 1(s).

Section 2(b) of the Management Agreement spelled out thirty "services and activities" of Two Harbors for which PRCM was responsible, including (as relevant here):

---

Corp.'s ('Two Harbors') operations as a mortgage real estate investment trust ('REIT')." Pl. 56.1 St. ¶ 1. Defendant "disputes" ¶ 1 on the ground that the first sentence "does not cite to specific evidentiary material" and that there is "conflicting evidence" showing that Pine River is a "global *multi-strategy* asset manager"). Def. 56.1 Counter-St. ¶ 1 (emphasis added).

- Pine River asserts that "[s]ince 2009, Two Harbors has been a publicly traded REIT, investing its capital in residential mortgage-backed securities and other mortgage-related financial assets." Pl. 56.1 St. ¶ 13. Defendant "disputes" ¶ 13 solely on the ground that it is "immaterial," Def. 56.1 Counter-St. ¶ 13, notwithstanding that defendant itself asserts, as a material undisputed fact, that Two Harbors "is a real estate investment trust ('REIT') 'focused on investing in, financing and managing Agency residential mortgage-backed securities, or Agency RMBS, mortgage servicing rights, or MSR, and other financial assets.'" Def. 56.1 St. ¶ 1.

- Pine River asserts that "[f]rom Two Harbors' inception in 2009 until August 14, 2020, Pine River provided investment advisory and other management services to Two Harbors pursuant to the MA, which the parties entered into on October 28, 2009." Pl. 56.1 St. ¶ 15. Defendant "disputes" ¶ 15 on six different grounds, including that these facts are "immaterial," that ¶ 15 cites ¶ 26 of Two Harbors' Counterclaim instead of "admissible evidence," and that ¶ 15 is "incomplete" because it fails to state that "Pine River failed to fulfill its obligations under the MA"). Def. 56.1 Counter-St. ¶ 15.

[11] In the Management Agreement, "the Manager" means PRCM, "together with its permitted assignees," and "Pine River" means PR Capital. *See* MA §§ 1(w), 1(ee). The contract permits PRCM to assign the Management Agreement to PR Capital "or any of its affiliates," in which case the assignee "shall execute and deliver to [Two Harbors] a counterpart of this Agreement naming such assignee as Manager." MA § 14(a). However, there is no evidence suggesting that PRCM ever assigned the Management Agreement. Consequently, "the Manager" means PRCM.

(vii)    providing executive and administrative personnel, office space and office services required in rendering services to the Company . . . ;

(x)    counseling the Company in connection with policy decisions to be made by the Board of Directors;

(xv)    furnishing reports and statistical and economic research to the Company . . . regarding their activities and services performed for the Company . . . by the Manager;

(xx)    assisting the Company . . . in complying with all regulatory requirements applicable to them in respect of their business activities . . . ; and

(xxix)    performing such other services as may be required from time to time for management and other activities relating to the assets and business of the Company . . . as the Board of Directors shall reasonably request or the Manager shall deem appropriate under the particular circumstances.

MA § 2(b).

Under § 11 of the Management Agreement (which PRCM refers to as a "hedge clause," *see* Pl. Opp. at 30 n.13), "[t]he Manager assumes no responsibility under this Agreement other than to render the services called for under this Agreement," and "will not be liable to the Company" for any acts or omissions "except by reason of acts constituting reckless disregard of the Manager's duties under this Agreement which has a material adverse effect on the Company," "willful misconduct," or "gross negligence, as determined by a final non-appealable order of a court of competent jurisdiction." MA § 11(a).

The Management Agreement automatically renewed each year unless terminated. MA § 13(a). As relevant here, Two Harbors could terminate its relationship with PRCM in two ways. Under § 13(a), it could terminate the contract without cause if two-thirds of the Independent Directors "agree[d] that (i) there has been unsatisfactory performance by the Manager that is materially detrimental to the Company . . . or (ii) the compensation payable to the Manager hereunder is unfair[.]" *Id.* In order to terminate under § 13(a), however, Two Harbors was required to provide notice at least 180 days prior to the termination date, and pay a termination fee equal to

8

"three times the sum of the average annual Base Management Fee earned by the Manager during the 24-month period immediately preceding the date of such termination." MA §§ 13(b)-(c).

Alternatively, under § 15(a), Two Harbors could terminate the Management Agreement "effective upon 30 days' prior written notice of termination from the Company to the Manager, without payment of any Termination Fee," but only if:

(i)     the Manager, its agents or its assignees materially breaches any provision of this Agreement and such breach shall continue for a period of 30 days after written notice thereof specifying such breach and requesting that the same be remedied in such 30-day period (or 90 days after written notice of such breach if the Manager takes steps to cure such breach within 30 days of the written notice),

(ii)    the Manager engages in any act of fraud, misappropriation of funds, or embezzlement against the Company or any Subsidiary, [or]

(iii)   there is an event of any gross negligence on the part of the Manager in the performance of its duties under this Agreement[.]

MA § 15(a).

The Management Agreement is governed by New York law. MA § 21.

## 2.     The Shared Services Agreement

Two Harbors had no employees. Pl. 56.1 St. ¶ 36. It repeatedly disclosed that fact in its SEC filings. *See* Wislocky Decl. Ex. 1 (compilation of relevant pages from TWO Annual Reports on Form 10-K for FYs 2010-2019). Instead, as Two Harbors explained to its shareholders, PRCM was responsible for providing "our management team, including our officers, along with appropriate support personnel," and each Two Harbors officer was also an "employee or partner of Pine River." Wislocky Decl. Ex. 1. These arrangements were set forth in more detail in the Management Agreement, which required PRCM "and its affiliates" to provide Two Harbors with a Chief Executive Officer (CEO), President, Chief Financial Officer (CFO), Chief Investment Officer (CIO), and "other support personnel." MA § 3(a).

9

PRCM also had no employees. Pl. 56.1 St. ¶ 20. However, the Management Agreement permitted it to "subcontract or assign" its responsibilities under certain sections of the agreement, including § 2(b), to "any of its affiliates." MA § 14(b). On October 28, 2009 (the same day it entered into the Management Agreement), PRCM entered into a Shared Facilities and Services Agreement (SSA) (Sama Decl. Ex. 5) with PR Capital, under which PR Capital agreed to make its "personnel and other resources" available to PRCM so that PRCM could "carry out its duties and perform its obligations under the Management Agreement." SSA at 1. Specifically, PR Capital agreed to "provide [PRCM] with a management team for [Two Harbors], along with any other support personnel necessary for [PRCM] to provide the services it is required to provide under the Management Agreement." *Id*. § 2. The SSA specified that the individuals so "provided" "shall be employees of [PR Capital] or its affiliates, and shall not be employees of the Manager." *Id*.

The initial Two Harbors management team consisted of:

| **Name** | **Two Harbors Title** |
|---|---|
| Brian C. Taylor | Chairman (and Director) |
| Thomas Siering | Chief Executive Officer, President (and Director) |
| Jeffrey Stolt | Chief Financial Officer and Treasurer |
| Steven Kuhn | Co-Chief Investment Officer |
| William Roth | Co-Chief Investment Officer |
| Timothy O'Brien | General Counsel and Corporate Secretary |
| Andrew Garcia | Vice President – Business Development |

SSA § 2.[12]

---

[12] Mr. Taylor served as the Chairman of Two Harbors for nine years, until December 14, 2018, when he resigned "to more fully focus on the business and operations of Pine River Capital Management L.P., for which he serves as Chief Executive Officer." 12/14/18 TWO Form 8-K (Conlin Decl. Ex. 22), Item 5.02. Mr. Taylor was replaced as Chairman of the Board by Stephen G. Kasnet, the Lead Independent Director. *Id*. Mr. Siering served as the CEO and President of Two Harbors until June 24, 2020, when the Board removed him. Pl. 56.1 St. ¶ 370; *see also* 6/24/20 TWO Form 8-K, Item 5.02. Mr. Stolt stepped down as CFO as of January 1, 2012, at which point he was replaced by Brad Farrell. *See* 1/3/12 TWO Form 8-K, Item 5.02. Mr. Roth and Mr. Kuhn served as Co-CIOs of Two Harbors until January 1, 2013, when Mr. Kuhn resigned. *See* 1/2/13

Most of these executives were limited partners of PR Capital. Def. 56.1 St. ¶ 39; *see also* 2007 PR Capital L.P. Ag. (Sama Decl. Ex. 42) at 24; 2011 PR Capital L.P. Ag. (Sama Decl. Ex. 43) at ECF pp. 33, 36. Additionally, Mr. Taylor was PR Capital's CEO and (as of 2011) the sole member of Pine River Capital Management LLC, the general partner of PR Capital. *See* 2011 PR Capital L.P. Ag. (Sama Decl. Ex. 43) at 28. Thus, Taylor had the "final say" regarding PR Capital's business, 10/14/22 Siering Dep. Tr. (Sama Decl. Ex. 6) at 19:22-24, including the compensation of the other limited partners. *Id.* at 213:9-10.[13]

Many of the personnel provided by PR Capital to PRCM – and then by PRCM to Two Harbors – were employees of yet another Pine River affiliate, PR Domestic. Two Harbors officers who were also Pine River partners were treated as employees of PR Domestic for purposes of their "monthly base draw," which was paid "in the form of salary." 2/8/19 O'Brien Memo (Sama Decl. Ex. 20 at ECF pp. 5-7) at 2.[14] Similarly, according to Two Harbors Human Resources director

---

TWO Form 8-K, Item 5.02. Thereafter, Mr. Roth continued as sole CIO of Two Harbors until his retirement in 2019. *See* 8/6/19 TWO Form 8-K, Item 5.02. Pine River then provided (and Two Harbors appointed) William Greenberg and Matthew Koeppen as co-CIOs. *Id.* Mr. O'Brien served as the General Counsel for both Two Harbors and PR Capital until March 1, 2013, when he was replaced as General Counsel of Two Harbors by Rebecca Sandberg. *See* 3/1/13 TWO Form 8-K, Item 5.02. Mr. O'Brien remained the General Counsel of PR Capital. *Id.*

[13] In 2014, the Pine River entities were reorganized, Pl. 56.1 Counter-St. ¶ 3, without impacting Mr. Taylor's ultimate control of the business. According to an organizational chart dated November 15, 2017, Pine River Capital Management LLC, which remained the general partner of PR Capital, was 98% owned by Mr. Taylor, 1% by Mr. O'Brien, and 1% by Aaron Yeary. *See* Conlin Decl. Ex. 97. According to the same chart, the limited partner of PR Capital was another limited partnership, Pine River Holdings, L.P. (PR Holdings), which in turn had various individual limited partners. *Id.* It thus appears that after the 2014 reorganization, the remaining "Pine River partners" in senior executive positions at Two Harbors (Messrs. Taylor, Siering, and Roth) had become partners of PR Holdings (one level up), rather than partners of PR Capital itself. *See* 2014 PR Holdings L.P. Ag. (Sama Decl. Ex. 44) at ECF pp. 41, 54, 55.

[14] *See also* Conlin Ex. 16 ¶ 3(d) (Two Harbors Restricted Stock Award to Mr. Siering, noting that he was employee of PR Domestic). The rest of the partners' compensation was paid in the form of allocated partnership income. *See* Part I(B)(3), *infra*.

Alecia Hanson, the offer letters sent by her department to non-officer personnel "generally listed Pine River Domestic Management L.P. as the 'Employer.'" Hanson Decl. ¶ 6; *see also*, *e.g*., Quan Offer Letter (Sama Decl. Ex. 49) (2017 letter-agreement between PR Domestic and Wei Quan, hired as "Vice President, Development Manager – Two Harbors"). However, some of the personnel who provided services to Two Harbors were treated as employees of PR Capital. *See* Pl. 56.1 Counter-St. ¶ 78; Sandberg Offer Letter (Conlin Decl. Ex. 10) (2010 letter-agreement between PR Capital and Sandberg, hired as Senior Counsel for Two Harbors, reporting to O'Brien); Riskey Offer Letter (Conlin Decl. Ex. 82 at ECF pp. 5-14) (2011 letter-agreement between PR Capital and Mary Riskey, hired as Director, Loan Accounting, reporting to Farrell); Koeppen Draft Offer Letter (Conlin Decl. Ex. 87 at ECF pp. 13-20) (2019 draft letter-agreement between PR Capital and Mr. Koeppen, promoting Koeppen to co-CIO of Two Harbors, subject to Board ratification).

It was understood from the outset that Pine River had other lines of business (principally a hedge fund business), that it could have other REIT clients, and that many of the individuals who performed services for Two Harbors would also have responsibilities for those businesses and clients. Accordingly, the Management Agreement specified that the Pine River personnel provided to Two Harbors would "devote such portion of their time to the management of [Two Harbors] as is necessary to enable [Two Harbors] to operate their business," MA § 3(a), but that "[n]othing in this Agreement shall . . . prevent the Manager, Pine River or any of their affiliates, officers, directors, employees or personnel, from engaging in other businesses or from rendering services of any kind to any other Person." *Id*. § 3(b).

### 3. Compensation of Two Harbors Management Team and Support Personnel

Two Harbors did not pay any cash compensation to its executive officers or to "any other employees of Pine River who support our business." TWO 2016 Sched. 14A (Conlin Decl. Ex. 39)

at 32. Instead, it paid an annual management fee to PRCM, equal to 1.5% of stockholders' equity. MA §§ 1(c), 8(a). PRCM, in turn, was "responsible for" the compensation of the Two Harbors CEO, CIO and other investment professionals, MA § 9, including "salaries and merit or performance-based bonuses[.]" TWO 2016 Sched. 14A at 32. The actual compensation decisions for these individuals were made by Pine River alone, "based on such factors as Pine River determines is appropriate." *Id*.[15] Two Harbors noted for its shareholders that the Management Agreement did not "require that a specified amount or percentage of the fees paid to PRCM Advisers be allocated to our named executive officers." *Id*. However, it explained, "[g]iven that the management fee is derived from our stockholders' equity," the "interests of PRCM Advisers and Pine River are aligned with the long-term interests of our company and our stockholders[.]" *Id*.

Internally, Pine River had a "three-tiered compensation waterfall for partners." 2/8/19 O'Brien Memo (Sama Decl. Ex. 20 at ECF pp. 5-7) at 1. In the first tier, each partner received a monthly base draw, characterized as salary. *Id*. at 2. In the second tier, each partner received an allocation of "the firm's income" at year end, "in the form of discretionary bonuses," determined

---

[15] Compensation for the other Pine River employees who staffed Two Harbors was handled somewhat differently. In addition to paying the annual management fee, Two Harbors was required to "reimburse the Manager" for, *inter alia*, its "allocable share" of the compensation "paid by the Manager" to Two Harbors' CFO and General Counsel, as well as "personnel employed by the Manager as in-house legal, tax, accounting, consulting, auditing, administrative, information technology, valuation, computer programming and development and back-office resources to the Company." MA § 9; *see also* Wislocky Decl. Ex. 1 (disclosing, in multiple Annual Reports on Form 10-K, that "we pay [PRCM] a base management fee equal to 1.5% of our stockholders' equity per annum [and] also reimburse [PRCM] for the allocable share of the compensation paid by Pine River to its personnel serving as our principal financial officer and general counsel and other reimbursable costs under the management agreement and shared facilities and services agreement").

by Mr. Taylor. *Id*. In the third tier, "Pine River's remaining net income [was] allocated to all partners annually pro rata, based on their partnership percentages." *Id*.

By 2013, the only Pine River partners serving as named executive officers of Two Harbors were Mr. Siering (as CEO) and Mr. Roth (as CIO). According to Mr. Taylor, they would typically be allocated 50% of the Two Harbors management fee – after the deduction of various expenses, including compensation paid to the other (non-partner) investment professionals assigned to Two Harbors – which they would split, but "not necessarily 50/50." 11/2/22 Taylor Dep. Tr. (Sama Decl. Ex. 8) at 152:14-153:17; *see also* 10/14/22 Siering Dep. Tr. (Sama Decl. Ex. 6) at 200:18-23 (50% of the management fee was "the target under the framework of the handshake agreement that we had"); 11/11/22 Roth Dep. Tr. (Sama Decl. Ex. 10) at 173:3-14 (agreeing that, "generally," he and Siering "split half of the [Two Harbors] management fee after certain deductions were taken out from that 50 percent of the management fee").[16]

Beginning in 2013, Two Harbors "add[ed] an equity incentive component to [its] compensation program in the form of grants of restricted common stock awards to [its] named executive officers[.]" TWO 2016 Sched. 14A (Conlin Decl. Ex. 39) at 32. Under this program, known as the long-term incentive program (LTIP), the restricted stock awards were approved by the Two Harbors Compensation Committee, "which consists solely of independent directors." *Id*. From 2013 forward, therefore, Two Harbors took a "hybrid approach" to the compensation of its named executive officers: Pine River was responsible for their cash compensation, which it paid

---

[16] Although the "deductions" typically included the compensation paid to the non-partner investment professionals assigned to Two Harbors, this practice was not always followed. For example, in 2014, when Pine River hired a team of experienced commercial real estate (CRE) professionals to expand Two Harbors' business, the cost of the compensation package for that team was "put on the other Pine River half," that is, it was not deducted from the 50% allocated to Siering and Roth. 11/2/22 Taylor Dep. Tr. (Sama Decl. Ex. 8) at 152:9-12.

out of the management fee, but the Two Harbors Compensation Committee was "responsible for overseeing any [] equity awards." *Id.*

From 2013 through 2019, Mr. Siering and Mr. Roth received LTIP awards with an aggregate grant date fair value of approximately $30.8 million. Def. 56.1 St. ¶ 17; *see also* Conlin Decl. Exs. 11-18 (Siering/Roth LTIP grants). Over the same time period, Pine River reduced the partnership income allocated to Siering and Roth by one-third of the value of those LTIP grants. *See* 11/2/22 Taylor Dep. Tr. (Sama Decl. Ex. 8) at 138:22-139:7 (explaining that he would "take Two Harbors' LTIP grants into consideration in determination of their partnership income allocation," by "reduc[ing] their partnership income allocation at Pine River by a third of that"). The total reduction, over the relevant period, was approximately $10.3 million. Def. 56.1 St. ¶ 22. While this arrangement "potentially altered the distribution of profits amongst individual Pine River LPs," 11/2/22 Taylor Dep. Tr. (Sama Decl. Ex. 8) at 141:20-21, it did not affect either the management fee paid by Two Harbors to PRCM, *see* Pl. 56.1 St. ¶ 228; 10/14/22 Siering Dep. Tr. (Sama Decl. Ex. 6) at 222:24-25 ("The amount that Two Harbors paid was not increased by a penny."), or the total income available for distribution to the Pine River partners, as a group, through the Pine River compensation waterfall. *See* 11/2/22 Taylor Dep. Tr. (Sama Decl. Ex. 8) at 141:13-16 (noting that any partnership income not distributed as discretionary bonuses "was also available to Tom and Bill at the bottom of the waterfall in the residual allocation").[17]

---

[17] In 2016, 2017, and 2018, Siering was paid ████████, ██████████, and ████████, respectively, in Pine River base salary, bonus, and residual pro rata allocation. During the same years, Roth was paid ████████, ██████████, and ████████, respectively. *See* Sama Decl. Ex. 20 at ECF p. 9. (These figures do *not* include the value of their Two Harbors LTIP grants.) The nine (non-partner) investment professionals providing services to Two Harbors were paid an aggregate of ████████ in base salary and bonus in 2016, ████████ in 2017, and ████████ in 2018. *Id.* at ECF p. 10. Eight of these individuals were dedicated to Two Harbors, and their compensation was paid entirely out of the Two Harbors management fee. *Id.* The ninth was paid in part out of Pine River's hedge fund business. *Id.*

### 4.    Built-In Conflicts

Two Harbors recognized, and repeatedly disclosed to its shareholders, that *"[t]here are conflicts of interest in our relationship with Pine River and its affiliates, including PRCM Advisers LLC, which could result in decisions that are not in the best interests of our stockholders*." TWO Form 10-K for FY 2018 (Conlin Decl. Ex. 38) at 28. For example, the Company explained, because the 1.5% management fee was based upon stockholders' equity rather than the REIT's financial performance, "significant management fees will be payable to PRCM Advisers LLC even if we have a net loss during a quarter." *Id.* at 29. Two Harbors also noted that if it terminated the Management Agreement without cause (which was "limited to certain specifically described circumstances"), it would be required to make a substantial termination payment, "equal to three times the sum of the average annual base management fee received by PRCM Advisers LLC during the 24-month period before such termination[.]" *Id.*

As an additional risk factor, the Company disclosed that Pine River was free to engage in "additional management or investment opportunities," and that (as of 2018) both Mr. Siering and Mr. Roth served as directors of another Pine River-managed REIT. TWO Form 10-K for FY 2018 at 28. Consequently, Pine River faced "conflicts in the allocation of resources" between Two Harbors and "any other funds they manage and for their own accounts." *Id.* Finally (as relevant here), Two Harbors repeatedly disclosed to its shareholders that it was "completely reliant on the employees provided to us by PRCM Advisers." *Id.* at 27. Consequently, it explained: "If the management agreement is terminated and no suitable replacement is found to manage Two Harbors or we are unable to hire our own qualified employees, we may not be able to continue to execute our business plan." *Id.* at 28.

