```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   5/2/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRCM ADVISERS LLC, et al.,

              Plaintiffs,

    -against-

TWO HARBORS INVESTMENT CORP.,

              Defendant.

20-CV-5649 (LAK) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs PRCM Advisors LLC (PRCM), Pine River Capital Management L.P. (PR Capital), and Pine River Domestic Management L.P. (PR Domestic) (collectively Pine River), and defendant Two Harbors Investment Corp. (Two Harbors) have cross-moved to exclude one another's expert opinion evidence pursuant to Fed. R. Evid. 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. For the reasons set forth below, the motions will be granted in part and denied in part.

# I.    BACKGROUND

PRCM managed Two Harbors, a publicly-traded real estate investment trust (REIT), from October 28, 2009, until August 14, 2020, when Two Harbors terminated the parties' Management Agreement (MA) and commenced managing itself. In this action, Pine River alleges principally that Two Harbors terminated the Management Agreement without "cause," as defined in § 15(a) thereof, and without paying any termination fee, after which it continued to use PRCM's valuable intellectual property (IP) in violation of MA § 27(a), which provides that "[a]ll Intellectual Property created or developed by [PRCM] in connection with [its] performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of [PRCM]." PRCM also asserts claims for misappropriation of the IP under

the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and related torts under New York law.

Two Harbors, for its part, contends that it was entitled to terminate the Management Agreement on eleven separate grounds, each of which also entitles it to damages or other relief on a variety of contract and tort theories, including the faithless servant doctrine. As to the IP that it admittedly retained and continues to use after the termination, Two Harbors contends that it was fraudulently induced to adopt § 27(a) as part of the Second Amendment to the Management Agreement in 2014; that § 27(a) is substantively unfair; and that in any event it has not violated § 27(a) because it – not PRCM – created and developed the IP at issue.

### A. Claims and Counterclaims

PRCM filed its initial Complaint in this action on July 21, 2020, followed by an Amended Complaint on September 4, 2020, portions of which were dismissed by the district judge pursuant to Fed. R. Civ. P. 12(b)(6).[1] After obtaining leave to amend,[2] PRCM, together with PR Capital and PR Domestic, filed the Second Amended Complaint (SAC) (Dkt. 86) on October 26, 2021. Invoking this Court's federal question jurisdiction, *see* SAC ¶ 25, Pine River asserts ten claims, eight of which survived defendant's motion to dismiss (in whole or in part):

| | |
|---|---|
| First Claim | Misappropriation of Trade Secrets (in violation of the DTSA) |
| Third Claim | Breach of Contract (improper termination in violation of MA §15(a)) |
| Fourth Claim | Breach of Contract (retention of IP in violation of MA § 27(a)) |
| Sixth Claim | Declaratory Judgment (that there was no basis to terminate the Management Agreement for cause, that the Second Amendment was "valid and binding," and that Two Harbors was not entitled to use Pine |

---

[1] *See* PRCM Advisers LLC v. Two Harbors Inv. Corp., 2021 WL 2582132 (S.D.N.Y. June 23, 2021) (PRCM I).

[2] *See* PRCM Advisers LLC v. Two Harbors Inv. Corp., 2021 WL 4847224 (S.D.N.Y. Oct. 18, 2021) (PRCM II).

River's intellectual property after terminating the Management Agreement)

Seventh Claim     Unfair Competition & Business Practices

Eighth Claim      Unjust Enrichment (pled in the alternative to the Fourth Claim, for breach of MA § 27(a))

Ninth Claim       Conversion (of Pine River's IP)

Tenth Claim       Tortious Interference with Contract (arising out of Two Harbors' post-termination employment of Pine River personnel, allegedly in violation of their confidentiality agreements)

SAC ¶¶ 115-217.[3]

On November 18, 2021, Two Harbors filed its Answer, Affirmative Defenses, and Counterclaims (Dkts. 89, 93), in which it asserted 42 affirmative defenses and pled twelve counterclaims, three of which were dismissed by the district judge pursuant to Fed. R. Civ. P. 12(c), along with one of defendant's affirmative defenses.[4] The surviving counterclaims are:

Counterclaim I     Breach of Fiduciary Duty (against PRCM)

Counterclaim II    Faithless Servant (against PRCM)

Counterclaim III   Gross Negligence (against PRCM and PR Capital)

Counterclaim IV    Fraud (against PRCM and PR Capital)

Counterclaim V     Negligent Misrepresentation (against PRCM and PR Capital)

---

[3] PRCM repleaded its Second and Fifth Claims (for misappropriation of trade secrets under New York law and for breach of the implied covenant of good faith and fair dealing), which were dismissed in *PRCM I*, as well as portions of its Third and Sixth Claims, which were similarly dismissed, but "[s]olely for the purpose of preserving its right to appeal." SAC at 77 n.5.

[4] *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2023 WL 5152288 (S.D.N.Y. Aug. 10, 2023) (*PRCM III*). The district judge dismissed Counterclaims VI, VII, and VIII, which sought rescission, setoff, and a declaratory judgment, respectively, on the ground that the Management Agreement violated the Investment Advisers Act of 1940 (IAA), as well as portions of Counterclaim IX, to the extent it "relies on Two Harbors' argument that the management agreement is invalid" under the IAA. *PRCM III*, 2023 WL 5152288, at *12. Additionally, the district judge dismissed defendant's second affirmative defense, which asserted that because the Management Agreement violated the IAA it was invalid, unenforceable, and void or voidable. *Id.*

Counterclaim IX    Unjust Enrichment (against PRCM and PR Capital)

Counterclaim X    Aiding and Abetting Breach of Fiduciary Duty (against PR Capital)

Counterclaim XI    Breach of Contract (against PRCM)

Counterclaim XII    Breach of the Implied Covenant of Good Faith and Fair Dealing (against PRCM)

Countercl. ¶¶ 156-244.

## B. Daubert Motions

On November 8, 2023, the parties filed competing summary judgment motions, as well as their competing *Daubert* motions. Defendant's *Daubert* motion (Dkt. 353) is supported by a memorandum of law (Dkt. 357) and two declarations signed by its attorney Christine V. Sama (Dkts. 360, 362). Defendant seeks to exclude the opinions of nine Pine River experts: Dr. Christopher Vellturo, Michael Maffattone, Victor O'Laughlen, Kenneth Slosser, Dr. Steven Kursh, Daniel Roffman, Michael Judlowe, Frederick Herbst, and William Johnson. On December 20, 2023, Pine River filed its opposition brief (Dkt. 388), accompanied by two declarations signed by its attorney Heather M. McElroy (Dkts. 386, 389). On January 25, 2024, defendant filed its reply brief (Dkt. 425), accompanied by another declaration signed by Ms. Sama (Dkt. 424).

Plaintiffs' motion (Dkt. 340) is supported by a memorandum of law (Dkt. 344) and the declaration of its attorney Barry M. Landy (Dkt. 346). Plaintiffs seek to exclude the opinions of five experts: Dr. David Lynn, William Hrycay, Justin McLean, Michael Wirth, and Robert Zeidman. On December 20, 2023, defendant filed its opposition brief (Dkt. 397), accompanied by a declaration signed by Ms. Sama (Dkt. 393). Finally, on January 25, 2024, plaintiffs filed a reply brief (Dkt. 412), accompanied by another declaration signed by Mr. Landy (Dkt. 413).

Earlier today, I issued a Report and Recommendation (R&R) (Dkt. 439) in which I concluded that none of the Pine River conduct relied on by Two Harbors to terminate the

Management Agreement furnished "cause" to do so pursuant to § 15(a) or constituted any independent breach or tort. Consequently, I have recommended that summary judgment be granted in favor of Pine River (as to liability) on its claim for breach of § 15(a) of the Management Agreement. I have also recommended that summary judgment be granted in favor of Pine River on defendant's termination-related contract and tort counterclaims, which are premised on the same conduct. As to the parties' IP-related claims and counterclaims, however, I concluded that there are disputed issues of material fact concerning the creation and development of the IP at issue in this action that require a trial.

If the district judge agrees with me, there will be no need for expert testimony concerning the parties' termination-related claims and counterclaims (except as to damages). For the sake of efficiency, therefore, the pending *Daubert* motions will be denied as moot insofar as the challenged expert opinions relate solely to whether Pine River's conduct breached the Management Agreement, furnished grounds for its termination, or constituted a termination-related tort. This portion of my ruling is without prejudice to reconsideration in the event the district judge determines that the termination-related claims and counterclaims must be tried.

## II.    LEGAL STANDARDS

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[T]he proponent of expert testimony must show its admissibility by a preponderance of the evidence." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 700 n.6 (S.D.N.Y. 2003). In *Daubert*, 509 U.S. at 597, the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, explaining that the Rules of Evidence – and Rule 702 in particular – "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").

Reliability depends on the indicia identified in Rule 702, "namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). However, "the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Id.* at 266. Thus, the law grants "broad latitude" to district courts to determine reliability in context. *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (because "there are many different kinds of experts, and many different kinds of expertise," court are granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

An expert's analysis must be "reliable at every step," meaning that "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994)); *cf. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) ("So long as 'an expert's analysis [is] reliable at every step,' it is admissible.")

(alteration in original). However, it is not the role of the court to determine whether the expert's conclusions are right or wrong. *In re Paoli*, 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). Thus, courts properly focus on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Amorgianos*, 303 F.3d at 266 (courts "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions"). If there are flaws in an expert's reasoning, only flaws "large enough" such that "the expert lacks 'good grounds' for his or her conclusions" should lead to a court excluding evidence. *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli*, 35 F.3d at 746); *see also Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022) ("In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds 'serious flaws in reasoning or methodology.'") (*quoting In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)). Ultimately, "expert testimony should be excluded if it is speculative or conjectural . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). The Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). Thus, "if an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with

the jury, rather than the trial court." *Lickteig*, 589 F. Supp. 3d at 330 (quoting *Kumho Tire*, 526 U.S. at 153). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Moreover, "exclusion remains the exception rather than the rule." *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see also* Fed. R. Evid. 702, advisory committee's note to 2023 amendment ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."). Accordingly, "[i]n a close case, a court should permit the testimony to be presented at trial, where it can be tested by cross-examination and measured against the other evidence in the case." *Lippe*, 288 B.R. at 700 n.6; *accord Crawford v. Franklin Credit Mgmt. Corp.*, 2015 WL 13703301, at *2.

## III.    ANALYSIS

### A.    Defendant's Motion

The opinions of Pine River experts Frederick Herbst and William Johnson focus solely on the issue of whether Pine River's conduct furnished grounds for termination of the Management Agreement or constituted a related tort. *See* Herbst Rep. (Sama Daubert Decl. I (Dkt. 360) Ex. 9) (Dkt. 360-7); Johnson Rep. (Sama Daubert Decl. I Ex. 25) (Dkt. 360-17).[5] In light of my

---

[5] Herbst was asked to "evaluate and provide opinions" regarding Two Harbors' allegations, in its letters and pleadings, "providing grounds for termination of the Management Agreement." Herbst Rep. ¶ 3. Specifically, as to each such ground, Herbst assesses "whether a board member or a typical investor would find the allegations or termination bases to be material and whether the allegations at issue are reflective of custom and practice in the REIT industry." *Id*. He was also "asked to evaluate whether the alleged conduct could have been cured or remedied had Two Harbors notified Pine River of the alleged issues." *Id*.

Johnson was asked by Pine River to "review Two Harbors' stated grounds for termination of the Management Agreement in its Notice of Termination, Supplemental Notice of Termination, and the Counterclaims," to assess "whether the allegations raised by Two Harbors about the conduct of Pine River would affect or be considered important to shareholders in Two Harbors," and to

recommendation that summary judgment be granted to Pine River on the parties' termination-related claims and counterclaims, I deny Two Harbors' *Daubert* motion as to these two experts as moot, without prejudice to reconsideration in the event the district judge determines that the termination-related claims and counterclaims must be tried. I now turn to the Pine River expert reports that provide opinions concerning the IP claims, and damages, which remain at issue.

### 1.    Roffman

Pine River expert Daniel Roffman is a vice president in the Forensic Services Practice at Charles River Associates, Inc. (CRA) with 20 years of experience in digital forensics and information security consulting. Roffman Rep. (Sama Daubert Decl. I Ex. 8) (Dkt. 360-6) § 1. CRA performed two onsite inspections of Two Harbors' office in Minnesota, from July 25 through August 19, 2022, and from September 26 through October 7, 2022. *Id.* § 4.1. The inspection sought to determine whether "Two Harbors still retained Pine River's Intellectual Property as that term is defined in the Management Agreement," and "if and how Two Harbors may be using and/or modifying the Intellectual Property." *Id.* The CRA inspection team wrote custom scripts to query Two Harbors' SQL servers, and compared the number of records in the database before and after the termination date. *Id.* § 4.2. The team also manually reviewed records and source code. *Id.* Roffman concludes that when Two Harbors terminated the Management Agreement, it "retained possession of the systems, applications and infrastructure, including certain intellectual property, created by Pine River to operate Two Harbors' business, and continues to use the applications and software originally developed by Pine River." *Id.* § 8.

---

"opine on what considerations a reasonable board member, sitting on Two Harbors' Board of Directors, would undertake when making decisions on behalf of the company." Johnson Rep. ¶ 7.