### 5. The Second Amendment

The Management Agreement was amended from time to time, including on November 3, 2014, when the Two Harbors Board unanimously approved the Second Amendment, which added § 27 ("Intellectual Property") to the agreement. Pl. 56.1 St. ¶ 32; Def. 56.1 St. ¶ 72; 2d Amend. (Conlin Ex. 2) § 2. That section states that "[a]ll Intellectual Property created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of the Manager." MA § 27(a).[18] It also grants Two Harbors "a non-exclusive, worldwide, fully paid up, royalty-free, non-sub-licensable, non-transferable license and right to use the Intellectual Property created or developed by Manager in connection with the Manager's performance of this Agreement for their business purposes." *Id.*

The Second Amendment was adopted in connection with Two Harbors' expansion into commercial real estate investment. At the prior Board meeting, on October 22, 2014, management made a presentation concerning a CRE opportunity that would require, among other things, hiring a team of CRE investment professionals and building out a "CRE platform." Sama Opp. Decl. Ex. 72 at ECF p. 6-7 (PowerPoint presentation). Management advised the Board that at the next meeting, it would ask for: (i) an amendment to the Two Harbors Investment Guidelines, to permit investment in CRE, and (ii) "an amendment to the Two Harbors Management Agreement to clarify

---

[18] "Intellectual Property" is defined broadly, to include " all work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment, supplies, processes, inventions, discoveries, improvements, trade secrets, and know-how or similar rights." MA § 27(b)(i). The only exception concerns "trademarks that include the name or logo of Two Harbors Investment Corp. or that of any of its Subsidiaries," which are excluded from the definition of "Intellectual Property" owned by PRCM. *Id.*

ownership rights with respect to Intellectual Property." *Id*. at ECF p. 13. Management also sought a grant of TWO restricted stock for the incoming CRE team. *Id*.

Before any IP-related amendment was presented to the Board, the Two Harbors General Counsel, Ms. Sandberg, consulted the Company's outside counsel at Stinson Leonard Street LLP (Stinson).[19] Ms. Sandberg asked, among other things, whether it would be "problematic" to have a "joint development/joint ownership agreement." Conlin Decl. Ex. 94 (email chain between Sandberg and Stinson) at ECF p. 3. Outside counsel responded, "Certainly we can draft any arrangement you like, but joint ownership of IP is usually very problematic in the long run." *Id*. at ECF p. 2. After listing some of the thorny questions arising from joint ownership, counsel concluded, "A cleaner solution is to have one party own the IP (including the code) but provide for a very permissive license to the other party. Nearly all of the above questions are answered as the owner has all the rights and responsibilities as a default with the licensee just having whatever rights and obligations are spelled out in the agreement." *Id*. at ECF p. 3. Later that same day, after reviewing the language ultimately presented to the Board, Ms. Sandberg wrote to Mr. Siering, Mr. Roth, and others to endorse that language, explaining that it was "the simplest approach" and "largely mirrors the way it works in practice now." Conlin Decl. Ex. 80 (email chain between Sandberg and PRCM executives) at ECF p. 2.

The Two Harbors directors were given an opportunity to review the language of the proposed Second Amendment before they were asked to vote on it. 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 183:2-8. Additionally, at the November 3, 2014 meeting, Ms.

---

[19] Stinson's client was Two Harbors, not PRCM. *See* Conlin Decl. Ex. 95 (memo from Stinson to Sandberg). Likewise, Ms. Sandberg was representing Two Harbors – and only Two Harbors – in evaluating and negotiating the Second Amendment, and thus "was acting solely on behalf of Two Harbors in seeking legal advice from the Stinson law firm" regarding its wording. 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 169:14-25, 170:9-13.

Sandberg reviewed the requested actions, and the Board asked questions, "all of which were answered to their satisfaction." 11/3/14 TWO Minutes (Sama Opp. Decl. Ex. 80) at ECF p. 2. The Board then unanimously approved the Second Amendment. *Id.*

The implementing resolution states, in its introductory recitals, that "in order to induce the Manager to develop the resources necessary for the Company to pursue the Commercial Real Estate Initiative, the Board has determined that it is advisable and in the best interests of the Company to amend the Management Agreement in order to clarify certain intellectual property matters as among the Company and the Manager." 11/3/14 TWO Board Resolution (Sama Opp. Decl. Ex. 80) at ECF p. 3. However, neither the resolution nor the amendment itself suggests that MA § 27 applies *only* to IP developed for purposes of the CRE initiative. To the contrary: as this Court previously noted,[20] the contractual language adopted on November 3, 2014 is both broad and uncomplicated, applying to "[a]ll" IP "created or developed by the Manager" (except for Two Harbors trademarks and logos), and rendering all of it "the sole and exclusive property of the Manager." MA § 27(a).

### 6.    Confidentiality Agreements

Both before and after the adoption of the Second Amendment, all of the employees provided to Two Harbors by Pine River were required to sign Confidentiality, Nonsolicitation, and Inventions Agreements (CNIAs) with PR Capital or PR Domestic. Def. 56.1 St. ¶ 79; Pl. 56.1 St. ¶ 53; *see*, *e.g.*, Zoellner CNIA (Wislocky Decl. Ex. 53) (executed in 2015, with PR Capital); Quan CNIA (Sama Decl. Ex. 53) (executed in 2017, with PR Domestic). The purpose of the CNIAs was

---

[20] *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2022 WL 18027566, at *3 (S.D.N.Y. Dec. 30, 2022). In the same opinion, this Court noted that six of the eight directors present on November 3, 2014 were Independent Directors, all of whom were "seasoned and sophisticated business professionals," including two lawyers and a former United States Senator. *Id.* at *2.

to protect the "Confidential Information" of "Pine River" and ensure that the employee used that information "for Pine River's benefit only[.]" CNIA at 1.[21] In the CNIAs, "Pine River" is defined to mean the Employer (either PR Capital or PR Domestic, as the case may be) "and its affiliates, including public companies, private funds and accounts for which Employer and its affiliates provide investment management services." *Id*. "Confidential Information" is defined broadly, to mean "any trade secret or other information not generally known in Pine River's line of business or readily ascertainable by proper means by others," including computer programs and code, third-party systems and software (if received in confidence), investor, client, and vendor information, employee information, trading and marketing strategies, and financial information regarding Pine River and the entities in which it invests. *Id*. ¶ 1(a). As relevant here, the individual signatory ("Employee") agreed that:

> Employee will not, during Employee's employment with Employer or at any time thereafter, divulge, furnish or make accessible to anyone or use in any way, on behalf of himself/herself or others, any Confidential Information, other than for the benefit of Pine River in the ordinary course of the business of Pine River or as required under compulsion of law.

CNIA ¶ 1(b).

Further, the Employee assigned "to Employer all of Employee's right, title, and interest in and to all Inventions" made by the employee relating to Pine River's business, CNIA ¶ 2(b), and acknowledged that "any computer software, program, or other work of authorship that Employee prepares within the scope of Employee's employment is a 'work made for hire' under U.S. copyright laws and that, accordingly, Employer exclusively owns all copyright rights in such

---

[21] There are a few minor language variations among the CNIA examples before the Court. Neither party contends that the variations are material to the issues in this action. For clarity, all "CNIA" citations in this Report and Recommendation are to the Quan CNIA (Sama Decl. Ex. 53).

computer software, program, and other works of authorship[.]" *Id*. ¶ 3. Additionally, the Employee

"specifically acknowledge[d]" that:

> all of the records of any and all business conducted by or related to Pine River, including records and files pertaining to products, services, suppliers, investors, clients, vendors, practices, techniques, licensors, and licensees are the property of Pine River and not that of Employee. Upon the termination of Employee's employment, or upon Employer's earlier request, Employee agrees to deliver promptly to Employer all of Pine River's property, including all Work Product, Inventions, any item containing Confidential Information, and all copies of any of the foregoing, and all other materials and copies thereof relating in any way to the business of Pine River or its investors, clients or vendors.

*Id*. ¶ 6.

> The CNIAs also contained a non-solicitation provision stating, in relevant part:

> Employee agrees that during Employee's employment with Employer and for a period of twelve (12) months immediately following Employee's termination . . . Employee will not (except on Pine River's behalf during Employee's Employment with Employer) . . . [s]olicit . . . or accept business . . . from . . . any investor or client of Pine River with whom Employee (or Employee's subordinates) worked, called upon, rendered services to or otherwise developed a relationship, during Employee's employment with Employer.

CNIA ¶ 4(a)(i). Relatedly, the Employee was prohibited from inducing, persuading, or attempting

to persuade any "client of Pine River, or any other person or entity doing business with Pine River,

to alter or terminate its relationship with Pine River." *Id*. ¶ 4(A)(ii).

Two Harbors does not claim that its Independent Directors were unaware of the CNIAs,

which were signed by every member of its workforce for more than ten years.

### 7.    Mr. Taylor's ████████████████

In October 2015, while Chair of the Two Harbors Board, Mr. Taylor ██████████████████



████████████████████████████████████████ Def. 56.1 St. ¶ 49. ████████████████

████████████████████████████████████ *Id*.; *see also* 11/2/22 Taylor Dep. Tr.

(Sama Decl. Ex. 8) at 233:21-235:10 ████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████, Taylor and Siering brought them to the attention of Two Harbors' Lead Independent Director, Mr. Kasnet, who informed the remainder of the Board. *See* 11/8/22 TWO Rule 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 128:18-129:11. Two Harbors' General Counsel, Ms. Sandberg, was also consulted, *see id*. at 127:4-5, 165:8-13, and Ms. Sandberg, in turn, spoke with Two Harbors' outside counsel concerning, *inter alia*, "the risk to the company." *Id*. at 164:21-165:7. As a result of these consultations, "it was agreed that [Mr. Taylor] needed to go back and apologize to the [Two Harbors] board related to this. That was the remedial action that was agreed upon." *Id*. at 165:8-13. Mr. Kasnet was one of the decision-makers driving this resolution. *Id*. at 127:24-128:1 (the apology followed "conversations amongst Taylor, Siering and Kasnet"). It was then Kasnet who "went to the directors, explained what happened, [and] explained that Brian Taylor apologized for it." *Id*. at 130:8-10. "The directors were disappointed," but "obviously they accepted his apology," and "didn't take any follow-on action after that." *Id*. at 130:10-12. ███████████████████████████ *Id*. at 132:15-16. Insofar as the Company is aware, no analyst or investor ever asked about them, and there was no news coverage of the incident. *Id*. at 132:23-133:8.

### 8.    The Independent Directors Investigate

For the first ten years of Two Harbors' corporate life, its Compensation Committee was uninterested in the amount that Pine River paid any of the individual partners who managed the REIT, or the manner in which their compensation was determined. For example, in 2012, when the Committee undertook a formal review of "officer compensation" (assisted by an outside compensation consultant and outside counsel), it reviewed the compensation of its then-CFO (who was not a partner at Pine River), but determined that it was "not necessary or appropriate" to review

Mr. Siering's compensation, because it was "not paid directly by the Company." Conlin Decl. Ex. 72 (3/8/12 committee minutes) at ECF p. 3. The Committee also noted that because Mr. Siering was a "partner of Pine River," his compensation "reflects not only his performance as CEO of the Company but also his work on behalf of Pine River and the success of Pine River as a whole." *Id.* Likewise, in 2014, when Two Harbors first made LTIP awards to Mr. Siering and Mr. Roth, the Compensation Committee did not ask about their Pine River compensation or place any conditions on the LTIP grants. 10/26/22 Kasnet Dep. Tr. (Sama Opp. Decl. Ex. 67) at 225:7-18.

In 2019, however, the Compensation Committee, chaired by attorney (and former U.S. Senator) Spencer Abraham, requested a "summary of the economic arrangements between Pine River and each of the company's CEO and CIO" (Siering and Roth), as well as the "total compensation" paid to them by Pine River. Sama Decl. Ex. 20 (email chain) at ECF p. 3. In response, on February 19, 2019, the Two Harbors HR Director, Ms. Hanson, forwarded a package of information, including the 2/8/19 O'Brien Memo, explaining Pine River's "compensation waterfall for partners," and a spreadsheet showing the total annual compensation paid by Pine River for the past three years to the four named executive officers of Two Harbors (the CEO, CIO, CFO, and General Counsel) and the nine non-partner investment professionals who provided services to Two Harbors. *Id.* at ECF pp. 9-10. In her email, Ms. Hanson explained that while Pine River bonuses were discretionary, the Two Harbors "investment professionals," as a group, historically shared 50% of the Two Harbors management fee, and that "going forward," the percentage was expected to remain 50%. *Id.* at ECF p. 2.

Eight months later, on October 17, 2019, the Compensation Committee requested additional information, including, as to Two Harbors' CEO, CIO, and investment professionals, "whether and how the annual LTIP award granted to such individuals impacts their overall

compensation." Conlin Decl. Ex. 83 (email chain) at ECF p. 2. On November 8, 2019, Mr. Siering

responded with a PowerPoint presentation which answered that question as follows:

- With respect to the CEO and CIO, their compensation, including the annual LTIP award granted to them, has been subject to a residual sharing agreement with Pine River. Heretofore, the cash compensation paid out of the management fee to the CEO and CIO has been reduced by 1/3 of the value of the LTIP award granted to the CEO and CIO for that performance year in the spirit of the sharing agreement.

- With regard to other investment professionals, the answer is no. Their compensation is driven by market and competitive compensation package considerations, which has been comprised of a mix of base salary, cash bonus and stock award. Any historical variations in the mix have been immaterial in the context of the total compensation package.

*Id*. at ECF p. 16.

The Independent Directors were previously unaware of the details of the Pine River cash

compensation awarded to Siering and Roth, or the effect of the Two Harbors LTIP awards on that

cash compensation. Def. 56.1 St. ¶ 23.

On November 26, 2019, the Compensation Committee again requested additional

information, including "when Tom's LTIP sharing agreement was initiated" and the "language

from the partnership agreement regarding Tom's non-compete covenant." Conlin Decl. Ex. 84

(email chain) at ECF p. 5. In response, Pine River CFO Nick Nussbaum wrote that "Tom's LTIP

sharing began at the inception of the Two Harbors LTIP program." *Id*. at ECF p. 4. Nussbaum also

forwarded the non-compete language applicable to Pine River partners, which prohibited them

from competing with Pine River, directly or indirectly, until "the first anniversary of a Partner's

Disaffiliation." *Id*. at ECF pp. 4-5; *see also* Conlin Decl. Ex. 7 (December 6, 2019 email from

Nussbaum to Compensation Committee members, attaching PR Holdings L.P. Ag. ¶ 10.4).

In this action, Two Harbors contends that the Independent Directors were unaware that the

Pine River partners were subject to non-competes until November 2019. *See* Def. 56.1 St. ¶¶ 42-43.

However, in December 2018 – almost one year earlier – Pine River provided the Independent Directors with copies of a draft complaint prepared by Aaron Yeary, which discussed the Pine River non-competes. *See* Yeary Draft Compl. (Sama Decl. Ex. 17) ¶ 97; 10/26/22 Kasnet Dep. Tr. (Sama Opp. Decl. Ex. 67) at 264:6-12 (testifying that Siering brought the draft complaint to Kasnet, who "shared it with the board," in December 2018).[22] Thus, as Independent Director Karen Hammond (a member of the Compensation Committee) explained at deposition, "it does appear that we might have been able to know and we might have been able to ask whether a noncompete related to Tom" in 2018, but "we did not." 10/18/22 Hammond Dep. Tr. (Conlin Decl. Ex. 114) at 189:17-20; *see also* 10/26/22 Kasnet Dep. Tr. (Sama Opp. Decl. Ex. 67) at 264:13-25 (testifying that he did not inquire about the non-competes on receipt of the Yeary draft because he did not know "what was truth and what wasn't" in the document).

Two Harbors was also aware that non-compete provisions were "standard in the financial industry." 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 71:7-10; 10/18/22 Hammond Dep. Tr. (Conlin Decl. Ex. 114) at 185:17-21 (same).

---

[22] Yeary was a Pine River partner uninvolved in managing Two Harbors. In his draft (which did not name Two Harbors as a defendant), ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Yeary never filed his complaint. Pl. 56.1 St. ¶ 98; *see also* 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 124:23-125:8 ("Correct, it was not public."). In February 2019, Yeary and Pine River settled their dispute. Sama Decl. Ex. 18 (settlement agreement). ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

### 9.    Two Harbors Terminates the Management Agreement - Twice

On a "periodic basis," beginning at least as early as 2015, the Two Harbors Board considered the pros and cons of "internalization," that is, terminating the Management Agreement, hiring its own employees, and managing itself. 11/8/22 TWO Rule 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 246:6-7. In late 2019 these considerations ripened into action.