Two Harbors argues that the Court should exclude all of Roffman's opinions because his report and deposition testimony are "littered with legal opinions that, based on the Management Agreement, Two Harbors' disclosures, the Second Amended Complaint, and other documents produced in this case, Pine River owns the technology at issue." Def. Mem. (Dkt. 357) at 44. Two Harbors further argues that Roffman "admits that all of his remaining opinions are based on his opinions about the ownership of the technology at issue." *Id.* at 45.

Two Harbors is correct that it is impermissible for an expert witness to opine as to which party owns the IP at issue in this action, which is a legal conclusion. *See SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 902 (N.D. Cal. 2022) (expert's opinions of party's copyright ownership "are just bald legal conclusions" and that "[w]hether the parties' evidence shows ownership is for [the judge] (at summary judgment) or the jury (at trial) as a factfinder.") "Expert testimony must not 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). The expert's role, under Rule 702(a), is to assist the trier of fact in "understand[ing] the evidence" or "determin[ing] a fact in issue," not to dictate either the facts or the law to the jury. *See Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *3 ("[E]xpert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations."). Thus, while "an opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), the Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (collecting cases); *see also Bilzerian*, 926 F.2d at 1294 ("although an expert may opine on an issue of fact within the jury's province, he may not give

10

testimony stating ultimate legal conclusions based on those facts"). This rule appropriately guards against "the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 advisory committee's note.[6]

As the Second Circuit explained in *United States v. Duncan*:

When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

42 F.3d 97, 101 (2d Cir. 1994).

The rule against expert testimony "which states a legal conclusion" is particularly important where the opinion "is not based on personal knowledge, but instead on [the expert's] review of documents and depositions produced by the parties." *Media Sport & Arts.*, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999). *Compare Duncan,* 42 F.3d at 102 (allowing opinion testimony based on personal knowledge), *with Scop,* 846 F.2d at 142 (disallowing opinion testimony by an investigator without personal knowledge of the facts as encroaching on exclusive province of the jury).

For the most part, however, Roffman does not attempt to supply improper legal opinions. Two Harbors contends that "Mr. Roffman opines that he 'understand[s] that all Intellectual Property created or developed by Pine River in the performance of the Management Agreement was the sole property of Pine River[.]'" Def. Mem. at 45 (citing Roffman Rep. at 6). In the quoted

---

[6] By way of example, an expert may not testify that a police officer used "deadly physical force" that would not be "justified under the circumstances," *Hygh*, 961 F.2d at 362, nor that the stock of a particular company was "manipulated," *United States v. Scop*, 846 F.2d 135, 138 (2d Cir.), *on reh'g,* 856 F.2d 5 (2d Cir. 1988), nor that a lawyer or doctor committed "malpractice." *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 2014 WL 12788845, at *11 (E.D.N.Y. Mar. 31, 2014).

portion of the report, however, Mr. Rothman does not appear to be offering his own opinion; he is merely setting forth his understanding as to what the Management Agreement says (that "all Intellectual Property created or developed by Pine River in the performance of the Management Agreement was the sole property of Pine River"), as background for his own assignment, which was (in part) to "establish whether and to what extent Two Harbors has continued to retain, use and/or modify any Intellectual Property developed in connection with Pine River's performance of the Management Agreement." *Id.* at 7.[7]

Two Harbors similarly objects to Mr. Roffman's "opinion" that "'any intellectual property created or developed by these [Pine River] employees for Two Harbors' use is "Intellectual Property" owned by Pine River, as that term is defined in the Management Agreement.'" Def. Mem. at 45 (citing Roffman Rep. at 8). Once again, however, it is quite clear, in context, that Roffman is simply describing his understanding of the contractual framework that makes his work relevant. Roffman's actual opinions (which begin on page 11 of his report) are, for the most part, highly technical and build to a series of conclusions concerning which entity (Pine River or Two Harbors) "developed" the systems, software, models, and databases that his team inspected; when they were developed; and which entity now possesses those systems, software, models and databases. *See*, *e.g.*, Roffman Rep. at 12 (opining that Pine River "developed" the TPS Prepayment

---

[7] Moreover, Roffman has – at least in this instance – accurately reported the key contractual language. *See* Management Agreement (Dkts. 359-2, 366-2) § 27(a) ("All Intellectual Property created or developed by the Manager in connection with the Manager's performance of this Agreement or otherwise and the Intellectual Property Rights associated therewith shall be the sole and exclusive property of the Manager."). Elsewhere in his report, Roffman is less careful. *See*, *e.g.*, Roffman Rep. at 67 ("I understand that [in 2019] Two Harbors was a Pine River managed company and *any IP created was . . . owned by Pine River.*") (emphasis added). As this Court recently explained, § 27(a) of the Management Agreement does not automatically make Pine River the owner of all software developed prior to its termination. *See* R&R at 75-84. Nonetheless, it remains clear that Roffman is providing background information as to his understanding of the governing contractual standard, not venturing his own legal opinion as to what ownership means.

Model, beginning no later than 2017, and that Two Harbors now has "possession of the TPS Prepayment Model," which it uses on a daily basis); *id*. at 66-68 (opining that Two Harbors has "possession of the Repo Monitor user interface," which was "developed prior to the Termination Date"). These opinions are well within the province of a digital forensics expert and do not improperly incorporate any legal opinions.

Drawing on Roffman's deposition testimony, Two Harbors next contends that he has "admit[ted] that all of his remaining opinions are based on his opinions about the ownership of the technology at issue." Def. Mem. at 45 (citing Roffman Dep. Tr. (Dkt. 360-18) at 84:16-87:12). In particular, Two Harbors points to Roffman's testimony that, if the Management Agreement did not govern the ownership of the IP, he would review whatever documents "do govern the intellectual property ownership," and then "form an opinion based on all of the available information that existed." Roffman Dep. Tr. at 85:8-25. This too is unobjectionable. It is also, of course, counterfactual (since the Management Agreement does in fact govern the ownership of the IP), and therefore irrelevant to the opinions that Roffman actually offers.

Two Harbors also argues that Roffman's deposition testimony "makes clear that he is opining on the ownership of the technology at issue." Def. Mem. at 45. In one instance, Roffman did step over the line:

> Q.     Okay. So, what is the basis for your assertion that the Management Agreement dictates the ownership of the alleged intellectual property?
>
> A.     So, I have, for example, read very basic documents in this case, things like the complaint and the Management Agreement itself. And while I'm not a lawyer and I'm not offering a legal opinion, . . . *it seems pretty clear to me, based on my understanding of those documents, . . . that intellectual property that was developed during the course of the Management Agreement belongs to Pine River*.

Roffman Dep. Tr. at 71:18-72:8 (emphasis added). Similarly, in his written report, Roffman occasionally exceeds the scope of his expertise and attempts to apply the standard set forth in

§ 27(a) (as he understands it) to the results of his forensic investigation. *See, e.g.*, Roffman Rep. at 111 ("Based on my experience and review of the available evidence in this matter, it is my opinion that Two Harbors possesses *Pine River's intellectual property*, has used that intellectual property consistently since the Termination Date and continues to use that intellectual property in its operations.") (Emphasis added). It is not the province of an expert witness to interpret the Management Agreement, nor to apply the legal standard set out in that contract to the facts. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *2. However, there is no basis for excluding "all of Mr. Roffman's remaining opinions," Def. Mem. at 45, simply because he has once or twice gone too far.

I note, in this regard, that Two Harbors does *not* object to the Roffman Report on relevance or reliability grounds. Defendant thereby concedes – and this Court agrees – that the investigation he performed and the opinions he offers (including his conclusions as to which entity developed the IP at issue, when it was developed, and which entity now possesses it) are relevant to the ultimate question of who owns that IP, and "the product of reliable principles and methods." Fed. R. Evid. 702(c). Thus, as to Mr. Roffman, Two Harbor's motion will be granted in part, to the extent that the witness may not testify, at trial, that Pine River "owns" the contested IP, or that it is Pine River's "property." Moreover, while he may reference § 27(a) of the Management Agreement for background purposes (*e.g.*, to explain why, and to what end, CRA undertook the various investigations described in his report), he may not offer, in his capacity as an expert, his own opinion as to the meaning or proper interpretation of that (or any other) contractual provision.

### 2. Kursh

Steven Kursh, Ph.D., a software expert, was asked to "testify about the software development process, certain software, databases, and systems developed by Pine River, including their functionality and features, and the time it would have taken TWO to develop independently

those software, databases, and systems in connection with the termination of the Management Agreement," as well as "the reasonable measures taken by Pine River to protect the confidentiality of its intellectual property." Kursh Rep. (Sama Daubert Decl. I Ex. 19) (Dkt. 360-14) ¶¶ 1, 69. Kursh concludes, among other things, that it would have taken Two Harbors at least three years to independently develop certain "software-related trade secrets" at issue in this action (including COSMOS, Repo Monitor, Neptune, the Agency Prepayment Model, EDMS, and Legal Portal), using the "software development personnel it had at the time it terminated the Management Agreement." *Id.* ¶¶ 73-74. In an alternative scenario, where Two Harbors retained Pine River as its external manager, it would have taken Two Harbors at least three years and six months to "independently develop Pine River's trade secrets in addition to certain Pine River intellectual property software in a clean room environment." *Id.* ¶¶ 75-76. Kursh also reviews Pine River's confidentiality measures, including its "employment agreements, workplace policies and procedures, IT protocols, physical security measures and other steps taken to restrict access and improper disclosure of its intellectual property," and concludes that "Pine River employed more than reasonable measures" to maintain confidentiality. *Id.* ¶ 79.

### a.    Methodology

Two Harbors contends that Kursh's opinion as to how long it would have taken Two Harbors to independently develop the software at issue should be excluded because Kursh "does not offer a reliable methodology" and "instead relies on guesswork." Def. Mem. at 40. Two Harbors first argues that Kursh inadequately explains why he decided to primarily use only two of six identified techniques to estimate the time and effort required to develop the software at issue, Def. Mem. at 40-41, using only "vague, conclusory statements," including that he made the decision "based on the evidence available." *Id.* at 41. Two Harbors cites *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 254 (2d Cir. 2021), and *United States v. Jones*, 965 F.3d 149, 162 (2d

Cir. 2020), for the proposition that this explanation as to his choice of techniques is "not enough." *Id.* However, in *Electra*, the Second Circuit held that an expert's damages report was properly excluded because his methodology "resulted in calculations of damages amounts far greater than the actual amount Appellants received," and therefore "systematically overestimated the fair market value." *Electra*, 987 F.3d at 255. No comparable issue is presented here. In *Jones*, the Second Circuit affirmed the district court's *denial* of a *Daubert* motion. Neither case provides support for Two Harbors' argument that Mr. Kursh's opinions should be excluded because he did not adequately explain his choice of technique.

Next, Two Harbors argues that Kursh employed an unreliable methodology, including "guesswork." Def. Mem. at 41-43. Specifically, Two Harbors asserts that Kursh unreliably assumed that the version of COSMOS in use in 2020 (when the Management Agreement was terminated) was necessary for Two Harbors to conduct its mortgage servicing rights (MSR) operations, and therefore errs by estimating the time it would take to redevelop the 2020 COSMOS system – not the initial 2016 version. *Id.* at 41. Two Harbors adds that Kursh's estimates are unreliable because the COSMOS-related project plan documents, or "project charters," that Kursh considered, "'do not necessarily reflect the actual number of hours spent by the IT department to develop each project or trade secret.'" *Id.* (citing Kursh Rep. ¶¶ 519, 525). Further, according to Two Harbors, Kursh improperly estimated the size of the project charters by calculating the average of available data – assuming there would be no outliers – without explaining why that was a reliable method. Def. Mem. at 42. Finally, Two Harbors asserts, using the estimated time it took to develop the 2020 version of COSMOS as a "baseline" to estimate the effort of coding *other* trade secrets "ensures that the guesswork in the estimates of redevelopment time for COSMOS

contaminate the estimates of redevelopment time for the other technology, thereby rendering all of the estimates unreliable." *Id.* at 42-43.

These points all go to the weight of Kursh's opinions, not their admissibility. Given that "only serious flaws in reasoning or methodology will warrant exclusion," Kursh need not have based his opinion "on the best possible evidence, regardless of availability, but upon good grounds, based on what is known." *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 178 (cleaned up); *see also Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 147 (N.D.N.Y. 2010) ("Experts are entitled to differing opinions as to the validity of the methodology, so long as the challenged methodology is grounded in reliable scientific principles and facts.") (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). Since Kursh's methodology falls within "'the range where experts might reasonably differ,'" it will be the duty of the factfinder to "determine[e] the weight and sufficiency of the evidence." *See Lickteig*, 589 F. Supp. 3d at 330 (quoting *Kumho Tire*, 526 U.S. at 153).

Two Harbors makes much of the fact that, at deposition, Kursh conceded that his "lines of code" method for estimating a redevelopment rate is "not a perfect tool" because, among other things, "there is no one right way to count lines of code[.]" Def. Mem. at 43 (quoting Kursh Rep. ¶ 560 and Kursh Dep. Tr. at 201:17); *see also* Kursh Dep. Tr. at 201:20-22 ("'[t]wo people can have exactly the same methodology and they may get different results"). Kursh is correct, however, that it is entirely possible for two experts, each using reasonably reliable methods, to come to two different results. *See Falise v. Am. Tobacco Co.*, 258 F. Supp. 2d 63, 68 (E.D.N.Y. 2000) ("the different experiences of the two experts accounts in part for their differing results" and "their divergent conclusions are based on sufficient reliable underlying facts and data, and sufficiently rigorous and accepted statistical methods to warrant submission to the jury"). That is what trials

(and expert rebuttal reports) are for. I therefore decline to exclude Kursh's opinions on reliability grounds.