On December 17, 2019, the Independent Directors held a meeting. *See* Conlin Decl. Ex. 65 (agenda). Four days later, Mr. Kasnet – by then the Board Chair – told the other Independent Directors that "Management of TWO would be commencing an analysis of internalizing the management of the Company" and that "our board fully supported this effort." *See* Conlin Decl. Ex. 85 (Kasnet email) at ECF p. 4. Kasnet explained that the Board would establish a committee "to oversee the effort," and that "Tom [Siering] will recuse himself from further participation in any board consideration or actions around this matter." *Id*.

The Special Committee was formed in January 2020, Pl. 56.1 St. ¶ 125, and promptly retained external legal counsel and independent financial advisors. Pl. 56.1 St. ¶¶ 127-28. On January 29, 2020, Two Harbors' senior management team (not including Siering) made a presentation to the Special Committee, recommending that Two Harbors internalize, either through negotiation with Pine River or by formally terminating the Management Agreement. *Id*. ¶¶ 132-34. The presentation noted, however, that there would be a "cost for intellectual property," given that the "Pine River employment agreements as well as the management agreement specify that all intellectual property developed by employees during their employment belongs to Pine River." 1/29/20 PowerPoint (Conlin Decl. Ex. 98) at 14.

On March 20, 2020, in a letter signed by Mr. Kasnet, Two Harbors advised PRCM "that at least two-thirds of the Independent Directors agree that the compensation payable to the Manager under the Management Agreement is unfair and that the Company intends not to renew the

26

Management Agreement upon the completion of the current Renewal Term under Section 13(a)(ii) of the Management Agreement." 3/20/20 Non-Renewal Ltr. (Sama Decl. Ex. 23) at 1. The effective termination date was to be September 19, 2020. *Id.* On April 13, 2020, Two Harbors publicly announced that it had "elected not to renew its Management Agreement" with PRCM; that it would pay an estimated $144 million termination fee in accordance with § 13(a); that it would become "a self-managed company"; and that it intended to employ its existing "senior management team along with the other personnel currently providing services to Two Harbors." 4/13/2020 TWO Press Rel. (Conlin Decl. Ex. 102) at 1-2. The press release did not address the IP issue.

On June 17, 2020, Pine River challenged the termination in New York state court, alleging, *inter alia*, that the claim of unfair compensation was "fabricated." *See* SAC ¶ 16-17. The next day, Brian Taylor wrote a letter addressed to "Pine River Partners and Employees," stating:

> As partners or employees of Pine River, you have fiduciary and contractual duties to Pine River. Those duties include to act in Pine River's best interests and not to take any action that could harm the interests of Pine River. Of utmost importance is your obligation to protect Pine River's valuable intellectual property. This means that under no circumstances are you to provide copies of any Pine River intellectual property to Two Harbors or assist Two Harbors in any way in obtaining Pine River's intellectual property. Nor should you communicate with any attorneys for Two Harbors. If you are contacted by Two Harbors concerning this lawsuit or concerning potential employment with Two Harbors, please let me know immediately.

Taylor 6/18/20 Ltr. (Sama Decl. Ex. 47) at 1. On June 23, 2020, Kasnet pushed back, accusing Taylor of attempting to "disrupt the operations of Two Harbors" and demanding that Pine River remedy its "material breaches" of the Management Agreement by sending another letter to the same personnel, within 24 hours, that "retracts and disavows" the June 18 letter. Kasnet 6/23/20 Ltr. (Conlin Decl. Ex. 60) at ECF p. 3. Additionally, Kasnet confirmed that the Two Harbors Board had asked Siering to resign as CEO, but refused to provide Pine River with a "basis" for its decision, pointing out that under MA § 3(c), Maryland law, and the Company's bylaws, the Board

had the right to remove an officer whenever, in its judgment, "the best interests of the Corporation would be served thereby." *Id*. at ECF p. 5.

On June 24, 2020, as demanded by Two Harbors, Taylor wrote a follow-up letter to "Pine River Partners and Employees," this time stating, "Of course, it goes without saying – but I want to reemphasize – that so long as Pine River is managing Two Harbors, Pine River and its employees and partners must continue to provide Two Harbors with the same high level of service that Pine River has provided to Two Harbors for the last ten years. This of course means that you must always act in the best interests of Two Harbors and its shareholders, and not take any action to the detriment of Two Harbors." Taylor 6/24/20 Ltr. (Sama Decl. Ex. 13) at 1. Taylor continued:

> You also can and should continue to rely on all intellectual property that Pine River developed in order to continue managing the day-to-day operations of Two Harbors up until the termination of the Management Agreement on September 19, 2020. To the extent that you must communicate with lawyers for Two Harbors concerning the day-to-day management of Two Harbors, you should certainly continue to do so. Finally, if you are contacted by Two Harbors concerning potential employment with Two Harbors, you have no obligation to inform Pine River that Two Harbors has contacted you.

*Id*.

Also on June 24, 2020, the Two Harbors Board removed Siering as its CEO and appointed Mr. Greenberg (formerly the co-CIO) in his stead. 6/24/20 TWO Form 8-K, Item 5.02.

On July 15, 2020, in another letter signed by Mr. Kasnet, Two Harbors notified PRCM that it was terminating the Management Agreement pursuant to § 15(a) thereof, effective August 14, 2020. 7/15/20 Term. Ltr. (Conlin Ex. 52). In the July 15 letter, Two Harbors listed seven "incurable material breaches" and "events of gross negligence" by PRCM. *Id*. at ECF pp. 3-5. Some of the incidents described in the letter dated back to 2013, while others were very recent (including the contents of Mr. Taylor's June 18, 2020 letter). *Id*. at ECF pp. 3-4.

On July 21, 2020, PRCM dismissed its state court action and filed this one, explaining that after the state court suit was filed, Two Harbors "made clear" that it "intended to misappropriate Pine River's intellectual property in violation of federal law." SAC at 1 n.1.

On August 7, 2020, Mr. Taylor wrote again to the personnel providing services to Two Harbors, noting that as of August 15, "Two Harbors will no longer be licensed to use" Pine River's IP, and asking them to provide – prior to that date – "all necessary passwords and access . . . to networks and servers in which Pine River's intellectual property resides." Taylor 8/7/20 Ltr. (Conlin Decl. Ex. 58 at ECF pp. 6-7) at 1.

Again, Kasnet pushed back, writing on August 14, 2020, that Taylor's August 7 letter constituted yet another incurable material breach, because if Two Harbors provided the requested "'passwords and access,'" it would violate "federal and state laws concerning the security and confidentiality of non-public personally identifiable information ('PII') of consumers – in particular, the individual borrowers of the residential mortgage loans for which the Company owns mortgage servicing rights[.]" Kasnet 8/14/20 Ltr. (Conlin Decl. Ex. 53) at 1-2.

On August 17, 2020 – three days after the August 14, 2020 termination date – Two Harbors announced that it had "completed its transition to self-management," and had likewise "completed the transition of the functions necessary to continue to operate its business without interruption." 8/17/20 TWO Press Release (Conlin Decl. Ex. 101). On a November 5, 2020 earnings call, the Company's new CEO, Mr. Greenberg, stated that the transition "occurred without interruption and was virtually seamless." Pl. 56.1 St. ¶ 373. He added that Two Harbors succeeded in hiring "100% of the employees who had previously supported" it. 11/5/20 TWO Earnings Call Tr. (Conlin Decl. Ex. 40) at 2-3. Two Harbors did not return any IP to Pine River, either before or after the effective date of the termination. Pl. 56.1 St. ¶ 174.

### C.    Summary Judgment Motions

#### 1.    Termination-Related Claims

Both sides seek summary judgment on Pine River's Third Claim, for breach of contract, which alleges that Two Harbors improperly terminated the Management Agreement without the required cause. *See* Pl. Moving Mem. at 8-9; Def. Moving Mem. at 24-30. As to that claim, Pine River must show that none of the eleven grounds upon which Two Harbors now relies for the termination, *see* Countercl. ¶¶ 7-17, was (i) a material breach of the Management Agreement; (ii) fraud; or (iii) gross negligence. *See* MA § 15(a). Two Harbors, for its part, must show that it was entitled to terminate the contract (without paying a termination fee) on at least one of the enumerated grounds, or, at a minimum (to defeat Pine River's motion) that there are disputed issues of material fact entitling it to go to trial as to at least one of those grounds, which are:

(1)    **LTIP Sharing Arrangement**. Two Harbors claims that Pine River "co-opted" the LTIP awards it made to Siering and Roth by reducing their cash compensation by one-third of the value of the LTIP awards, thereby saving approximately $10.3 million over the same time period, "while concealing their improper and disloyal practice from the Independent Directors" until November 2019. Countercl. ¶¶ 7, 51-71.

(2)    **Siering/Roth Compensation Structure**. Two Harbors alleges that by paying Mr. Siering and Mr. Roth 50% of the management fee received from Two Harbors, *less* the compensation paid to the other Two Harbors investment personnel, Pine River created a conflict between the executives' personal interests and the best interests of Two Harbors. Countercl. ¶¶ 11, 101-03. Further, Two Harbor alleges, Pine River concealed this arrangement from the Two Harbors Independent Directors until 2019. *Id*. ¶¶ 104-07.

(3)    **Pine River Restrictive Covenants**. Two Harbors contends that the non-compete provisions in the Pine River partnership agreements rendered the executives "conflicted in their management of Two Harbors," and that Pine River "concealed their improper and disloyal practice from the Independent Directors" until December 2019. Countercl. ¶¶ 8, 72-84.

(4)    **Reputational Risks**. Two Harbors alleges that Mr. Taylor's conduct, ████████████████████, "created reputational issues and risks for Two Harbors," "including with respect to personnel recruitment and retention, marketplace standing, counterparty confidence, and press coverage." Countercl. ¶¶ 122, 125. There is no allegation that any of the risks posed by Mr. Taylor's personal conduct materialized.

(5)    **Business Disruptions**. Two Harbors asserts that Mr. Taylor's June 18, 2020 letter, in which he "told dedicated Two Harbors personnel that (among other things) they were obligated 'to act in Pine River's best interests' . . . and directed those personnel not to 'communicate with any attorneys for Two Harbors,'" was "bad faith conduct," Countercl. ¶ 16, that was "intended to disrupt Two Harbors' business," *id*. ¶ 140, in violation of Pine River's duty of "loyalty good faith, and care in managing Two Harbors." *Id*. ¶ 145.

(6)    **Second Amendment**. As noted above, § 27(a) of the Management Agreement, added by amendment in 2014, governs the ownership of IP "created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise." MA § 27(a). Two Harbors now claims that its Independent Directors were misled as to the reasons for the amendment, which was in reality an "underhanded attempt to co-opt ownership of certain 'intellectual property' developed and paid for by Two Harbors," and would never have voted in favor of it had they understood it. Countercl. ¶¶ 13, 115-17, 120.

(7)    **Granite Point Restrictive Covenants**. On June 22, 2017, Two Harbors contributed its commercial real estate business to Granite Point, a separate REIT that was also externally managed by Pine River, in exchange for equity in Granite Point. Countercl. ¶¶ 9, 86-87. In this action, Two Harbors alleges that the Pine River employment agreements with various Granite Point executives included non-compete clauses that "precluded the executives from continuing to provide services to Granite Point in the event that Granite Point did not renew or terminated its management agreement with Pine River," *id*. ¶ 88, and that these covenants were concealed from the Two Harbors Independent Directors, thereby misleading them as to the value of the transaction. *Id*. ¶ 89.

(8)    **Proposed Co-CIO Restrictive Covenants**. In 2019, in connection with Mr. Roth's retirement and the appointment of Mr. Greenberg and Mr. Koeppen as co-CIOs for Two Harbors, Pine River "sought to impose restrictive covenants" on them, which would "ensure that Two Harbors would lose the benefit of the Co-CIO Appointees if Two Harbors internalized." Countercl. ¶¶ 10, 93-94. (Because the incoming co-CIOs were not limited partners of PR Capital, they were not already subject to such restrictions. *Id*. ¶ 93.) However, after the Two Harbors Independent Directors objected, Pine River dropped the proposal. *Id*. ¶ 95.

(9) **Proposed Siering Retirement Agreement**. In the second half of 2019, Pine River "sought to enter into" a retirement agreement with Mr. Siering, under which he would "receive substantial payments . . . if he remained Two Harbors' Chief Executive Officer through 2021 *and* PRCM remained Two Harbors' manager until at least 2022." Countercl. ¶¶ 12, 109 (emphasis added). Two Harbors alleges that this agreement would have improperly "incentivize[d] the Former CEO to delay or prevent the nonrenewal or termination of the Management Agreement by Two Harbors," *id.* ¶ 110, and that Pine River failed to disclose these terms to the Independent Directors of Two Harbors. *Id.* ¶ 111. The proposed retirement agreement was never executed.

(10) **Internalization Interference**. Two Harbors alleges that Pine River "sought to silence efforts by dedicated Two Harbors personnel to ensure that the Independent Directors were advised of the need for, and benefits of, internalization." Countercl. ¶ 15. As an example, according to Two Harbors, when internalization was included on the agenda for a 2015 meeting of Two Harbors executives, "those executives who were Pine River partners reacted with anger and shut down any discussion of internalization." *Id.* ¶ 128. Then, in 2018, although Two Harbors' management team made a board presentation regarding internalization, it "understated the potential financial benefits to Two Harbors from internalizing," because it was in its financial interest to keep the Management Agreement in place. *Id.* ¶¶ 130-36.

(11) **PII Demand**. Lastly, Two Harbors contends that Mr. Taylor's August 7, 2020 request for "all necessary passwords and access . . . to networks and servers in which [PRCM's] intellectual property resides," Countercl. ¶ 152 (alterations in original), amounted to an unlawful demand for the PII "of borrowers of residential mortgage loans for which Two Harbors owned MSR," which "would have required Two Harbors to violate federal and state law." *Id.* ¶¶ 17, 153. There is no allegation that Pine River obtained any protected PII.

The same eleven instances of alleged misconduct by Pine River underlie Two Harbors'

counterclaims for breach of fiduciary duty (Counterclaim I); recovery of compensation and profits

pursuant to the faithless servant doctrine (Counterclaim II); gross negligence (Counterclaim III);

unjust enrichment (Counterclaim IX)[23]; breach of contract (Counterclaim XI); and breach of the

---

[23] The unjust enrichment claim was dismissed to the extent it relied on defendant's "argument that the management agreement is invalid." *PRCM III*, 2023 WL 5152288, at *12.

implied covenant of good faith and fair dealing (Counterclaim XII).[24] In its remaining counterclaims, for fraud (Counterclaim IV), negligent misrepresentation (Counterclaim V), and aiding and abetting breach of fiduciary duty (Counterclaim X), Two Harbors relies upon some – but not all – of the same factual allegations.

Pine River seeks summary judgment on all of Two Harbors' termination-related counterclaims. *See* Pl. Moving Mem. at 29-50. Two Harbors, for its part, affirmatively seeks summary judgment in its favor only on its faithless servant counterclaim (Counterclaim II). *See* Def. Moving Mem. at 8-23.

### 2. IP-Related Claims

Pine River's remaining claims arise, in whole or in part, out of Two Harbors' allegedly unlawful use of IP belonging to PRCM: misappropriation of trade secrets in violation of the DTSA (First Claim); breach of § 27(a) of the Management Agreement (Fourth Claim); declaratory judgment as to § 27(a) of the Management Agreement (Sixth Claim); unfair competition and business practices (Seventh Claim); unjust enrichment (Eighth Claim); conversion (Ninth Claim); and tortious interference with contract (Tenth Claim).

In its moving brief, Pine River argues that "resolution of the IP ownership issue" entitles it to summary judgment on its claims for breach of § 27(a) of the Management Agreement (Fourth Claim), conversion (Ninth Claim, erroneously referred to as "Count VII" in Pine River's moving brief), and tortious interference (Tenth Claim). Pl. Moving Mem. at 8. It does not appear to seek

---

[24] As discussed in Part III, *infra*, Two Harbors has narrowed its focus somewhat for summary judgment purposes, relying on only five of the eleven grounds to support its own motion: the LTIP Sharing Arrangement, the Siering/Roth Compensation Structure, the Pine River Restrictive Covenants, the Reputational Risks, and the alleged Business Disruptions. *See* Def. Moving Mem. at 8-22 (faithless servant), 24-30 (breach of contract). All eleven grounds remain in play, however, for purposes of Pine River's summary judgment motion.

summary judgment on its claims for misappropriation (First Claim), declaratory judgment as to § 27(a) of the Management Agreement (Sixth Claim), unfair competition and business practices (Seventh Claim), or unjust enrichment (Eighth Claim). Two Harbors, for its part, seeks summary judgment on all of Pine River's IP claims. *See* Def. Moving Mem. at 33-39. It does not appear to seek summary judgment on the portion of its own Counterclaim IX alleging that PRCM and PR Capital have unjustly retained the contested IP.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 128-29 (2d Cir. 1996). A fact is material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co. Inc*., 258 F.3d 62, 69 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

#### 1.    Burdens

The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 323; *Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 165 (2d Cir. 2002). If the moving party satisfies its initial burden, the burden shifts to the non-moving party to establish, through admissible evidence, a genuine dispute

of material fact sufficient to prevent the entry of judgment against it. *Celotex*, 477 U.S. at 323-24; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).

"The showing necessary to satisfy [the movant's] initial burden varies depending on whether the movant would bear the burden of proof as to the particular issue at trial." *Read Prop. Grp. LLC v. Hamilton Ins. Co.*, 2018 WL 1582291, at *5 (E.D.N.Y. Mar. 30, 2018). If the burden at trial would fall on the non-moving party (such as where a defendant seeks summary judgment on a plaintiff's claim), the moving party may satisfy its initial burden either by pointing to the absence of evidence on an essential element of the non-moving party's claim, *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322-23), or by submitting evidence that "negates an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)). To avoid summary judgment in such a case, the non-moving party must "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial" as to the challenged element(s). *Simsbury-Avon Pres. Soc'y*, 575 F.3d at 204 (citing *Celotex*, 477 U.S. at 322-23).

If, by contrast, the burden at trial would fall on the moving party (such as where a plaintiff seeks summary judgment on its own claim), its "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). In this scenario, the moving party "must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Prac. & Proc.* § 2727.1, at 492 (4th ed. 2021). If the moving party fails to make the required initial showing, "the court must deny the motion, even if the

opposing party has not introduced contradictory evidence in response." *Id.*; *see also In re Refco Inc. Secs. Litig.*, 2013 WL 12191891, at *3 ("[I]f the Plaintiffs[] have not presented a sufficient showing of entitlement to summary judgment, then the Defendant[] ha[s] no burden of going forward at all."). If, on the other hand, the moving party satisfies its initial burden, the burden shifts to the non-moving party to establish a genuine dispute of material fact sufficient to prevent the entry of judgment against it. *Celotex,* 477 U.S. at 323-24; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). At this point, the non-moving party must present specific, admissible evidence showing that the dispute is genuine. *Celotex*, 477 U.S. at 324; *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (the nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful") (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)). That evidence must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

### 2.    Inferences

In evaluating the evidence, the court must construe it in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008). However, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Thus, when a defendant moves for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*;

*see also Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) ("Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted.") (citation omitted).