### b. Improper legal conclusions

Two Harbors also argues that Kursh (i) improperly offers the legal conclusion that the technology at issue "would be considered to be trade secrets" while (ii) admitting that the same technology did not meet the legal definition of a trade secret. Def. Mem. at 44. It is not clear to the Court, however, that Kursh did either of these things. In his written report, he carefully avoids opining on whether the technology at issue would qualify as a trade secret. At deposition, he confirmed that he was not asked by counsel to opine on that question. *Id.* (citing Kursh Dep. Tr. (Sama Daubert Decl. I Ex. 20) (Dkt. 360-15) at 82:9-83:4). Nowhere in the portion of the deposition transcript submitted to the Court by Two Harbors does Kursh make any "admission" on this issue. *See id*. (citing Kursh Dep. Tr. at 85:8-11). Consequently, there is nothing to exclude.

Nor has Two Harbors provided the Court with any support for its suggestion that Kursh is attempting to "shoehorn . . . legal opinions" concerning ownership rights under the Management Agreement into his expert report. Def. Mem. at 44. To the contrary: Kursh assured Two Harbors' counsel, at deposition, that "I don't get near interpreting agreements" and that "'ownership rights under [the Management Agreement]' were 'a legal issue'" beyond the scope of his report. *Id*. (citing Kursh Dep. Tr. at 86:6-14). Once again, there is simply no evidence that Kurch offered, or plans to offer, any excludable legal opinions. Consequently, as to Mr. Kursh, Two Harbors' motion will be denied.

### 3. O'Laughlen

Victor O'Laughlen, an expert in the mortgage finance industry, was retained by Pine River to provide an opinion as to actions that two government-sponsored enterprises (GSEs), Fannie Mae and Freddie Mac, would have taken if Two Harbors had been unable to access the COSMOS

software after terminating the Management Agreement. O'Laughlen Rep. (Sama Daubert Decl. I Ex. 3) (Dkt. 360-2) ¶¶ 1-2, 7. O'Laughlen explains that with COSMOS, which is a "master servicing" technology platform, Two Harbors was able to "(1) continue to grow the size of the MSR portfolio, (2) reduce the need to add operational MSR personnel and thus improve profitability, (3) maintain management control over MSR purchases to ensure a consistent quality of loan purchases, and (4) implement strong oversight of the subservicers consistent with the expectations of Fannie Mae and Freddie Mac to retain the Agencies' approval to service mortgages." *Id.* ¶¶ 2, 35. Without COSMOS, however, Two Harbors "would be unable to continue its MSR operations" after the Management Agreement was terminated on August 14, 2020. *Id.* ¶ 3. O'Laughlen was also asked to estimate how long it would have taken "Two Harbors' principals to wind down its MSR business, start another company, and grow that company to the size Two Harbors was on August 14, 2020." *Id.*

O'Laughlen opines that Two Harbors would not have been able to continue operations if unable to access COSMOS, because "[t]he loss of COSMOS would have been a major, irreversible disruption to Two Harbors' daily operations." O'Laughlen Rep. ¶ 51. In that scenario, Two Harbors would have been required to notify Fannie Mae and Freddie Mac of the loss of access to the IP, at which point – in O'Laughlen's view – the agencies would have suspended Two Harbors from MSR purchases within a few weeks. *Id.* ¶¶ 55-56. Thereafter, according to O'Laughlen, the agencies would have "required the complete wind-down of Two Harbors' MSR operation." *Id.* ¶ 58. O'Laughlen further opines that it would take approximately three years for a "new Two Harbors" to regain the ability to service MSRs. *Id.* ¶ 73.

Two Harbors seeks to exclude O'Laughlen's opinions on the ground that they are based on speculation, offered without any analysis, and unsupported by any reliable methodology. Def.

Mem. at 31-33. Two Harbors notes that O'Laughlen did not personally examine COSMOS or test third-party alternatives to COSMOS, *id.* at 32, and argues that his references to "general principles" of GSEs "provide no reliable basis" for his opinions concerning what would have occurred if Two Harbors had lost access to COSMOS. *Id.* at 34. Two Harbors adds that if O'Laughlen intends to rely on his own experience with GSEs as the basis for his opinions, "he must show 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* at 35 (quoting *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021)). Instead, Two Harbors argues, O'Laughlen "merely states that he worked for Freddie in various capacities and for the MBS [mortgage-backed securities] division of a mortgage REIT." Def. Mem. at 35.

Two Harbors' arguments are unconvincing. Testifying experts need not conduct original research; they may rely on facts or data gathered by others, as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see also Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 95 (2d Cir. 2000) ("The expert need not have conducted her own tests."). It follows that O'Laughlen was not required to personally examine COSMOS in order to offer an admissible opinion. He instead permissibly relies on "documents and testimony provided to [him] by counsel, particularly as it relates to the purpose, scope and operation of COSMOS and how this technology supported the master servicing functions performed by Two Harbors . . . , as well as the employees of Pine River who were responsible for the day-to-day management of Two Harbors[.]" O'Laughlen Rep. ¶ 4.

O'Laughlen also applies his own experience working for a GSE (discussed below) and, in his report, sufficiently "'explain[s] how [his] experience leads to the conclusion[s] reached, why that experience is a sufficient basis for [his] opinion, and how that experience is reliably applied

to the facts.'" *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee's note). An expert witness may base his testimony on his own experience if he shows why that experience is a reliable foundation for the testimony. *Pension Comm. Of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 473. Moreover, it is within the court's discretion to determine whether an expert has provided a sufficient "degree of detail in linking his experience to his conclusions." *Id.* at 464.

O'Laughlen was employed as a vice president by Freddie Mac for 25 years, from 1985 to 2005 and again from 2009 to 2013. *See* O'Laughlen Rep. at ECF pp. 42-43. He was retained by Pine River to opine as to actions that Fannie Mae and Freddie Mac would have taken had Two Harbors lost access to COSMOS. *Id.* ¶¶ 7-13. At Freddie Mac, O'Laughlen was responsible for "monitoring compliance activities of the nation's largest mortgage servicers." Pl. Opp. (Dkt. 388) at 27 (citing O'Laughlen Rep. at ECF p. 42). As to his experience, O'Laughlen testifies that "the timeline of key events following Two Harbors' loss of access to COSMOS is based on 'a wind down remedy that [he has] seen Freddie Mac use on a couple different occasions.'" Pl. Opp. at 27 (citing O'Laughlen Dep. Tr. (Sama Daubert Decl. III (Dkt. 424) Ex. 53) (Dkt. 424-3) at 318:18-319:17). The Court agrees with Pine River that a lay person would not be able to testify as to how the GSEs would have responded to the loss of COSMOS, Pl. Opp. at 27, but that O'Laughlen has sufficient experience to offer a useful opinion.

Beyond his own experience, O'Laughlen bases his opinion upon a review of documents that not only describe "the functionality and import of COSMOS to Two Harbors' business," but also discuss "the fact that Two Harbors had not identified any alternative solutions at the time of

termination." Pl. Opp. at 26.[8] Moreover, he explains the "objective factors . . . necessary for Two Harbors to maintain its approval to continue purchasing and owning MSRs from the GSEs," and describes how Two Harbors uses COSMOS to satisfy those objectives. Pl. Opp. at 25.[9]

Two Harbors has raised non-frivolous issues as to whether O'Laughlen drew reasonable conclusions from adequate data. Under *Daubert*, however, "an expert need not base his or her opinion on the best possible evidence, regardless of availability, but upon 'good grounds, based on what is known.'" *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 178 (quoting *Daubert*, 509 U.S. at 590); *see also Amorgianos*, 303 F.3d at 266 (an expert need not "back his or her opinion with published studies that unequivocally support his or her conclusions"); *In re Int. Rate Swaps*, 2023 WL 8675625, at *4 (an expert need not have "employed the best possible input data to form her testimony"). I conclude that Two Harbors' reliability arguments go to the weight of O'Laughlen's opinions, not their admissibility, and can be tested on cross-examination.

### 4.    Slosser

Kenneth Slosser is a senior investment banker and capital markets professional with experience in the formation of REITs. Slosser Rep. (Sama Daubert Decl. I Ex. 5) (Dkt. 360-4) ¶ 1. In his report, Slosser opines on a number of issues related to the parties' termination-related claims

---

[8] O'Laughlen writes that he "reviewed the documents listed in the Relied Upon Materials section of this report (Appendix: Section IX)." O'Laughlen Rep. ¶ 5. Appendix IX is not attached to the version of the report filed on the docket.

[9] As one example, O'Laughlen writes that Fannie Mae requires a servicer to "have sufficient staffing levels, technology, and properly trained staff (including third-party providers of its outsourced servicing activities and technology) to carry out all aspects of their servicing duties in accordance with the timing requirements of the *Servicing Guide*, maintain acceptable performance standards, and provide borrowers with assistance when it is requested." O'Laughlen Rep. ¶ 44. As to these requirements, O'Laughlen writes that COSMOS "provides the daily monitoring and reporting of loan level actions taken by sellers, subservicers and others, and it further supports monthly compliance management functions," and that "COSMOS, when fully developed, enabled Two Harbors employees to manage the status of each loan and monitor all of the intersections of this integrated process from acquiring MSRs through its lifecycle to final disposition." *Id.* ¶ 40.

and counterclaims. In light of my recommendation that summary judgment be granted to Pine River on those claims and counterclaims, defendant's *Daubert* motion will be denied as moot insofar as it challenges the termination-related portions of Slosser's report, without prejudice to reconsideration in the event the district judge determines that those claims and counterclaims must be tried. I now address the portion of the report in which he opines on several IP-related issues.

Slosser was also asked to assess the "market impact" on Two Harbors if it lost access to "Pine River's intellectual property" upon termination of the Management Agreement, and to determine how long it would have taken Two Harbors' management to form and capitalize a new mortgage REIT if (as he contends) internalizing without access to the IP would have forced a sale or wind-down of Two Harbors itself. Slosser Rep. ¶ 11. He concludes that Two Harbors would not have been able to operate without the IP. *Id.* ¶¶ 118-19. In Slosser's view, the loss of the IP would have been a material event, such that Two Harbors would have been required to disclose it to the SEC. This, in turn, would have caused institutional shareholders to sell, which would have resulted in a stock price decline, which would ultimately have forced the sale or liquidation of Two Harbors. *Id.* ¶¶ 119-24. Slosser references the failure of Silicon Valley Bank (SVB) in 2023 as a "similar cascading share price event" that occurred "due to investors seeking to sell their shares out of fear that the bank lacked sufficient capital to handle its financial obligations." *Id.* ¶ 124. Slosser also reviews case studies of mortgage REITs (mREITs) that wound down their operations "as the result of underperformance or distress," *id.* ¶ 117, and finds a "similar trend in price movements" in the months leading up to the sale, liquidation, or bankruptcy. *Id.* ¶ 124. Slosser concludes that Two Harbors would have likely been forced to sell or liquidate its assets, and that it would take approximately twelve months to begin operating a new REIT. *Id.* ¶¶ 13, 125, 140, 149.

a.    *Qualifications*

Two Harbors asks this Court to exclude Slosser's opinions concerning the impact of the hypothetical IP loss because he does not have expertise as to the "actual management of REITs" or "when and how a REIT would wind down." Def. Mem. at 39. "The qualification of experts falls within the broad discretion of the trial court, . . . which need not preclude an expert from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Peretz v. Home Depot Inc.*, 2009 WL 3124760, at *2 (E.D.N.Y. Sept. 29, 2009). Courts do not exclude experts with "educational and experiential qualifications in a general field closely related to the subject matter in question, . . . solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 2023 WL 5670711, at *4 (S.D.N.Y. Mar. 6, 2023) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282) (E.D.N.Y. 2007).

Although Slosser has not managed a REIT, he regularly represented and advised sellers and buyers of publicly traded mortgage REITs while serving as Executive Vice President and Head of Investment Banking of a publicly traded investment bank (FBR Capital Markets) from 2011 to 2017. Slosser Rep. ¶ 2. Here, he was asked, *inter alia*, to assess how long it would have taken Two Harbors' management to form and capitalize a new mortgage REIT if Two Harbors itself did not survive. *Id*. ¶ 11. He writes that, as an investment banker, he is "broadly familiar with the steps involved and capital required in forming a mortgage REIT business, the structure and corporate governance of both internally and externally managed REITs (particularly residential mortgage REITs), and in evaluating management compensation and incentive plans." *Id.* ¶ 4. He adds that he was "directly involved in seven transactions involving the formation of a REIT by an external sponsor who managed, subject to a management agreement, the REIT following the formation and initial capitalization." *Id.* ¶ 5. Given Slosser's relevant experience, his opinions should not be

24

excluded on the ground that he is unqualified to offer them. Two Harbors' concerns regarding Slosser's expertise go to the weight, not admissibility, of his testimony, and can be addressed through cross-examination.