### 3.    Local Civil Rule 56.1

Local Civil Rule 56.1(a) requires the moving party to submit a "short, and concise statement, in numbered paragraphs," of the material facts that the moving party contends to be undisputed, with citations to the underlying evidence. The non-moving party must then respond in kind, with numbered paragraphs that correspond "to each numbered paragraph in the statement of the moving party[.]" Local Civ. R. 56.1(b). To the extent not "specifically denied and controverted" by the non-moving party, the statement of material facts submitted by the moving party will be "deemed to be admitted for purposes of the motion." Local Civ. R. 56.1(c).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz*, 258 F.3d at 74. In this case, as noted above, Pine River strained the limits of the rule – submitting a moving statement that, at 89 pages and 443 paragraphs, was neither "short" nor "concise" – while Two Harbors ignored its purpose altogether, repeatedly disputing facts as to which there can be no "genuine" dispute, and, as a result, requiring the Court to "hunt through voluminous records" merely to pin down facts that should have been readily conceded.

### B.    New York Law

### 4.    Breach of Contract

"To state a claim for breach of contract under New York law, a plaintiff must allege '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *PRCM I*, 2021 WL 2582132, at *6 (quoting

*Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). A breach of contract is "material" if it "go[es] to the root of the agreement between the parties." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotation omitted). "Accordingly, '[t]here is no material breach if the effect of the alleged breaching action on the contract as whole is negligible." *PRCM I*, 2021 WL 2582132, at *8 (alteration in original) (quoting 28 N.Y. Prac., Contract Law § 17:11); *see also Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875, 885 (E.D.N.Y. 1994) (breach was not material where it was "insignificant in light of the nine-year duration of the franchise" and "the effect on the 'whole of the contract' was negligible"), *aff'd*, 57 F.3d 1062 (2d Cir. 1995).

### 5. Fraud

"Under New York law, the elements of a fraud claim are: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Skyline Risk Mgmt., Inc. v. Legakis*, 733 F. Supp. 3d 316, 329-30 (S.D.N.Y. 2024). If the fraud claim is based on an omission, the plaintiff must also show that the defendant had a "duty to disclose the material information." *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995). Each element of a New York fraud claim must be shown "by clear and convincing evidence." *Id.*

### 6. Gross Negligence

A claim of gross negligence under New York law requires proof of: (1) a duty; (2) a breach of that duty; (3) an injury; and (4) "conduct [that] evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *PRCM I*, 2021 WL 2582132, at *8 (alteration in original) (quoting *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012)). "Recklessness in the context of gross negligence refers to 'conduct

which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'" *PRCM I*, 2021 WL 2582132, at \*8 (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009)).

"New York law generally disallows claims in tort for the negligent performance of a duty arising under a contract." *BDG Gotham Residential, LLC v. W. Waterproofing Co., Inc.*, 2024 WL 4349163, at \*8 (S.D.N.Y. Sept. 30, 2024), *reconsideration denied,* 2024 WL 5201596 (S.D.N.Y. Dec. 23, 2024), and *motion to certify appeal denied,* 2024 WL 5245007 (S.D.N.Y. Dec. 30, 2024). Thus, the duty underlying the negligence claim must be "a legal duty independent of the contract itself." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 193 (1987) (affirming dismissal of claim for gross negligence (based on allegations that defendant failed to exercise due care in the performance of its contractual obligations); *see also Tchrs. Ins. & Annuity Ass'n of Am. v. CRIIMI Mae Servs. Ltd. P'ship*, 2007 WL 7569162, at \*1 (S.D.N.Y. Sept. 7, 2007) (Kaplan, J.) ("Tort claims that merely seek to enforce contractual obligations must be dismissed unless they are premised on a breach of a duty arising independently of the contract."), *aff'd,* 481 F. App'x 686 (2d Cir. 2012). Put simply, "New York law does not recognize a cause of action for a 'negligent' breach of contract. It follows then that no claim can be stated for a 'grossly' negligent breach of contract." *Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 365 (E.D.N.Y. 2013) (citations omitted); *see also City of New York v. 611 West 152nd Street, Inc.,* 273 A.D.2d 125, 126, 710 N.Y.S.2d 36, 38 (1st Dep't 2000) ("claims based on negligent or grossly negligent performance of a contract are not cognizable").

### 7.    Breach of Fiduciary Duty

Under § 15(a) of the Management Agreement, breach of fiduciary duty is not a basis for termination. However, Two Harbors asserts counterclaims for breach of fiduciary duty (Counterclaim I) and aiding and abetting breach of fiduciary duty (Counterclaim IX), premised on

much of the same conduct that it relies on to defend its no-fee termination of the Management Agreement. *See* Countercl. ¶¶ 159, 227. Similarly, its faithless servant counterclaim (Counterclaim II) rests on the theory that PRCM "owed fiduciary duties to Two Harbors as its external manager," which it breached "by creating conflicts of interest . . . and then failing to disclose those conflicts of interest to Two Harbors' Independent Directors." Def. Moving Mem. at 9-11.

The elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty between the parties; (2) a breach of that duty; and (3) damages proximately caused by the breach. *Metro. West Asset Mgmt. v. Magnus Funding, Ltd.,* 2004 WL 1444868, at *8 (S.D.N.Y. June 25, 2004) (applying New York law). Absent the third element – damages proximately caused by the breach – there can be no liability. *See*, *e.g.*, *BNY Cap. Markets, Inc. v. Moltech Corp.*, 2001 WL 262675, at *10 (S.D.N.Y. Mar. 14, 2001) (Lynch, J.) (no liability where the claimant "cannot possibly demonstrate that such a putative breach caused any harm"). To establish a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show (1) "a primary breach" by another, *Tchrs. Ins. & Annuity Ass'n of Am.*, 2007 WL 7569162, at *1; (2) that the defendant knowingly induced or participated in the breach; and (3) resulting damages. *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847-48 (2d Cir. 1987).

It is uncontroversial that "[i]nvestment advisors who manage funds belonging to others" are "fiduciaries who owe the highest duty of loyalty to those on whose behalf they act." *Beacon Hill CBO II, Ltd. v. Beacon Hill Asset Mgmt. LLC*, 249 F. Supp. 2d 268, 273 (S.D.N.Y. 2003) (Lynch, J.), *aff'd on other grounds,* 89 F. App'x 749 (2d Cir. 2004); *see also PRCM III*, 2023 WL 5152288, at *11 (ruling, on the pleadings, that "the alleged investment advisory relationship between plaintiffs and Two Harbors 'imposed on [plaintiffs] also a duty to act with care and loyalty independent of the terms of the contract'") (citation omitted). However, Pine River's broader

40

management responsibilities did not give rise to a similar duty. *See Seven Hanover Assocs., LLC v. Jones Lang Lasalle Americas, Inc.*, 2008 WL 464337, at \*1-4 (S.D.N.Y. Feb. 19, 2008) (property management agreements under which defendant undertook to do "all things necessary, required or desirable for the proper and efficient management, operation, and maintenance" of plaintiff's office buildings did not "create a fiduciary relationship between the parties"), *aff'd,* 363 F. App'x 49 (2d Cir. 2009). Here, none of the conduct alleged to constitute a breach of PRCM's fiduciary duties arises out of the investment advice it provided or its management of the REIT's portfolio. Rather, the alleged breaches relate to matters far removed from those fiduciary functions (for example, PRCM's failure to police the personal conduct of Mr. Taylor so as to guard against reputational risk) or – in some instances – matters expressly committed to PRCM's discretion (for example, determining what to pay the Pine River partners and employees serving as Two Harbors officers and investment professionals, *see* MA § 9).

Fiduciary duty is not an all-or-nothing proposition. New York law is clear that even where a party has stepped into a fiduciary relationship, the courts may not "automatically imply the application of every duty that has ever been attached to some other sort of fiduciary relation." *Beacon Hill*, 249 F. Supp. 2d at 276; *see also Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 300 (S.D.N.Y. 2019) (escrow agent's fiduciary obligations did not "extend past the specific transactions covered by the escrow agreement" or impose a "duty of full transparency in every unrelated future matter that might arise"); *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 21-22, 832 N.E.2d 26, 32 (2005) (underwriter's fiduciary duty to IPO issuer "is limited to the underwriter's role as advisor. We do not suggest that underwriters are fiduciaries when they are engaged in activities other than rendering expert advice.").

The courts are particularly reluctant to impose broad fiduciary obligations where – as here – "the parties to a relationship specified the precise content of their agreements" in language "drafted by sophisticated lawyers acting on behalf of sophisticated entities." 249 F. Supp. 2d at 275.[25] Thus, in *Beacon Hill*, the court held that the issuers of a collateralized bond obligation could not fire the CBO's investment adviser after losing "confidence" in it (notwithstanding "the equitable principle allowing for termination at will of a fiduciary relationship"), because "such a loss of confidence is not specified in the Agreements as a basis for removal[.]" *Id.* at 270-72, 274.

In this case, while the Management Agreement identifies PRCM as Two Harbors' "agent" in carrying out its core investment management functions,[26] it does not contain any language imposing on PRCM a broad fiduciary duty to "place Two Harbors' interests above its own" in every sphere, as defendant posits. *See* Def. Opp. at 12. To the contrary: by its terms, the contract required only that PRCM use "commercially reasonable efforts" to perform its various duties, "subject to the supervision of the Company's Board of Directors." MA §§ 2(a), 2(b). This directive is "far removed . . . from the much higher duties created by a fiduciary relationship." *Calvin Klein Trademark Tr.*, 129 F. Supp. 2d at 250 (contractual duty to "proceed in 'good faith'" did not render trust servicer a fiduciary to trust).

---

[25] *See also, e.g., Tchrs. Ins. & Annuity Ass'n of Am.*, 2007 WL 7569162, at *1 ("Where, as here, a contract 'on its face[ ] is an arm's-length contract between sophisticated parties[, it] will not be held to entail fiduciary duties absent some express agreement to that effect.'") (quoting *Calvin Klein Trademark Trust v. Wachner,* 129 F. Supp. 2d 248, 250 (S.D.N.Y. 2001)) (alterations in original).

[26] *See* MA § 2(c) (appointing the Manager as the Company's "lawful agent and attorney-in-fact . . . to negotiate, execute, deliver, and enter into" credit finance agreements, securities repurchase and reverse repurchase agreements, brokerage agreements, interest rate swaps, and the like); *id.* § 4 ("The Manager shall act as agent of the Company . . . in making, acquiring, financing and disposing of Investments, disbursing and collecting the funds of the Company . . . , paying the debts and fulfilling the obligations of the Company and the Subsidiaries, supervising the performance of professionals engaged by or on behalf of the Company . . . and handling, prosecuting and settling any claims of or against the Company . . . , the Board of Directors, holders of the Company's securities or representatives or properties of the Company[.]").

Further, the parties expressly agreed that PRCM could not be liable to Two Harbors "except by reason of acts constituting reckless disregard of the Manager's duties under this Agreement which has a material adverse effect on the Company," "willful misconduct," or "gross negligence." *Id*. § 11(a). New York courts "routinely" enforce limitation-of-liability provisions such as this "when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk[.]" *Kaplin v. Buendia*, 2021 WL 1405517, at *6 (S.D.N.Y. Apr. 14, 2021) (quoting *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016)). Consequently, unless Two Harbors' fiduciary duty claims are predicated on "willful acts, gross negligence, or reckless disregard for others' rights," they cannot survive summary judgment. *Kaplin*, 2021 WL 1405517, at *8. More generally, when evaluating Two Harbors' claim that the various grounds relied on to terminate the Management Agreement also constitute actionable breaches of fiduciary duty, the Court must apply common-law fiduciary principles "cautiously, and with particular attention to the facts of the situation presented." *Beacon Hill*, 249 F. Supp. at 273.

### 8.    Faithless Servant

"New York's faithless servant doctrine holds that one who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *PRCM III*, 2023 WL 5152288, at *10 (cleaned up). The doctrine is typically (although not exclusively) applied to employer-employee relationships. In order to "claw back" an employee's compensation under the faithless servant doctrine, the employer must show (i) that the employee acted disloyally in the performance of her duties, and (ii) that the disloyalty "permeated the employee's service in its most material and substantial part." *PRCM III*, 2023 WL 5152288, at *10 (quoting *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, at *3 (S.D.N.Y. July 2, 2007) (Lynch, J.)); *accord Ebel v. G/O Media, Inc.*, 2021 WL 2037867, at *5 (S.D.N.Y. May 21, 2021). Acts of disloyalty cannot qualify

as "substantial" if, among other things, "the employer knew of and tolerated the behavior." *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 201-02 (2d Cir. 2003).

Unlike a claim for breach of fiduciary duty, a faithless servant claim – at common law – does not require "provable damage as a result of the breach of fidelity by the agent." *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 929, 363 N.E.2d 350, 351 (1977). However, "the faithless servant doctrine, like the traditional fiduciary duty standard, is 'limited to matters relevant to affairs entrusted' to the employee." *Sanders*, 2007 WL 1933933, at *4 (quoting *Ross v. FSG PrivatAir, Inc.,* 2004 WL 1837366, at *7 (S.D.N.Y. Aug. 17, 2004)). Misconduct in areas outside the scope of the agency relationship, even if significant, does not trigger the "drastic" remedies available under the faithless servant doctrine. *Id*. at *6.[27]

Even within the agency relationship, a faithless servant claim "is available only where the employee has acted directly against the employer's interests – as in embezzlement, improperly competing with the current employer, or usurping business opportunities.'" *Ebel*, 2021 WL 2037867, at *5 (quoting *Veritas Cap. Mgmt., LLC v. Campbell*, 82 A.D.3d 529, 530, 918 N.Y.S.2d 448, 449 (1st Dep't 2011)).[28] "[M]isuse of the employer's resources to compete with the employer is generally required." *Id*. (quoting *Cerciello v. Admiral Ins. Brokerage Corp.*, 90 A.D.3d 967,

---

[27] For example, in *Sanders*, where the employer accused a former senior executive of engaging in an "unauthorized direct marketing" business, in violation of the employer's code of conduct (and/or committing tax fraud by claiming deductions for the direct marketing business), *see* 2007 WL 1933933, at *3-4, the court held that no faithless servant claim was stated, because the alleged misconduct was "so far removed from [the executive's] job responsibilities." *Id*. at *7.

[28] Merely preparing to compete does not trigger faithless servant liability. *See*, *e.g*., *Feiger*, 41 N.Y.2d at 929, 363 N.E.2d at 351 (no liability for employee who "planned and took preliminary steps to enter into a competitive business" but "never lessened his work on behalf of defendant and never misappropriated to his own use any business secrets or special knowledge"); *Parker Waichman, LLP v. Mauro*, 215 A.D.3d 869, 870, 872, 188 N.Y.S.3d 529, 532, 534 (2d Dep't 2023) (no faithless servant liability for lawyers, previously employed by PW, who set up their own firm and schemed to "steal away PW clients," where they did not "use[] PW's time or resources" to do so or "lessen[] their work on behalf of PW" prior to resigning).

968, 936 N.Y.S.2d 224, 226 (2d Dep't 2011)); *see also Farricker v. Penson Dev., Inc.*, 2010 WL 845983, at *2 (S.D.N.Y. Mar. 4, 2010) ("The duty of loyalty has been limited to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks.") (citation omitted). Although every case necessarily turns on its own facts, "the common thread running through the case law" is that the employer must show "some form of self-dealing by the employee that directly operated to the financial detriment of the employer." *Nuveen Servs., LLC v. Fuller*, 2024 WL 4264864, at *16 (S.D.N.Y. Aug. 1, 2024).

A claim under the faithless servant doctrine "is a claim in equity," *Webb v. RLR Assocs., Ltd.*, 2004 WL 555699, at *2 (S.D.N.Y. Mar. 19, 2004), and the attendant disgorgement remedy is likewise "equitable in nature." *Id.*; *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 2011 WL 13263368, at *5 (S.D.N.Y. Dec. 7, 2011) (disgorgement of defendants' salaries, "for the period of their disloyalty," was "an equitable remedy").

## III.    TERMINATION-RELATED CLAIMS

Although Two Harbors has articulated eleven separate grounds for its termination of the Management Agreement (and cites the same grounds, in various combinations, to support its counterclaims), in seeking summary judgment on its own faithless servant counterclaim, and on Pine River's claim for breach of § 15(a) of the Management Agreement, Two Harbors relies upon only five of the eleven grounds: the LTIP Sharing Arrangement, the Siering/Roth Compensation Structure, the Pine River Restrictive Covenants, the Reputational Risks, and the alleged Business Disruptions. *See* Def. Moving Mem. at 8-23 (faithless servant), 24-30 (breach of contract). Consequently, I discuss these five issues first, and then turn to the remaining instances of alleged misconduct by Pine River.

### A.    Pine River Compensation Issues (LTIP Sharing Arrangement and Siering/Roth Compensation Structure)

As noted above, the Management Agreement reserves for PRCM all decisions regarding the allocation of the management fee among the Pine River partners (including those serving as the Company's CEO and CIO) and the Pine River employees serving as Two Harbors' "investment professionals." MA § 9. Under the express language of the parties' contract, these compensation decisions are "*specifically* the responsibility of the Manager." *Id.* (emphasis added). Two Harbors reinforced this point in its communications with its shareholders, repeatedly explaining that the CEO, CIO, and investment professionals were paid out of the management fee; that Pine River was "solely responsible" for determining their cash compensation, "based on such factors as Pine River determines appropriate"; and that the Management Agreement "does not require that a specified amount or percentage of the fees paid to PRCM . . . be allocated" to them. TWO 2014 Sched. 14A (Sama Decl. Ex. 25) at 24; TWO 2016 Sched. 14A (Conlin Decl. Ex. 39) at 32; TWO 2018 Sched. 14A (Conlin Decl. Ex. 37) at 35. Two Harbors also told its shareholders that these "compensation policies and practices are aligned with the interests of our stockholders." TWO 2014 Sched. 14A at 27; TWO 2018 Sched. 14A at 39.