b.    <i>Methodology</i>

Two Harbors next contends that Slosser "does not offer any methodology," relying instead on "speculation." Def. Mem. at 36. Two Harbors argues that Slosser bases his doomsday-scenario opinion on "a single risk disclosure in Two Harbors' SEC filings," in which "Two Harbors noted that the loss of technology 'could have a material adverse effect' on its operations and that 'it may be difficult or costly to replace certain intellectual property.'" Def. Mem. at 37 (citing Two Harbors' 2019 10-K (Sama Daubert Decl. I Ex. 15) (Dkt. 362-15) at ECF pp. 3-4). In Two Harbors' view, nothing in that risk disclosure supports Slosser's conclusion that it would have been forced to wind down. Def. Mem. at 37. Rather, it contends, Slosser "simply speculates that an investor 'would find the loss of access to that IP as a material piece of information they would want to know.'" *Id.* (quoting Slosser Dep. Tr. (Sama Daubert Decl. I Ex. 7) (Dkt. 362-7) at 310:14-16). Two Harbors adds that Slosser cannot rely on the "speculative opinions" of two other expert witnesses (Maffattone and O'Laughlen) to "bolster his own." *Id.* at 38.

Two Harbors also objects to Slosser's comparison of Two Harbors to SVB, arguing that he "does not even try to explain how a failed bank provides any insight into how investors would respond to a REIT's loss of access to software." Def. Mem. at 38. Additionally, according to Two Harbors, Slosser fails adequately to connect his examples of instances in which a stock-price drop preceded the wind-down of a an mREIT to the facts of this case, pointing out that Two Harbors itself suffered a stock-price drop in March 2020 (at the start of the Covid pandemic) "but did not wind down." *Id.*

I first note that many of Two Harbors' arguments in effect ask this Court to exclude Slosser's opinion because it is incorrect. That is not the standard. *See In re Paoli*, 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). As for Two Harbors' argument that Slosser relies on "speculative opinions" of other Pine River experts, I disagree that O'Laughlen's opinions are unduly speculative, and therefore decline to exclude Slosser's report on this ground. However, as discussed below, certain of Maffattone's opinions substantially exceed his stated IT expertise and will be excluded for that reason. Slosser may not rely on those portions of the Maffatone Report for any purpose.

As to Two Harbors' remaining arguments – concerning Slosser's methodology – I remain mindful that "only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 178; *see also Fleischman*, 728 F. Supp. 2d at 147 ("[e]xperts are entitled to differing opinions as to the validity of the methodology"). Here, Slosser relies on his relevant experience, in addition to a review of SEC filings and daily stock price data for instances in which stock-price drops preceded an mREIT's wind-down. Slosser Rep. ¶ 124. I therefore conclude that Slosser's opinions are not based on "insufficient data" in violation of Rule 702. Nor does Slosser rely upon facts or data beyond those that experts in his field "would reasonably rely on," in violation of Rule 703.

I agree, however, that Slosser's reliance on the SVB failure is unwarranted (as well as sensationalist). Banks are not the same as REITs, and Slosser does not claim to have been personally involved in the SVB collapse. Moreover, he offers no explanation for his reference to a single non-REIT "extinction event," which strongly suggests that he added it to his report simply because the failure of SVB was "widely reported," Slosser Rep. ¶ 124, and catastrophic. Thus, as to Mr. Slosser, Two Harbor's motion will be granted in part, to the extent that the witness may not

26

rely for any purpose on the excluded portions of the Maffattone Report (as discussed below), and may not draw on the SVB failure to support his opinions concerning the likely fate of Two Harbors in the scenario he posits.

### 5. Maffattone

Pine River asked Michael Maffattone to provide his "analyses and conclusions on certain technical and business aspects" concerning Two Harbors' alleged trade secret misappropriation. Maffattone Rep. (Sama Daubert Decl. I Ex. 4) (Dkt. 360-3) ¶¶ 1, 29. Maffattone opines that the trade secrets at issue are "highly valuable proprietary assets" that "were and are critical to enabling Two Harbors' business to reach the levels of success it has experienced." *Id.* ¶ 29. He further opines that within three months of Two Harbors terminating the Management Agreement without retaining access to the trade secrets and IP at issue, Two Harbors' MBS and MSR operations would have "collapsed." *Id.* ¶ 30. He also opines that it would take approximately four years for a "New Two Harbors" to "return to the scale of operations Two Harbors experienced in August 2020, if it could do so at all," *id.* ¶ 31, including six months to "recreate certain intellectual property and trade secret documents." *Id.* ¶ 33. Lastly, Maffattone opines that "Pine River employed beyond reasonable measures to ensure the secrecy of its trade secrets and other confidential or proprietary information." *Id.* ¶ 32.

#### a. *Unqualified Witness*

Two Harbors argues that Maffattone improperly offers opinions "far beyond" his proffered area of expertise in the field of "information technology." Def. Mem. at 27. Two Harbors specifically takes exception to the fact that Maffattone opines as to Two Harbors' business operations; the reactions of counterparties, investors, and GSEs to its hypothetical loss of the trade secrets at issue in this action; and the likely course of its hypothetical wind-down and relaunch. *Id.* at 28. Two Harbors points out that once he is beyond his actual area of expertise, "[t]he best that

Mr. Maffattone can offer is that he has 'seen' word spread of failing companies and, while working for the Federal Reserve, he 'was in the monetary policy area' and the 'people that [he] worked for met with bankers whenever there was a crisis.'" *Id.* (quoting Maffattone Dep. Tr. (Sama Daubert Decl. I Ex. 6) (Dkt. 360-5) at 330:14-333:5).

The Court agrees. Unlike Slosser, Maffattone has no business (or regulatory) experience outside of the information technology and cybersecurity fields. *See* Maffattone Rep. ¶¶ 4-19. While he has filled many "technology leadership roles," *id.* ¶ 15, including some at mREITs, he is not qualified to offer expert opinions concerning the likely financial implosion of Two Harbors in a hypothetical world in which it internalized without retaining any of the IP at issue in this action, much less the likely timeline of its post-implosion relaunch efforts, including, for example, finding start-up capital, contracting with vendors, and registering with regulators.

As discussed above, a court should not exclude an expert with "educational and experiential qualifications in a general field closely related to the subject matter in question, . . . solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Ripple Labs, Inc.*, 2023 WL 5670711, at *4 (citing *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282). In this instance, however, there is a significant gap between Maffattone's "educational and experiential qualifications," which are impressive but highly specialized, and the broader financial and business opinions he offers in portions of his report. In an effort to widen his perceived qualifications, Maffattone states that during his "35 plus years in the financial industry," he has "seen many failures of financial institutions," some of which he "worked closely with as a counterparty or regulator." Maffattone Rep. ¶ 213. That may be. But having "seen many failures" does not qualify an IT expert to opine (for example) that:

> [I]t would take approximately three months for Two Harbors to sell its Agency MBSs and other related instruments like TBAs and unwind its swaps based on their

excellent liquidity in the market and the credit backing from Fannie Mae, Freddie
Mac and GNMA. It would have taken around 5-6 months to sell the MSRs, and
another few months to complete transfers. Other assets and activities would
probably take months more to wind down.

*Id.* ¶ 219. Nor is Maffattone qualified to explain how and why Two Harbors' MBS business would

collapse once it started making mistakes due to its lack of critical systems and software:

> Errors would raise further red flags with counterparties, further damaging lender
> confidence in Two Harbors. A counterparty with its own repo systems would likely
> detect when it is receiving the same MBSs as collateral twice, or less collateral to
> cover the repo, resulting in the counterparty's trust in Two Harbors being
> diminished. The result would be that Two Harbors would incur higher repo rates
> that would reduce their interest rate spread between their short term financing and
> their longer term MBSs or higher haircut rates requiring pledging more collateral,
> which would diminish potential profitability and therefore dividends to
> shareholders. Or more likely, a repo counterparty would stop providing financing
> to Two Harbors, where the results could be much worse than just earning less and
> paying a lesser dividend to shareholders (e.g., forced selling of significant portions
> of Two Harbors' portfolio, given its degree of leverage, in order to satisfy repo
> maturities that could not be extended or refinanced).

*Id.* ¶ 224.

Maffattone is well qualified to opine on the technical aspects of the IP at issue, as well as

the value of that IP, the effort and time it would take to replace or recreate it, and the measures that

Pine River took to protect it. However, his opinions regarding "what would have happened to Two

Harbors' business after it terminated the Management Agreement and did not retain access to Pine

River's trade secrets and intellectual property" will be excluded, along with his views concerning

how long it would take "following the restart for a New Two Harbors to return to the scale of

operations Two Harbors experienced in August 2020, if it could do so at all." Maffattone

Rep. ¶¶ 30-31.[10]

---

[10] Maffattone's inadmissible opinions are summarized in ¶¶ 30-31 and fleshed out in ¶¶ 209-51
and ¶¶ 254-67. All will be excluded.

*b.    Methodology*

Two Harbors also challenges Maffattone's methodology (or lack thereof), particularly when he is opining on broader business trends rather than the specifics of the IP that is the subject of Pine River's claims in this action. For example, Two Harbors complains that, when discussing the likely collapse of Two Harbors, Maffattone "cherry-picks four of the most dramatic bank failures of the last 15 years," though "none is remotely relevant." Def. Mem. at 26.[11]

Again, the Court agrees. When a proposed expert relies primarily on his experience to support his opinions, the court must determine whether he has provided a sufficient "degree of detail in linking his experience to his conclusions." *Pension Comm. Of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 464, 473. Here, I conclude that Maffattone has insufficiently linked his experience (as a participant in the IT arena but merely an observer of the financial institution failures he discusses) to his broader opinions concerning "what would have happened to Two Harbors' business after it terminated the Management Agreement and did not retain access to Pine River's trade secrets and intellectual property," and how long it would take "following the restart for a New Two Harbors to return to the scale of operations Two Harbors experienced in August 2020, if it could do so at all." Maffattone Rep. ¶¶ 30-31. For this reason as well, ¶¶ 30-31, 209-51, and 254-67 will be excluded.

Additionally, the Court excludes Maffattone's opinion that "Two Harbors misappropriated a number of Pine River's trade secrets," Maffattone Rep. ¶ 81, for the same reasons discussed in Part III(A)1, *supra*, with respect to Mr. Roffman. Whether Two Harbors misappropriated any trade

---

[11] In order to "illustrate how quickly markets and investors can turn their business away from leveraged financial institutions," Maffattone spends four pages discussing the demise of Lehman Brothers, Bear Stearns, and SVB, as well as the near-demise of Credit Suisse in 2023. Maffattone Rep. ¶¶ 230-34.

serets – and, if so, whose trade secrets they were – are legal conclusions reserved for the finder of fact at trial. *See Bilzerian*, 926 F.2d at 1294 ("[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.").

### c.    Interested Witness

Lastly, Two Harbors argues that all of Maffattone's opinions should be excluded because he is a biased witness with ties to Randall Brett, who was one of Pine River's Rule 30(b)(6) witnesses in this case. Def. Mem. at 29. Brett and Maffattone have known each other for approximately 15 years, and were colleagues at Harvard Management Company for approximately two-and-a-half to three of those years. Maffattone Dep. Tr. (Dkt. 360-5) at 93:15-94:13.[12] Maffattone testified that he learned about this action in 2022, while "having a conversation with Randall Brett, who is one of my colleagues that I know for some time, and just checking in how he was doing, telling him what I was doing." Maffattone Dep. Tr. at 14:25-15:6. Maffattone also testified that he has recommended Brett for multiple jobs; that he asked Brett to consider his son for an internship at Pine River; and that he also asked Brett to consider a friend's daughter for such an internship. *Id*. at 110:15-19, 114:18-22, 118:6-10.

Maffattone may have personal ties of friendship to a Pine River witness, but this does not amount to the "clear conflict of interest" or "bias of an extraordinary degree" generally required to merit disqualification of an expert on that ground. *El Ansari v. Graham*, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019). By way of example, an expert witnesses may be disqualified where he

---

[12] Two Harbors describes Brett as a "former Pine River partner" (Def. Mem. at 29), while Pine River contends that Brett was an employee, not a partner. *See* Pl. Opp. at 22. Brett's resume, *see* McElroy Daubert Decl. I (Dkt. 386) Ex. 14 (Dkt. 386-14) states that from March 2012 to March 2021, he was a managing director at Pine River.

is also a party in the case, lives with a party, or is a party's attorney. *See Hasemann v. Gerber Prods. Co.,* 2024 WL 1282368, at *7 (E.D.N.Y. Mar. 25, 2024) (collecting cases). In less obvious situations, a court may exercise its discretion, within the bounds of Rule 702, and permit the expert to testify. *See Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (the fact that a proposed expert is an "interested witness" employed by defendant for 31 years did "not automatically disqualify him from rendering expert testimony"); *Hasemann*, 2024 WL 1282368, at *7 (declining to exclude expert who worked for defendant's parent company for two decades, and noting that "the opposing party's 'arguments that [the proffered expert] is an interested witness . . . may be raised on cross-examination at trial on the issues of [his] bias and credibility'") (quoting *Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005)). Here too, I decline to exclude the remainder of Maffattone's opinion on the ground that he is an interested witness. At trial, Two Harbors may of course raise his potential bias on cross-examination.

Consequently, Two Harbors' motion will be granted in part as to Mr. Maffattone, who may not opine on the business issues discussed in ¶¶ 30-31, 209-51, and 254-67 of his report, and may not offer legal conclusions as to ownership or misappropriation of the IP at issue in this action.