Yet Two Harbors now contends that it was "faithless" for PRCM to allocate 50% of the management fee collectively to Mr. Siering (the CEO), Mr. Roth (the CIO), and the investment professionals, because this structure (the "Siering/Roth Compensation Structure") "incentivized" Siering and Roth "to minimize the compensation of the rest of Two Harbors' investment team even if it was not in Two Harbors' best interests." Def. Moving Mem. at 15. Similarly, according to Two Harbors, it was "faithless" for Pine River to reduce the partnership income that it would otherwise have allocated to Siering and Roth by a portion (1/3) of the value of their Two Harbors LTIP awards, because this arrangement (the "LTIP Sharing Arrangement") resulted in a "cash benefit"

to Pine River of "at least $10,283,306" (approximately one-third of the $30,849,920 in LTIP awards that Siering and Roth received from 2013 to 2019). *Id*. at 12. Two Harbors adds that it was equally "faithless" for PRCM to fail to disclose these facts to the Independent Directors until 2019, when the Compensation Committee asked (for the first time) for the details of Pine River's internal compensation practices. *Id*. at 13, 15. On this basis (among others), Two Harbors argues that it is entitled to summary judgment on its faithless servant counterclaim (Counterclaim II). Def. Moving Mem. at 11-17. Additionally, according to Two Harbors, these two compensation arrangements warranted the for-cause termination of the Management Agreement under the "gross negligence" standard set forth in § 15(a) – thus entitling it to summary judgment on Pine River's Third Claim – because a failure to act in "good faith" is by definition "more culpable than gross negligence." *Id*. at 29-30 (*quoting Rahbari v. Oros*, 732 F. Supp. 2d 367, 389 (S.D.N.Y. 2010)).[29] In its

---

[29] As to the § 15(a) claim, this is the sum total of Two Harbors' legal analysis. It makes no effort to argue that the LTIP Sharing Agreement, the Siering/Roth Compensation Arrangement, or any of the other grounds upon which it relies materially breached the Management Agreement (as required to terminate it with cause under § 15(a)(i)), or that Pine River "engage[d] in any act of fraud, misappropriation of funds, or embezzlement" (as required to terminate it with cause under § 15(a)(ii)). Instead, it relies wholly on § 15(a)(iii) (permitting termination with cause if "there is an event of any gross negligence on the part of the Manager in the performance of its duties under this Agreement"). *See* Def. Moving Mem. at 29-30. Moreover, defendant never explains which "duties under [the] Agreement" PRCM breached or how its conduct was "an extreme departure from the standards of ordinary care." *PRCM I*, 2021 WL 2582132, at *8. Instead, Two Harbors argues that if it has established "faithless" conduct by Pine River, it has also, "*a fortiori*," established cause to terminate the Management Agreement under the "gross negligence" prong of § 15(a). Def. Moving Mem. at 30.

The syllogism is invalid. The cases that Two Harbors relies on for this point all involve the duty of an individual corporate director to act in "good faith," not the faithless servant doctrine. Notwithstanding the shared use of the word "faith," these doctrines are not interchangeable. Moreover, "bad faith" conduct by a corporate director is not simply "more culpable than . . . gross negligence," *Rahbari*, 732 F. Supp. 2d at 389 (quoting *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006)); it is "qualitatively different." *Id*. at 382 (quoting *Stone*, 911 A.2d at 369). The same is true here, in the sense that faithlessness and gross negligence are "qualitatively different," not simply two points on the same scale. The faithless servant doctrine requires Two Harbors to show (among other things) that Pine River breached its common-law duty of loyalty. *Parker Waichman*, 215 A.D.3d at 872, 188 N.Y.S.3d at 533. MA § 15(a)(iii), by contrast, requires Two Harbors to show

opposition to Pine River's motion, Two Harbors further argues that "disputed facts" concerning the LTIP Sharing Agreement and the Siering/Roth Compensation Arrangement "preclude summary judgment for Pine River" on Two Harbors' counterclaims. *See* Def. Opp. at 10-16, 30-31.

In response, Pine River argues, among other things, that both of the challenged compensation arrangements were "outside the scope of the agency relationship" and "insubstantial and immaterial as a matter of law." Pl. Opp. at 7, 15.[30] Therefore, Pine River urges, Two Harbors cannot rely on them either to furnish "cause" for its termination of the Management Agreement or as a basis for liability on the counterclaims, whether under the faithless servant doctrine or otherwise. *See id*. at 7-15; Pl. Reply at 6-10.

On the first point, Pine River is clearly correct. Just as a law firm's duty to its clients does not extend to its internal compensation decisions (that is, allocation of the fees paid by the clients), PRCM's duty to Two Harbors – whether as agent or fiduciary – did not extend to its internal decisions as to allocation of the management fee. I would reach this conclusion even if the Management Agreement were silent on the point. But is it not silent. In § 9, which was "drafted by sophisticated lawyers acting on behalf of sophisticated entities," *Beacon Hill*, 249 F. Supp. 2d at 275, Two Harbors gave Pine River the right to divide the management fee among its own

---

that PRCM was grossly negligent "in the performance of its duties *under this Agreement*." (Emphasis added.) Because Two Harbors has neither identified the duties as to which PRCM fell short nor marshaled the evidence establishing its grossly negligent performance of those duties, it has not carried its initial burden under Rule 56(c) as to Pine River's Third Claim, for breach of § 15(a) of the Management Agreement.

[30] Pine River also argues, at various points, that the LTIP Sharing Arrangement and the Siering/Roth Compensation Structure were merely informal understandings that guided rather than governed Pine River's compensation decisions. *See, e.g.*, Pl. Opp. at 7. Pine River is correct that the evidence points to a set of informal and somewhat variable practices, thus calling into question (for example) Two Harbors' calculation that the LTIP Sharing Arrangement cost Siering and Roth $10.3 million in partnership compensation from 2013 to 2019. For purposes of the instant summary judgment motions, however, I accept defendant's interpretation of the relevant evidence as to the mechanics of the challenged practices.

partners and employees as it saw fit. "Such carefully negotiated, highly specific rights should not be overridden by a court armed only with general equitable principles." *Id.* Consequently, Two Harbors cannot now be heard to complain that it did not like how the fee was divided. *See, e.g.*, *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 326 (S.D.N.Y. 2010) ("Any finding of a fiduciary duty regarding the misuse and non-return of funds must fall short if the [contract] says that RCM could use the funds for any purpose."), *adopted*, *id.* at *1; *Steinbeck v. McIntosh & Otis, Inc.*, 2009 WL 928189, at *7-8 (S.D.N.Y. Mar. 31, 2009) (where express contract between late author's widow and author's other heirs gave the widow "complete power and authority" to negotiate rights in the author's works, literary agent's fiduciary duty was "circumscribed by the terms of the agreement," such that other heirs "had no right to extract undivided loyalty" from the agent), *aff'd sub nom. Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572 (2d Cir. 2010).

Pine River is also correct that the alleged misconduct, which was many leagues removed from its investment advisory duties, did not "permeate [its] service in the most material and substantial part," *PRCM III*, 2023 WL 5152288, at *10, as required for a faithless servant claim. Pl. Opp. at 10. Even more fundamentally, the record does not show that any misconduct was committed. As to the Siering/Roth Compensation Structure, defendant's theory proves too much. If allocating 50% of the management fee to the Two Harbors investment team (Siering, Roth, and the non-partner investment professionals) improperly "incentivized Mr. Siering and Mr. Roth to pay the investment team less so that they could keep more," Def. Opp. at 15, then allocating any other percentage of the management fee to the same group (or no fixed percentage at all) would present precisely the same "conflict of interest." This is so because "the CIO, CEO, [and] investment professionals get paid out of [the] management fee," 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 210:1-4, and the management fee is a finite pool. Every dollar allocated

to Siering or Roth was a dollar that could not be allocated to the non-partners, and *vice versa*. *See id.* at 208:10-14 (agreeing that Pine River "[p]artner compensation would, by definition, be reduced by the amount of money that it spends on investment personnel").

Tellingly, Two Harbors does not explain what allocation methodology would *not* "incentivize" the partners to "increase their own compensation" by "reduc[ing] the compensation of the rest of Two Harbors' investment team." Def. Moving Mem. at 16. That is because there is none. As Pine River correctly observes, "[t]he 'incentive' for owners who share in profits to minimize expenses is inherent in any business and exists under any compensation framework." Pl. Reply at 10.[31] Moreover, Two Harbors has never claimed that the non-partner investment professionals were actually underpaid (or that there were too few of them), much less that it suffered any "loss of business" or other damage related to the Siering/Roth Compensation Structure. *See* 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 218:13-18, 219:12-16.[32]

As to the LTIP Sharing Arrangement, Two Harbors complains that "Pine River realized a substantial cash benefit from Two Harbors' equity incentive awards to Mr. Siering and Mr. Roth," Def. Moving Mem. at 11, consisting of the roughly $10.3 million in partnership income that Pine River did not allocate to Siering and Roth over the six-year period (2013-2019) during which Siering and Roth received, in the aggregate, $30.8 million worth of LTIP awards. *Id.* at 12. In its

---

[31] For example, law firm partners have an economic incentive to minimize employee compensation. But a law firm is also a fiduciary to its clients, who may be harmed if the firm does not pay enough to attract and retain competent non-partner personnel. Under Two Harbors' logic, a law firm is operating under a conflict of interest – and therefore violating its duties to its clients – every time it sets associate salaries or determines year-end bonuses.

[32] After it terminated the Management Agreement, Two Harbors *reduced* the number of investment professionals on its staff by four. 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 218:20-219:10. According to defendant's Rule 30(b)(6) witness, this was because "we no longer had our nonagency portfolio, so we no longer needed the investment professionals related to that." *Id.* at 219:1-3.

reply brief, Two Harbors goes even further, claiming that Pine River "misappropriated" more than $10 million from Two Harbors through the LTIP Sharing Arrangement, Def. Reply at 4 n.4; *see also id*. at 9 ("Pine River took $10+ million under the LTIP Sharing Arrangements"). Thus, in Two Harbors' view, Pine River "created a conflict of interest by placing the interests of Pine River above the fiduciary duties owed to Two Harbors." Def. Moving Mem. at 14-15 (citing *GPIF-I Equity Co. v. HDG Mansur Inv. Servs., Inc.*, 2014 WL 1612004, at *6 (S.D.N.Y. Apr. 21, 2014)).

The primary flaw in Two Harbors' reasoning – as Pine River points out, *see* Pl. Opp. at 11 – is that there was no "cash benefit" to the Manager as a result of the LTIP sharing, and certainly no "misappropriation" from the Company. Notwithstanding defendant's rhetoric, the evidence on this point is entirely undisputed. By contract, PRCM earned a management fee equal to 1.5% of stockholders' equity. MA §§ 1(c), 8(a). Neither the LTIP grants (which went to Siering and Roth individually, *see* 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 43:10-21), nor the sharing arrangement increased the management fee by as much as a "a penny," 10/14/22 Siering Dep. Tr. (Sama Decl. Ex. 6) at 222:24-25. By the same token, Two Harbors would not have paid PRCM a penny less in the absence of the challenged sharing arrangement. If and to the extent there were victims of the sharing arrangement, those victims were the "faithless" executives themselves – Mr. Siering and Mr. Roth – and the "cash beneficiaries" were the individual Pine River partners who were paid more, by Pine River, at the expense of Siering and Roth.

This case is thus fundamentally unlike the "misappropriation" cases relied on by Two Harbors, in which the faithless agent either stole directly from his principal,[33] took money or other

---

[33] *See GPIF-I Equity Co*., 2014 WL 1612004, at *1 (defendant investment adviser paid itself an extra $5.8 million in financing fees by secretly withdrawing that sum from its clients' accounts).

benefits from a third party for the work he performed on behalf of his principal,[34] or diverted to himself payments to which his principal was entitled.[35] Pine River did none of these things. Moreover, Two Harbors cannot identify any business losses or other tangible harm resulting – directly or indirectly – from the LTIP Sharing Arrangement. *See* 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 58:25-59:2 (agreeing that "[w]e have not lost any business" and adding that "the issuing of equity awards really has nothing to do with the performance of the business").

Unable to explain how either the Siering/Roth Compensation Structure or the LTIP Sharing Arrangement benefited Pine River at Two Harbors' expense, defendant contends that PRCM nonetheless had a duty to disclose the precise methodology by which it made the internal compensation decisions expressly committed to its discretion by the Management Agreement. *See* Def. Moving Mem. at 14, 17 (arguing, as to both compensation issues, that Pine River "compounded its faithless performance" by "failing to disclose [its] conflict of interest"); *see also* Def. Opp. at 12, 15 (arguing, as to both, that Pine River was required to disclose because its "duty to disclose conflicts of interests that it created does not depend on the materiality of those conflicts"). This argument, however, assumes its own premise: that those compensation decisions created a conflict of interest that PRCM was required, as a fiduciary, to disclose. Since I have rejected the premise, I cannot accept the conclusion. *See Bd. of Trustees of Aftra Ret. Fund v.*

---

[34] *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 2001 WL 1524479, at *27 (S.D.N.Y. Nov. 29, 2001), *aff'd in part, vacated in part, rev'd in part,* 344 F.3d 184 (2d Cir. 2003) ("As part of his duty of loyalty, 'an employee must not seek to acquire indirect advantages from third persons for performing duties and obligations owed to his employer.'") (quoting *Rodgers v. Lenox Hill Hosp.,* 239 A.D. 2d 140, 142, 657 N.Y.S.2d 616, 617-18 (1st Dep't 1997) (Rubin, J., dissenting in part)), *aff'd in part, vacated in part, rev'd in part,* 344 F.3d 184 (2d Cir. 2003).

[35] *See Kleeberg v. Eber,* 665 F. Supp. 3d 543, 580-82 (S.D.N.Y. 2023) (Kaplan, J.) (one-third owner of family business, held in trust for himself and two others, engaged in "classic self-dealing" by arranging both an asset sale and a "consulting agreement" with the purchaser, under which he alone was paid $3 million, thereby "personally taking all or the lion's share of the more than $5 million that otherwise would have been available to the [trust] for the assets").

*JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 694 (S.D.N.Y. 2011) ("JPMC had no duty to disclose its 'conflicted status' or 'conflicted position' to the Class, *because there was no conflict of interest.*").[36]

For these reasons, I conclude that Pine River did not act faithlessly, breach its fiduciary duty to Two Harbors, or commit any other breach or tort in connection with the LTIP Sharing Arrangement or the Siering/Roth Compensation Structure. Nor did plaintiffs' conduct in making challenged compensation decisions (or in failing to volunteer the details of those decisions to the Independent Directors) give Two Harbors "cause" for the termination of the Management Agreement, because nothing about the challenged compensation arrangements constituted a material breach of the Management Agreement, fraud, or gross negligence in the performance of any of the Manager's contractual duties. *See* MA § 15(a).

## B.    Pine River Restrictive Covenants

Both before and after the formation of Two Harbors, the Pine River partners (including Mr. Siering and Mr. Roth) were subject to non-compete provisions, contained in their Pine River partnership agreements, which precluded them from working for any competitive business while they remained at Pine River, or for one year after they "disaffiliated," "except in connection with

---

[36] As to the LTIP Sharing Arrangement, Two Harbors also argues that disclosure was required because the Independent Directors *might* have made different (albeit unspecified) decisions with respect to the LTIP awards had they known. Def. Opp. at 13. The testimony on this issue is both vague and speculative. *See, e.g.*, 10/18/22 Hamond Dep. Tr. (Sama Opp. Decl. Ex. 90) at 173:19-174:2 ("[T]he Compensation Committee could have made any number of different decisions in their judgment about what the right [number] of share awards would be[.]"); ███████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Even if Two Harbors had a coherent theory on this point, however, it would not suffice to impose a retroactive disclosure duty on Pine River. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (absent a duty to disclose, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact").

such Partner's duties hereunder." *See* 2007 PR Capital L.P. Ag. (Sama Decl. Ex. 42) ¶ 10.4(a); 2014 PR Holdings L.P. Ag. (Sama Decl. Ex. 44) ¶ 10.4(a). These clauses, if enforced, would have barred Mr. Siering and Mr. Roth from "continuing to provide services to Two Harbors for at least one year in the event that Two Harbors did not renew or terminated the Management Agreement." Def. Moving Mem. at 18. The Independent Directors, who were aware that non-compete provisions were "standard in the financial industry," 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 71:7-10, were alerted to the existence of such provisions in the Pine River partnership agreements in December 2018, *see* 10/26/22 Kasnet Dep. Tr. (Sama Opp. Decl. Ex. 67) at 264:6-12, but did not ask to see the "language" of Siering's non-compete provision until November 2019, *see* Conlin Decl. Ex. 84, at ECF p. 5, at which point Pine River provided the full text of ¶ 10.4. *Id.* at ECF p. 4.

Two Harbors now argues that the Pine River non-compete covenants entitle it to summary judgment on its faithless servant counterclaim because they "disincentiviz[ed] Mr. Siering and Mr. Roth . . . from considering, or advising Two Harbors and its Independent Directors on, issues related to internalization fairly and objectively," and constituted "obstacles if Two Harbors sought to change managers or internalize." Def. Moving Mem. at 19. In its opposition to Pine River's motion, Two Harbors further argues that "disputed facts" concerning the non-compete covenants "preclude summary judgment for Pine River" on any of Two Harbors' counterclaims. *See* Def. Opp. at 16-20, 31.

In response, Pine River argues that the terms of its own partnership agreements, including the non-compete provisions, were outside the scope of its agency relationship with Two Harbors, Pl. Opp. at 16, and that in any event it had "no fiduciary duty to inform Two Harbors of risks already well known" to it – including that it "may be unable to hire Pine River employees in the

event it internalized or terminated the MA," which it repeatedly disclosed to its own shareholders. *Id*. at 17. Further, In Pine River's view, the non-compete covenants did not create any conflicts (and certainly did not "permeate[] Pine River's performance under the MA in its most material and substantial part") because they *benefitted* Two Harbors during the term of the Management Agreement (by protecting its executives from "being poached by a competing REIT"), and could not have affected it adversely until and unless the Management Agreement was terminated – at which point Pine River would no longer owe Two Harbors any duties at all. *Id*. at 18-19. Pine River also points out that Two Harbors had no interest in hiring either Roth (who retired in 2019) or Siering (whom it fired in June 2020, prior to the effective date of the termination). *Id*. at 19.[37] Thus, Pine River suggests, it cannot be the case that their non-compete covenants "made it more difficult and costly for Two Harbors to internalize." Def. Opp. at 31.

Pine River is correct that it had no contractual obligation to make its partners available to Two Harbors after the termination of the Management Agreement. Under that agreement, PRCM was required to provide the Company with a management team (including a CEO and a CIO) for however long PRCM itself served as its Manager – not perpetually. *See* MA § 13(d) (termination "shall be without any further liability or obligation of either party to the other"); 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 84:6-10 (agreeing that nothing in the Management Agreement "prohibits Pine River from having its partners have noncompetes"). Nor was Pine River obligated as a fiduciary to make it easy for Two Harbors to hire away its partners for the purpose of competing with it at the conclusion of the parties' relationship. *See* Rest. (3d) of Agency § 8.01 cmt. c (fiduciary duty is "generally coterminous with the duration of the agency relationship"). Put

---

[37] This is presumably why Two Harbors never asked Pine River to release either Roth or Siering from their non-competes. *See* 10/26/22 Kasnet Dep. Tr. (Conlin Decl. Ex. 117) at 258:12-17.

another way, nothing in the Management Agreement or New York law prevented Pine River from putting in place the same "standard" non-compete provisions used throughout the financial services industry to discourage precisely such poaching.[38]

Two Harbors cites *Samba Enterprises, LLC v. iMesh, Inc.*, 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009) (Chin, J.), *aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc.*, 390 F. App'x 55 (2d Cir. 2010), for the proposition that "[a] fiduciary acts faithlessly when it enters into contractual provisions that could be detrimental to the principal to whom it owes fiduciary duties." Def. Moving Mem. at 19. Nothing in *Samba*, however, states the proposition that broadly. Samba was hired by iMesh to help iMesh find a partner with which it could enter into a software bundling agreement. *Id.* at *2. Samba succeeded in making a match between iMesh and Zango, thus entitling it to a commission from iMesh, but – unbeknownst to iMesh – also arranged to take a "referral fee" from Zango, calculated as a percentage of Zango's profits from the deal. *Id.* at *2-3. Samba thus violated the well-understood duty of a fiduciary not to secretly work both sides of the street. *Id.* at *9 (explaining that "the less money Zango had to pay iMesh, the greater Zango's profits," and hence, the greater Samba's referral fee); *see also*, *e.g.*, *Wendt v. Fischer*, 243 N.Y. 439, 443, 154 N.E. 303, 304 (1926) (Cardozo, J.) (real estate brokerage firm breached its fiduciary duty when, acting as agent for the seller, it took a commission on a sale to a dummy corporation secretly controlled by a member of the firm, who quickly flipped the property for a profit).