### 6.    Judlowe

Michael Judlowe provided a series of opinions related to the damages suffered by Pine River as a result of Two Harbors' termination of the Management Agreement. Judlowe Rep. (Landy Daubert Decl. I (Dkt. 346) Ex. 10) (Dkt. 346-10) ¶ 5. Judlowe opines that REITs typically internalize through negotiations with their external managers. Judlowe Rep. ¶ 7(d). He identifies various negotiated internalization transactions, and applies "a series of screening parameters . . . that represent the price and terms commonly agreed upon when a REIT and its external manager negotiate the internalization." *Id.* ¶ 66. He then uses a group of eleven transactions to estimate that negotiated internalizations executed by publicly traded REITs in the United States have transacted

at an average management fee multiple of 4.28x. *Id.* ¶¶ 7(e), 68. Finally, he concludes that because Pine River was a "good steward" of Two Harbors, which had consistently below-average expense ratios, the internalization price paid by Two Harbors to Pine River would likely have been greater than the price implied by that multiple. *Id.* ¶¶ 7(f), 81.

*a.*     *Methodology*

Two Harbors takes issue with the methodology that Judlowe used to arrive at the average management fee multiple of 4.28x, arguing that he created "a set of supposedly comparable transactions that excludes similar transactions and includes dissimilar ones." Def. Mem. at 48. For example, according to Two Harbors, Judlowe considered only "related-party transactions," which are "not the result of arm's-length negotiations," and therefore do not produce "reliable estimates of the fair market value of a hypothetical negotiated internalization transaction." Def. Mem. at 47. In response, Pine River rejects that premise, arguing that "[b]y its inherent nature, an internalization transaction is an agreement between a REIT and its external manager – which is a related-party relationship," and that this "relatedness of the parties is a *commonality* between a negotiated internalization of Two Harbors and the transactions identified by Mr. Judlowe, not a distinction, which demonstrates the reliability of his methodology (and lack of reliability of [Two Harbors' rebuttal expert] Dr. Lynn's)." Pl. Opp. at 39-40.

Two Harbors also challenges Judlowe's consideration of transactions that occurred after 2020, since his "stated objective is to create a set of transactions that the parties would have considered in hypothetical negotiations no later than February 2020." Def. Mem. at 47. Two Harbors writes that Judlowe "agreed, however, that the 3 transactions that post-date February 2020 should be excluded." *Id*. at 48 (citing Judlowe Dep. Tr. (Dkt. 362-14) at 155:24-156:11).[13] In

---

[13] That is not entirely accurate. In the cited deposition testimony, Judlowe agrees only that the post-2020 transactions "would not have been included in any negotiations, so those data points

response, Pine River notes that Judlowe explained that these post-2020 transactions "'reinforce [his] dataset' as they demonstrate the accuracy of his interquartile range and confirm the 'good triangulation of the good data' he used." Pl. Opp. at 40 (citing Judlowe Dep. Tr. at 155:9-156:22). In any event, Pine River asserts, exclusion of the post-2020 transactions would result in an *increased* average Management Fee Multiple. Pl. Opp. at 40.

Next Two Harbors critiques Judlowe for excluding the internalization of the Granite Point REIT, a "more comparable transaction." Def. Mem. at 48. Additionally, Two Harbors explains that the Granite Point internalization "was the only transaction that did not involve related parties – the amount of the internalization was determined by a neutral arbitrator – which made it closer to an arm's-length transaction and a better estimate of the fair market value of a hypothetical negotiated internalization transaction." Def. Mem. at 48. Pine River responds that the Granite Point internalization *did* involve related parties, in that Pine River was Granite Point's external manager from 2017 to 2020. Pl. Opp. at 41. Moreover, Pine River rejects Two Harbors' contention that "related-party" transactions are unreliable because they are not "arm-length transactions." *Id.* Pine River adds that Judlowe "had good reason" to exclude Granite Point, because he was focusing on transactions involving only negotiated price terms. *Id.* at 41-42.

Two Harbors also takes issue with Judlowe's exclusion of "5 transactions that had been considered by the parties prior to litigation" and his "ad hoc adjustments to nearly half of the transactions (5 of 11) because he does not believe them to be sufficiently similar." Def. Mem. at 48. Pine River responds that the five excluded transactions did not meet Judlowe's screening criteria, and that he properly relied on his "professional judgment" in excluding them. Pl. Opp. at

---

don't help to inform [his] opinion on a multiple of a hypothetical internalization." Judlowe Dep. Tr. at 155:24-156:11.

42. In any event, Pine River states, if those transactions were included, "they would have increased the average Management Fee Multiple." *Id*. In Pine River's view, Judlowe's "strict" methodology is "consistent with the authority cited by Two Harbors' own experts." *Id*. at 42-43.

Turning to Judlowe's methodology for estimating Two Harbors' performance, Two Harbors argues that it is unreliable. Def. Mem. at 49. According to defendant, Judlowe "artificially cuts off his analysis several months before the termination of the Management Agreement – and shortly before Two Harbors realized a loss of $1.5 billion, which had a significant, negative impact on its equity returns," and impermissibly bases his cut-off on his opinion that Two Harbors was "searching for an ability to terminate." *Id.* at 49-50. In response, Pine River contends that Judlowe based his opinion on the "objective fact" that Two Harbors was terminating the MA, which in effect precluded a negotiated internalization, making data after that date irrelevant. Pl. Opp. at 45. Pine River notes that "'[o]n March 14, 2020, the 2020 Special Committee sent a letter to Brian Taylor [Pine River's Chairman] to inform Pine River of its anticipated recommendation to the Two Harbors Independent Directors to' terminate the MA based on alleged unfair fees," and that "on March 23, 2020, Two Harbors' Board informed Pine River of the Independent Committee's determination." Pl. Opp. at 44 (citing Judlowe Rep. ¶ 32).

Finally, Two Harbors argues that "Judlowe matched his opinions about Two Harbors' performance to his own preconceptions," and "cherry-picked the facts to support his preconception." *Id.* at 50. For example, Judlowe "admitted that he 'picked a normal time period that gave me the results I wanted' and claimed that 'there was nothing that was interesting in a slightly different time period.'" Def. Mem. at 50-51 (citing Judlowe Dep. Tr. at 288:10-14). Pine River responds that Two Harbors misrepresents Judlowe's testimony, in that he testified about picking a "normal time period that gave [him] the results [he] wanted" when asked "why he used

a 10-year period for *his comparable REIT internalization transaction analysis – not* his analysis of Two Harbors' performance." Pl. Opp. at 45.

The Court is not convinced that any of Two Harbors' arguments as to Judlowe's methodology warrant exclusion. As with Kursh, all of Two Harbors' critiques of Judlowe's methodology go to the weight of his opinions, not their admissibility. As long as there is a "factual basis" for an expert's decision, the inclusion or exclusion of certain data points, when making an estimate, generally "falls within the range where experts might reasonably differ, making the duty of determining the weight and sufficiency of the evidence on which the expert relied one for the jury, rather than the trial court." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 135 (S.D.N.Y. 2022) (cleaned up) (declining to exclude expert opinion "for relying on unverified revenue figures as part of his analysis, for cherry-picking among sales data, and for underlying limited verification of data," because "the asserted divots in [the expert's] data and approach are best left for adversarial testing at trial."); *see also DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 2024 WL 1115944, at *11 (S.D.N.Y. Mar. 14, 2024) ("when constructing a study, researchers "necessarily rely on their discretion, to some degree," to determine what data "meets their selection criteria"). I therefore decline to exclude Judlowe's opinions on reliability grounds.

### b.  State of Mind

Two Harbors also argues that Judlowe impermissibly opines on the parties' intentions in two instances. First, Two Harbors points to Judlowe's deposition testimony that "Two Harbors was searching for an ability to terminate." Def. Mem. at 50 (citing Judlowe Dep. Tr. at 239:4-240:4). Second, it points to his written opinion that Pine River "sought to act as a good steward for Two Harbors' shareholders." Def. Mem. at 51 (citing Judlowe Rep. ¶¶ 50-54).

Two Harbors is correct that both of these statements violate the well-understood principle that expert witnesses (other than psychiatrists and other mental health professional called for

precisely that purpose) may not "comment on a party's state of mind." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *10.

Judlowe may testify about "Pine River's actions that contributed to Two Harbors' performance," as well as "'instances in which Pine River pursued investment decisions that were in the best interest of Two Harbors' shareholders (sometimes at the expense of Pine River's own immediate interests).'" Pl. Opp. at 46 (citing Judlowe Rep. ¶ 50). He may also opine (as he does, in his written report) that, "[b]ased on my review of Two Harbors' history as a public company, Pine River *acted as a good steward* while manager." Judlowe Rep. ¶ 50 (emphasis added). However, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187-88 (S.D.N.Y. 2008) (prohibiting experts from testifying as to what the defendant "believed," from making "inferences regarding the knowledge and intent of RBC employees," and from testifying that parties were "concerned" or "pleased"). Thus, it was improper for Judlowe to opine that "management's implementation of stock buybacks indicate that Pine River *sought to act as a good steward* for Two Harbors' shareholders despite a reduction in management fees." Judlowe Rep. ¶ 53 (emphasis added). As to Judlowe, therefore, Two Harbors' motion will be granted only to the extent that, at trial, Judlowe must avoid making inferences about the parties' intent or motive.

### 7.    Velituro

Christopher Vellturo, Ph.D., an economist, was retained to estimate Pine River's damages stemming from Two Harbors' termination of the Management Agreement; its retention of the contested IP; and its direct employment of the Pine River personnel assigned to staff the REIT prior to the termination. Velituro Rep. (Landy Daubert Decl. I Ex. 11) (Dkt. 346-11) ¶¶ 4-5. Dr.

Vellturo was asked to assess damages stemming from defendant's "Alleged Misconduct," which he defines as:

- The unlawful termination of Two Harbors' 2009 management agreement with Pine River (the "Management Agreement"), according to which Pine River administered the day-to-day business activities and operations of Two Harbors in exchange for a management fee;

- Contemporaneously, the misappropriation, continued use of, and refusal to return trade secrets (the "Asserted Trade Secrets") and other intellectual property (collectively, the "Asserted IP") developed by Pine River in the course of the execution of its duties under the Management Agreement;

- The improper coercion and hiring of Pine River employees, causing the employees to violate their terms of employment with Pine River.

*Id.* ¶¶ 4-5. Dr. Vellturo holds a doctorate in economics, specializes in industrial organization and econometrics, and has "extensive experience" in the valuation of IP and the assessment of damages for breach of contract. Vellturo Rep. ¶ 2. In writing his report, Vellturo considered financial documents and business strategy documents produced by both parties, publicly available financial statements of Two Harbors, court filings in this action, deposition testimony, conversations with Pine River personnel, and the expert reports of Kursh, Maffattone, O'Laughlen, Judlowe, Roffman, and Slosser. *See id.* ¶ 6.

a. *DTSA Damages*

In connection with Pine River's DTSA claim, Vellturo was asked to estimate Two Harbors' "unjust enrichment" resulting from its alleged misappropriation, "relative to two alternative states of the world but for [that] alleged misappropriation." Vellturo Rep. ¶ 16. In the first "alternative state" (in which, absent access to the Alleged Trade Secrets following its August 2020 termination of the Management Agreement, Two Harbors would have been forced to "wind down" permanently), Vellturo estimates damages of $722.3 million. *Id.* ¶¶ 16-17. In calculating this figure, he relies on Slosser's opinion that – without the IP – the existing Two Harbors REIT would

have been forced to unwind, which Vellturo characterizes as "a blow from which it would likely never recover." *Id.* ¶ 17. Under this scenario, Vellturo computes defendant's total historical profits from August 15, 2020, through December 31, 2023, "as proxied by Two Harbors' 'core earnings' or 'earnings available for distribution' [] profit measure – and adjust[s] this amount to account for the residual profits Two Harbors would continue to generate during its wind-down process." *Id.* As to the second "alternative state" (in which, following its wind-down, Two Harbors would have launched a new REIT as it independently developed the functionality historically provided by the Asserted Trade Secrets), Vellturo estimates damages of $686 million *Id.* ¶¶ 16, 18-19. As an alternative, Vellturo also calculates "reasonable royalty" damages totalling $283.4 million. *Id.* ¶ 20.

Two Harbors argues that Dr. Vellturo's estimates of unjust enrichment damages of $686 million, or, alternatively, reasonable royalty damages of $283.4 million, should be excluded because both are unreliable. Def. Mem. at 11. First, Two Harbors criticizes Vellturo because all of his DTSA damages estimates are based on the assumption – supplied by Pine River's other experts – that Two Harbors would have been forced to wind down had it lost access to the software at issue. Def. Mem. at 11. Two Harbors adds this assumption is "absurd" because, among other things, "Not a single Pine River (or Two Harbors) expert has ever heard of a REIT collapsing because it lost access to software." *Id.* Relatedly, Two Harbors characterizes Vellturo's opinion as speculative because, had he "sought to verify the reliability of his assumptions, he would have learned that none of the other Pine River experts (or anyone else) had ever heard of a REIT winding down its operations because it lost access to software." *Id.* at 17.