---

[38] Non-competes are not, of course, limited to the financial services industry. If reasonable in time and scope, they are routinely enforced by the courts, even where they prevent a principal from hiring away personnel furnished to that principal by an agent retained for that purpose. *See*, *e.g.*, *Omni Consulting Grp., Inc. v. Marina Consulting, Inc.*, 2007 WL 2693813, at *2 (W.D.N.Y. Sept. 12, 2007), *aff'd sub nom. Omni Consulting Grp., Inc. v. Pilgrim's Pride Corp.*, 488 F. App'x 478 (2d Cir. 2012).

Unable to show that the non-compete covenants in the Pine River partnership agreements gave PRCM an improper adverse interest in any transaction that it undertook on behalf of Two Harbors, defendant argues instead that the covenants disadvantaged the Company indirectly, by "disincentivizing" Messrs. Siering and Roth from counseling it to terminate the Management Agreement, even if termination was in the REIT's best interest. Def. Moving Mem. at 19; *see also* Def. Reply at 11-12 (the covenants "disincentivized the then-CEO and then-CIO from considering, or advising Two Harbors on, issues related to internalization fairly and objectively").

The unspoken premise of this argument is that PRCM's fiduciary duty to Two Harbors extended to counseling it ("fairly and objectively") as to whether, when, and under what terms to fire PRCM. I reject that premise. I also reject Two Harbors' claim (made only in its brief, unsupported by any evidence) that because the Independent Directors were not told about the non-compete covenants, they were "unaware" that the Pine River partners serving as Two Harbors executives "were subject to conflicts of interest with respect to issues related to internalization." Def. Moving Mem. at 18. In fact, there were multiple, obvious, and well-disclosed conflicts inherent in any advice given by Pine River's partners to Two Harbors about terminating the Management Agreement.[39] It is no doubt for this reason that the Management Agreement expressly

---

[39] As Two Harbors repeatedly explained to its shareholders, PRCM earned a 1.5% management fee based upon stockholders' equity, meaning that "significant management fees will be payable to PRCM Advisers even if we have a net loss during a quarter." TWO Form 10-K for FY 2018 (Conlin Decl. Ex. 38) at 29. This fact alone would put the Pine River partners in a conflicted position if asked to advise Two Harbors regarding termination. Moreover, termination under § 13(a) required a determination that "there has been unsatisfactory performance by the Manager" or, alternatively, that the Manager's compensation was "unfair." MA § 13(a). No rational Independent Director would turn to a Pine River partner for help in making that determination. Nor could those Independent Directors expect the Pine River partners to advise them regarding § 15(a) – the provision they ultimately invoked – which permits the Company to terminate the contract *and* avoid the termination fee, but only if the Manager has materially breached its contractual obligations, committed fraud, or engaged in gross negligence. MA § 15(a).

required that termination decisions under § 13(a) be made by "two thirds of all of the Independent Directors" or by a majority of outstanding shares of TWO common stock ("other than those shares held by Pine River or its affiliates"). MA § 13(a). Not surprisingly Mr. Kasnet confirmed at deposition that when he considered whether internalization was in Two Harbors' best interest, he "wasn't at all relying upon [Pine River's] analysis." 10/26/22 Kasnet Dep. Tr. (Conlin Decl. Ex. 117) at 109:8-15. Pine River's non-partner personnel were also "subject to conflicts of interest with respect to issues related to internalization." Def. Moving Mem. at 18. Under their CNIAs, they were prohibited from, *inter alia*, inducing, persuading, or attempting to persuade any "client of Pine River, or any other person or entity doing business with Pine River, to alter or terminate its relationship with Pine River." CNIA ¶ 4(A)(ii).

Pine River is also correct that Two Harbors suffered no actual harm as a result of the Pine River Restrictive Covenants. Defendant does not point to any evidence suggesting that the existence of the non-compete covenants (or their late disclosure) had the slightest effect on Two Harbors' internalization. To the contrary: according to Mr. Greenberg (who became Two Harbors' CEO when the Board removed Mr. Siering), the process "occurred without interruption and was virtually seamless." Pl. 56.1 St. ¶ 373. Greenberg specifically noted that Two Harbors succeeded in hiring "100% of the employees who had previously supported" it (including Greenberg himself). 11/5/20 TWO Earnings Call Tr. (Conlin Decl. Ex. 40) at 2-3; *see also* 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 85:3-6 (agreeing that Two Harbors "did not intend to have any Pine River partner continue working at the company" after termination of the Management Agreement). Likewise, when defendant's Rule 30(b)(6) witness was asked whether the non-compete covenants otherwise harmed Two Harbors, he testified only that the "lack of disclosure" had "an impact on the board's view of Pine River and certain of its partners." 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin

Decl. Ex. 113) at 85:14-86:21. Two Harbors does not, and could not, contend that this is an injury for which damages are available.

I therefore conclude that Pine River did not act faithlessly, breach its fiduciary duty to Two Harbors, or commit any other tort in connection with the Pine River Restrictive Covenants. Nor did those covenants violate the Management Agreement or otherwise furnish Two Harbors with "cause" to terminate it on a no-fee basis.

### C.    Reputational Risks

The facts regarding the reputational risks created by Brian Taylor's



are uncomplicated and undisputed. Mr. Taylor, who was then the Chair of the Two Harbors Board as well as a Pine River partner,

*Id*.; *see also* 11/8/22 TWO Rule 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 130:25-131:3

The incident quickly came to the attention of Two Harbors' CEO, Mr. Siering, its Lead Independent Director, Mr. Kasnet, and its dedicated General Counsel, Ms. Sandberg, who looped in the Company's outside counsel regarding "the risk to the company." 11/8/22 TWO Rule 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 127:4-5, 127:24-128:1 128:18-129:11, 164:19-165:7. These Two Harbors decision-makers "agreed that [Mr. Taylor] needed to go back and apologize to the board related to this. That was the remedial action that was agreed upon." *Id*. at 165:8-13. Taylor apologized, and Kasnet "went to the directors, explained what happened, [and] explained that Brian Taylor apologized for it." *Id*. at 130:8-10. "The directors were disappointed," but "obviously they accepted his apology," and "didn't take any follow-on action after that." *Id*. at 130:10-12. The

photos were "taken down" at the Company's request. *Id*. at 132:15-16. No analyst or investor ever asked about them, and there was no news coverage of the incident. *Id*. at 132:23-133:8. Taylor remained on the Two Harbors Board until 2018, *id*. at 130:13-16, when he stepped down "to more fully focus on the business and operations of Pine River Capital Management L.P." 12/14/18 TWO Form 8-K (Conlin Decl. Ex. 22), Item 5.02.[40]

Notwithstanding Two Harbors' determination in 2015 that Mr. Taylor's conduct warranted only a verbal apology to the Board (on which he continued to sit for three more years), the Company now asserts that it is entitled to summary judgment on its faithless servant claim (and therefore that it can claw back all of the compensation paid to the Manager at least since 2015) because it was "faithless," as a matter of law, for PRCM to fail to prevent Mr. Taylor from ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Def. Moving Mem at 20. In its opposition to Pine River's motion, Two Harbors further argues that insofar as its remaining counterclaims are premised on Mr. Taylor's conduct, "the record precludes" a grant of summary judgment to Pine River on those counterclaims. *See* Def. Opp. at 20-21, 31-32.

Pine River disagrees. In Pine River's view, the events of October 2015 cannot lead to liability – under the faithless servant doctrine or otherwise – because Mr. Taylor's personal conduct was not within the scope of PRCM's agency relationship with Two Harbors, and because no reasonable jury could conclude "that Mr. Taylor ██████████████████████████████ ██████ permeated Pine River's decade-long service to Two Harbors in its most material and substantial part." Pl. Opp. at 22. Pine River also points out that Two Harbors tolerated the allegedly

---

[40] At the December 14, 2018 meeting of the Two Harbors Board, both Mr. Siering and Mr. Kasnet (who replaced Taylor as Chair) "expressed their gratitude to Mr. Taylor for his service to the Company since its inception." Conlin Decl. Ex. 78 (12/14/18 board minutes).

faithless conduct at the time – asking only that Taylor apologize to the Board, which he did – and that no actual harm ever materialized as a result of the incident. *Id*. at 21-22. Therefore, Pine River argues, Two Harbors cannot rely on Taylor's reputationally risky behavior in 2015 either to furnish cause for its termination of the Management Agreement in 2020 or as a basis for tort liability of any description. *See* Pl. Moving Mem. at 21-24; Pl. Reply at 12-13.

Pine River is correct. I note at the outset that the question before this Court is not whether Mr. Taylor breached a legal duty that he owed to Two Harbors as a director; it is whether *Pine River* breached a legal duty that *it* owed to Two Harbors in connection with Mr. Taylor's conduct. There is no evidence in the summary judgment record that could support such a conclusion. PRCM's duties to Two Harbors, whether as agent or fiduciary, did not extend to policing Mr. Taylor's ▮▮▮▮▮ or otherwise preventing him from making poor decisions in his personal life.[41] Likewise, the conduct that created the reputational risk was "far removed" from Pine River's duties as Two Harbors' investment adviser and manager. *See Sanders*, 2007 WL 1933933, at *5-7 (unethical and potentially illegal conduct committed by senior executive in violation of employer's "broad ethical policies," but on her own time, could not be the basis of a faithless servant claim).[42]

---

[41] There is no allegation that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were work-related.

[42] Two Harbors cites two Delaware cases for the proposition that creating reputational risk can constitute faithlessness, even if the risk never materializes: *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652 (Del. Ch. 2023), and *Triple H Fam. Ltd. P'ship v. Neal*, 2018 WL 3650242 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019). Def. Moving Mem. at 21. Neither case involves a faithless servant claim. Nonetheless, they provide helpful examples of risk-generating behavior that *was* within the scope of the defendant's fiduciary duties. In *Triple H*, defendant Neal, acting on behalf of his insurance business, Omni, was supposed to renew a corporate client's insurance policies, but allowed the client's D&O policy to lapse for three days (and lied about it), thus exposing Omni to "significant risk of monetary and reputational harm." 2018 WL 3650242, at *19. In *McDonald's*, the shareholders of a public corporation brought a derivative suit alleging, among other things, that the company's Chief People Officer (that is, the officer responsible for enforcing its "zero-tolerance" sexual harassment policy) was instead largely to blame for a "corporate culture that condoned sexual harassment and misconduct." 291 A.3d 652,

As Judge Lynch explained, a faithless servant doctrine "read as broadly" as urged by the employer in *Sanders* (and by Two Harbors here) would allow a principal to seek drastic remedies whenever the agent (or, as here, an individual partner of the agent) "engaged in any conduct that fell short of the [principal's] ethical standards," no matter how disconnected to the principal's business, simply because it might "reflect poorly" on the principal. *Id.* at *6.

Even if Pine River's fiduciary duties could be deemed to include preventing its personnel from engaging in personal conduct that might "reflect poorly" on Two Harbors, no faithless servant claim could be premised on Mr. Taylor's conduct in October 2015, because such a claim requires "disloyal" activity, *PRCM III*, 2023 WL 5152288, at *10, as opposed to poor judgment. *See also Phansalkar*, 344 F.3d at 200 (a faithless servant claim requires "disloyal or faithless performance of employment duties"); *Nuveen Servs.*, 2024 WL 4264864, at *16 (there must be "self-dealing by the employee that directly operated to the financial detriment of the employer"). The claimant must also show that the misconduct was "substantial," *PRCM III*, 2023 WL 5152288, at *10, which Two Harbors cannot possibly do after determining – at the time – that Mr. Taylor's lapse of judgment required nothing more than an apology, which the Board "accepted," 11/8/22 TWO Rule 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 130:10-12, and then retained him as Chairman for the next three years. *See Phansalkar*, 344 F.3d at 202 (disloyalty will not be deemed "substantial" where it "consisted of a single act, or where the employer knew of and tolerated the behavior").

Finally, Pine River is correct that the 2015 ███████ incident did not damage Two Harbors. No scandal ensued, no business was lost, and there is no evidence that the Company's performance suffered in any way. *See* 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at

---

661 (Del. Ch. 2023). Among other things, the CPO "grabbed an employee and forced her onto his lap" while attending a company event for the human resources staff. *Id*. at 666.

144:13-145:21. While damage proximately caused by the breach need not be shown for purposes of a common-law faithless servant claim, the absence of any concrete harm is fatal to Two Harbors' remaining theories of liability. *See*, *e.g.*, *Moltech*, 2001 WL 262675, at *10 (no liability for breach of fiduciary duty absent a showing that the breach "caused any harm").

For these reasons, I conclude that the Reputational Risks created by Mr. Taylor's conduct in 2015 did not give Two Harbors cause for the termination of the Management Agreement in 2020. Nor does that conduct support any of the counterclaims that defendant filed in 2021.

### D. Business Disruptions

The fifth and final instance of allegedly faithless conduct that Two Harbors relies on in support of its own summary judgment motion is the June 18, 2020 letter from Mr. Taylor to the Pine River personnel staffing Two Harbors. Once again, the material facts are undisputed. In that letter – sent three months after Two Harbors moved to terminate the Management Agreement and one day after Pine River filed its state court lawsuit – Taylor made the following statements:

- As partners or employees of Pine River, you have fiduciary and contractual duties to Pine River. Those duties include to act in Pine River's best interests and not to take any action that could harm the interests of Pine River.

- Nor should you communicate with any attorneys for Two Harbors. If you are contacted by Two Harbors concerning this lawsuit or concerning potential employment with Two Harbors, please let me know immediately.

Taylor 6/18/20 Ltr. (Sama Decl. Ex. 47) at 1.

In Two Harbors' view, the first statement was "contrary to the fiduciary duties owed [by Pine River] to Two Harbors," Def. Moving Mem. at 22, while the second "presented a significant obstacle to Two Harbors in responding to a pending SEC investigation into both Pine River and Two Harbors." *Id*. at 23.[43] Thus, by sending the June 18 letter, "PRCM was faithless in the

---

[43] The summary judgment record does not disclose the genesis of the SEC investigation. █████████

performance of its services to Two Harbors." *Id.* In its opposition to Pine River's motion, Two Harbors further argues that insofar as its remaining counterclaims are premised on the business disruptions caused by the June 18 letter, "the record precludes" a grant of summary judgment to Pine River on those counterclaims. *See* Def. Opp. at 21-23, 32.

In response, Pine River argues that the June 18 letter was unobjectionable, because the employees providing services to Two Harbors did in fact have "fiduciary and contractual duties to their employer, Pine River." Pl. Opp. at 24; *see also id.* at 25 ("[I]t is not a breach of fiduciary duty for a fiduciary to insist that its contractual rights be respected."). In any event, Pine River points out, Mr. Taylor sent a follow-up letter on June 24, 2020 (within 24 hours of Mr. Kasnet's retraction demand), "clarifying" his message by stating, among other things:

- Of course, it goes without saying – but I want to reemphasize – that so long as Pine River is managing Two Harbors, Pine River and its employees and partners must continue to provide Two Harbors with the same high level of service that Pine River has provided to Two Harbors for the last ten years. This of course means that you must always act in the best interests of Two Harbors and its shareholders, and not take any action to the detriment of Two Harbors.

- To the extent you must communicate with lawyers for Two Harbors concerning the day-to-day management of Two Harbors, you should certainly continue to do so. Finally, if you are contacted by Two Harbors concerning potential employment with Two Harbors, you have no obligation to inform Pine River that Two Harbors has contacted you.

Taylor 6/24/20 Ltr. (Sama Decl. Ex. 13) at 1.[44]

---

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████

[44] That same day, Pine River's lawyers wrote a longer letter to Two Harbors' lawyers, stating, among other things, that Two Harbors had no objection to communications between the Company's in-house and outside counsel regarding "applicable laws and regulatory requirements." Wislocky Decl. Ex. 48 (6/24/20 letter from Sidley Austin to Goodwin Proctor) at 4-5.

Pine River also points out, correctly, that there is no evidence of any actual "disruption" to Two Harbors' business (or its SEC response) as a result of Mr. Taylor's June 18 letter. Pl. Opp. at 23-24; Pl. Reply at 13. At deposition, Two Harbors could not identify "a single employee who did not perform his or her duties," 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 161:18-23, and agreed that "[n]otwithstanding that noise, we were able to continue operations virtually seamlessly." *Id*. at 162:6-7. In its own reply brief, Two Harbors concedes the point, but argues that it is irrelevant, because the absence of harm "has no bearing on whether Pine River breached its fiduciary duties to Two Harbors." Def. Reply at 17.

 Once again, Pine River has the better end of the argument. The lack of any actual disruption to defendant's business is, in fact, dispositive of its fiduciary duty counterclaims, *see Moltech*, 2001 WL 262675, at *10; *Pacelli v. Peter L. Cedeno & Assocs., PC*, 220 A.D.3d 596, 597, 198 N.Y.S.3d 332, 333 (1st Dep't 2023) (directing the entry of summary judgment to defendants on breach of fiduciary duty claim because plaintiffs "failed to raise a triable issue of fact as to whether recoverable damages were incurred"). Similarly, the lack of any actual disruption is fatal to defendant's counterclaims for breach of contract, fraud, and negligence, all of which require proof of damages proximately caused by the breach or the tort. *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 246 (2d Cir. 2020) (under New York law, "nominal damages cannot satisfy the 'damage' element of a tort that requires actual harm").

At common law, no proof of damages is required to prevail under the faithless servant doctrine. However, the faithless conduct must have "permeated the employee's service in its most material and substantial part." *PRCM III*, 2023 WL 5152288, at *10 A "single act," even if wrongful, will not require disgorgement of compensation unless it was part of a "persistent pattern of disloyalty." *Schwartz v. Leonard*, 138 A.D.2d 692, 693, 526 N.Y.S.2d 506, 508 (2d Dep't 1988)

(reversing faithless servant judgment against a lawyer who, in a single "misguided attempt" to protect his own interests, removed client files from his employer's office while preparing to open his own practice). Here, as in *Schwartz*, the misconduct complained of was a single – albeit misguided – attempt by Pine River to protect its own contractual interests in the context of an agency relationship that was already on its last legs (at Two Harbors' insistence). Moreover, unlike in *Schwartz* (where the lawyer refused to return the files until ordered to do so by the Disciplinary Committee, *see* 138 A.D.2d at 693, 526 N.Y.S.2d at 508), Pine River withdrew the offending letter within 24 hours of Two Harbors' retraction demand, and replaced it with a letter appropriately emphasizing the employees' continuing duties to Two Harbors through the date of termination. Thereafter, Pine River's employees never "lessened their work on behalf of [Two Harbors]," *Parker Waichman*, 215 A.D.3d at 872, 188 N.Y.S.3d at 534, enabling it to internalize "virtually seamlessly." 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 162:6-7.