As discussed above, an expert need not conduct original research, nor need he personally verify the work of other experts upon whom he relies for assumptions or other inputs. Rather, an

expert may rely on facts or data gathered by others – including other experts – if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see also Gussack Realty*, 224 F.3d at 94-95 ("an expert may rely on data that she did not personally collect" and "need not have conducted her own tests"). The flip side of this principle, however, is that if one expert's opinion is excluded by the court (for example, because that expert was inadequately qualified, or her methodology was unreliable), any calculations, analyses, or conclusions reached by other experts in reliance on the excluded opinion must themselves be excluded. *See In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *5 (S.D.N.Y. July 28, 2017) ("[E]xperts may rely on one another, but they may only do so if the requisite standards for reliability are met each step of the way. If one expert's opinions are built upon a foundation laid by another, reliability of the latter requires reliability of the former.") (collecting cases); *Robert F. v. N. Syracuse Cent. Sch. Dist.*, 2021 WL 4207203, at *4 (N.D.N.Y. Sept. 16, 2021) ("Now that Dr. Schonwald's opinion and testimony discussing G.F.'s long-term prognosis is precluded and Dr. Reagles depended on this opinion, the Court must similarly preclude Dr. Reagles' report.").

Here, Vellturo relies, to various degrees, on the opinions prepared by Pine River's other experts, including Roffman, Kursh, O'Laughlen, Slosser, Maffattone, and Judlowe. Vellturo Rep. ¶ 6. He also held conversations with his fellow experts, *id.*, which he footnotes throughout his report. *See*, *e.g.*, *id.* ¶ 58 & nn. 119-124, 127-128 (relying on the Maffattone Report and "Maffattone Conversation" for his understanding of COSMOS, Neptune, and other Asserted Trade Secrets at issue). In particular, Vellturo relies on Maffattone for his "second scenario," in which, following a three-month wind-down period, Two Harbors would have been "offline" for twelve months, and then spent another three years ramping up before its business returned to pre-

termination levels. *Id.* ¶¶ 18-19; *see also* Maffattone Rep. ¶¶ 214-15, 256 (laying out the timeline relied on by Mr. Vellturo). For the reasons set forth above, however, I have excluded this portion of Mr. Maffattone's work. Consequently, I must also exclude the portions of the Vellturo Report "built upon [the] foundation laid" in ¶¶ 30-31, 209-51, and 254-67 of the Maffattone Report. *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *5. It appears to this Court that substantial portions of Vellturo's $686 DTSA unjust enrichment estimate are in fact built upon that foundation, *see* Vellturo Rep. ¶¶ 19, 113-169, and consequently must be excluded.[14]

### b. Breach of Contract Damages

As to Pine River's breach of contact damages – flowing from the unilateral termination of the Management Agreement – Dr. Vellturo assumes that on the date of the alleged breach, Pine River "would have been willing to negotiate an agreement that would have effectively terminated its management relationship with Two Harbors only if it were made as well off as it would have been were the management relationship to remain in effect." Vellturo Rep. ¶ 12. Vellturo estimates a total of $353.4 million in damages, which includes "present value of an ongoing stream of management fees, net of incremental costs and suitably discounted for time and uncertainty." *Id.*

Dr. Vellturo also calculates an "alternative and conservative measure of damages" in which he "relax[es] the assumption that Two Harbors would have been contractually unable to unilaterally terminate the Management Agreement." *Id.* ¶ 13. Under this alternative, Vellturo concludes that Pine River and Two Harbors would have negotiated an internalization payment of $271.2 million ($169.1 million as to the breach of contract claims and $102.1 million as to the IP

---

[14] Vellturo's alternative DTSA damages estimate, based upon a reasonable royalty for the allegedly misappropriated IP, does not appear to rely on the exluded portions of the Maffattone Report. *See* Vellturo Rep. ¶¶ 170-188. Nor is it otherwise excludable on reliability grounds.

claims), through which Two Harbors would "'internalize' Pine River's management while retaining rights to the Asserted IP." *Id.* ¶ 13.

Two Harbors argues that these estimates are too unreliable to be admitted. First, it contends, Vellturo relied on unreliable estimates provided by Pine River's CFO/COO Nicholas Nusbaum regarding "the proportion of total annual Pine River employee time spent on intellectual property development by subdivision," without reviewing the data underlying the estimates. Def. Mem. at 19. In response, Pine River argues that Vellturo sufficiently corroborated the expenses of developing the IP by comparing the expense estimates to Two Harbors' own estimated costs, and by reviewing Two Harbors' interrogatory responses, which corroborate Nusbaum's data. Pl. Opp. at 15. Two Harbors next argues that Vellturo improperly relied on the opinion of Pine River expert Michael Judlowe that Two Harbors would have agreed to pay at least 4.28 times Pine River's annual management fee, without independently evaluating the eleven negotiated internalization transactions on which Judlowe relied, thereby "fail[ing] to satisfy his duties as an expert." Def. Mem. at 20-21. Additionally, according to Two Harbors, Vellturo misapplies Judlowe's estimate, in that it was based on a hypothetical negotiation that would have taken place in February 2020, while Vellturo's estimate assumed a negotiation in August 2020. *Id.* at 21.

For the reasons discussed in Part III(A)(6), *supra*, Judlowe's opinions are not excludable on reliability grounds. Consequently, Vellturo's analysis of Pine River's breach of contract damages is not excludable simply because Vellturo relies on Judlowe. Moreover, any errors flowing from the difference between February and August 2020 go to the weight of Vellturo's opinion, not its admissibility, and can be addressed at trial.

As to Mr. Vellturo, therefore, Two Harbors' motion will be granted in part. Mr. Vellturo may not testify as to any portion of his DTSA damages estimate that relies, in turn, on the analysis, obervations, or opinions expressed in ¶¶ 30-31, 209-51, and 254-67 of the Maffattone Report.

### B.    Plaintiffs' Motion

The opinion of Two Harbors expert William Hrycay calculates defendant's damages related to its "counterclaims . . . alleging that PRCM and certain affiliates breached their statutory, fiduciary, and contractual duties as Two Harbors' manager." *See* Hrycay Rep. (Landy Daubert Decl. I Ex. 1) (Dkt. 346-1) ¶ 3; *see also id*. ¶ 11 (summary of damages estimates). In light of my recommendation that summary judgment be granted to Pine River on the underlying counterclaims, I deny Pine River's *Daubert* motion as to Hrycay as moot, without prejudice to reconsideration in the event the district judge determines that those counterclaims must be tried. I now turn to the Two Harbors expert reports that provide opinions concerning the claims remaining at issue.

### 1.    Lynn

Dr. David Lynn's rebuttal report responds to the opinions of various Pine River experts concerning the termination of the Management Agreement and Pine River's resulting damages. *See* Lynn Rebuttal Rep. (Landy Daubert Decl. I Ex. 9) (Dkt. 346-9) ¶¶ 12-14. Dr. Lynn is a real estate professional who is the CEO and founder of a REIT. *Id.* ¶ 1. Specifically, Lynn was asked to rebut Judlowe's opinions concerning "terms historically agreed upon when a REIT and its external manager have engaged in negotiations to internalize," from which he derived an average termination-related payment of 4.28 times the previous year's management fee, *id.* ¶ 12; Vellturo's damages opinion, to the extent based on Judlowe's analysis, *id.* ¶ 13; and Slosser's opinions concerning the materiality of Pine River's alleged non-disclosures. *Id.* ¶ 14. In light of my recommendation that summary judgment be granted to Pine River on all claims and counterclaims

arising from Pine River's alleged non-disclosures, I deny as moot the portion of plaintiffs' *Daubert* motion seeking to exclude Lynn's rebuttal of Slosser's opinions regarding Pine River's non-disclosures, without prejudice to reconsideration in the event the district judge determines that those claims and counterclaims must be tried. I now examine Pine River's arguments concerning Lynn's rebuttal of Judlowe and Vellturo.

### a.   Rebuttal of Judlowe

Pine River argues that Lynn's rebuttal of Judlowe should be excluded for unreliability. Pl. Mem. at 4. First, Pine River points to Lynn's opinion that Judlowe's "analysis of purportedly comparable negotiated internalization transactions is fundamentally flawed and wholly unreliable," Lynn Rep. ¶ 15, because, in part, Judlowe's analysis includes transactions between related parties, which are "not appropriate comparable transactions for Two Harbors' internalization because they were not conducted at 'arm's length.'" *Id.* ¶ 21. In Pine River's view, "Dr. Lynn's opinion concerning 'related party transactions' is unreliable and incoherent" because "[b]y its nature," an internalization transaction is a related-party relationship. Pl. Mem. at 4-5. In response, Two Harbors argues that "Pine River's disagreement with Dr. Lynn's rebuttal opinion is not a basis to exclude it." Def. Opp. at 5. Two Harbors notes that Lynn explains that "related-party transactions should not be the sole basis of valuation because they provide a distorted view of fair value," and "[t]hat other REIT internalizations are related-party transactions does not mean that they are an appropriate benchmark for fair value in Mr. Judlowe's construct of a hypothetical negotiation between Pine River and Two Harbors." *Id.* at 5-6.

Second, Pine River objects to Lynn's statement that "'[a] wide body of literature examining related party transactions finds that the prices paid in related party transactions are significantly higher than in arm's length transactions between non-related parties.'" Pl. Mem. at 6 (citing Lynn Rep. ¶ 21). Pine River argues that this is an "unwarranted assumption," as Lynn relies on only one

article (not a "wide body") "comparing the price at which controlling shareholders buy or sell assets by looking at a sample of 254 transactions that *solely occurred in Hong Kong over 25 years ago*." Pl. Mem. at 5-6. In response, Two Harbors argues that Lynn also relies on "scholarly work," "public filings," "a detailed discussion of one of the transactions that Mr. Judlowe considered," and "the opinion of Pine River proposed expert Kenneth Slosser," and that, in any event, Pine River's objections to the article in question "go[es] at most to weight, not admissibility." Def. Opp. at 6-7.

Third, Pine River argues that Lynn "blanketly concludes that all of Mr. Judlowe's precedent transactions were tainted by conflicts of interest," without considering the steps that public companies take to mitigate potential conflicts of interest in related-party transactions. Pl. Mem. at 7-8. In response, Two Harbors states that "Dr. Lynn understands that mitigation measures can help reduce the unfairness of related-party transactions, but he also understands that mitigation measures are not perfect," and, in any case, "Pine River's argument goes to weight, not admissibility." Def. Opp. at 8-9.

Fourth, Pine River objects to Lynn's opinion that Judlowe "ignores the most relevant comparable transaction, Granite Point's 2020 negotiated internalization transaction with Pine River." Pl. Mem. at 8 (citing Lynn Rep. ¶ 15). According to Pine River, Lynn's opinion as to Granite Point is unreliable because (i) "relying on a single purported precedent transaction is not a reliable methodology"; (ii) Judlowe excluded Granite Point because its internalization was resolved via arbitration, and Judlowe used examples involving only negotiated price terms; and (iii) Lynn "lacks a sufficient understanding of the Granite Point arbitration proceeding to render an informed opinion as to whether it was a meaningful data point." Pl. Mem. at 8-9. In response, Two Harbors contends that Granite Point's internalization having been resolved via arbitration "is

precisely the reason that the Granite Point internalization transaction is a more relevant comparable transaction than the related-party REIT internalization transactions on which Mr. Judlowe relies," as the fee was "not affected by the fact that the parties were related and not negotiating at arm's length." Def. Opp. at 9.

Once again, the parties have demonstrated, through their back-and-forth, that reasonable minds could disagree as to whether Lynn drew the most appropriate conclusions from the best available data. Under *Daubert*, however, "an expert need not base his or her opinion on the best possible evidence, regardless of availability, but upon 'good grounds, based on what is known.'" *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 178 (quoting *Daubert*, 509 U.S. at 590). Pine River has failed to show that the asserted flaws in Lynn's reasoning are "large enough" such that he "lacks 'good grounds'" for his conclusions. *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli*, 35 F.3d at 746). I conclude that Two Harbors' reliability arguments go to the weight of Lynn's opinions, not their admissibility, and can be tested at trial.

Pine River also seeks to exclude Lynn's opinion that "under Pine River's management, Granite Point and Pine River's hedge funds performed poorly," Lynn Rep. at 27, on the ground that this is irrelevant to anything in the Judlowe Report (or Pine River's other expert reports) and consequently constitutes improper rebuttal. Pl. Mem. at 13. The purpose of a rebuttal report is to "contradict or rebut evidence on the same subject matter" previously identified by another party. Fed. R. Civ. P. 26(a)(2)(D)(ii). However, "district courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quoting *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013)); *accord Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 360 (S.D.N.Y. 2023); *Rekor Sys., Inc. v. Loughlin*, 2022 WL 2063857, at *7 (S.D.N.Y. June

46

8, 2022). Thus, a rebuttal expert is permitted some leeway in how he or she explains, counteracts, repels, or disproves the opinion being rebutted. *See, e.g.*, *Scott*, 315 F.R.D. at 44 ("A rebuttal expert is permitted to use new methodologies 'for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness'") (quoting *Park W. Radiology v. CareCore Nat'l LLC*, 675 F.Supp.2d 314, 326 (S.D.N.Y. 2009)). Moreover, "[a] district court has wide discretion in determining whether to permit evidence on rebuttal." *United States v. Tejada*, 956 F.2d 1256, 1266 (2d Cir. 1992); *accord Scott*, 315 F.R.D. at 44. Even where the proposed rebuttal report presents "new legal arguments" or otherwise goes beyond the bounds of Rule 26(a)(2)(D)(ii), the court may permit the rebuttal report if the untimely disclosure "causes no prejudice." *Ebbert v. Nassau Cnty.*, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (citations omitted).