Under the circumstances, I cannot conclude that Mr. Taylor's June 18, 2020 letter amounted to an act of disloyalty so severe that it "permeated the [agent's] service in its most material and substantial part," *PRCM III*, 2023 WL 5152288, at *10. Consequently, Two Harbors' claim of Business Disruptions does not entitle it to equitable relief under the faithless servant doctrine.

### E. Second Amendment

Two Harbors does not rely on the Second Amendment to support its own motion for summary judgment. *See generally* Def. Moving Mem. In opposition to Pine River's motion, however, it argues that there are "disputed facts" as to whether the Second Amendment was (i) fraudulently induced (in that Pine River materially misrepresented its "purpose and effect," Def. Opp. at 47, or (ii) substantively unfair (in that it gave PRCM IP rights that it did not previously own), *id*. at 48, either of which, in defendant's view, would entitle it to summary judgment on all of Pine River's IP-related claims. I discuss these contentions here because they are also relevant to

the parties' termination-related contract claims, *see* MA § 15(a) (permitting termination for "fraud" by the Manager) as well as Two Harbors' counterclaims for fraud and breach of fiduciary duty.

As to fraudulent inducement, Two Harbors claims that Pine River wrongfully omitted a material fact when it presented the proposed Second Amendment by "failing to inform the Board of Pine River's position" that the new language would give Pine River ownership of *all* of the IP "created or developed" by the Manager, "not only the (different) intellectual property associated with the CRE initiative." Def. Opp. at 47, 49 n.30.

The claim is meritless. Pine River could not possibly have "fail[ed] to inform the Board" that the Second Amendment would give PRCM ownership of "all" IP that it created or developed (not just the "different" IP that it created or developed for the new CRE venture), because that is exactly what the Second Amendment said:

> Section 2. <u>Addition of Intellectual Property Provisions</u>. The Management Agreement is hereby amended to include the following as a new Section 27:
>
> "Section 27. <u>Intellectual Property</u>.
>
>> (a) *All* Intellectual Property created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of the Manager.["]

Second Amend. at 1 (emphasis added).[45]

In New York, the courts routinely hold "as a matter of law that a party's reliance [is] unreasonable where the alleged misrepresentation is explicitly contradicted by the written agreement." *Great Lakes Reinsurance (UK) SE v. Herzig*, 2023 WL 4266012, at *5 (S.D.N.Y.

---

[45] As discussed in Part IV(B), *infra*, the evidence adduced on summary judgment does not clearly establish which party "created or developed" the IP now at issue. It is crystal clear, however, that *if* it was created or developed by the Manager – whether or not for CRE purposes – it is the Manager's "sole and exclusive property." MA § 27(a).

June 29, 2023) (quoting *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008)); *accord Phoenix Companies, Inc. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 595 (S.D.N.Y. 2021). Moreover, "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir. 1984)); *see also Junk v. Aon Corp.*, 2007 WL 4292034, at *7 (S.D.N.Y. Dec. 3, 2007) (because plaintiff was an attorney, and therefore "a sophisticated party," he is deemed to have understood that the presence of a merger clause made the written contract "controlling," and to have "signed the document with this intent").

Here, no affirmative misrepresentation is alleged. That is, Two Harbors does not claim that anyone told the Board – orally or in writing – that § 27(a) of the Management Agreement would *only* apply to CRE-related IP. Rather, the claim is that the Independent Directors developed that "understanding" because the Second Amendment was discussed in the "context" of the CRE initiative. 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 177:11-15, 183:20-25. Moreover, as noted above, the six Independent Directors of Two Harbors – all of whom voted in favor of the Second Amendment – were seasoned and sophisticated business professionals (including two lawyers and a former U.S. Senator), with "access" not only to the plain text of the amendment but also to the unconflicted advice of Two Harbors' General Counsel, Ms. Sandberg.[46] Under these circumstances, Two Harbors cannot hope to sustain a claim of fraudulent inducement

---

[46] Ms. Sandberg remained in that role after the Management Agreement was terminated. According to Two Harbors' Rule 30(b)(6) witness, she "always" acted in the best interest of the Company, and was "acting solely on behalf of Two Harbors" in connection with the Second Amendment. 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Decl. Ex. 113) at 52:13-15, 170:9-13.

(or any other species of fraud) on the theory that Pine River failed to tell the Independent Directors that "all" means "all." *See Steinbeck*, 2009 WL 928189, at *7 (whatever fiduciary duty was owed by literary agent to deceased author's heir was "not so broad as to include a duty to explain the legal consequences of his [IP] rights where [the heir was] represented by independent counsel prior to signing an agreement specifically addressing those interests"). Consequently, the presentation and adoption of the Second Amendment in 2014 cannot constitute "cause" for the termination of the Management Agreement six years later. Nor did PRCM breach a fiduciary duty or commit any other tort by presenting that amendment to the Board.

As to the "substantive unfairness" of the Second Amendment, defendant argues that "where, as here, 'a fiduciary relationship exists between parties to a contract, there must be clear proof of the integrity and fairness of a transaction between them, or any instrument thus obtained will be set aside or held as invalid[.]'"). Def. Opp. at 48 (quoting *Aviles*, 380 F. Supp. 3d at 301). Further, according to Two Harbors, the Second Amendment was not "objectively fair" because (if plaintiffs are interpreting it correctly) it gave PRCM IP rights that it did not previously own. *See id.* at 48-49 (arguing that the Second Amendment was unfair because, prior to its enactment, the CNIAs "assigned rights only to PR Domestic – not PRCM or PR Capital").

Once again, Two Harbors is incorrect. First, it assumes, mistakenly, that PRCM was acting within the scope of its fiduciary duty as Two Harbors' investment adviser when negotiating the Second Amendment to the Management Agreement. It was not. *See Moltech*, 2001 WL 262675, at *9 (explaining that BNY could not have been acting within the scope of its fiduciary duties as Moltech's acquisition adviser when it was "negotiating over fees" with Moltech, and therefore had no duty to "reduce its fees or accept a carve-out").

Second, even in the fiduciary context, New York courts do not shift the burden of proof (and require the defendant to establish "the integrity and fairness of the transaction") unless "the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality." *Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 698-99, 385 N.E.2d 285, 288-89 (1978) (quoting *Cowee v. Cornell*, 75 N.Y. 91, 99-100 (1878)). In *Gordon* (the source of the language quoted in *Aviles* and relied on in defendant's brief), the estate of an elderly nursing home patient, Ida Gorodetsky, sought to set aside a financial "donation" that she made to the home shortly after she suffered a stroke, and less than a month before her death. On the day of the donation, Mrs. Gorodetsky "was unable to speak, made no spontaneous movement and was paralyzed in both hands." *Id*. at 697, 385 N.E.2d at 287. Yet she somehow made her "mark" on a letter directing the donation. *Id*. On these facts, the Court of Appeals agreed that "the donee bears the burden of proving by clear and convincing evidence that the gift was voluntarily and understandingly made by the donor, uninfluenced by fraud, duress or coercion." *Id*. at 695-96, 385 N.E. 2d at 287. Two Harbors is hardly in the same position as Mrs. Gorodetsky.

Third, as the *Gordon* court explained, even where the burden is shifted due to the obvious inequality of the parties' positions, the defendant is not required to show that the transaction was *substantively* fair (this would be impossible in the case of a donation, which by definition lacks consideration); rather, it must show "that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood." 45 N.Y.2d at 699, 385 N.E.2d at 289. Two Harbors' "unfairness" claim thus collapses into its fraudulent inducement claim, which likewise turns on whether PRCM wrongfully withheld material information from Two Harbors when negotiating the Second Amendment, and fails for the same reasons outlined above.

### F.      Remaining Termination-Related Issues

The remaining grounds relied on by Two Harbors to terminate the Management Agreement – and to support its termination-related counterclaims – can be swiftly dealt with.

#### 1.      Granite Point Restrictive Covenants

It is now undisputed that the Granite Point Restrictive Covenants (that is, non-compete provisions in the employment contracts between Pine River and three Pine River employees serving as Granite Point's senior executives) did not go into effect until after Granite Point was spun off from Two Harbors in 2017. Pl. 56.1 St. ¶ 278; 11/8/22 TWO 30(b)(6) Dep. Tr. at 103:17-22. Consequently, "those employment terms did not impact PRCM's performance under the Management Agreement," *PRCM II*, 2021 WL 4847224, at *5.

Two Harbors does not argue otherwise. Instead, it speculates that the challenged covenants *might* have negatively affected the value of Granite Point itself, and therefore should have been disclosed to Two Harbors before its Board voted to approve the terms of the Granite Point spinoff. *See* Def. Opp. at 23 ("Pine River was required to disclose the Granite Point Restrictive Covenants to Two Harbors because of their impact on the [value of the] Granite Point shares that Two Harbors received"). At deposition, however, Two Harbors' Rule 30(b)(6) witness equivocated: "If you want to say that the absence of those disclosures could have impacted somehow the pricing of the Granite Point IPO when it went out, perhaps that was a way they said it was harmed. That is very hypothetical and hard to guess." 11/8/22 TWO 30(b)(3) Dep. Tr. at 101:13-17. One of the factors making it "hard to guess" was the (publicly available) Granite Point Management Agreement, which contained its own non-compete provision, barring Granite Point from retaining the services of *any* Pine River personnel for two years after a termination without cause. Pl. 56.1 St. ¶ 274; Conlin Decl. Ex. 6 (Granite Point Mgmt. Ag.) § 3(e). Two Harbors presents nothing but "speculation," *Kulak*, 88 F.3d at 71, to suggest that the overlapping non-compete clauses in three

individual Granite Point employment contracts could have moved the needle on valuation. Moreover, those individual employment contracts were not in fact concealed from Two Harbors. They were sent to Ms. Hanson (Two Harbors' dedicated HR director) nearly a month before the spinoff. Pl. 56.1 St. ¶ 279; Conlin Decl. Ex. 19. On these facts, no rational jury could return a verdict in Two Harbors' favor, on any of the parties' termination-related claims and counterclaims, based on the Granite Point Restrictive Covenants.

### 2.    Proposed Co-CIO Restrictive Covenants

The same is true with respect to the Proposed Co-CIO Restrictive Covenants. Two Harbors is correct that including non-compete covenants in the 2019 employment contracts for Mr. Greenberg and Mr. Koeppen would have made it more difficult for Two Harbors to retain its co-CIOs after terminating the Management Agreement, thus presenting an "obstacle" to internalization. Even assuming, however, that Pine River had an obligation to remove all such obstacles,[47] Two Harbors cannot establish any breach (much less injury), because Pine River *removed* the non-compete clauses from the draft employment agreements for the incoming co-CIOs before presenting the revised agreements – minus the restrictive covenants – to the Two Harbors Board, which approved them. Pl. 56.1 St. ¶¶ 289-91; 11/8/22 TWO 30(b)(3) Dep. Tr. (Conlin Decl. Ex. 113) at 108:2-18; 11/3/22 Koeppen Dep. Tr. (Conlin Decl. Ex. 120) at 103:1-7 (confirming that Mr. Taylor accepted Mr. Koeppen's changes, "and a clean version was sent on to Two Harbors' compensation committee for them to review").

### 3.    Proposed Siering Retirement Agreement

Similarly, the Proposed Siering Retirement Agreement was never anything other than a "proposed" agreement. *See* 11/8/22 TWO 30(b)(3) Dep. Tr. (Conlin Decl. Ex. 113) at 121:10-13.

---

[47] *See* Part III(B), *supra*.

In the second half of 2019, Siering told Kasnet that he was negotiating retirement terms with Pine River ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Two Harbors

has not provided any authority for the proposition that a fiduciary can be liable for *thinking about* contract terms that its principal "would have refused." Countercl. ¶ 113. Consequently, the Proposed Siering Retirement Agreement cannot be the basis of any liability for Pine River, nor grounds for terminating the Management Agreement.

### 4.    Internalization Interference

According to Two Harbors, "[t]he record reflects disputed facts as to whether Pine River breached its fiduciary duties by attempting to thwart Two Harbors' internalization[.]" Def. Opp. at 25. Once again, however, Two Harbors argues from a flawed premise, namely, that PRCM had an obligation to advise Two Harbors as to the pros and cons of firing PRCM. *See id.* ("There is no carve-out to Pine River's fiduciary duties for internalization."). Moreover, Two Harbors makes no claim that it should have internalized earlier than it did – much less that it was somehow prevented from doing so by anything that Pine River did or failed to do. *See*, *e.g*., 11/8/22 TWO 30(b)(6) Dep. Tr. (Conlin Ex. 113) at 245:24-246:25 ("I don't think it is Two Harbors' position" that internalization was "in the best interest in 2016"); *id*. at 253:8-25 ("I can't sit here today and say the company thought . . . in 2018 that it was in its best interest [to internalize], because it hadn't done the homework yet."). Consequently, even if Pine River had – and breached – contractual or fiduciary duties to counsel the Independent Directors regarding internalization, Two Harbors could not sustain a damages claim on that basis.

### 5. PII Demand

Lastly, Two Harbors alleges that Mr. Taylor's August 7, 2020 letter – asking it to provide "all necessary passwords and access . . . to networks and servers in which [Pine River's] intellectual property resides," prior to the August 14, 2020 termination date of the Management Agreement, constituted an unlawful demand for the personally identifiable information "of borrowers of residential mortgage loans for which Two Harbors owned MSR," which "would have required Two Harbors to violate federal and state law." Countercl. ¶¶ 17, 152. Pine River strenuously denies the charge, pointing out that Mr. Taylor's letter said nothing about PII, *see* Pl. Moving Mem. at 25, and that Pine River's counsel specifically addressed the issue in a longer, more nuanced letter sent to Two Harbors' counsel on August 6, 2020:

> To the extent that any non-public personally identifiable information of consumers ("PII") remains on Pine River's proprietary software and systems, or to the extent that PII is comingled within Pine River intellectual property, Pine River proposes that Liz Olney Arms (Pine River's Head of Legal and Chief Compliance Officer) and Randall Brett (Pine River's Managing Director, Chief Technology Officer) and an appropriate Pine River employee dedicated to Two Harbors review the relevant data to remove PII from Pine River intellectual property. Ms. Arms and Mr. Brett both have had compliance training and are familiar with the standard duty of care in handling PII**.** Further, as the Management Agreement remains in effect, Pine River is still responsible for the management of Two Harbors and accordingly, its management team is authorized to view this information in compliance with all federal and state laws.

Conlin Decl. Ex. 63 (8/6/20 letter from Sidley Austin to Goodwin Proctor) at 3-4. Moreover, it is also undisputed that Two Harbors did not provide any passwords or any network or server access, and thus that no PII was improperly accessed.

Two Harbors, for its part, offers no further evidence that Pine River improperly sought to access consumer PII. Nor, for that matter, does it offer any further analysis. Instead, the single footnote devoted to this issue in Two Harbors' summary judgment briefs offers only a naked conclusion: "Pine River also breached its fiduciary duties by demanding that Two Harbors

personnel turn over alleged intellectual property that contained PII." Def. Opp. at 22 n.12. I therefore conclude that, as to the alleged PII Demand, Two Harbors has failed to come forward with admissible evidence sufficient to raise a genuine issue of fact for trial under any theory of recovery. *Simsbury-Avon Pres. Soc'y*, 575 F.3d at 204.

## IV.    IP-RELATED CLAIMS

Assuming the validity of the Second Amendment (discussed in Part III(D), *supra*, and Part V, *infra*) the parties agree that a common "threshold issue," *PRCM I*, 2021 WL 2582132, at *10, underlies all of Pine River's IP-related claims: whether the intellectual property that Two Harbors routinely used to conduct its business prior to terminating the Management Agreement – including computer programs, databases, financial models, investor and prospective investor information, and more – was "created or developed by the Manager," MA § 27(a), that is, by PRCM. If so, the clear and unambiguous language adopted by the Board on November 3, 2014, compels the conclusion that the IP was "the sole and exclusive property of the Manager," *id*. (except for trademarks using the name or logo of Two Harbors, *id*. § 27(b)(i)), and therefore that PRCM is entitled to summary judgment as to liability on its Fourth Claim (for breach of § 27(a)) and its Ninth Claim (for conversion of the IP), and PR Capital and PR Domestic are entitled to summary judgment as to liability on their Tenth Claim (for tortious interference with the CNIAs). *See*, *e.g.*, Pl. Moving Mem at 3-5.[48] Conversely, if the IP was not "created or developed by the Manager,"

---

[48] As noted in Part I(C)(2), *supra*, Pine River does not appear to seek summary judgment on its First Claim (for misappropriation of trade secrets under the DTSA), its Sixth Claim (to the extent it seeks a declaratory judgment as to its rights under MA § 27(a)), its Seventh Claim (for unfair competition and unfair business practices), or its Eighth Claim (pled in the alternative, for unjust enrichment). *See* Pl. Moving Mem. at 8.

then PRCM "does not own" the IP, and "this Court should grant Two Harbors summary judgment" on Pine River's IP-related claims. Def. Moving Mem. at 30, 33-36.[49]

### A.    Law of the Case

Addressing this issue at the motion to dismiss stage, the district judge held that Pine River's IP-related claims were "alleged sufficiently," *PRCM I*, 2021 WL 2582132, at *10, because the human creators and developers of the IP at issue were the Pine River personnel provided to Two Harbors under the Management Agreement and the SSA. *Id*. at *10-11. In so holding, the district judge considered and rejected Two Harbors' argument that the IP could not have been created or developed by "the Manager" – that is, by PRCM – because the individuals who performed the work were, in many cases, employees of PR Domestic, which was neither an assignee under the Management Agreement nor a party to the SSA. The district judge explained:

> Two Harbors' assumption that PRCM could act only through employees or assignees is incorrect. For example, PRCM could delegate its responsibilities by contract, in which case the delegee's acts may be attributed to PRCM, at least in some circumstances. In fact, the Management Agreement expressly contemplated that PRCM would fulfill its responsibilities as manager through the employees, officers, partners, and personnel of its affiliates pursuant to the Shared Services Agreement.
>
> Accordingly, the bright line that Two Harbors has constructed between PRCM's employees and other personnel acting on PRCM's behalf is an oversimplification. While PRCM does not allege that it hired employees, it does allege that it contractually retained personnel to carry out its responsibilities under the Management Agreement. Whether the nature of their relationship with PRCM made their acts attributable to the "manager" under section 27 of the Management Agreement is a fact specific question that the Court cannot decide on a motion to dismiss. At this stage, PRCM has alleged sufficiently that these personnel were acting on its behalf when the intellectual property was developed. This is sufficient for PRCM to claim plausibly that it owns the intellectual property at issue here.