I conclude that Lynn's rebuttal opinion – including the references to Pine River's management of Granite Point and the performance of its hedge fund business – permissibly responds to the subject matter covered by Judlowe's opinion concerning Pine River's management. Judlowe opines, for example, that "Pine River continually acted as a good steward during its tenure as manager," and that its "investment track record indicates that Pine River was skilled at identifying attractive investment opportunities[.]" Judlowe Rep. ¶ 46. He adds that, under Pine River's management, Two Harbors "underertook multiple new strategic investment initiatives when temporary dislocations arose in the real estate market with appealing risk-adjusted returns for investors." *Id.* ¶ 47. Specifically, according to Judlowe, "Two Harbors identified, scaled, and spun off" two "new real estate investment initiatives," namely, Granite Point and Silver Bay (each of which became a stand-alone REIT, managed, at least for a time, by Pine River). *Id.* ¶ 48. Since Judlowe expressly relies on the Granite Point spin-off as an example of Pine River's success as an external manager, Pine River cannot now complain when Two Harbors' expert proposes to take a

closer look at its performance under Pine River's management. I therefore decline to preclude this portion of Lynn's rebuttal opinion.

### b. Rebuttal of Vellturo

Dr. Lynn notes that Dr. Vellturo used "Mr. Judlowe's termination-related payment multiple of 4.28x to conclude that $195.7 million is 'the minimum negotiated internalization payment implied under a consideration of the historical marketplace transactions identified by Mr. Judlowe.'" Lynn Rep. ¶ 13. Lynn opines that Vellturo's calculation is unreliable because it is based on Judlowe's underlying analysis – which is also unreliable – and because it is contradicted by Pine River's own valuation of its business. *Id.* ¶ 15. He concludes that "it is impossible, in this case, that the value of the Management Agreement is greater than the value of Pine River's entire business." *Id.*

Pine River seeks to exclude Lynn's critique of Vellturo's damages estimate because Lynn is not a damages expert. Pl. Mem. at 10 (citing Lynn Dep. Tr. (Dkt. 346-13) at 375:4-12: "I wasn't asked to opine on damages. I'm not a damages expert.") Moreover, according to Pine River, Lynn's attempted rebuttal of Vellturo is "substantively flawed and unreliable, principally because it relies on the same flawed analysis underlying his criticism of Mr. Judlowe." Pl. Mem. at 10. In response, Two Harbors argues that Lynn's rebuttal of Vellturo is properly grounded in Lynn's REIT expertise, which qualifies him to opine that Vellturo failed to "consider information that may have informed Dr. Vellturo's construct of a hypothetical internalization negotiation and resulting estimate of a minimum internalization payment." Def. Opp. at 12. According to Two Harbors, Lynn is qualified "to opine on what parties likely would have considered or discounted in a hypothetical internalization negotiation." *Id.* at 13.

A non-damages expert may permissibly offer opinion evidence to rebut a damages expert's conclusions. *See Better Holdco, Inc.*, 666 F. Supp. 3d at 370 (declining to exclude opinion of non-

damages expert as to "certain corporate characteristics of [the parties] in the context of the mortgage industry in which he is an expert," where "such analysis just happens to be relevant to rebutting [the opposing party's] damages calculation"). As to Vellturo, Lynn does not, for the most part, attempt to assert damages-related expertise that he does not have. However, nothing in Lynn's background qualifies him to discuss the merits of a series of valuations, prepared by an outside firm, of "the fair market value of Pine River," opine on which valuations should be credited and which should not, or use those valuations to impugn Vellturo's damages analysis. *See* Lynn Rep. ¶¶ 33-34 and accompanying footnotes. Consequently, Pine River's motion to exclude the opinions of Dr. Lynn will be granted in part, to the extent that Lynn may not testify as to the Stout valuations in connection with Vellturo's damages estimates.

### 2.    McLean

Defendant retained Justin McLean to rebut the report of plaintiffs' damages expert Dr. Vellturo. McLean Rebuttal Rep. (Landy Daubert Decl. I Ex. 9) (Dkt. 346-30) ¶ 1. McLean has a master's degree in Industrial Administration and over 20 years of experience in economic and financial consulting. *Id*. ¶¶ 4-5. His primary areas of expertise are damages estimation, applied finance theory, and valuation, including assignments relating to REITs. *Id*. ¶ 4. In his rebuttal report, McLean addresses Pine River's asserted damages on both its termination-related claims and its IP-related claims. However, in its *Daubert* motion, Pine River seeks only to exclude those portions of the McLean Rebuttal Report discussing its IP-related damages. *See* Pl. Mem. at 28-29.

McLean begins by rejecting Dr. Vellturo's assumption that, without the trade secrets at issue, Two Harbors would have been functionally inoperable as of August 15, 2020 (the day after the termination of the Management Agreement), and forced to shut down. McLean Rebuttal Rep. ¶ 25. In McLean's view, Two Harbors would have had a number of alteratives, including engaging a new external manager or licensing the necessary technologies. *Id*. ¶ 26. McLean also opines that

Dr. Vellturo's "DTSA damages are overstated" because Vellturo "attributes the entire value of all Two Harbors future profits" to the trade secrets at issue, without considering other "contributors of value" to the company, such as "other technologies, employee skills, [and] human judgment." *Id.* ¶ 27. McLean then recalculates Pine River's potential DTSA damages based on "avoided development costs" (a form of unjust enrichment damages), under the "assumption that Two Harbors is able to implement alternatives to the Asserted Trade Secrets prior to terminating the Management Agreement." *Id.* ¶ 28. Specifically, McLean opines, Two Harbors could have developed "alternative technologies that would replicate the core functionalities of the Asserted Trade Secrets," and could have done so "prior to the termination of the Management Agreement" in "no more than 4.5 months." *Id*. ¶ 92.[15] Under this scenario, McLean calculates that Pine River's unjust enrichment damages would be approximately $6.5 million, *id.* ¶ 28(d) & Ex. 6, and a reasonable royalty for the misappropriated IP (based on the assumption that the parties would "split the economic surplus" that Two Harbors obtained by misappropriating it) would be "no more than $3.3 million." *Id.* ¶ 29.

Pine River asks the Court to exclude McLean's opinions to the extent they are based on a counterfactual scenario in which Two Harbors developed alternatives to the trade secrets at issue *prior* to August 15, 2020, which was "the first date of misappropriation." Pl. Mem. at 28-29. According to Pine River, McLean's approach is based on a "legally flawed framework," *id.* at 28, because, when assessing unjust enrichment or royalty damages in a trade secrets misappropriation case, "the law looks to the time at which the misappropriation occurred to determine what the value

---

[15] McLean relies on another Two Harbors expert, Robert Zeidman, for the 4.5 month timeline. *See* McLean Rebuttal Rep. ¶ 66. Zeidman opines that Two Harbors could have developed and implemented alternatives to the trade secrets at issue by August 14, 2020, if it had started by March 26, 2020 – the day on which "Pine River indic[a]ted it would not renegotiate its compensation pursuant to the Management Agreement." *Id*.

of the misappropriated secret would be to a defendant." *Id.* at 26 (quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974)). Pine River concedes that recent case law on this point is sparse, *id.*, but notes that the same principle is used in patent infringement cases,[16] and argues that the *University Computing* rule "makes sense," because "[i]t does *not* allow a defendant to argue a hypothetical reimagination of reality prior to the date of first misappropriation, where it could have acted differently than it actually did, such that the misappropriated trade secrets were less beneficial to it than they actually were." *Id.* at 28.

In opposition, defendant argues that the standard for measuring damages in a trade secrets case is "very flexible," Def. Opp. at 26 (quoting *Univ. Computing*, 504 F.2d at 535), and generally permits a defendant to present all of the alternatives that a "rational" defendant in its position would have pursued. *Id.* Two Harbors continues: "[I]n a hypothetical world in which Pine River was the adjudicated owner of the alleged trade secrets, a rational party in Two Harbors' position would have begun to develop alternative software once it became aware of Pine River's refusal to negotiate its management fees and the resulting termination of the Management Agreement." *Id.* at 27.

Two Harbors does not cite any authority for the proposition that the appropriate "hypothetical world" for a damages calculation is one in which the defendant, having had the

---

[16] *See*, *e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 5958172, at *3-5 (N.D. Cal. Nov. 7, 2013) (concluding, in a patent infringement case, that a reconstruction of the "hypothetical, infringement-free market" must consider actions the infringer would have taken to avoid infringement "beginning on the date of first infringement"), *enforcement granted,* 2013 WL 6001902 (N.D. Cal. Nov. 12, 2013); *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 1322854, at *3 (N.D. Cal. Mar. 28, 2014) (confirming that, in assessing lost profits damages, plaintiff's damages expert need not consider "non-infringing alternatives" available to the defendant prior to the date of infringement, and noting that any other rule would "make it easier for an infringer to avoid liability for lost profits because the infringer could choose to infringe and later assert the availability of design-arounds at the earlier notice date, instead of the date it first infringed").

benefit of an advance "adjudication" as to the ownership of the IP in question, did not misappropriate it. However, Two Harbors also points out, correctly, that McLean "'design[ed] [his] analysis so that if the time period one looks at is shifting one month, four months, whatever, it's still mathematically the same outcome for the out-of-pocket development costs associated with salaries.'" *Id*. at 30 (quoting McLean Dep. Tr. (Dkt. 393-4) at 205:10-15); *see also* McLean Dep. Tr. at 206:6-17 ("I made my calculation versatile because it's based on developer months that regardless of the starting point of the efforts it applies."). Consequently, the Court will not exclude the challenged portions of the McLean Report. It will be up to Pine River's counsel and experts, at trial, to persuade the finder of fact that McLean has erred in relying on assumptions about what Two Harbors could have done in advance of August 15, 2020, to avoid infringing Pine River's trade secrets.

### 3.    Wirth

Two Harbors retained Michael Wirth to provide rebuttal expert testimony as to the functionality of the IP at issue and its importance to Two Harbors, and to assess alternatives to that IP. Wirth Rebuttal Rep. (Landy Daubert Decl. I Ex. 33) (Dkt. 346-32) ¶ 18. Wirth has 38 years of experience in the financial services industry, including holding senior positions at public mREITs and public Master Limited Partnerships. *Id.* ¶ 1. In forming his opinions, Wirth relied in part on discussions (one in-person meeting and three calls) with the following Two Harbors personnel: Jason Vinar (Vice President and Chief Operating Officer), Matt Keen (Vice President and Chief Technology Officer), Mary Riskey (Vice President and Chief Financial Officer), Rebecca Sandberg (Vice President, General Counsel, Secretary and Chief Compliance Officer), Jesse Steinberg (Senior Director of Servicing & Operations), Nathan Benz (Vice President – Counterparty Oversight Manager), Brianna Bergenheier (Vice President – Securities Operations),

Joleen Wallace (Vice President – Funding Trader), and Colin Hribal (Vice President – Treasury Analyst). *Id.* ¶ 19 n.35.

Wirth concludes that the IP at issue "performs very common business functions and processes widely known and used by MSR and MBS investors at large, including other mREITs," and does not provide Two Harbors the "competitive advantage" described by Mr. Maffattone. Wirth Rebuttal Rep. ¶ 21. Wirth opines that if Two Harbors no longer had access to the applications and databases at issue, "straightforward 'work-arounds' could readily provide sufficient functionality using ubiquitous data processing software such as Excel and MS Access to maintain its operations while it pursued other, more permanent solutions such as licensing third party software or developing internal applications to perform certain functionality." *Id.* Wirth specifically challenges Maffattone's "broad assertions" that certain documents created by Pine River (for example, its Compliance Manual, its Mortgage Compliance Management Program Manual, and its TPS Report on the Agency Prepayment Model) provided economic value to Two Harbors, opining that these documents are "commonplace" among mREITs and other publicly traded companies. *Id.* Wirth adds that – according to the Two Harbors employees he spoke to – Two Harbors has not used at least three of the documents discussed by Maffattone since sometime before the termination of the Management Agreement. *Id*. Thus, in Wirth's view, Two Harbors receives no benefit from those documents. *Id.*; *see also id*. ¶¶ 184-208 (discussing documents)

Plaintiffs seek to exclude the portions of Wirth's rebuttal report that rely on "undisclosed information," including his conversations with Two Harbors employees never disclosed as witnesses and his discussion of third-party software packages never identified in Two Harbors' interrogatory responses. *See* Pl. Mem. at 29-37 (requesting that the Court strike ¶¶ 71, 77-78, 82, 87-90, 98, 99, 100, 102 & n.170, 109, 110, 122, 128, 145, 148, regarding conversions with

previously undisclosed Two Harbors employees, and ¶¶ 82, 87-90, and 135, regarding previously undisclosed third-party software).

Plaintiffs argue that Two Harbors never previously disclosed six of the employees that Wirth spoke to in person, and that this was a violation of the automatic disclosure rule, which requires each party to disclose "the name . . . of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses." Pl. Mem. at 31 (quoting Fed. R. Civ. P. Rule 26(a)(1)(A)(i)). According to plaintiff, Two Harbors knew or should have known that these six individuals had relevant information, but "withheld the identity of those individuals from its Initial Disclosures, ensuring that Pine River was not able to take their depositions, so that they could feed any information they wanted to Mr. Wirth without being subject to cross examination." *Id.* at 30. As to the third-party software, plaintiffs assert that none of the purported alternatives that Wirth identifies in his expert report were disclosed in Two Harbors' response to Pine River's Interrogatory No. 10, which asked Two Harbors for the factual bases for its contention that it could replace Pine River's IP. *Id.* at 30.