---

[49] As noted in Part I(C)(2), *supra*, Two Harbors does not appear to seek summary judgment on the portion of Counterclaim IX (for unjust enrichment) which alleges – somewhat incoherently – that if this Court determines that PRCM and PR Capital own the IP pursuant to MA § 27(a), it should also determine that PRCM and PR Capital unjustly retained that IP. Countercl. ¶ 219.

*Id*. at *11-12 (footnotes omitted).

Notwithstanding the district judge's analysis, which is now the law of the case, Two Harbors continues to argue that PRCM could not own any of the IP at issue because "the personnel who provided services to Two Harbors were employed by a different entity, PR Domestic." Def. Moving Mem. at 31. In Two Harbors' view, this circumstance dictates the conclusion that "PRCM did not in fact delegate its responsibilities under the Management Agreement to the personnel who carried out those responsibilities, and the acts of those personnel are not attributable to PRCM." *Id*.; *see also* Def. Reply at 21 (since "the personnel who provided services to Two Harbors were employed by a different entity, PR Domestic," their acts "are not attributable to PRCM under the MA, and Pine River does not own the alleged intellectual property or trade secrets under the MA").

This argument – which is purely legal – fails at summary judgment for the same reasons it failed under Rule 12(b)(6). As the district judge explained, although PRCM never assigned the Management Agreement in its entirety, it could – and did – "delegate" its responsibilities thereunder "by contract, in which case the delegee's acts may be attributed to PRCM, at least in some circumstances." The Management Agreement required PRCM to "provide" personnel to Two Harbors, MA § 3(a), but did not require that the individuals so provided be on PRCM's payroll. *See also* MA § 14(b) (PRCM could "subcontract" any or all of its responsibilities under §§ 2(b), 2(c) and 2(d) "to *any of its affiliates*") (emphasis added). Likewise, the SSA required PR Capital to "provide" personnel to PRCM (so that PRCM, in turn, could "provide" them to Two Harbors), but did not require that they be on PR Capital's payroll. *See* SSA § 2 ("All [PR Capital] personnel who provide services hereunder shall be employees of [PR Capital] *or its affiliates*") (emphasis added). Consequently, there is no "bright line," *PRCM I*, 2021 WL 2582132, at *12, preventing this Court from attributing the acts of personnel who happened to be on the PR Domestic payroll

to PRCM, so long as "the nature of their relationship with PRCM made their acts attributable to the 'manager' under section 27 of the Management Agreement[.]" *Id.* [50]

Pine River, for its part, confuses the motion to dismiss standard with the summary judgment standard when it relies on *PRCM I* to argue a factual point: that although the relevant personnel were employees of PR Capital and PR Domestic, "they were 'acting on [PRCM's] behalf when the intellectual property was developed.'" Pl. Opp. at 34 (quoting *PRCM I*, 2021 WL 2582132, at *12). The full quotation from PRCM makes the distinction clear: "*At this stage*, PRCM has *alleged sufficiently* that these personnel were acting on its behalf when the intellectual property was developed." *PRCM I*, 2021 WL 2582132, at *12 (emphasis added). At summary judgment, of course, a party may no longer rely on its allegations; it must produce evidence. *See Golden Pac. Bancorp*, 375 F.3d at 200.

The question now before the Court, therefore, is not whether the developers, programmers, and other individuals who created and developed the IP at issue were on PRCM's payroll; it is the "fact specific question" whether the relationship between those individuals and PRCM "made their acts attributable to the 'manager' under section 27 of the Management Agreement." *PRCM I*, 2021 WL 2582132, at *12. For the reasons that follow, I conclude that the evidence on this point is mixed, such that summary judgment cannot be granted to either side.

### B.    Whether the Personnel Who Developed the IP Were Acting on PRCM's Behalf

The question necessarily left unanswered at the pleading stage is fundamentally one of agency: whether the individuals who created and developed the IP at issue were acting as agents of PRCM or as agents of Two Harbors when they did so. *See PRCM I*, 2021 WL 2582132, at *12

---

[50] Moreover, discovery has shown that some of the personnel providing services to Two Harbors were on the PR Capital payroll. *See* Part I(B)(2), *supra*.

n.125. "The three elements necessary to an agency relationship are (1) a manifestation by the principal that the agent will act for [it]; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *United States v. Hoskins*, 44 F.4th 140, 149-50 (2d Cir. 2022) (quoting *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013))[51]; *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) (Kaplan, J.) ("An agency relationship exists under New York law when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent.") (citations omitted); Rest. (3d) of Agency § 1.01 (An agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). Although there is no rigid rule for determining the existence and scope of an agency relationship, "[t]he element of control often is deemed the essential characteristic of the principal-agent relationship." *In re Parmalat*, 375 F. Supp. 2d at 290; *see also Maung Ng We v. Merrill Lynch & Co.*, 2000 WL 1159835, at *4 (S.D.N.Y. Aug. 15, 2000) ("It is critical to the establishment of an agency relationship that 'the agent acts subject to the principal's direction and control.'") (quoting *Shulman*

---

[51] *Hoskins* was a criminal prosecution brought under the Foreign Corrupt Practices Act after API – the U.S. subsidiary of global power and transportation company Alstom – hired consultants to bribe Indonesian officials in return for a power contract. The individual defendant, Hoskins, was "employed by Alstom's UK subsidiary, but was assigned to work in its French subsidiary," where he provided "support" to API, such as by overseeing the preparation of the consulting contracts with the individuals who were to deliver the bribes. 44 F.4th at 146. The jury convicted Hoskins on the theory that he was an "agent" of API. *Id.* at 145. However, the district court acquitted on a post-verdict motion, and the Second Circuit affirmed the acquittal, because there was no evidence that any "API representatives actually controlled Hoskins's actions as Hoskins and his API counterparts operated under separate, parallel employment structures." *Id.* at 150. In particular, the Court noted that Pierucci (the instigator of the bribery scheme) "did not hire Hoskins, lacked the ability to fire Hoskins, and lacked any say in Hoskins's compensation," *id.*, and – more generally – that there was no evidence that API could "do anything to control Hoskins's actions." *Id.* at 151.

*Transport Enterprises, Inc. v. Pan American World Airways, Inc.,* 744 F.2d 293, 295 (2d Cir. 1984)).

"The existence of an agency relationship 'is a mixed question of law and fact,'" *In re Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d 447, 460 (E.D.N.Y. 2007) (quoting *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.,* 347 F.3d 448, 462 (2d Cir. 2003)), which, if dependent upon "contradictory evidence," or "evidence . . . from which different inferences reasonably may be drawn," must go to the jury. *Id.* at 461 (quoting *Hedeman v. Fairbanks, Morse & Co.,* 286 N.Y. 240, 248–49, 36 N.E.2d 129, 133 (1941)); *see also Samba*, 2009 WL 705537, at *7 ("The existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury."); *Mouawad Nat. Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("Unless the material facts from which agency is to be inferred are undisputed, the question of agency should be submitted to the jury."). Here, the relevant evidence is susceptible of more than one reasonable inference, making summary judgment inappropriate.

Under the SSA, upon which Pine River principally relies, "[o]ffice personnel" provided to PRCM (so that PRCM could provide them to Two Harbors) "shall be advised that while providing services to the Manager, they are to follow the directions of the Manager and are to act in the best interests of the Manager." SSA § 2. Pine River characterizes this provision as an unambiguous manifestation of PRCM's "intent that [PR Capital] and its employees act for PRCM in fulfilling its responsibilities under the MA." Pl. Moving Mem. at 4. However, it is not clear from the SSA whether the "office personnel" were to prioritize the directions and interests of the Manager over those of Two Harbors – or simply over those of the Pine River entity listed as their employer.

Moreover, although PRCM and PR Capital agreed among themselves that the relevant individuals would be "advised" to follow the directions of the Manager, the actual advice those

individuals were given was somewhat confusing. Pine River points to the CNIAs they signed, which required them to assign any Inventions to their Employer (PR Capital or PR Domestic). CNIA ¶ 2(b). The CNIAs also required them to acknowledge that any Work Product they created on the job (that is, software or other copyrightable works of authorship) was a "work made for hire," as to which their Employer owned the copyright. *Id.* ¶ 3. Elsewhere in the same document, however, they agreed that upon the termination of their employment they would "deliver promptly to [the] Employer all of *Pine River's property*, including all Work Product, Inventions, [and] any item containing Confidential Information." *Id.* ¶ 6 (emphasis added). This language is significant because the CNIAs define "Pine River" to include not only the Employer (PR Domestic or PR Capital, as the case may be) and its affiliates, but also the "public companies, private funds and accounts for which Employer and its affiliates provide investment management services," *id.* at 1 – such as Two Harbors. The CNIAs are thus internally inconsistent. Paragraphs 2 and 3 attribute ownership of Inventions and Work Product to the Employer, while ¶ 6 seemingly attributes ownership of the same IP – collectively – to the Employer, its affiliates (including PRCM) *and* Two Harbors.

Making matters even murkier, the Two Harbors Compliance Manual instructed all of the individuals providing services to Two Harbors:

> You are expected [to] discharge your duty to Two Harbors in the best interests of Two Harbors and its stockholders, especially in situations where the interests of Two Harbors may be in conflict with your own interests or those of Pine River or its affiliates.

Sama Decl. Ex. 12, at ECF p. 6. The forward to the Compliance Manual, urging faithful adherence to the guidelines set forth therein, was signed by Mr. Siering. *Id.* at ECF p. 3. The Compliance Manual could be construed, therefore, as a direct instruction from a Pine River partner – who was

also a Two Harbors officer and director – that the personnel provided to Two Harbors were to "act for" Two Harbors, rather than Pine River, especially where their interests conflicted.

Further, the record contains evidence that Two Harbors maintained its own human resources (HR) and information technology (IT) functions, largely separate from Pine River's. According to Ms. Hanson, the Two Harbors "HR team," supervised by the Two Harbors Hiring Committee (consisting of Ms. Hanson, the Two Harbors CEO, and the Two Harbors CFO) recruited, hired, on-boarded, set the compensation of, and (if necessary) fired Two Harbors personnel "at all levels," including "information technology and application development personnel," without requiring "approval from Pine River." Hanson Decl. ¶¶ 3-9, 12. These facts suggest that that Two Harbors, rather than PRCM, "actually controlled" the IT staff working in its offices. *See Hoskins*, 44 F.4th at 150 (holding that Hoskins was *not* the agent of an entity that did not hire him, could not fire him, and had no say in his compensation).

Once onboarded, the IT personnel reported to Two Harbors' dedicated Chief Technology Officer (CTO), worked in Two Harbors' dedicated office space, and used "Two Harbors' equipment." 11/2/22 Quan Dep. Tr. (Conlin Decl. Ex. 122) at 209: 5-12 (testifying that he "viewed [himself] as a Two Harbors employee, because [he] reported to the Two Harbors CTO" and "worked in Two Harbors ' office . . . using Two Harbors' equipment"). Indeed, by 2014 Two Harbors had its own source code repository, accessible only through its own secure network. *See* 11/18/22 Brett Dep. Tr. (Sama Opp. Decl. Ex. 64) at 48:4-19. As explained by Pine River's then-CTO, James Brett, "[t]he only way for hedge fund staff . . . to have access [to the Two Harbors network] would be to request access from Rebecca [Sandberg]," the dedicated Two Harbors General Counsel. *Id.* at 116:7-10. Two Harbors also had its own Information Security Standards and Procedures manual, which "define[d] the security standards and procedures applicable to the

data, information and information systems of Two Harbors[.]" Sama Opp. Decl. Ex. 73, at ECF p. 7. The evidence thus suggests that, as a practical matter, Two Harbors also controlled the methods that its personnel used to create and safeguard the IP now at issue.[52]

To be sure, the record also contains ample evidence that Two Harbors' officers and directors believed and accepted – for years – that the IP used by the Company belonged to the Manager. When Two Harbors reported the Second Amendment to its shareholders in 2014, it explained that it now had "a non-exclusive license . . . to use Manager's intellectual property . . . for the term of the Management Agreement." 11/7/14 TWO Form 8-K (Conlin Decl. Ex. 21), Item 1.01. When the Company's senior managers (not including Mr. Siering) recommended internalization on January 29, 2020, they warned the Special Committee that there would be a "cost for intellectual property," because "all intellectual property developed by employees during their employment belongs to Pine River." 1/29/20 PowerPoint (Conlin Decl. Ex. 98) at 14. The following month, Two Harbors told its shareholders that "[i]n the event of a termination of the management agreement," it could be "difficult or costly to replace certain intellectual property" previously "provided by or contracted through Pine River." TWO Form 10-K for FY 2019 (Conlin Decl. Ex. 28) at 28. Indeed, insofar as the record reflects, the first time Two Harbors articulated a different view was after Pine River filed its state court lawsuit, when Mr. Kasnet asserted, in his June 23, 2020 letter to Mr. Taylor, that "intellectual property created or developed by dedicated

---

[52] Pine River points out, correctly, that the Two Harbors Hiring Committee members and the Two Harbors CTO were themselves Pine River partners or employees, and argues, on this basis, that *none* of the personnel providing services to Two Harbors were actually "controlled" by Two Harbors. *See* Pl. Reply at 3 ("When Two Harbors says that the personnel were under the control of 'Two Harbors' and not 'Pine River,' what they really mean is that they were under the control of other Pine River personnel providing services to Two Harbors."). Under the Management Agreement, however, those "other Pine River personnel" were, in turn, subject to the supervision of the Two Harbors Board, *see* MA § 2(b), which was controlled by Independent Directors.

Two Harbors personnel for Two Harbors' use and at Two Harbors' expense is the intellectual property of Two Harbors (not Pine River) and belongs to Two Harbors (not Pine River)." Kasnet 6/23/20 Ltr. (Conlin Decl. Ex. 60) at ECF p. 4.

The question underlying the parties' IP-related claims and counterclaims, however, is not what the parties' officers and directors *thought* about which entity owned the IP; it is which entity actually "created or developed" the IP. MA § 27(a). As discussed above, this question turns on whether the human beings who created and developed that IP were acting as agents of PRCM or Two Harbors when they did so. Since the evidence on this point is susceptible of more than one reasonable inference, *see Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d at 460-61, neither Pine River nor Two Harbors is entitled to summary judgment on the parties' IP-related claims and counterclaims.[53]

## V.    INVESTMENT ADVISERS ACT

The district judge dismissed all of Two Harbors's counterclaims under the IAA (Counterclaims VI, VII, VIII, and portions of IX), as well as its second affirmative defense, which asserted that the Management Agreement is unenforceable, void, and/or voidable because it violates the IAA. *PRCM III*, 2023 WL 5152288, at *12.[54] Nonetheless, Two Harbors continues to argue that the Management Agreement is unenforceable because it violates the IAA. Def. Moving Mem. at 24-29; Def. Opp. at 36. Specifically, it argues that MA § 11 (the hedge clause) and MA § 13(b) (the termination fee provision) are "proscribed" by the IAA, rendering the entire contract void, and insulating defendant from liability for breach of contract. Def. Moving Mem. at

---

[53] Moreover, since a wide variety of intellectual property is at issue in this action – created and developed over more than a decade – it is possible that neither Pine River nor Two Harbors will succeed in showing that it is the owner of all of the contested IP.

[54] *See* Ans. at 63 ("The Complaint's claims are barred, in whole or in part, because the Management Agreement is not a valid and enforceable contract, is void, and/or is voidable.").

25-28. In its reply brief, Two Harbor contends that this argument is still available to it because, although the district judge granted Pine River's Rule 12(c) motion, he "has not yet ruled on the affirmative defense presented in Two Harbors' motion for summary judgment." Def. Reply at 19.

Two Harbors is mistaken. All of its IAA-related claims and defenses were dismissed. No portion of its second affirmative defense survived the Rule 12(c) motion. Any doubt on this score is erased by the district judge's careful treatment of Two Harbors' unjust enrichment counterclaim, which was dismissed "to the extent" it "relies on Two Harbors' argument that the management agreement is invalid." *PRCM III*, 2023 WL 5152288, at *12. Pine River is therefore correct that defendant's effort to revive its IAA defense on summary judgment is, in substance, a "procedurally improper and untimely motion for reconsideration," Pl. Opp at 27, that should be ignored.

Even if the issue were not foreclosed, Two Harbors cannot avoid liability under the Management Agreement by claiming that the contract under which it conducted its business for over a decade is unenforceable. In support of its contention that §13(b) violates the IAA, Two Harbors describes "decades of consistent guidance" by the SEC, which takes the position that termination fees in advisory agreements "*may* be inconsistent with the adviser's fiduciary duty." Def. Moving Mem at 25 (quoting *Constellation Fin. Mgmt. L.L.C.*, 2003 WL 76185, at *2 (S.E.C. No-Action Letter Jan. 9, 2003)) (emphasis added). Similarly, Two Harbors' argument as to § 11(a) rests entirely on SEC no-action letters. *Id*. at 27. It does not cite a single litigated case, from any jurisdiction, invalidating a comparable termination provision or hedge clause, much less in the context of a complex contract, going well beyond investment management services, negotiated between sophisticated parties. Thus, if and to the extent Two Harbors' renewed arguments under the IAA are considered on the merits, they should be rejected.

## VI.     CONCLUSION

For the reasons set forth above, I recommend, respectfully, that Pine River's motion (Dkt. 347) be GRANTED IN PART. Plaintiff PRCM is entitled to summary judgment as to liability on its Third Claim, for termination of the Management Agreement without cause in violation of § 15(a) thereof. Additionally, Pine River is entitled to summary judgment on Two Harbors' counterclaims for breach of fiduciary duty (Counterclaim I); recovery under the faithless servant doctrine (Counterclaim II); gross negligence (Counterclaim III); fraud (Counterclaim IV); negligent misrepresentation (Counterclaim V); unjust enrichment (Counterclaim IX), insofar as Two Harbors seeks recovery of "the nearly $10.3 million cash benefit realized by Pine River pursuant to the improper LTIP Sharing Agreements," Countercl. ¶ 218; aiding and abetting breach of fiduciary duty (Counterclaim X); breach of contract (Counterclaim XI); and breach of the covenant of good faith and fair dealing (Counterclaim XII). Pine River's motion should otherwise be DENIED. Two Harbors' motion for summary judgment (Dkt. 338) should be DENIED.

Because the parties filed portions of their motion papers under seal, and because I have necessarily discussed some of the sealed material, the Clerk of Court is respectfully directed to file this Report and Recommendation under seal, at the "selected parties" viewing level, such that only the attorneys appearing for the parties, and court personnel, may view it. By separate order (Dkt. 438), the parties have been given an opportunity to submit proposed redactions before this Report and Recommendation is filed in public view.

Dated: New York, New York
         March 31, 2025

**BARBARA MOSES**
**United States Magistrate Judge**

## <u>NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS</u>
## <u>TO THIS REPORT AND RECOMMENDATION</u>

The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), unless they receive this Report and Recommendation solely by mail, in which case they have 17 days from the date on which it was mailed. *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. Lewis A. Kaplan, and delivered to Judge Kaplan in accordance with his individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Kaplan. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).