Plaintiffs' arguments do not warrant exclusion of the Wirth report. Pine River cites no case in which a court excluded expert testimony on the ground that the expert spoke to an individual whose name had not been disclosed, or limited a rebuttal expert to information previously disclosed in interrogatory responses. Moreover, as defendant points out, it is "well settled that 'expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions.'" Def. Opp. at 32-33 (citing *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993)). Defendant also points to *Better Holdco*, 666 F. Supp. 3d at 363, in which – on similar facts – the court declined to exclude the opinion of

defendant Beeline's expert on the ground that the expert had spoken with two witnesses who were "never identified in Beeline's Rule 26 disclosures." The court explained that "it is well-settled that 'expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions,'" *id*. (quoting *United States v. Dukagjini*, 326 F.3d 45, 57 (2d Cir. 2003), as long the expert is not simply "'a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'" *Id.* (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). The *Better Holdco* court had "no reason to doubt" the expert's assertion that the interviews were "the most reasonably practicable and reliable way for [him] to learn the information necessary, *id.* at 364, and pointed out that while the expert learned "specific pieces of information" from the interviews, his opinion was otherwise "all his own." *Id*. at 363.

The same is true here. The Wirth report does not serve as a conduit for hearsay evidence from undisclosed witnesses. Rather, as Wirth explains, he visited Two Harbors to "observe the functionality" of the contested IP "first hand," and, while there, interviewed Two Harbors personnel regarding how they actually used the IP. Wirth Rep. ¶ 71 (Repo Monitor); *see also id*. ¶ 94 (COSMOS). His opinions are his own. *See* Wirth Dep. Tr. (Dkt. 393-5) at 136:13-17 ("I was not asking [the Two Harbors employees] for opinions. I was asking for how do they use it, and then directing them as to the applications, again, menus, tabs, that type of thing."). This was a reasonable and practical way for Wirth to gain the information he needed to prepare his report, and was not improper.

In any event, a district court has "wide discretion in determining whether to permit evidence on rebuttal." *Tejada*, 956 F.2d at 1266; *accord Scott*, 315 F.R.D. at 44. Even where the proposed rebuttal report presents "new legal arguments" or otherwise goes beyond the bounds of Rule

26(a)(2)(D)(ii), the court may admit the report if it "causes no prejudice." *Ebbert*, 2008 WL 4443238, at *13. Here, Pine River has made no showing of prejudice.

Accordingly, the Court denies plaintiffs' motion with respect to the Wirth rebuttal report.

### 4.    Zeidman

Two Harbors retained Robert Zeidman to provide "opinions and conclusions related to the development of certain software at issue" in this case. Zeidman Rep. (Landy Daubert Decl. I Ex. 44) (Dkt. 346-43) ¶ 10. Zeidman has a master's degree in electrical engineering and decades of experience in electrical engineering and software development. *Id.* ¶ 2. In his original report, dated May 19, 2023, Zeidman concludes that Pine River's and Two Harbors' computer networks have been separated since December 2011, and that since the segmentation, the parties have maintained source code repositories on separate servers. *Id.* ¶¶ 13-14. He states that Pine River would not have been able to access Two Harbors' repository without express authorization; that the source code associated with the IP at issue in this action can be found in Two Harbors' repository, but not in Pine River's; and that it is standard practice to keep source code associated with IP in a repository "that is controlled by the owner of the intellectual property or trade secrets." *Id.* ¶ 14.

Zeidman also submitted a rebuttal report, dated July 21, 2023, in which he responds to the expert reports of Kursh, Roffman, Maffattone, and O'Laughlen. *See* Zeidman Rebuttal Rep. (Landy Daubert Decl. I Ex. 45) (Dkt. 346-44) ¶ 2. In his rebuttal report, Zeidman opines that it would have taken Two Harbors 4.5 months to redevelop "the asserted trade secret applications." *Id.* ¶ 328. He arrived at this estimate by, among other things, counting the total lines of souce code for each application. *Id.* at p. 130 (chart). At his deposition, which was taken on September 12, 2023, Mr. Zeidman provided Pine River with a "supplemental" analysis – marked as Deposition Exhibit 4 – in the form of an updated version of the chart appearing on page 130 of his rebuttal report. *See* Landy Daubert Decl. I (Dkt. 346) Ex. 46 (Dkt. 346-45).

###### a.    Improper legal conclusion

Pine River first requests that the Court strike ¶ 88 and 94 of Zeidman's May 19 report and ¶ 378 of his July 21 report, in which he "improperly opines that Two Harbors owns the IP because the IP was located on Two Harbors's network." Pl. Mem. at 40. Pine River argues that Zeidman cannot opine "on the ultimate question of ownership, which is a legal issue," and that, in any event, ownership is governed by the Management Agreement, under which it is irrelevant where the IP is stored. *Id.* at 40-41. Pine River is correct that Zeidman cannot opine as to which party owns the IP. *See* Part III(A)(1), *supra*. Paragraph 378 of his rebuttal report (which states, *inter alia*, "Two Harbors owns the alleged intellectual property") will be excluded for this reason. Paragraph 88 of his original report comes at the issue more obliquely, stating: "Once Two Harbors and Pine River separated their networks in 2011, Pine River no longer had any ability to access Two Harbors' network. In my experience, this is fundamentally inconsistent with Pine River's assertion that it owns the alleged intellectual property and trade secrets at issue in this case." This too crosses the line, as an expert witness may not "undertake[] to tell the jury what result to reach" based on the facts adduced. *Duncan*, 42 F.3d at 101. Paragraphs 14 and 94 of the original report, and ¶¶ 187 and 351 of the rebuttal report are similarly flawed.

Zeidman may, however, testify about where the IP was stored, how it was accessed, and who controlled that access. As this Court recently explained, these issues are in fact relevant to the IP ownership question, which will turn on "whether the individuals who created and developed the IP at issue were acting as agents of PRCM or as agents of Two Harbors when they did so." R&R at 78; *see also id*. at 82-83 (discussing the parties' separate source code repositories). What Zeidman may not do, either directly or indirectly, is offer his own opinion as to whether and why these facts signify that Two Harbors is the "owner" of the IP.

b.    *Supplemental Analysis*

Next, Pine River requests that the Court preclude Zeidman from testifying about his supplemental analysis concerning how long it would have taken for Two Harbors to redevelop the necessary software, and exclude Deposition Exhibit 4. Pl. Mem. at 37 (characterizing the supplemental analysis as "both untimely and factually inaccurate"); *see also id*. at 42 ("Mr. Zeidman's Belated Supplemental Analysis Is Improper, Inaccurate, and Should Be Excluded"). Plaintiffs argue that Zeidman prepared the supplemental analysis in recognition of a serious mistake that he made when originally estimating development time. *Id.* at 43. However, rather than admit that simply "fixing the mistake would bring his estimate close to Pine River's," *id.* at 43, Zeidman disingenuously altered his methodology – breaking up several large projects into multiple smaller projects – which allowed him to apply a higher "productivity rate" to each sub-project and thereby protect his original conclusion that Two Harbors could have redeveloped all necessary programs and applications in four and a half months. *Id.*

The Court need not determine whether Zeidman's revised chart is "factually inaccurate." It will be excluded because it was an improper attempt to supplement a rebuttal report that Pine River was entitled to rely on as served. "[E]xperts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2021 WL 4810266, at *22 (S.D.N.Y. Sept. 30, 2021) (quoting *Sandata Techs., Inc. v. Infocrossing, Inc.*, 2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007)); *Sandata Techs.*, 2007 WL 4157163, at *6 (excluding proposed "second supplemental" report prepared by testifying expert in "an attempt to improve upon the prior reports").

Fed. R. Civ. P. Rule 26(e)(1)(A) requires that a disclosure be supplemented when the party who made it "learns that in some material respect the disclosure . . . is incomplete or incorrect."

As applied to expert reports, however, Rule 26(e) is not "a vehicle to permit a party to serve a deficient opening report and then remedy the deficiency through the expedient of a 'supplemental' report." *Lidle v. Cirrus Design Corp.*, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009). An expert is required to provide a "complete statement" of his opinions when he timely serves his report (including a rebuttal report), along with all "facts or data" considered in forming them. Fed. R. Civ. P. 26(a)(2)(B). The purpose of the rule is to provide certainty to the opposing party, so that it can prepare for trial accordingly. If the expert is permitted to shore up his original report – weeks or months later – with additional facts and data, "the very purpose of the rule is nullified." *Lidle*, 2009 WL 4907201, at *5 (quoting *Coles v. Perry*, 217 F.R.D. 1, 4 (D.D.C. 2003)). Thus, before an expert can supplement his report, he must show that the information he seeks to add "was previously unknown or unavailable," and that its absence rendered the prior report "inaccurate or misleading because it was incomplete." *Gyllenhammer v. Am. Nat'l Red Cross*, 2018 WL 1956426, at *4 (N.D.N.Y. Jan. 23, 2018) (internal quotation and citation omitted).[17]

Zeidman does not make the necessary showing. At deposition, he testified that the new chart was merely a "clarification" of the chart presented on page 130 of his written report. *See* Zeidman Dep. Tr. (Dkt. 346-47) at 10:19-21. He said he "hadn't changed the analysis" and merely wished to provide "more detail." *Id.* at 10:23-25, 280:19-21. Two Harbors makes the same

---

[17] S*ee also Sandata Technologies, Inc. v. Infocrossing, Inc*., 2007 WL 4157163, at *4 (S.D.N.Y. Nov. 16, 2007) ("It is only if the expert subsequently learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete, that the duty to supplement arises."); *Lidle*, 2009 WL 4907201, at *6 (rejecting supplemental report containing new test results because the expert could and should have performed the tests "prior to the submission of his opening report"); *Exist, Inc. v. Tokio Marine Am. Ins. Co.*, 2023 WL 7117369, at *3 (S.D.N.Y. Oct. 5, 2023) (disallowing proposed supplemental report where plaintiff "fail[ed] to explain why the information it pledges to provide in its amended expert report . . . could not have been included in the original Santicola Report").

argument in its brief. *See* Def. Opp. at 43 ("Deposition Exhibit 4 provides more detail on the software projects so that the subparts of each project are more easily identifiable and understood.") Defendant does not assert, however, that Zeidman's original analysis (or the chart illustrating it) was "inaccurate or misleading," *Gyllenhammer*, 2018 WL 1956426, at *4, nor that he was prevented in some way from making any necessary clarification, or preparing a chart with adequate detail, when he served his rebuttal report on July 21, 2023. Consequently, Deposition Exhibit 4 will be excluded.

*c.  Third-party Software*

Lastly, plaintiffs request that the Court exclude ¶¶ 333-340 of Zeidman's rebuttal report, in which Zeidman relies on Wirth's rebuttal report, because Wirth discusses "undisclosed" third-party software. Pl. Mem. at 45. Having concluded that Wirth's testimony concerning that software need not be excluded, Zeidman may properly rely on it.

As to Zeidman, therefore, Pine River's motion will be granted in part, to the extent that the witness may not testify, at trial, that Two Harbors "owns" the contested IP, nor opine as to what facts and circumstances are indicative of ownership. Additionally, Zeidman Deposition Exhibit 4 is excluded as an untimely amd unauthorized attempt to supplement his rebuttal report. At trial, however, Zeidman will be free to explain – to the best of his ability – why he believes that the chart requires clarification.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion (Dkt. 340) is GRANTED in part and DENIED in part. As to the report of William Hrycay, and the portion of Dr. David Lynn's report rebutting Kenneth Slosser, plaintiffs' motion is DENIED AS MOOT, without prejudice to reconsideration in the event the district judge determines that the termination-related claims and counterclaims must be tried. As to the portion of Dr. Lynn's report rebutting the opinions of Michael Judlowe,

60

plaintiffs' motion is DENIED. As to the portion of Dr. Lynn's report rebutting the opinions of Dr. Christopher Vellturo, plaintiffs' motion is GRANTED, to the extent set forth in Part III(B)(1)(b). As to the reports of Justin McLean and Michael Wirth, plaintiffs' motion is DENIED. As to the opening and rebuttal reports of Robert Zeidman, plaintiffs' motion is GRANTED IN PART, to the extent set forth in Part III(B)(4), *supra*.

Defendant's motion (Dkt. 353) is GRANTED in part and DENIED in part. As to the reports of Frederick Herbst and William Johnson, and the portion of Kenneth Slosser's report concerning the parties' termination-related claims, defendant's motion is DENIED AS MOOT, without prejudice to reconsideration in the event the district judge determines that the termination-related claims and counterclaims must be tried. As to the remaining portion of Slosser's report, defendant's motion is GRANTED IN PART, to the extent set forth in Part III(A)(4), *supra*. Similarly, as to the reports of Daniel Roffman, Michael Maffattone, Michael Judlowe, and Dr. Christopher Vellturo, defendant's motion is GRANTED IN PART, to the extent set forth in Parts III(A)(1), (A)(5), (A)(6), and (A)(7), *supra*. As to the reports of Dr. Steven Kursh and Victor O'Laughlen, defendant's motion is DENIED.

Because the parties filed portions of their motion papers under seal, and because I have necessarily discussed some of the sealed material, the Clerk of Court is respectfully directed to file this Opinion and Order under seal, at the "selected parties" viewing level, such that only the attorneys appearing for the parties, and court personnel, may view it. By separate order (Dkt. 438), the parties have been given an opportunity to submit proposed redactions before this Opinion and Order is filed in public view.

Dated:  New York, New York
           March 31, 2025

SO ORDERED.

_____
**BARBARA MOSES**
**United States Magistrate Judge**